**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA** *ex rel.*
Larry Hawkins, Randall Hayes, Clinton
Sawyer, James Locklear and Kent Nelson,

**LARRY HAWKINS**
Herbststrasse 6
Deining, Germany,

**WILLIAM RANDALL HAYES**
1244 County Road 3319
Troy, Alabama 36079,

**CLINTON SAWYER**
1007 Odelle Circle
McDonough, Georgia 30253,

**JAMES LOCKLEAR**
2304 Lilly Drive
Killeen, Texas 76542

and

**KENT NELSON**
4030 E 100 N.
Rigby, Idaho 83442,

*Plaintiffs*

v.

**MAN TECH INTERNATIONAL**
**CORPORATION**
1100 New Jersey Avenue, S.E.
Suite 740
Washington, D.C. 20003,

Serve on:

CT Corporation System
1015 15th Street, NW
Suite 1000
Washington, D.C.  20005

Case No. _____


**COMPLAINT**

For Violations of
The False Claims Act,
Trafficking Victims Protection
Reauthorization Act and
Breach of Contract


**FILED UNDER SEAL**
**DO NOT PLACE IN PRESS BOX**
**DO NOT ENTER ON PACER**


**JURY DEMAND**

and

**MANTECH
TELECOMMUNICATIONS AND
INFORMATION SYSTEMS
CORPORATION**
12015 Lee Jackson Highway
Fairfax, Virginia  22033

Serve on:

CT Corporation System
1015 15th Street, N.W.
Suite 1000
Washington, D.C. 20005

*Defendant*s.

I<small>NTRODUCTION</small>

1.      The United States of America ("U.S."), by and through  Larry Hawkins

("Hawkins"), Randall Hayes ("Hayes"), Clinton Sawyer ("Sawyer"), James Locklear

("Locklear"), and Kent Nelson ("Nelson"), brings this action under the False Claims Act, 31

U.S.C. § 3729, *et seq*., against Defendants ManTech International Corporation ("MT

International") and ManTech Telecommunications and Information Systems Corporation ("MT

Telecom") (collectively, "ManTech" or "Defendants").  Hawkins, Hayes, Sawyer, Locklear and

Nelson are denominated herein as "Relators" for purposes of the False Claims counts.

2.      Hawkins, Hayes Sawyer, Locklear and Nelson also bring this action against

ManTech under the Trafficking Victims Protection Reauthorization Act ("TVPRA").  They are

denominated herein as "Plaintiffs" for purposes of the TVPRA counts.

3.      In addition, Plaintiffs, invoking this Court's supplemental jurisdiction, bring

common law claims for breach of contract against ManTech.

2

4.      Relators/Plaintiffs are mechanics who were previously employed by ManTech to maintain and repair U.S. Army Mine Resistant Ambush Protected ("MRAP") vehicles in Kuwait under Contract W56HZV-12-C-0127 between the United States Department of the Army and ManTech ("the Contract").

5.      Defendants' false claims, as to which Relators are original sources, are as follows:

6.      <u>False Claims of Work Efficiency with Respect to Direct Labor Hours, Made to Induce the U.S. to Make Payments under the Contract and to Exercise Options 1-4 on the Contract, Worth $2.6 Billion</u>.  In order to induce the U.S. to make payments under the Contract, and to exercise more than $2.6 billion in contract options included in Contract W56HZV-12-C-0127, ManTech under-reported man hours expended on direct labor tasks so as to misrepresent its efficiency in its contract performance, and was therefore qualified for award of the contract options.  Each day, ManTech's mechanics were required to record time dedicated to mission-critical, direct labor tasks.  For example, if a mechanic spent four hours extracting the transmission from an MRAP vehicle, two hours repairing the transmission, and four hours reinstalling it, he or she was ordered to record in the Department of Defense's Standard Army Maintenance System-Enhanced data management system ("SAMS-E") each discrete task undertaken according to specific work codes, including the time spent performing each task. This categorization and compilation of various labor codes not only was the basis for U.S. payments to ManTech, the data collected in SAMS-E provided key real-time information to the U.S., informing policy planners on key issues such as readiness (how quickly military hardware can be returned to battle), cost of repair, reliability, and whether U.S. taxpayers should continue to finance the purchase of such hardware.

7.      To create a false image of efficiency in its performance of direct labor tasks,

ManTech ordered its mechanics to falsify their time records.  To illustrate, rather than entering the code for four hours of direct labor actually spent extracting a transmission, mechanics were ordered to doctor their hours to record, for example, two hours under the task code for direct labor for "transmission extraction" and account for the missing time by using task codes for non-direct labor tasks such as  "inventory maintenance."   The false data submitted to the U.S. Army by ManTech induced the government to make payments under the Contract and to exercise more than $2.6 billion in contract options in favor of ManTech.

8.      Thus, the U.S. has been injured at least twice by ManTech's false claims.  First, the false data has undermined the government's ability to budget correctly for purchase of new military equipment and allocation of funds for servicing of existing equipment for return to the battlefield.  Second, as noted above, ManTech's entry of false data into SAMS-E induced the government to make payments under the Contract and to award valuable contract options to ManTech.

9.      False Claims With Respect to *Sina Qua Non* Conditions For Contracting with the U.S.  In order to receive payment of U.S. taxpayer funds, federal contractors must comply with important federal mandates.  Failure to adhere to mandated conduct disqualifies a contractor from doing business with the U.S.  These requirements include compliance with:  (1) the TVPRA; (2) the McNamara-O'Hara Service Contract Act ("SCA"), and (3) prescribed safety standards to safeguard the health of U.S. citizens performing federal contracts.

10.      In derogation of its legal obligations, Defendants did not disclose to the U.S. that ManTech, in its performance of the Contract: (a) was engaged in human trafficking and forced labor; (b) was violating the SCA; and (c) was forcing its mechanics to work in isolated, lawless, and toxic environments that endangered their health and well-being.

4

11.     By falsely representing that it was in compliance with Contract mandates under U.S. law (and the costs associated with compliance), ManTech received payments it was not due, at rates of profit that were excessive, and in a manner that placed the U.S. at risk of being implicated as a beneficiary of illegal human trafficking and health/safety regulations.  The false compliance certifications also caused the U.S. to exercise more than $2.6 billion in contract options in favor of ManTech, thereby exacerbating the injury to the Government.  As MT International and MT Services directly benefited from this scheme, rendering them legally liable.

THE PARTIES

**Relators/Plaintiffs**

12.     Relators are United States citizens who were employed by ManTech in Kuwait as mechanics performing vehicle repair services on MRAP vehicles pursuant to the Contract.

13.     **Larry Hawkins** ("Hawkins") is a United States citizen domiciled in Deining, Germany, who was employed by ManTech in Kuwait to perform services pursuant to the Contract.

14.     **William Randall Hayes** ("Hayes") is a citizen of the State of Alabama who was employed by ManTech in Kuwait to perform services pursuant to the Contract.

15.     **Clinton Sawyer** ("Sawyer") is a citizen of the State of Georgia who was employed by ManTech in Kuwait to perform services pursuant to the Contract.

16.     **James Locklear** ("Locklear") is a citizen of the State of Texas who was employed by ManTech in Kuwait to perform services pursuant to the Contract.

17.     **Kent Nelson** ("Nelson") is a citizen of the State of Idaho who was employed by ManTech in Kuwait to perform services pursuant to the Contract.

18.     Plaintiffs are "employees" as the term is used in the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*.  *See* 29 U.S.C. § 203(e).

**Defendants**

19.     **ManTech International Corporation** ("MT International"), a Delaware

corporation with offices in the District of Columbia at 1100 New Jersey Avenue, S.E., Suite 740,

Washington, D.C. 20003 and 600 Maryland Avenue, SW Washington, D.C. 20024, is a publicly-

traded company that provides defense-related services to the United States Government in the

District of Columbia and throughout the world.

20.     **ManTech Telecommunications And Information Systems Corporation** ("MT

Telecom") is a wholly owned subsidiary of MT International, incorporated in Delaware and

based in Virginia, with a registered agent for service of process located in D.C. at 1015 15th

Street, N.W., Suite 1000, Washington, D.C. 20005.  MT Telecom transacts considerable,

ongoing business in the District of Columbia with various U.S. government agencies, in its own

name and through MT International.  At all relevant times, MT International and MT Telecom

were the employer(s) of Relators within the meaning of 29 U.S.C. § 203(d) and the Kuwaiti

Private Sector Labor Law.

## JURISDICTION AND VENUE

21.     The subject matter jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§

1331, 1367 and 3730(b), and 18 U.S.C. §§ 1595(a) and 1596(a).

22.     Venue lies in this District pursuant to 28 U.S.C. §§ 1391(b)(3) and 3732(a), as

ManTech conducts a continuous, robust course of business in the District of Columbia,

maintaining offices in D.C. and contracting with various U.S. government agencies based in

D.C.

23.     There is no procedural bar to recovery by the United States or Relators under the

False Claims Act, 31 U.S.C. §3730(e).  Relators have direct, independent, knowledge of the

information on which the allegations herein are based, and as alleged above, are an "original source" of the allegations herein, as that term is defined in the pertinent statutory authority. The primary allegations herein have not been publicly disclosed in the media, in a federal criminal, civil, or administrative hearing in which the U.S. or its agent was a party, or in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation. Relators' knowledge and disclosures materially adds to those allegations and transactions that have already been publicly disclosed.

### MANTECH'S W56HZV-12-C-0127 CONTRACT FOR MRAP MAINTENANCE

24.     On May 31, 2012, the U.S. Army Contracting Command, Warren, Michigan, upon information and belief, awarded MT Telecom the Contract. Publicity material generated by MT International, however, represents that the Contract was awarded to MT International. Upon further information and belief, MT International and MT Telecom are interchangeable for purposes of Contract performance and liability therefor. (Relators lack access to the fully executed Contract; however, material Contract requirements, upon information and belief, are set forth in the publicly available solicitation for the Contract, Solicitation W56HZV-11-R-0181.)

25.     The Contract had an original value of $248,026,023.00 for services consisting of maintenance and repair of MRAP vehicles, with a completion date of November 26, 2012.

26.     According to a ManTech website, however, the exercise of successive options following the original completion date has brought the total value of the Contract to $2.85 billion. *See* http://investor.mantech.com/releasedetail.cfm?ReleaseID=679199 (last visited 11/3/15). Upon information and belief, the new estimated completion date is May 28, 2017.

27.     The Contract established that "[a] maximum quantity of 32,026,613 Level of Effort man hours are available to be awarded over the life of the contract."

28.     The Contract included detailed requirements on reporting time. Contract at 110,

Section L.4.3.1.  For example, Section L.4.3.3.3 requires:

> The hours input by both prime and subcontractors on the EOR Labor worksheet in Attachment 12 and 13 shall be equal the hours that are automatically calculated in Attachment 10, Staffing Matrix (Column X entitled # of hours in EOR).  The hours input by both prime and subcontractors on the OR worksheets shall fulfill the government provided RFP Requirement for direct labor in RFP Requirement check worksheet.  For evaluation purposes only, assume that the RFP requirement hours in each performance periods labor categories and work locations will be evenly spread across the months of that performance period.  To confirm that proposed hours do fulfill the RFP requirement hours, a Requirement check worksheet is included in Attachment 12.

29.    The contractor had an affirmative obligation to inform the U.S. when the hours actually worked were likely to exceed the hours estimated in the contract bid.  Specifically,

> (c) If, at any time, the Contractor has reason to believe that the hours which it expects to incur in the performance of a Work Directive, when added to all hours incurred previously in performance of such Work Directive, shall exceed the estimated total hours set forth in the Work Directive, the Contractor shall notify in writing the Contracting Officer and Technical Representative for their appropriate action.  The Contractor shall furnish a revised statement of total hours to complete such work together with said notice.  Said notice must be furnished as early as possible and prior to the incurrence of additional hours.

Contract at 9, § B.3.

30.    The affirmative obligation to report accurate hours was also emphasized at page 51, Section H.13 (d)(1): "The Contractor shall notify the Procuring Contracting Officer immediately in writing whenever it has reason to believe that: (i) The level of effort the Contractor expects to incur under any work directing in the next 60 days, when added to the level of effort previously expended in the performance of that work directive, will exceed seventy-five (75%) percent of the level of effort established for that work directive; or (ii) The level of effort required to perform a particular work directive will be greater than the level of effort established

for that word directive."

31.     Moreover, "[a]s part of the notification, the Contractor shall provide the Contracting Officer a revised estimate of the level of effort required to perform the directive. As part of the notification, the Contractor also shall submit any proposal for adjustment to the estimated cost and fixed fee that it deems would be equitable if the Government were to increase the level of effort as proposed by the Contractor."  Section H.13 (d)(1)(ii).

32.     Section H.13 (d)(2) required that "[w]ithin thirty days after completion of the work under each work directive, the Contractor shall submit the following information directly, in writing, to the ordering officer, with copies to the COR and the Defense Contract Audit Agency office to which vouchers are submitted: (i) The total number of man hours of direct labor, including subcontract labor, expended and a breakdown of this total showing the number of man hours expended in each direct labor classification listed in the work directive schedule, including the identification of the key employees utilized; (ii) The Contractor's estimate of the total allowable cost incurred under the work directive; and (iii) In the case of a cost under run, the amount by which the estimated cost of the work directive may be reduced to recover excess funds."

33.     The Contract made clear that "[t]he contract will consist of two (2) contract types: a Firm Fixed Price Phase-In period of six (6) months and a Cost Plus Fixed Fee (CPFF) Operational Readiness period of eight (8) months [and] three (3) 12 month CPFF Option periods and one (1) 10 month option period."  Contract at 4.  Specifically:

> B.1.2. Phase In Period CLINS: This period begins at Contract Award and the ending will not exceed 180 days after award. The Phase Period will be awarded as a Firm Fixed Priced CLIN on the contract.
>
> B.1.3 Early Operational Readiness (EOR) Period CLINS: The beginning of this period is defined by the contractor and will end

180 days after award. The EOR Period will be awarded under a Cost Plus Fixed Fee Level-of-Effort (CPFF LOE) CLIN(s). The Government will issue Work Directives for work performed under EOR. Work Directives will include a list of labor categories, estimated hours, skill mix, performance locations, material, ODCs and fixed fee based on the contractors price proposal Attachment 012.

B.1.4 Operational Readiness (OR) Period CLINS: This period begins at the end of the Phase-in period (181 days after award) and goes to January 13, 2013. The OR Period will be awarded under a Cost Plus Fixed Fee Level-of-Effort (CPFF LOE) CLIN(s). The Government will issue Work Directives for work performed under OR. Work Directives will include a list of labor categories, estimated hours, skill mix, performance locations, material, ODCs and fixed fee based on the contractors price proposal Attachment 012.

B.1.5 Operational Readiness (OR) Option Periods CLINS: The Operational Readiness Option Periods begin after the OR Base Period ends (beginning January 14, 2013 through 13 November 2016). There are four OR option periods, which include three 12 month option periods, and one 10 month option period. The OR Option Periods will be awarded under Cost Plus Fixed Fee Level-of-Effort (CPFF LOE) CLIN(s). The Government reserves the right to either fully fund or incrementally fund the option periods if necessary. The Government will issue Work Directives for work performed under the option periods. Work Directives will include a list of labor categories, estimated hours, skill mix, performance locations, material, ODCs and fixed fee based on the contractor's price proposal Attachment 012.

*Id.* at 9.

34.    As stated, the Contract gave the U.S. the option to extend it:

H.14 Option to Extend the Term of the Contract

(a) The Government has the unilateral right to extend the term of the contract by up to four option periods (for a total maximum potential contract term of 5 years).

* * *

(c) . . .

Option 1 rates are established in Attachment 012 and may be exercised during the period from 14 January 2013 through 13 January 2014 for no more than 6,729,996 labor hours.

Option 2 rates are established in Attachment 012 and may be exercised during the period from 14 January 2014 through 13 January 2015 for no more than 6,729,996 labor hours.

Option 3 rates are established in Attachment 012 and may be exercised during the period from 14 January 2015 through 13 January 2016 for no more than 6,725,410 labor hours.

Option 4 rates are established in Attachment 012 and may be exercised during the period from 14 January 2016 through 13 November 2016 for no more than 5,604,508 labor hours.

(d) The Government may unilaterally exercise the option(s) ahead of the periods listed above, if necessary to meet mission requirements.

(e) If the Government exercises this option, the extended contract shall be considered to include this option clause.

(f) Any options that lapse due to a failure on the part of the Government to exercise those options with the prescribed time limits shall no longer be available for exercise unless revived by mutual agreement of the parties.

Contract at 52.

35.     The Solicitation established "[t]he locations where services will be provided under this contract [as] broken into three worldwide geographical areas: AOR (Area of Responsibility): Iraq, Afghanistan, and Kuwait (at award of contract the predominance of the work will be in the AOR)[;] CONUS (Contiguous United States): . . . [and] OCONUS (Outside CONUS): with the exception of the AOR as defined above (current known OCONUS locations are Germany, and Okinawa, Japan)."  Contract at 3.

36.     In Kuwait, the putative Contractor was expected to perform services 10 hours a day.  Contract at 5.

37.     Section I of the Contract required the contractor to adhere to the SCA, which requires, *inter alia*, payment of overtime wages.  Contract at 54, 60, and 97.  *See infra* at 18-20. Federal Acquisition Regulation ("FAR") 52.222-41(p) requires government contractors to certify that they are not ineligible for payment on SCA-mandated contracts on account of a statutorily imposed 3-year bar for prior SCA violations.

38.     Further, the contractor was required to adhere to exacting requirements prohibiting the trafficking of humans.  Section C-3, "952.222-0001 Prohibition Against Human

11

Trafficking, Inhumane Living Conditions, Jul/2010 (C3) And Withholding Of Employee

Passports," of the Contract makes clear:

> (a) All contractors (contractors refers to both prime contractors and all subcontractors at all tiers) are reminded of the prohibition contained in Title 18, United States Code, Section 1592, against knowingly destroying, concealing, removing, confiscating, or possessing any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person, to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the persons liberty to move or travel, in order to maintain the labor or services of that person.

> (b) Contractors are also required to comply with the following provisions:

> (1) Contractors shall only hold employee passports and other identification documents discussed above for the shortest period of time reasonable for administrative processing purposes.

> \* \* \*

> (5) Contractors shall incorporate checks of life support areas to ensure compliance with the requirements of this Trafficking in Persons Prohibition into their Quality Control program, which will be reviewed within the Governments Quality Assurance process.

> (6) Contractors shall comply with International and Host Nation laws regarding transit/exit/entry procedures, and the requirements for visas and work permits.

> (c) Contractors <u>have an affirmative duty to advise the Contracting Officer if they learn of their employees violating the human trafficking and inhumane living conditions provisions contained herein</u>. Contractors are advised that contracting officers and/or their representatives will conduct random checks to ensure contractors and subcontractors at all tiers are adhering to the law on human trafficking, humane living conditions and withholding of passports.

> (d) The contractor agrees to incorporate the substance of this clause, including this paragraph, in all subcontracts under his contract.

(Emphasis added).

39.     The Contract incorporated FAR 52.222-50, "Combating Trafficking in Persons,"
which makes clear that "[t]he United States Government has adopted a zero tolerance policy
regarding trafficking in persons." *Id.* at § (b).  The Federal Acquisition Regulations give notice
that "Contractors and contractor employees shall not — (1) Engage in severe forms of trafficking
in persons during the period of performance of the contract; . . . or (3) Use forced labor in the
performance of the contract." *Id.*  In addition:

> The Contractor shall — (1) Notify its employees of —  (i) The
> United States Government's zero tolerance policy described in
> paragraph (b) of this clause; and  (ii) The actions that will be taken
> against employees for violations of this policy. Such actions may
> include, but are not limited to, removal from the contract,
> reduction in benefits, or termination of employment; and (2) Take
> appropriate action, up to and including termination, against
> employees or subcontractors that violate the policy in paragraph
> (b) of this clause.

*Id.* at § (c).

40.     FAR 52.222-50 (d)(1), "Notification," requires that "[t]he Contractor shall inform
the Contracting Officer immediately of — Any information it receives from any source
(including host country law enforcement) that alleges a Contractor employee, subcontractor, or
subcontractor employee has engaged in conduct that violates this policy. . . ."   A contractor's
failure to inform the United States of trafficking activity may result in "(3) suspension of
contract payments; (4) Loss of award fee, consistent with the award fee plan, for the performance
period in which the Government determined Contractor non-compliance; (5) Termination of the
contract for default or cause, in accordance with the termination clause of this contract; or (6)
Suspension or debarment." *Id.* at (e).

41.     Further, the Contract required the contractor to

> comply with, and shall ensure that its employees and its subcontractors and their employees, at all tiers, are aware of and obey all U.S. and Host Nation laws, Federal or DoD regulations, and Central Command orders and directives applicable to personnel in Kuwait including but not limited to USCENTCOM, Multi-National Force and Multi-National Corps operations and fragmentary orders, instructions, policies and directives.

Contract at 79.

42.    Page 50 of the Contract incorporated FAR 252.222-7002, "Compliance with Local Labor laws (Overseas)." This FAR provision states, "The Contractor shall comply with all— (1) Local laws, regulations, and labor union agreements governing work hours; and (2) Labor regulations including collective bargaining agreements, workers' compensation, working conditions, fringe benefits, and labor standards or labor contract matters." Id. As a prerequisite to contract award, ManTech was required to certify annually its compliance with host nation labor laws, through the U.S. On-Line Representations and Certifications Application ("ORCA") system.

43.    ManTech, as awardee of the Contract, was required to comply with all of the above contractual provisions.

### MANTECH'S EMPLOYMENT CONTRACTS WITH RELATORS/PLAINTIFFS

44.    In order to work for ManTech, Relators and their coworkers were required to sign employment contracts that committed them to work for ManTech for twenty-four (24) months. A significant financial penalty was imposed for early termination. "MRAP-FOV Contract Offer Addendum – SSILOG, Host Nation Sponsorship & Work Visa- Kuwait (CIVIL ID)" made it clear that ManTech would control the immigration requirements for its employees to work in Kuwait, incurring substantial costs for this process. Relators' employment contracts stated:

> Due to the significant cost for sponsorship, (up to and exceeding $10,000 per person for first year and $5,000 for second year), you

14

agree to commit to a minimum period of employment (deployment) of 24 months or the completion of the contract whichever comes first.  Once the process is completed, *should you decide to terminate employment, or are terminated for any reason*, voluntary or involuntary, prior to completing 24 months (non-consecutive) of "boots on ground" (BOG) service, *you are responsible for costs incurred and will be required to reimburse the cost to obtain a work visa*. In this event, ManTech will make a determination of financial obligation based on the current circumstances.  *Reimbursable costs include all expenses related directly and indirectly to the sponsorship, including travel, lodging, per diem, medical exam(s), background investigation and administration/ administrative fees.  If terminated, you may also be responsible for employment and deployment costs* as described in the Offer Addendum, as well as costs related to any training or certification process provided to you as part of your employment, including employment related expenses described in the Offer Addendum.

*See* Employment Contract Excerpts at Ex. 02 (Emphasis added).

  45. The oppressive consequence of "MRAV-FOV" – repayment of visa, employment and deployment costs – is compounded when read in conjunction with "MRAP-FOV Contract Offer Addendum Contract Mandated Training and Training Certification."  There, ManTech mandated:

In the event that you fail to complete an assigned training course or fail to complete an obligated employment period under this contract and defined in this offer, *you will be required to reimburse prorated costs related to the training and certification process*. You further understand and agree that in the event your employment with ManTech is voluntarily terminated or terminated for cause before you complete this commitment period, *you will be required to reimburse training related expenses as defined above on a prorated basis* (1/12th for each month that your employment term is short of the twelve (12) month commitment).

  46. By imposing such onerous and financially oppressive terms on Relators, ManTech imposed onto its workforce heightened fears – in addition to the usual and oft-experienced fears associated with termination and unemployment.

**STATUTORY AND REGULATORY REQUIREMENTS**

Direct Productive Labor Hour Recording and SAMS-E

47.     With respect to "Level of Effort (Cost-Plus-Fixed-Fee, Term Contracts)",

identified in the Contract as the basis for evaluation of the successful bidder for the Contract,

FAR 1352.216-71 (a) states: "In performance of the effort directed in this contract, the contractor

shall provide the total of Direct Productive Labor Hours (DPLH) . . . defined as actual work

hours exclusive of vacation, holidays, sick leave, and other absences."  DoD 7000.14-R Financial

Management Regulation Volume 4, Chapter 20, Section 200303, "Identifying Direct Productive

Labor Hours" makes clear that:

> Direct Productive Labor Hours (DPLH) are the hours expended by
> employees that are directly attributable to production. Management
> identifies employees whose work constitutes productive labor
> hours within the production department. These hours are totaled
> and then estimated idle time and leave/holiday hours are deducted.
> The result is total departmental productive hours, used as a
> denominator in the determination of the actual shop rate[.]

48.     SAMS-E is the mechanism by which the DPLH are recorded.  SAMS-E is a

decentralized tactical Logistics Information System operated and maintained by the U.S. Army at

the unit level.  SAMS-E provides information to every level of command.  It is the key

maintenance component of the Army's Logistics Information Technology systems:

> [SAMS-E] provides Warfighters around the world with automated
> management of equipment maintenance on everything from M-16
> rifles to aircraft.   Soldiers use SAMS-E to track asset and
> equipment life, order parts, interface with related logistics systems
> and much more. SAMS-E users can compile equipment readiness
> reports to provide operational command and control support to
> Army and Joint leadership. The system also enables effective
> Force and Fleet sustainment operations at the national level
> through consolidated equipment maintenance data.

49.     The SAMS-E system consists of generated hard copy reports that consist of

record numbers: Maintenance Requests, Preventive maintenance schedules, Equipment inspection and maintenance worksheets, Historical records or logbooks, Equipment maintenance records, Shop property accounts, Oil Analysis Records, and Equipment operation permits that are kept at the unit level CFA. Tables contain information on maintenance, equipment, parts records, maintenance fault status, .and operator equipment permits.

50.     SAMS-E is critically important for the timeliness, accuracy and reporting of maintenance data.  It has been described as "the most important automated system to field maintenance managers."  Army Pamphlet 750-3 18 September 2013 UNCLASSIFIED Maintenance of Supplies and Equipment Soldiers' Guide for Field Maintenance Operations, Section 3-2 (b), "The Army Maintenance Management System."

51.     SAMS-E is also a maintenance management tool that assists front line managers with work scheduling and dispatching of government equipment. Source input is manually input by users and data is transferred from other Logistics Information System (LIS) via Secure File Transfer Protocol (SFTP).

52.     Accurate SAMS-E reporting is a critical instrument for commanders to assess overall readiness.  *See* Department of the Army, Pamphlet 750–1, Maintenance of Supplies and Equipment, Commanders' Maintenance Handbook Headquarters Department of the Army Washington, DC, 4 December 2013, pp. 4, 11, 17, 18, 24, 26-29, 34, 37-41, and 43.

53.     The Relators and their ManTech colleagues recorded the maintenance, including time records, through SAMS-E.

<u>The Trafficking Victims Protection Reauthorization Act.</u>

54.     The U.S. has long had a policy prohibiting Government employees and contractor personnel from engaging in trafficking-in-persons activities, including severe forms of

trafficking-in-persons. "Severe forms of trafficking in persons" is defined in section 103 of the

TVPRA to include the recruitment, harboring, transportation, provision, or obtaining of a person

for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to

involuntary servitude, peonage, debt bondage, or slavery, and sex trafficking.  22 U.S.C. § 7102.

55.    The TVPRA states:

> Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means— (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process;  or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d).

18 U.S.C. § 1589(a).

56.    Moreover, 18 U.S.C. § 1592 (b) states:

> Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

57.     The United States has identified certain "unlawful conduct with respect to

documents in furtherance of forced labor."  18 U.S.C. § 1592(a).  Section 1592(a) states:

> Whoever knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person-- . . . . to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons, as defined in section 103

18

of the Trafficking Victims Protection Act of 2000 [22 USCS § 7102].

58.     Title 22 U.S.C. §7109a ("Trafficking Victims Protection") requires that an integrated U.S. Government database be established that provides "an effective mechanism for quantifying the number of victims of trafficking on a national, regional, and international basis . . . ."  The database shall combine "all applicable data collected by each Federal department and agency represented on the Interagency Task Force to Monitor and Combat Trafficking . . . ."  *Id.*

The Service Contract Act

59.     The Service Contract Act ("SCA"), 41 U.S.C.§6702 *et seq.* protects prevailing labor standards, including the payment of overtime wages, by preserving the wages and benefits of service employees working for contractors or subcontractors under federal service contracts.

60.     The SCA applies to Defendants pursuant to the terms of the Contract.

61.     The SCA is primarily enforced by the Department of Labor and is interpreted and administered in federal agencies through FAR Subpart 22.10 and Title 29 of the Code of Federal Regulations (CFR) Parts 4, 6, 8, and 1925.

62.     The statute gives the Secretary of Labor the authority to administer and enforce its provisions.

63.     The SCA also establishes liability and penalties for violations of its provisions.

64.     Any party responsible for violating one of the required contract provisions is liable for back pay "equal to the sum of any deduction, rebate, refund, or underpayment of compensation due any employee engaged in the performance of the contract." 41 U.S.C. § 6705(a).  Such amounts may be withheld from payments owed to the contractor by the federal government; and if the withholdings are insufficient, the government may bring a civil action against the contractor in any court of competent jurisdiction to recover the remaining amount.

*Id.* at § 6705(b).

65.   Upon any violation of a contract stipulation, the federal contracting agency may cancel the contract, and then make arrangements for a new contract or a new contractor to complete the original contract, with any incidental costs charged to the violating contractor.  *Id.* at § 6705(c).

66.   Anytime a contractor is found to have violated these provisions, it must be blacklisted for three years and not awarded any federal government contract "[u]nless the Secretary recommends otherwise because of unusual circumstances."  *Id.* at § 6706.

67.   The House Report on the SCA explained why it was necessary to expand these wage protections to service employees:

> The Federal Government has added responsibility in this area because of the legal requirement that contracts be awarded to the lowest responsible bidder. Since labor costs are the predominant factor in most service contracts, the odds on making a successful low bid for a contract are heavily stacked in favor of the contractor paying the lowest wage. **Contractors who wish to maintain an enlightened wage policy may find it almost impossible to compete for government service contracts with those who pay wages to their employees at or below the subsistence level. When a government contract is awarded to a service contractor with low wage standards, the government is in effect subsidizing subminimum wages.**

H.R. Rep. So. 918, 89th Cong., 1st Sess. 2 (1965) (emphasis added).

68.   Congress sought to both close the gap in labor standards protection for service contract employees and to remove wages as a bidding factor in the competition for federal service contracts.

69.   There is no private right of action under the SCA.  However, an individual may sue under the False Claims Act, on behalf of the United States, for its recovery of damages arising from a contractor's misrepresentation that it has complied with the SCA in the

performance of its government contract in order to get paid under the contract.

<u>Health and Safety Requirements For CARC Coated DoD Equipment</u>

70.     U.S. Army manuals repeatedly warn that Chemical Agent Resistant Coating ("CARC") paint, which coats the MRAP vehicles (which Relators/Plaintiffs worked on), contains toxins, some of which are known carcinogens.

71.     U.S. Army Public Health Command, Guidelines for Controlling Health Hazards in Painting Operations, Technical Guide 144 ("TG 144") "[p]rovides occupational health, environmental, and procedural information and guidance associated with controlling health hazards in painting operations within the Army."

72.     TG 144 Chapter 3 describes the procedures to be followed and the safety equipment that must be distributed to the employees of a government contractor in order to provide adequate protection from CARC paint hazards.

73.     TG 144 Chapter  Section 1.5, "Standards," states: "In overseas workplaces, where the applicable Status of Forces Agreements specifically require that U.S. Forces comply with host country law, host country standards take precedence if stricter than U.S. requirements. If host country law is less stringent or nonexistent, Army requirements apply."

74.     U.S. Army Technical Bulletin 43-0242, WD CARC Spot Painting, Department of the Army, 3 Dec 2007, asserts bluntly at 7-1: "Welding is Out.  Never weld or use a cutting torch on CARC – or WD CARC-painted material.  Welding or cutting painted surfaces releases toxic gases, vapors and metal fumes."

<u>Compliance with Host Nation Laws</u>

75.     In addition to the explicit obligations of the Contract, the Federal Acquisition Regulations create obligations for compliance with local laws.  Specifically, 48 CFR 252.222–

7002 requires compliance with local labor laws overseas.

76.     The Kuwait Private Sector Labor Law ("KPSLL") establishes "the replacement of the expatriate labor force by the national labor force – whenever it can be possible – . . . is one of the main objectives of the State that should finally be achieved." Explanatory Memorandum Law No. (6) of 2010 Concerning Private Sector Labour Law Explanatory Memorandum, pp. 45-6. Expatriates, such as Relators, cannot work in Kuwait unless they subject themselves to Kuwait's laws.

77.     Article 10 of the KPSLL states: "The employer is banned to employ foreign labor force unless they are duly authorized by the Competent Authority to work for him."

78.     Article 10 of the KPSLL states: "An employer shall not recruit laborers from outside the country or appoint laborers from inside the country without making them to work for him."   Article 10 further states, "If it is evident that he is not actually in need of those labourers, in this case, the employer shall bear the expenses for returning the labourer to his country.  If the worker abandons coming to his work and worked for another employer, the employer shall be obliged to return the employer back to his home country, upon registering an absconding notice against the worker by his main sponsor."

79.     KPSLL Article 64 of the State of Kuwait Labor Law states: "it is forbidden to allow workers to work for more than 48 hours per week or 8 hours a day, except in such events as are specified in this Law."  Moreover, "[w]orking hours during the holy month of Ramadan shall be equal to 36 hours per week."  *Id.*

80.     KPSLL Article 66 provides when a laborer is required to work in excess of forty-eight (48) hours per week, the laborer has the "right to obtain a wage against the overtime hours in a rate which is more than his ordinary rate in a similar period by 25%."  The KPSLL makes

clear that, [t]he additional working hours shall not be more than two hours per day and in a maximum number of one hundred eighty (180) hours per year. Also the additional work periods shall not exceed three days a week and ninety days per year." *Id.*

81.     Per KPSLL Article 68, "The official holidays granted to a laborer with full pay are: a) Hijiri New Year Day - One day; b) Ascension (lsra & Miraj) Day -One day; c) Eid Al Fitr (Lesser Bairam) -Three days; d) Waqfat Arafat Day - One day; e) Eid Al Adha Greater Bairam - Three days; f) Prophet Birthday - One day; g) National Day (25th February) - One day; h) Liberation Day (26th February) - One day; i) New Gregorian Year - One day." Further, Article 68 states, "If the work circumstances require keeping any laborer in work on any of the official holidays, he shall be paid a double wage together with an alternative compensation day."

82.      Under Kuwait's immigration laws, it is illegal for a U.S. citizen to enter Kuwait for the purpose of working without first obtaining a State of Kuwait Resident Visa (known as a "Visa 18"), which, as a resident, makes that person subject to the laws of Kuwait.

*Relators'/Plaintiffs' Work Experience*

83.     On or about September 18, 2012, **Hawkins** became an employee of ManTech after having worked for its predecessors on the MRAP vehicle contract in Kuwait.  After he was hired, ManTech required that he return to the United States for training, after which ManTech returned him to Kuwait.

84.     When ManTech transported Hawkins to Kuwait to work, the company did not obtain a Visa 18 for him.

85.     When Hawkins arrived back in Kuwait, ManTech had his visa stamped with a tourist visa.  ManTech then confiscated his passport, explaining that it was doing so to facilitate acquisition of a Visa 18.  In fact, however, ManTech never obtained a Visa 18 for Hawkins.

23

86.     Hawkins alerted his superiors that he needed to have a Visa 18 in order to work legally in Kuwait.  Ignoring that advice, ManTech instead ordered him to engage in multiple "visa runs," *i.e.*, leave and return to Kuwait multiple times (when his then-current tourist visa expired) so that he could remain there on a tourist visa, working for ManTech illegally.  Hawkins was fearful of violating Kuwaiti law, but equally fearful of losing his job – and the harsh economic consequences that would follow.

87.     On ManTech's order, Hawkins left Kuwait for Bahrain on December 23, 2012, returning his passport to him at the airport just before his departure.  Following ManTech's instructions, he attempted to reenter Kuwait after returning from Bahrain (less than 24 hours after his departure), but immigration officials barred him from doing so.

88.     ManTech did not come to his assistance while he was stranded in Bahrain. Hawkins had to hire a Kuwait-based lawyer at his own expense to determine why he could not reenter the country.

89.     After his attorney identified and corrected a paperwork error, he was allowed re-entry in – eight days after leaving.  Upon his re-entry to Kuwait, ManTech once again confiscated his passport.

90.     At ManTech's direction, Hawkins again left Kuwait on March 27, 2013, for Bahrain.  His passport was returned to him at the airport just before he left Kuwait.

91.     Following ManTech's further instructions, Hawkins returned to Kuwait that same day.  Upon his arrival, his passport was stamped with a tourist visa.  As soon as he exited the airport, ManTech once again confiscated his passport.

92.     The same pattern was repeated on May 5, 2013.  Each time this happened Hawkins' dual fears were exacerbated: He was afraid of being arrested for violating Kuwait's

labor laws, and deported and barred from ever returning to Kuwait, and he was equally afraid of being fired and suffering an horrendous financial penalty.

93.     Hawkins worked in a poorly ventilated ManTech warehouse with approximately 200 other mechanics.  The air was polluted with the smoke of burning CARC paint caused by the arc-welding of MRAP vehicles; the grinding of metal by sanders; fossil fuels released through engine exhaust; fumes from petroleum products; and other toxins released by the employees' abrasive work on the MRAP vehicles.

94.     ManTech was fully aware of the unsafe environment, but did nothing to protect Hawkins and the other mechanics from the ill-effects of the pollution.

95.     ManTech did not provide any personal protective equipment (including a respirator or exterior ear muffs).

96.     ManTech refused to run ventilating fans to remove smoke-filled air from the work spaces where he and the other mechanics worked.  ManTech did not test the air quality to determine whether it posed a health hazard.

97.     While Hawkins worked there, the air quality inside the building worsened.  When he and other mechanics complained about the air quality, and asked that the ventilator fans be activated, ManTech refused.  Rather ManTech told Hawkins and the other mechanics that they could open the large bay doors to bring outside air into the facility.  That was infeasible, however, as the outdoor temperature frequently exceeded 100° F.  The indoor air pollution at the ManTech facility caused Hawkins to suffer severe headaches.

98.     Hawkins was forced to work in this unsafe environment thirteen hours a day, six days a week.  Including the drive from Hawkins's living quarters to the remote OMF (off-site maintenance facility), he was in service to ManTech more than 15 hours every day.

99.     Hawkins was never paid overtime for the hours he worked for ManTech in Kuwait.

100.     ManTech frequently asked Hawkins to serve as a temporary supervisor because he was an experienced mechanic and had worked as a supervisor before.

101.     He was given supervisory authority over other ManTech employees, and was asked to attend meetings of ManTech management and officials, including presentations by managers to U.S. military authorities and contracting officers.   In those meetings with U.S. officials, ManTech falsely reported information regarding the efficiency and time allocated to vehicle repair.

102.     ManTech represented to the government that its efficiency in returning MRAP vehicles back to service met or exceeded the efficiency achieved by prior contractors Ranger Land Systems and VSE.   Hawkins knew that these statements were false because he had seen the rate of efficiency realized by prior contractors and the rate of efficiency realized by ManTech.  He knew that, notwithstanding ManTech's statements to the government to the contrary, efficiency had dropped dramatically.

103.     One of the primary reasons why ManTech's efficiency was so low was because it hired non-mechanics to work as mechanics.  ManTech tasked Hawkins, an experienced mechanic, to work with many of these new hires.  Some of the men knew nothing about being a mechanic.

104.     Hawkins has direct knowledge that ManTech instructed managers to tell mechanics to misreport their man hours.  Specifically, when a mechanic spent a significant amount of time on direct labor, management instructed him to reduce the recorded time for that labor, and make up the difference by falsely reporting additional time spent on administrative

tasks.  By substituting administrative tasks hours for direct labor hours, ManTech created a false

record of efficiency in performance of direct labor tasks.

105.    Prior to working for ManTech, **Hayes** worked for Ranger Land Systems in

Kuwait.  Ranger Land Systems had secured a Visa 18 for him to insure that he could work there

legally.  When Ranger Land Systems lost the contract, however, Kuwait cancelled his Visa 18.

When ManTech hired Hayes, it returned him to the United States for training, where he worked

44 hours per week at the Red River Training Depot in Texas.  However, he was not paid the

overtime rate of compensation for his excess hours.  ManTech paid him $16.46 per hour for

hours 41-44.  He should have been paid an additional $8.23 per hour for those hours.

106.    When Hayes's training ended, ManTech returned him to Kuwait to continue work

on the MRAPs.  Upon his arrival at the Kuwait International Airport, ManTech transported him

to Camp Ali Al-Salem, the transit point for Americans arriving in Kuwait.  After a day at Ali Al-

Salem, ManTech then transported him back to the Kuwait International Airport to have his

passport stamped with a tourist visa.  From the Kuwait International Airport, ManTech took

Hayes and other mechanics to apartments it provided for them, and then confiscated their

passports.

107.    ManTech never obtained a Visa 18 for Hayes, which would have allowed him to

work legally in Kuwait.  Instead, ManTech instructed him to engage in repeated "visa runs" to

Bahrain to have his tourist visa repeatedly renewed.  On or about February 5, 2013, Hayes's

supervisor, Bud Delano, directed Hayes to go on a "visa run."  Following Delano's instruction,

Hayes was picked up by a ManTech bus at 4:00 a.m. at the ManTech housing facility and driven

to the Kuwait International Airport.  There, ManTech agents employed by a company called

Millbrook Kuwait ("Millbrook") returned his passport to him and gave him a round-trip airplane

ticket to Bahrain.

108.     Upon his arrival in Bahrain, Hayes went through border control and then, following ManTech's further instructions, boarded a plane for a return trip to Kuwait that same day.  While going through border control in Kuwait, the authorities warned him that he had violated Kuwait law by returning to Kuwait without waiting 72 hours.  He feared arrest, but having warned him, the authorities simply stamped his passport with a tourist visa and allowed him back into the country.  Millbrook agents were waiting, and they immediately confiscated his passport.

109.     In the spring of 2013, Hayes's Kuwait tourist visa expired, and he told ManTech. They took no action, even though he was now in the country illegally.  When he voiced his concern that he could be arrested and deported, ManTech instructed him to stay in his apartment when he was not working.  Just prior to May 16, 2013, ManTech again ordered him to do a "visa run," following the same procedure as his first one.  A ManTech bus picked him up at 4:00 a.m. He was driven to the Kuwait International Airport where Millbrook agents met him and gave him his passport and a round-trip plane ticket to Bahrain.  Hayes flew to Bahrain, went through border control, re-entered the airport, boarded a flight back to Kuwait, and returned on the same day that he had left.  Hayes warned his ManTech supervisors that he was in danger of being arrested for doing another "visa run," but they ignored his concerns.  He was admitted into Kuwait with a tourist visa.  The day after he returned from Kuwait, Hayes was instructed to meet Millbrook representatives at a coffee shop to surrender his passport to them again, which he did.

110.     Hayes worked long hours for ManTech.  Six days a week he boarded a ManTech bus at 5:00 a.m., arriving at the ManTech MRAP repair facility by 5:45 a.m.  Beginning work at 6:00 a.m., Hayes was allowed a fifteen-minute break at approximately 9:00 a.m., a one-hour

lunch break at approximately 12:00 noon, and another fifteen-minute break at approximately

3:00 p.m.  His workday ended at 7:00 p.m., and he got back to his apartment at approximately

7:45/8:00 p.m.  Thus, including transportation, Hayes spent approximately fifteen hours a day

working for ManTech, amounting to ninety hours per week, with twelve hours (excluding

breaks) per day, seventy-two hours per week spent at the ManTech MRAP maintenance facility.

He was never paid overtime, nor was he paid for holidays on which he worked.

111.    Hayes's supervisor, Bud Delano, ordered him to alter his SAMS-E reporting data

to create a false record that he was expending less time on mission-critical tasks than he was

spending.  Hayes's fellow mechanics told him that ManTech had given all of them the same

order – to under-report their time.  But Hayes refused to doctor his time records.  ManTech

subsequently fired him.  Hayes believes that he was fired, at least in part, because he refused to

follow those orders, and accordingly, appeared to be an inefficient worker when compared to the

employees who were, at ManTech's direction, falsifying their SAMS-E numbers.

112.    The smoke-filled work areas at the ManTech facility (described above) had little

or no ventilation, and as a result, the working conditions for Hayes and the other mechanics were

horrific.  Smoke and particulate matter were discharged from a multiple sources, including arc-

welding of CARC paint-coated MRAP vehicle bodies, exhaust from running vehicle engines,

metallic dust from the grinding down of MRAP metallic parts, and other sources of toxicity.

Some days, smoke filled the work area so densely that Hayes could not see from one side of the

facility to the other.

113.    ManTech did not provide Hayes (or, to his knowledge, any other ManTech

employee) a respirator to protect him from the ill-effects of the smoke and particulate matter that

consumed his work area.  Prior to working for ManTech, Relator Hayes rarely, if ever,

experienced a nose-bleed.  While working in the smoke- and particulate-choked environment in the ManTech MRAP facility, however, his nose bled almost every day.  He also developed a severe burning sensation in his eyes and throat.  In addition, he suffered from respiratory distress and sinus congestion.

114.   Hayes is still undergoing respiratory distress that he attributes to his exposure to the overwhelming toxic smoke and fumes in the closed environment of the ManTech MRAP facility in Kuwait.

115.   **Sawyer** is a retired U.S. Army serviceman whose military occupational specialty consisted of vehicle maintenance and quality control.  ManTech hired him on December 11, 2012.

116.   Prior to working for ManTech, Sawyer was employed by VSE Corporation ("VSE"), the predecessor to ManTech for MRAP maintenance.

117.   When he began work for ManTech he told the company that a new Visa 18 should issue in his name, identifying him as a ManTech employee.

118.   From November 22, 2012 to May 2013, Sawyer worked in Kuwait without a Visa 18.

119.   Shortly after he started working for ManTech, the company confiscated Sawyer's passport.

120.   On or about March 30, 2013, a ManTech official summoned him and ordered him to participate in what the ManTech manager described as a "turn and burn."  Specifically, ManTech ordered Sawyer to accompany other ManTech employees to Bahrain and immediately reenter Kuwait so that they could obtain new tourist visas.

121.   In response to ManTech's order, Sawyer and the other ManTech employees

30

informed ManTech that, to their knowledge, if he and others returned to Kuwait less than 72 hours after leaving, they might be arrested by Kuwait immigration authorities.

122.    ManTech ignored this warning and ordered Sawyer and the others to proceed with the one-day "turn and burn" as scheduled, or be fired.

123.    Sawyer felt he had no choice, as he could not afford the financial loss attendant to termination from ManTech employment prior to completion of 24 months of service.

124.    In March 2013, Sawyer attended a leadership meeting led by ManTech manager Scott Campbell.  Campbell instructed the assembled group to falsify the SAMS-E reporting by under-reporting the hours the mechanics were working.

125.    On or about March 30, 2013, pursuant to ManTech's demand, Sawyer reported to a designated rendezvous point at about 5:30 a.m.  There, he and the other ManTech employees were picked up by ManTech's agent Millbrook and driven to Kuwait International Airport.

126.    At the airport, the Millbrook agent returned Sawyer's passport and gave him a round-trip plane ticket to Bahrain.

127.    Using the ManTech-issued airline plane tickets, Sawyer and his fellow employees boarded a flight to Bahrain.

128.    As further instructed by ManTech, once Sawyer and his fellow employees reached Bahrain, they exited the plane, went through Bahrain's customs and immigration controls, turned around, went back through Bahrain's customs and immigration controls, boarded the next flight for Kuwait (Sawyer thinks it was the same plane they had flown to Bahrain), and returned to Kuwait.

129.    After the plane landed, Sawyer and the others entered Kuwaiti customs and immigration control.  There, the authorities questioned Sawyer and his colleagues about why

they had gone to Bahrain and returned the same day.

130.    The immigration authorities told Sawyer and the other ManTech employees that their conduct was illegal and that they were subject to arrest.  After giving this warning, the Kuwait authorities stamped Sawyer's and his colleagues' passports with a Kuwait tourist visa, and allowed them to enter Kuwait.

131.    As Sawyer exited the Kuwait International Airport, he was met by ManTech's Millbrook agents who, once again, confiscated his passport.

132.    Sawyer lived in fear of arrest because he now lacked his U.S. passport, proper immigration papers, and a proper work authorization.  He understood that Americans, when arrested, were poorly treated in Kuwait prisons.  He also understood that, if arrested, he would have to share an overcrowded jail cell, would likely not receive adequate food, would be exposed to poor sanitation, and would be subject to physical and verbal abuse, summary deportation, and a life-time ban on reentering Kuwait.  Yet he also feared the consequences of being fired by ManTech, including the financial penalty for termination prior to completing 24-months of service.

133.    On or about May 30, 2013, ManTech returned his passport to him with a Visa 18 inserted in it.  The following day, ManTech fired him and forced him to leave the country.

134.    Sawyer sought to return to Kuwait to work for ITT Corp.  Through the hiring process at ITT, he learned that ManTech had not taken the steps necessary to cancel his Visa 18 and, thus, he could not work for any other employer in Kuwait.  At his own expense, Sawyer had to fly back to Kuwait on a tourist visa so that he could clear his Visa 18 from ManTech.

135.    While employed by ManTech in Kuwait, Sawyer worked in the same facility, in the same horrendous conditions, as described above.  This building lacked the ventilation

necessary to vent the particulate matter generated from arc-welding through CARC paint, running scores of MRAP engines simultaneously, and grinding of auto-body metal.

136.    The air quality was so poor that Sawyer had difficulty breathing.  ManTech's MRAP repair facility lacked the most fundamental safety equipment: ManTech would not provide Personal Protective Equipment ("PPE"), respirators, or adequate ear protection against excessive noise.

137.    When Sawyer complained about the lack of respirators to filter the smoke-filled air, ManTech threatened to fire him.  In fear of losing his job, Sawyer raised no further objections to the working conditions.  He was never paid for overtime or for recognized holidays for the hours he worked in Kuwait.

138.    **Locklear** worked for ManTech in Kuwait from November 2012, until his unjustified termination in May 2013.  During this time, ManTech never obtained a Visa 18 for Locklear.

139.    When he started working for ManTech in Kuwait in November 2012, ManTech confiscated his passport.  As a result, Locklear lived in constant fear of arrest and deportation.  He knew of other expatriates – including Americans – who had been arrested for immigration violations and for working illegally in Kuwait.  He knew that persons arrested and detained in Kuwaiti jails were generally mistreated and subjected to humiliating treatment.

140.    Despite his repeated requests to ManTech to provide him with a Visa 18, ManTech never got him one.

141.    Locklear's manager told him that he would have to participate in a "visa run."  Visa runs were scheduled by a ManTech employee named Laurie.  Laurie had a list of ManTech employees with the dates on which their tourist visas would expire.

142.    As an employee's tourist visa was about to expire, Laurie would contact his

manager and instruct him to order the employee do a "visa run" to Bahrain.  Locklear's visa run

was on a Sunday, his only day off.  He was picked up at the ManTech-provided housing facility

by a ManTech driver at 5:00 a.m., and driven to the Kuwait International Airport.

143.    At the airport, ManTech gave Locklear a round-trip ticket to Bahrain.  When he

reached Bahrain, he transited through Bahrain immigration control and got a Bahrain entry stamp

whereupon, as previously instructed by ManTech, he returned immediately through Bahrain's

immigration and customs controls to fly back to Kuwait.

144.    When Locklear got back to Kuwait, he feared that he would be arrested because

he understood Kuwaiti law to require those exiting Kuwait to remain outside of the country for

three days prior to re-entry.  But he was also afraid that if he did not obey ManTech's orders he

would be fired and subject to a harsh financial penalty.

145.    Locklear's job at ManTech was to gut the insides of MRAP vehicles and grind-

down their interior metallic parts so that the vehicles could be fitted with new equipment.  The

grinding down of the metal released dangerous particulate matter into the air.

146.    Locklear's work environment was constantly filled with smoke as fellow workers

used arc-welders to cut through the MRAP vehicles while other employees ran the engines of

other vehicles when undertaking maintenance or making repairs.  This arc-welding caused

additional particulate matter to fill the air from the burning of the CRAC paint.

147.    The space in which Locklear worked was not ventilated and lacked air-

conditioning.  Yet, other than gloves and goggles, ManTech did not provide Locklear with any

Personal Protective Equipment or respirators.

148.    While at ManTech, Locklear was required to awake at 4:00 a.m. so that he could

be picked up by ManTech's employee bus at 5:00 a.m.  He and other employees were then driven for approximately one hour to the ManTech warehouse.

149.    For part of his employment experience in Kuwait, Locklear worked in the warehouse tool room.  When working in the tool room, Mr. Locklear lacked access to the SAMS-E reporting systems and, thus, had no ability to personally enter his time into the SAMS-E system.  However, Locklear knew that time was being entered in his name into the SAMS-E database by Science Applications International Corporation, a subcontractor to ManTech, on instruction from ManTech managers.  Locklear did not, himself, enter this time or have any say in what increments of time this data was entered.

150.    When Locklear worked directly on MRAP vehicles and, thus, had access to the time reporting processes of SAMS-E, he was under constant pressure by ManTech managers to misrepresent his hours.  ManTech manager communicated to Locklear and others certain hour "targets" for tasks and Locklear and others were instructed to be creative in the recordation of their hours in order to meet the expected targets.  Specifically, if on any given day Mr. Locklear recorded a low number of direct hour labor for work on an MRAP vehicle, he was instructed to increase the number of hours reported into the SAMS-E database.  If, however, he spent more than ten hours on a direct labor task, he was instructed not to record any direct hours in excess of ten hours regardless of the time consumed on the task and to mischaracterize the hours in excess of ten hours as non-direct labor tasks.  The consequence of the management-demanded manipulation of the recordation of hours led to pervasive misreporting of direct-labor and other man-hour data into the SAMS-E database.

151.    Locklear returned to his apartment at 7:30 p.m.  Thus, he was obligated to ManTech for approximately 15 of the 24 hours of each day, six days a week, for a total of 93

hours per week.   He was never paid for overtime or for recognized holidays for the hours he worked in Kuwait.

152.     On October 27, 2012, **Nelson** contracted to work for ManTech in Kuwait.  He was required to attend orientation at the ManTech facility in Chantilly, Virginia from August 5-10, 2012.  He worked 48 hours, yet he was not paid the overtime rate for the 8 excess hours. From August 13, 2012, through September 21, 2012, ManTech required him to attend training at the Red River Depot in Texas.  Again, he was not paid for his overtime, nor was he paid overtime for working on Labor Day.

153.     Nelson trained further at the Individual Replacement Deployment Operations Center at Camp Atterbury, Indianapolis, Indiana.  Again, he was not paid the overtime rate for 16 hours of overtime.  ManTech required Nelson to return to Camp Atterbury from November 3-9, 2012, for which he was again not paid overtime.

154.     Nelson left for Kuwait on November 09, 2012, after completion of his training. ManTech did not provide him with any information about the requirements for working legally in Kuwait.  ManTech did not, for example, tell Nelson that it was illegal to work in Kuwait when in-country only on a tourist visa.

155.     ManTech never obtained a Visa 18 for him, a prerequisite for him to work there.

156.     The flight that transported Nelson to Kuwait carried approximately twenty other new ManTech employees.  To his knowledge, none of them knew that it would be illegal for them to work in Kuwait without a Visa 18.

157.     Through conversations with employees of other companies such as ITT and General Dynamics, Nelson learned that expatriates could work in Kuwait only if they had a Visa 18.  His friends at those companies had all obtained Visa 18s before going to Kuwait.  Nelson

lived in fear that he would be arrested and deported.  Particularly unnerving was the fact that,

unlike his colleagues at ITT and General Dynamics, because he had no passport, he lacked the

ability to immediately prove his U.S. citizenship in a time of crisis.  Thus, in the event of a crisis,

he not only lacked the legal authority to be in Kuwait, he also lacked the ability to take shelter on

a nearby U.S. military facility.  Nelson knew that other employees of ManTech had the same

problem – and concerns.  The expatriate community was acutely aware of the Kuwaiti

authorities' periodic arrests of foreign nationals, and that they were ill-treated upon their arrest.

158.    On or about April 28, 2013, ManTech management told Nelson and other

ManTech employees whose temporary visas were about to expire that they must do a "visa run."

159.    Following ManTech's instruction, he and the others met the ManTech bus at 4:00

a.m.  The bus took them to the Kuwait International Airport.

160.    As instructed, he flew to Bahrain and, after approximately ten to twelve hours, he

flew back.  When he returned, he feared that he was at risk of arrest because it was his

understanding that once he left Kuwait, he was required to stay outside of the country for 72

hours before returning.  He also feared being fired by ManTech, and the financial consequences

therefrom, if he did not obey ManTech's instructions.  Upon exiting the airport terminal with his

newly issued tourist visa, Nelson was met by employees of Millbrook who confiscated his U.S.

passport.

161.    Nelson describes the ManTech MRAP maintenance facility as a "slave camp."

ManTech used intimidation and coercion to keep its employees in constant fear of being

terminated and deported.  The work conditions themselves were horrific.  The air was putrid and

thick with suffocating smoke and fumes from a variety of sources.

162.    Nelson was required to work long hours.  He had to catch the bus at

approximately 4:45 a.m. so that he could start work at 6:00 a.m.  At 9:00 a.m., he got a fifteen

minute break.  At noon, he was allowed to take a 60 minute break for lunch.  Then, at 3:00 p.m.,

he was permitted another 15 minute break.  Nelson was not allowed to stop work until 7:00 p.m.,

and did not get back to his living quarters until 8:00 p.m.  Thus, he was devoting nearly 15 hours

a day to ManTech, working for 12 hours, 6 days a week.   Nelson was never paid for overtime or

for holidays for the hours he work in Kuwait.

False Claims Due To Under-Reporting Hours

163.    ManTech ordered its mechanics to falsify their direct labor hours reported in the

SAMS-E system by under-reporting them to create the false impression of efficiency in

performing direct labor mission-critical tasks.

164.    In consequence, the U.S. made payments to ManTech under the Contract, and

exercised options that paid ManTech over $2.6 billion to continue maintaining and servicing

MRAP vehicles.

165.    The damage to the U.S. extends far beyond the direct financial injury inflicted by

the procurement fraud and the servicing of U.S. equipment by a contractor that employed

unqualified mechanics (at the expense of more qualified contractors).

166.    The United States military depends on accurate data to determine readiness for

military action.  Readiness includes the availability of weaponry and equipment in the field.

Readiness is gauged by recorded maintenance turn-around times, the reliability of the equipment

that has been deployed, and whether equipment currently being used by our forces is sufficiently

reliable to merit additional purchase (or whether the U.S. would be better served purchasing

different, more reliable equipment).

167.    A contractor reporting false data in this data-driven system pollutes readiness

38

calculations, reliability assessments, and procurement decisions and does damage to the U.S. military.

False Claims with Respect to Conditions Precedent to Contracting

168.     At all times, ManTech was under an affirmative obligation to disclose to the U.S. facts that would, if known, disqualify ManTech from contracting with the U.S.  ManTech's failure to disclose its knowledge of human trafficking activity by its employees, its lack of adherence to the SCA, and its lack of adherence to prescribed safety standards constitute false claims regarding qualification for payment and, thus, false claims for payment.

169.     Ignoring the U.S. Government's "zero-tolerance" policies with respect to prohibitions on Human Trafficking and its express obligations under the Contract, ManTech trafficked Relators and their colleagues illegally into Kuwait, abused Kuwait's immigration and labor laws and, by doing so, inflicted serious harm on Relators and their colleagues.

170.     Through its trafficking activity, ManTech placed Relators and their colleagues in fear of arrest, imprisonment, and expulsion; forced Relators and their colleagues to work in deplorable, dangerous conditions; and refused to pay them in accordance with the laws of the U.S. and Kuwait.

171.     ManTech's employment contracts expressly or impliedly misrepresented that employees would be working in Kuwait legally and that the conditions of employment would be lawful.  Once the employees were in Kuwait, their contracts forced them to remain on the job for at least two years – even after they discovered that they were in-country illegally and that the conditions of their employment were unlawful – on pain of payment of substantial financial penalties for resigning sooner.

172.     ManTech abused Kuwait's labor and immigration laws by ordering Relators and

their colleagues to engage in "visa runs" in which they left Kuwait, flew to and entered Bahrain, and then turned around and flew back to and entered Kuwait on order to be issued renewed tourist visas.

173.    ManTech placed Relators and their colleagues in fear of arrest for this violation – which was exacerbated by their fear of being fired by ManTech, and the harsh economic consequences that would follow.

174.    ManTech did not comply with the minimum requirements of the SCA or the Kuwait Private Sector Labor Law.

175.    ManTech's failure to comply with the SCA included the refusal to pay overtime for work undertaken in the United States; likewise, ManTech refused to pay overtime consistent with U.S. or Kuwaiti law for work done in Kuwait.

176.    By forcing Relators and their colleagues to work in fear, without the protection of any country's laws, ManTech was able to extract their services at an extremely low rate, underbid its competitors for contract work, and make exorbitant profits by obtaining illegal payments from the U.S.

177.    Further, ManTech failed to observe any country's wage laws, including those of host country Kuwait.  For example:

> A.    Hayes worked 72 hours a week in Kuwait.  That is 24 hours beyond the Kuwaiti maximum of 48 hours per week, and 32 hours beyond the maximum established by the United States Fair Labor Standards Act. Hayes worked 23 weeks in Kuwait at a rate of $19.67 per hour, and 7 weeks at $19.98 per hour.  Under the Kuwait Private Sector Labor Law, ManTech owed him approximately $2,714.46 (24 hours x 23 weeks x 19.67 per hour x .25 (additional overtime rate)); plus $839.16 (24 x 7 x 19.98 x .25, or $209.79) for an estimated total overtime compensation of $3,553.62.  Under the Fair Labor Standards Act, ManTech owed Hayes approximately $7,338.56 (calculated as 32 hours x 23 weeks x 19.67 per hour x .50 (additional overtime rate)); plus $2,237.76 (32 hours x 7 weeks x 19.98 x .50) for an estimated total compensation of working

40

overtime of $9,576.02.

B.　Locklear worked 26 weeks in Kuwait.  He was also required to work a 72 hour work week.  Using his pay of $19.56 as the rate to calculate his missing overtime wages, Locklear was entitled to additional pay at the Kuwaiti rate of 24 hours x $19.56 x .25 x 26 weeks, or $3,051.36.  At a rate compensable under the Fair Labor Standards Act, Locklear was entitled to 32 hours x $19.56 x .50 x 26 weeks or $3,976.02.

C.　During his 1st week in Kuwait, Nelson worked 80 hours.  Accordingly, for the overtime worked that week, under the Kuwait Private Sector Labor Law, Nelson was owed $144.00 ($16.00 x .25 x 36 hours), and under the Fair Labor Standards Act, he was owed $320.00 ($16.00 x .50 x 40 hrs.).  During his 2nd week of work in Kuwait, Nelson worked 60 hours.  Under Kuwaiti law he was owed $112.00 ($16.00 x .25. x 28 hours); and under the FLSA he was owed $256.00 ($16.00 x .50 x 32 hours).  During the 3rd-12th weeks of his work in Kuwait, Nelson was required to work 72 hours each week.  Under Kuwaiti law, he was owed $1,120.00 ($16.00 x .25 x 28 hours x 10 weeks); and under the FLSA, $2,560.00 ($16.00 x .50 x 32 hours x 10 weeks).  In addition, in weeks 16 through 20 Nelson was forced to work 72 hours each week.  Under Kuwaiti law, he was owed $448.00 ($16.00 x .25 x 28 hours x 4 weeks); under the FLSA, $1,024.00 ($16.00 x .50 x 32 hours x 4 weeks).  In week 21, Mr. Nelson's pay was raised to $16.26 per hour.  Yet he was still required to work 72 hours for weeks 21 through week 28.  Thus, under Kuwaiti law he is owed $796.74 (16.26 x .25 x 28 hours x 7 weeks) and under the FLSA he is owed $1,821.12 ($16.26 x .5 x 32 hours x 7 weeks).  In week 29, Nelson was required to work 64 hours.  Under Kuwaiti law he was owed $112.00 ($16.26 x .25 x 20 hours); and under the FLSA $195.12 ($16.26 x .50 x 24 hours).

178.　Thus, ManTech was not meeting the SCA requirement to pay fair prevailing wages.  Yet, ManTech never informed the U.S. of its SCA non-compliance.  Had it done so, ManTech would have been barred from contracting with the U.S. for three years.  Through its artifice, however, ManTech appeared to be eligible for award of contract options worth $2.6 billion, which, in fact, were awarded.

179.　ManTech inflicted additional serious harm upon Relators and their colleagues by forcing them to work in dangerous, toxic, "slave"-like conditions without the bare-minimum of equipment necessary to safeguard Relators' health and safety.

41

180.    The U.S. would not have continued contracting with ManTech had it been revealed that the company was in wholesale violation of  the minimum requirements for protection of its U.S.-citizen workforce from serious, life-threatening work conditions that included excessive hours trapped in a non-ventilated hanger filled with carbon monoxide, known carcinogens, and excessive heat.  Moreover, by placing its workers in constant fear of arrest, imprisonment, deportation, and the economic consequences of being fired, ManTech created an intimidating environment wherein ManTech employees were fearful of reporting ManTech's abuses.

## COUNT I
### (Violations of the False Claims Act - Presentation of False Claims, 31  U.S.C. § 3729(a)(1)(A) --Against All Defendants)

181.    The allegations in Paragraphs 1-180 are incorporated in this count by reference as though fully stated herein.

182.    By virtue of the acts and omissions described above, Defendants knowingly presented, or knowingly caused to be presented, false and/or fraudulent claims for payment or approval by the U.S. Government, in violation of 31 U.S.C. § 3729(a)(1).

183.    As a prerequisite for payment, the Contract required that ManTech record accurately man hours expended in performing services.  As previously described, ManTech not only did not accurately record the man hours expended in performing Contract services, it intentionally instructed its employees to report falsely their man hours, which were then input into the SAMS-E system.

184.    Each false recordation of time constitutes an independent false claim made to the U.S.

185.    Each false claim of time expended in performance of the Contract was material to

the government's decision to make payments under the Contract.

186.    Each false claim for time expended in performance of the Contract was submitted by ManTech to the U.S. for the purpose of inducing the U.S. to pay it under the Contract and to exercise Options 1-4 of the Contract and falsely obtaining additional contracts with the U.S.

187.    The inducement succeeded, and the U.S., in reliance on ManTech's false reporting, paid the false claims submitted under the Contract and awarded ManTech Options 1-4 of the Contract.

188.    By knowingly, willfully or recklessly presenting or causing others to present claims for payment/reimbursement to the U.S. under the Contract for services performed by ManTech, Defendants defrauded the U.S. in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), by inducing the U.S. to make payments under the Contract and to enter into Contract Option 1, 2, 3, and 4 and pay money for these Options it was not obligated to pay.

189.    In committing these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to the U.S.'s decision to pay these false claims.  Had the U.S. known of the falsity of ManTech's man hour reporting (and ManTech's attendant inefficiency in performing its contractual obligations), the Government may not have paid the invoices submitted under Contract 1.

190.    In committing these wrongful acts, Defendants have damaged the U.S. by polluting the SAMS-E data system with false records of maintenance.  The presence of this false maintenance data damages the U.S. far beyond inducing the U.S. to enter into contracts under false pretenses.  The entry of false data damages U.S. national security by adulterating military readiness calculations, leading to inadequate appropriations for vehicle maintenance and faulty determinations for military combat vehicle procurement.

191.     In addition, ManTech made false claims under the Contract by submitting invoices for payment to the U.S. when ManTech knew that it was not in compliance with the TVPRA, the SCA, Kuwaiti labor and immigration laws, or baseline health and safety regulations – all prerequisites for payment under the Contract.

192.     By knowingly, willfully or recklessly presenting claims for payment/reimbursement to the U.S. under the Contract for services performed contrary to the SCA, the TVPRA, Kuwaiti labor and immigration law, and baseline health and safety regulations, ManTech has defrauded the U.S. in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), to the damage of the U.S. Treasury, by causing the U.S. to pay money it should not have paid.

193.     In committing these wrongful acts, ManTech has engaged in a protracted course and pattern of fraudulent conduct that was material to the U.S.'s decision to pay these false claims.  Specifically, had the U.S. known of the falsity as to ManTech's compliance with the SCA, TVPRA, Kuwaiti labor and immigration law, or baseline health and safety regulations it may not have paid the invoices submitted under the Contract.

194.     All invoices for payment submitted by ManTech for payment under Contract Options 1, 2, 3, and 4 were also false claims because ManTech was ineligible to perform that contract due to its violations of the SCA, TVPRA, Kuwaiti law, and baseline health and safety regulations while performing the Contract.

195.     By knowingly, willfully or recklessly presenting claims for payment/reimbursement to the U.S. for services performed under the Contract and Options 1, 2, 3, and 4, ManTech has defrauded the U.S. in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), to the damage of the treasury of the U.S., by causing the U.S. to pay out money it

should not have paid.

196.    In performing these wrongful acts, ManTech has engaged in a protracted course and pattern of fraudulent conduct to obtain payment from the U.S.  Had the U.S. known of this falsity as to ManTech's performance under the Contract, the U.S. could not have contracted with, much less legally paid, ManTech pursuant to the Contract or Contract Options 1, 2, 3, and 4.

197.    Damages to the U.S. include, but are not limited to, three times the full value of all such fraudulent claims.

198.    Each invoice on the Contract and Contract Options 1, 2, 3, and 4 is a separate false claim; and each and every fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

199.    Defendants are jointly and severally liable for all damages under this Count.

## COUNT II
**(Violations of the False Claims Act – Material False Records and Statements,**
**31  U.S.C. § 3729(a)(1)(B) – (Against All Defendants)**

200.    The allegations in Paragraphs 1-199 are incorporated in this count by reference as though fully stated herein.

201.    By virtue of the acts and omissions described above, Defendants agreed to make use of, and did make use of, or cause to be made use of, false records or statements to get false or fraudulent claims paid or approved by the U.S. Government, in violation of 31 U.S.C. § 3729(a)(1)(B).

202.    As described above, upon information and belief, ManTech submitted material false statements and certifications regarding ManTech's man hours, compliance with the SCA, compliance with the TVPRA, compliance with host nation laws, and compliance with baseline health and safety regulations in the performance of the Contract and Contract Options 1, 2, 3,

and 4.

203.    ManTech violated the False Claims Act by intentionally and/or recklessly

submitting inaccurate information and certifications to the U.S. regarding its qualification to

continue serving as a U.S. Government contractor, where:

- such submissions were made to induce payment under the Contract and induce the

  U.S. to award ManTech Contract Options 1-4, and pay false claims submitted

  pursuant thereto;

- had the U.S. known, ManTech would have been legally disqualified as a government

  contractor because of its failure to observe the requirements of the SCA and its

  engagement in human trafficking in contravention of the TVPRA;

- had the U.S. known, ManTech would have been legally disqualified from doing

  business or employing mechanics in Kuwait because of pervasive violations of State

  of Kuwait immigration and labor laws;

- had the U.S. known, ManTech would have been legally disqualified from receiving

  payment from the U.S. because the abominable, toxin-infused slave-like conditions  it

  forced upon its workforce.

204.    Upon information and belief, the periodic reports that ManTech submitted to the

U.S. Government attesting to ManTech's compliance with the SCA, TVPRA, State of Kuwait

host nation laws, and baseline health and safety regulations, contained material false statements

and certifications.  Upon further information and belief, such reports failed to advise that

ManTech was in noncompliance with the above-stated legal requirements, and that ManTech

was thus disqualified from further serving as U.S. government contractor.  Upon further

information and belief, on each of these reports, which were required to be submitted on a semi-

annual and annual basis, ManTech certified that the work was being performed in compliance with the SCA, TVPRA, Kuwait host nation laws, and baseline health and safety regulations.

205.    ManTech was under a duty timely to amend these reports, but upon information and belief, failed to do so.

206.    ManTech knowingly made these false statements in order to obtain the Contract and induce the U.S. to enter into Contract Options 1, 2, 3, and 4, and to induce the Government to pay amounts under Contract 1 and Contract Options 1, 2, 3, and 4 that the U.S. should not lawfully, and may not, have paid had the truth been disclosed.

207.    As such, the false statements and certifications that ManTech made in reports to the Government were material to the U.S.'s decision to award the Contract options as well as its decision to pay the false claims that ManTech subsequently presented pursuant to Contract and the options.

208.    All such false records or statements were implied by ManTech or made directly to the U.S. by ManTech to get false or fraudulent claims paid or approved by the U.S.

209.    As a direct and proximate result of ManTech's use of false records and statements, each and every claim presented by ManTech under Contract 1 and Contract Options 1, 2, 3, and 4 is a false or fraudulent claim within the meaning of the False Claims Act.

210.    Damages to the U.S. include, but are not limited to, three times the full value of all such fraudulent claims.

211.    Each and every fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000)

212.    Defendants are jointly and severally liable for all damages under this Count.

## COUNT III
### (Violations of the Trafficking Victims Protection Reauthorization Act,
### (18 U.S.C. § 1581, *et seq.* – Class Action As To Liability Against All Defendants)

213.    The allegations in Paragraph 1-180 are incorporated in this count by reference as though fully stated herein.

214.    Plaintiffs bring this count under the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1581, *et seq*.

215.    Section 1595 of the TVPRA allows private citizens to bring suit against a perpetrator who has violated the TVPRA.

216.    Section 1589(a)(3) establishes that whoever knowingly provides or obtains the services of a person by means of the abuse or threatened abuse of law or legal process shall be punished pursuant to the Act.

217.    Section 1592 establishes that whoever knowingly conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person --  in the course of a violation of section 1589 with intent to violate section 1589; or to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the services of that person, is liable under the TVPRA.

218.    Section 1593(a) establishes that in in addition to any other civil or criminal penalties authorized by law, the court shall order restitution for any TVPRA offense.

219.    Under Section 1593(b)(1), the order of restitution under this section shall direct the defendant to pay the victim the full amount of the victim's losses including any costs incurred by the victim for medical services relating to physical, psychiatric, or psychological care; physical and occupational therapy or rehabilitation; necessary transportation, temporary

housing, and child care expenses; lost income; attorneys' fees, as well as other costs incurred; and any other losses suffered by the victim as a proximate result of the offense.

220.     Under Section 1593(b)(1), the order of restitution shall also include the greater of the gross income or value to the defendant of the victim's services including the offender's ill-gotten gains.

221.     ManTech obtained Plaintiffs' services by abusing Kuwaiti law and legal process. It is a criminal offense to work in Kuwait without legal authorization to do so.   ManTech was banned from employing U.S.-hired mechanics unless those linguists were duly authorized by Kuwait to work there for ManTech.   Under Kuwaiti law, ManTech was prohibited from recruiting mechanics from the U.S. without reporting to the Kuwaiti Government that such laborers were working for ManTech.

222.     ManTech told Plaintiffs that it would be responsible, as their employer, for obtaining all of the immigration approvals and work permits needed for them to work in Kuwait. Through such statements, Plaintiffs were led to believe that ManTech would act in accordance with the law in obtaining the necessary immigration approvals and necessary authorizations for Plaintiffs to work in Kuwait.

223.     In contract documents provided to Plaintiffs, however, ManTech failed to inform them that they needed Resident Visas as a pre-condition to working legally in Kuwait. By confiscating their passports when they arrived in Kuwait, ManTech effectively prevented Plaintiffs from obtaining, on their own volition, the necessary immigration and work authorizations required to work legally in Kuwait.   Further, confiscation of their passports prevented Plaintiffs from leaving the country at the time of their choosing.

224.     In addition, Plaintiffs were forced to work without payment of overtime, which

was illegal under any circumstances.

225.     Rather than complying with the Kuwait requirement that expatriate employees obtain a Visa 18 prior to working in that country, ManTech further abused Kuwaiti immigration law by demanding that Plaintiffs, as a condition to further employment and to avoid the harsh economic consequences of being terminated, fly from Kuwait to Bahrain, have their passports stamped as having exited Kuwait, pass through Bahrain immigration control and obtain an entry stamp, turn around, pass back through Bahrain's border control to receive an "exit" stamp, fly back to Kuwait so that a new tourist visa could be entered into their passport.  By this artifice, ManTech was able to circumvent Kuwait's immigration control for persons entering its country to work yet at the expense of placing Plaintiffs in fear of arrest.  .

226.     Plaintiffs did not want to work under the inhumane and arduous conditions to which they were subjected by ManTech, but reasonably believed that they had no choice, due to ManTech's absolute control over their lives, as manifested, *inter alia*, by ManTech's confiscation of their passports and refusal to obtain work visas for them, placing them in fear of arrest.  Further, Plaintiffs felt trapped in their jobs because of the severe economic consequences imposed by ManTech if they terminated their employment prior to 48 months of service.

227.     As a result of the aforementioned actions, Plaintiffs suffered serious harm, including but not limited to contracting communicable illnesses that went untreated; emotional distress and physical injuries that also went untreated; arrest by Kuwaiti law enforcement authorities; incarceration for criminal offenses; wrongful detention in Kuwait against their will; blacklisting from re-entry into Kuwait and Gulf Cooperation Council countries; and financial harm.

<u>Liability Class Action Allegations</u>

228.    Count III is properly maintained as a class action for purposes of liability by Plaintiffs, and the putative class they represent, against all Defendants.

229.    Definition of Liability Class: All persons who worked for ManTech under the Contract in Kuwait without a Visa 18 but were not compensated under the U.S. Fair Labor Standards Act or the Kuwait Private Sector Labor Law or any other laws that would have entitled such persons to compensation for overtime.

230.    Numerosity: Upon information and belief, during Contract performance, at any given time there were approximately 200 ManTech employees without Visa 18s performing services under the Contract in Kuwait, and not being paid in accordance with the U.S. Fair Labor Standards Act or the Kuwait Private Sector Labor Law.  Thus, the class of ManTech employees fitting the class definition is so numerous that joinder of all members is impracticable.

231.    Common Questions of Fact and Law: There are common questions of fact and law that are common to all liability class members.  By way of example, and without limitation, these common questions include:

        A.      Was a Visa 18 a pre-requisite to lawful employment in Kuwait during the period of Contract performance?

        B.      Under the Contract, was it the responsibility of ManTech to apply for a Visa 18 for its employees slated to work in Kuwait?

        C.      Under Kuwaiti law, was it the responsibility of ManTech to apply for a Visa 18 for its employees slated to work in Kuwait?

        D.      Under Kuwaiti law, was it a criminal violation for a non-Kuwaiti citizen to work in Kuwait without a Visa 18 during the period of Contract performance?

E.      During the period of Contract performance, did ManTech have a company policy of not paying overtime and holiday pay?

F.      Was ManTech's failure to pay overtime and holiday pay to its employees working in Kuwait under the Contract a violation of the U.S. Fair Labor Standards Act payment requirements of the Service Contract Act?

G.      Was ManTech's failure to pay overtime and holiday pay to its employees working in Kuwait under the Contract a violation of the Kuwait Private Sector Labor Law?

232.    Typicality of Claims: The claims of the representative Plaintiffs are typical of the claims of the liability class in that they all allege a unitary scheme on the part of ManTech to abuse Kuwait's immigration and employment law, and deny Plaintiffs and the putative class they represent the compensation to which they were entitled under U.S. and Kuwaiti law.

233.    Adequacy of the Representative Plaintiffs: Representative Plaintiffs are adequate representative plaintiffs as their claims are typical of the absent class members, there exist no outstanding questions regarding any of the Representative Plaintiffs' veracity or ability to testify under oath regarding their relationship with ManTech, nor any other known inhibition in their ability to assist counsel in bringing the claims asserted on behalf of the absent class members to a trial on the merits.

234.    The Risk of Inconsistent or Varying Adjudication.  This action should be maintained as a class action as separate courts considering the same issues under the TVPRA, wherein laborers are forced to work in an abuse of the host nation's immigration and labor law processes and without the protection of such laws, might reach different results sewing confusion with respect to the legality of bringing an expatriate workforce to a foreign country.

235.    ManTech has acted with respect to requiring its workers to work in Kuwait prior

to obtaining the approvals necessary for such employees to work legally in Kuwait and to obtain

the protection of Kuwait's laws in a manner that is generally applicable to all persons fitting the

class description.  This makes final and remedial injunctive relief appropriate with respect to the

class as a whole.

236.    Superiority of Class-Wide Adjudication.  Finally, class-wide adjudication is

appropriate as the questions of law or fact common to the putative members of the class as

described predominate over any questions affecting only individual members, and that a class

action is superior to other available methods for the fair and efficient adjudication of this broad-

based controversy.

237.    Additional Factors Favoring Class Certification.  Litigation costs, in terms of

discovery and complex legal arguments, are prohibitively expensive for individual persons fitting

the class description.  For example, individuals would have to bear the expense of taking

depositions of ManTech officials, the expense of obtaining expert opinion on the applicability of

the TVPRA, in addition to the cost of any depositions on the issue of ManTech's business

processes with respect to hours worked in Kuwait or other issues related to total time worked by

ManTech employees.

238.    A single determination, on a class-wide basis, regarding whether ManTech

violated the TVPA would be far more cost effective than individual, piece-meal adjudications in

a variety of courts.

239.    WHEREFORE, consistent with the policy goals established by Congress in the

TVPRA, Plaintiffs seek the greater of all of the wages owed to them had they been compensated

under the Fair Labor Standards Act and the payment of all damages incurred by them as a

consequence of ManTech's illegal human trafficking, or the disgorgement of any and all ill-

gotten gains realized by ManTech through its illegal trafficking of U.S. citizens into Kuwait pursuant to its scheme to abuse the immigration and labor laws of the State of Kuwait.

## COUNT IV
### Breach of Contract

240.    The allegations in Paragraphs 1-180 are incorporated in this count by reference as though fully pleaded herein.

241.    The contract documents that governed the terms and conditions of its employee's relationship with ManTech stated, "You must provide at least two weeks written notice to your ManTech supervisor of your intention to resign from employment with ManTech." Other ManTech contract documents required thirty days notice prior to an employee resigning employment from ManTech.

242.    On or about May 29, 2013, Plaintiffs Hayes, Nelson, Sawyer, and Locklear ("Count IVPlaintiffs") were called into the office of John Guarnieri, Senior Maintenance Supervisor for ManTech.  Also present at the time were Senior Maintenance Supervisor, Mike Hansford, and Site Supervisor, Brian Earhart.  Count IV Plaintiffs were told that they were being laid off.

243.    On or about June 1, 2013, only hours before Count IV Plaintiffs left to fly back to the United States, they were handed a letter from ManTech advising them that their employment with ManTech had been terminated June 10, 2013, for unsatisfactory job performance. Specifically, the letter stated, "This is to advise you that your employment with ManTech Telecommunications and Information Systems Corporation is terminated June 10, 2013, for unsatisfactory job performance. As such, you are ineligible for rehire. On the regular pay cycle, you will receive your paycheck for hours worked. . . . Your departure is involuntary, and as such, you may be entitled to unemployment benefits as established by law, however, be advised that it

is ManTech policy to challenge state decisions to award unemployment benefits where termination resulted from actions wholly committed by the employee or where misconduct has occurred."

244.     The claim that Count IV Plaintiffs had performed their jobs in an unsatisfactory manner was a knowingly false statement.

245.     Count IV Plaintiffs had exemplary job performance as was known by ManTech.

246.     In part because the interval between being informed of their termination and being taken off the worksite and flown out of Kuwait was so short, Count IV Plaintiffs had no opportunity to challenge the factual basis for their termination for cause.

247.     As a consequence of being terminated on grounds that were knowingly false, Count IV Plaintiffs have been harmed in the form of lost wages, lost benefits, and other damages.

248.     Moreover, ManTech's lack of reasonable notice to Count IV Plaintiffs caused them additional damages in that they were denied the opportunity to seek employment with another contractor operating in Kuwait, were denied the opportunity to make financial arrangements in anticipation of the loss of income that would be incurred by being summarily terminated including child support payments required under court order, credit card payments, and other lines of credit that would have to, suddenly, be satisfied notwithstanding an abrupt cessation of income.

249.     WHEREFORE, Count IV Plaintiffs seek redress in the United States District Court for the District of Columbia in the form of payment of lost wages, restitution and other forms of compensable damages, and through the award of whatever damages, restitution, or injunctive action is necessary to bring complete relief with respect to the wrongful termination of

their employment including damages inflicted upon them from the lack of reasonable notice of the termination.

## PRAYER FOR RELIEF

WHEREFORE, Relators/Plaintiffs, on behalf of themselves and the U.S., pray as follows:

**As to Counts I-II (Violations of the False Claims Act)**:

A.      That this Court enter judgment against all Defendants jointly and severally in an amount equal to three times the amount of damages the U.S. has sustained in regards to the Contract, Contract Option 1, 2, 3, and 4 including but not limited to, the full value of the Contract and Options 1, 2, 3, and 4;

B.      That this Court enter judgment against all Defendants in an amount equal to three times the amount of damages the U.S. has sustained in regards to the Contract and Options 1, 2, 3, and 4 including but not limited to, the full value of these contractual obligations;

C.      That each Defendant be held jointly and severally liable for a civil penalty not to exceed $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every false claim it presented or caused to be presented and each false statement and record it made or caused to be made in violation of the False Claims Act under the Contract, and Options 1, 2, 3, and 4;

D.      That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

E.      That Relators be awarded their expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law;

F.      That Relators and the U.S. be awarded pre-judgment and post-judgment interest on all monies awarded;

G.      That Relators be granted any and all other relief set forth in the False Claims Act that was not specifically referenced above;

H.      That Relators be granted such other and further relief as may be determined by the Court to be just, equitable and proper;

**As to Count III (Violations of the TVPRA):**

I.      That Plaintiffs be awarded damages, including compensatory and statutory damages, for the wrongful acts complained of herein, in an amount to be determined at trial;

J.      That Plaintiffs be awarded punitive or exemplary damages in an amount of which will be proven at trial;

K.      That Plaintiffs be awarded their expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law;

L.      That Plaintiffs be awarded pre-judgment and post-judgment interest at highest rate allowed by law;

M.      That Plaintiffs be awarded all general, special, and equitable relief to which Plaintiffs are entitled by law;

N.      Plaintiffs, consistent with the U.S. Government's "zero-tolerance" for contractors who violate the TVPRA, request an Order immediately debarring ManTech from bidding on future contracts with the U.S. Government and an Order terminating, for cause, all existing contracts between ManTech and the U.S. Government; and

O.      That Plaintiffs be granted such other and further legal and equitable relief as may be determined by the Court to be just, equitable and proper.

**As to Count III Class Action:**

P.      Plaintiffs request that the Court Order Defendants to pay damages in an amount to be determined at trial;

Q.      in addition to the specific remedies requested for each individual count, Plaintiff, individually and on behalf of the Class members defined herein, Plaintiffs generally pray for the appointment of the named Plaintiffs as a Class representatives;

R.      the appointment of Charles S. Fax and Liesel S. Schopler of Rifkin, Weiner, Livingston, Levitan & Silver, LLC, and Joseph A. Hennessey of The Law Office of Joseph Hennessey, LLC as Class Counsel;

S.      a declaration of financial responsibility on the part of Defendant for the costs of Class notification;

T.      additional equitable relief, including an Order requiring Defendant to pay Plaintiff and all members of the Class for any act or practice declared by this Court to be unlawful or in breach of contract;

U.      additional equitable relief, including cy pres (fluid recovery) relief, in the event that a residue exists in the common fund created for the Class, in order to ensure that Defendant do not retain any illicit profit;

V.      an award of attorneys' fees, as allowed by applicable law;

W.      an award of costs, as allowed by law;

X.      an award of pre- and post- judgment interest at the maximum legal rate; and

Y.      such other and further legal or equitable relief as the Court deems proper in order to achieve complete justice on the violations and wrong-doing complained of herein.

## As toCount IV (Breach of Contract):

Z.      Plaintiffs request that the Court Order Defendants to pay damages for breach of contract, including but not limited to payment of the anticipated and expected monies due to them had the Plaintiffs finished the term of their employment contract, consequential damages to compensate Plaintiffs for the injury inflicted by Defendants' termination of their employment, and whatever further legal or equitable relief the Court deems proper in order to achieve complete justice for Defendants violation of their contract with Plaintiffs.

AA.      In addition, Plaintiffs pray that the Court declare the rights and duties of the parties consistent with the relief sought by Plaintiffs; issue a declaratory judgment that ManTech's acts, policies practices, and procedures complained of herein violated provisions of the FLSA; enjoin ManTech from further violations of the FLSA; recover for Plaintiffs unpaid wages and liquidated damages as provided under the law and in FLSA, 29 U.S.C. § 216(b) and in amounts to be determined at trial; award reasonable attorneys' fees, costs, and expenses; and provide whatever additional relief is necessary and proper to serve the interests of justice.

Respectfully submitted,

Joseph A. Hennessey, Esq.
The Law Office of Joseph Hennessey, LLC
2 Wisconsin Circle, Suite 700
Chevy Chase, Maryland 20815
Telephone: (301) 351-5614
Email: Jhennessey@jahlegal.com

Charles S. Fax
Rifkin, Weiner, Livingston, Levitan & Silver, LLC
7979 Old Georgetown Road, Suite 400
Bethesda, Maryland 20814
Telephone: (301) 951-0150
Telecopier: (301) 951-0172
Cell Phone: (410) 274-1453
Email: cfax@rwlls.com

Liesel J. Schopler
Rifkin, Weiner, Livingston, Levitan & Silver, LLC
225 Duke of Gloucester Street
Annapolis, Maryland 21401
Telephone: (410) 269-5066
Telecopier: (410) 269-1235
Email: lschopler@rwlls.com

**JURY DEMANDED**

Plaintiffs hereby demand a trial by jury of this action.

Joseph A. Hennessey

Friday, December 04, 2015

60