# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* LARRY HAWKINS, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 15-2105 (ABJ) |
| MANTECH INTERNATIONAL CORPORATION, *et al.*, | ) ) ) |
| Defendants. | ) ) |

## <u>MEMORANDUM OPINION</u>

Larry Hawkins, William Randall Hayes, Clinton Sawyer, James Locklear, and Kent Nelson brought this lawsuit against their former employer, ManTech Telecommunications and Information Systems Corporation ("ManTech"), and its parent corporation, ManTech International Corporation, alleging four violations of the False Claims Act on behalf of the United States, 31 U.S.C. § 3729 (2012), and a violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"). 18 U.S.C. § 1581 *et seq.* (2012). The second amended complaint alleges that ManTech submitted claims to the United States government that were false in several respects: the number of labor hours employees reportedly worked; the data entered into a system called "SAMS-E"; the qualifications of the employees; and the company's compliance with the TVPRA. Second Am. Compl. [Dkt. # 30] ("SAC") ¶¶ 22–145; 265–90. Plaintiffs also allege that ManTech violated the TVPRA when it forced them to work under the threat of serious harm and the threatened abuse of legal process. *Id.* ¶¶ 146–263.

Defendants moved to dismiss all the counts pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1), and 12(b)(6). Defs.' Mot. to Dismiss the Second Am. Compl. [Dkt. # 41] ("Defs.' Mot."); Defs.' Mem. of Law in Supp. of Defs.' Mot. [Dkt. # 41] ("Defs.' Mem."). Plaintiffs opposed the motion, Pls.' Opp. to Defs.' Mot. [Dkt. # 43] ("Pls.' Opp").

For the reasons stated below, defendants' motion will be granted as to Counts II, III, and V. It will be denied as to Counts I and IV.

## BACKGROUND

### I. The Contract

On May 31, 2012, the U.S. Army awarded Contract No. W56HZV-12-C-0127 (the "Contract")[1] to ManTech Telecommunications and Information Systems Corporation, a wholly owned subsidiary of ManTech International Corporation. SAC ¶ 5; Contract [Dkt. # 30] at 6. The Contract provided for "logistics sustainment and support" for Mine Resistant Ambush Protected vehicles ("MRAPs"). Contract at 6. These vehicles were developed and designed to protect U.S. military personnel from improvised explosive device attacks and ambushes. *Id.* ¶ 2. Troops in MRAPs are fourteen times more likely to survive the blast than those riding in other vehicles, and they have saved thousands of lives. *Id.* ¶ 4. The Contract provided for MRAP repair facilities in Kuwait City, Kuwait. *Id.* ¶ 5.

The Contract had an original value of $823,446,067.28 for "services consisting of maintenance and repair of MRAP vehicles" with a completion date of November 26, 2012. SAC

---

1    Plaintiffs have attached what they believe to be is a publicly-available copy of the Contract. Plaintiffs stated that they have requested a copy of the Contract from defendants, but defendants have refused. SAC at 6 n.1.

¶ 23.  It also offered successive contract options, which brought the total value of the Contract to $2.85 billion.  *Id.*

The Contract provided for a "phase in" period that would start at the date of contract award and end no later than 180 days after.  SAC ¶ 24.  This period was compensated on a "firm fixed-price" basis.  *Id.*  After the phase-in period came the "early operational readiness" period, which was compensated on a "cost-plus fixed fee level-of-effort" basis.  *Id.* ¶ 25.  This would begin after the phase in period but could not exceed 180 days after contract award.  *Id.*

The Contract also included an "operational readiness" period which also began after the phase-in period and ran until January 13, 2013.  SAC ¶ 28.  Following the operational readiness period, the Contract would proceed to the "operational readiness option period."  *Id.* ¶ 29.  There were four option periods (three 12-month options and one 10-month option).  *Id.*  Each of these options would be compensated on a cost-plus fixed-fee level-of-effort basis.  *Id.*  These periods all included work directives from the government regarding which labor categories were to be used and estimates of labor hours to be expended.  *Id.* ¶¶ 25, 28, 29.  The government exercised all four of the Contract options.  *Id.* ¶ 32; Contract at 7.

## II.    Factual and Procedural History

Plaintiffs, all U.S. citizens, were employed by ManTech and stationed at the Kuwait Maintenance Sustainment Facility ("KMSF").  SAC ¶ 6.  Plaintiff Larry Hawkins was employed by ManTech at the KMSF from September 18, 2012 to May 30, 2015.  *Id.* ¶ 12.  Plaintiffs Randall Hayes and Kent Nelson worked at the KMSF from October 2012 to May 2013.  *Id.* ¶¶ 13, 16.  Plaintiffs Clinton Sawyer and James Locklear worked at the KMSF from November 2012 to May 2013.  *Id.* ¶¶ 14, 15.

Plaintiffs were hired to perform engineering services pursuant to the Contract. SAC ¶¶ 12–16. Plaintiffs' employment contracts committed them to ManTech for two years, *id.* ¶ 160, and provided financial penalties for early termination in the form of reimbursement for the costs incurred for sponsorship of the employee in Kuwait (approximately $15,000) and the employee's training and certification. *Id.* ¶¶ 160–62.

In May 2013, Hayes, Sawyer, Nelson, and Locklear were fired from ManTech on the grounds that the labor hours they reported were too low. SAC ¶¶ 66, 67, 69, 71, 73. Hawkins left ManTech in May 2015. *Id.* ¶ 12.[2]

Plaintiffs filed their initial *qui tam* complaint on December 4, 2015, alleging that defendants were in violation of the False Claims Act, the Trafficking Victims Protection Reauthorization Act, and contract law. Compl. [Dkt. # 1] ¶¶ 1–3. While the complaint remained under seal, the United States investigated plaintiffs' allegations regarding the False Claims Act violations. Notice of Election to Decline Intervention [Dkt. # 14].

On September 7, 2017, the United States filed a notice of its decision to decline intervention. *Id.* at 1. In accordance with the government's notice, the Court entered an order on September 13, 2017 unsealing plaintiffs' complaint and other relevant documents, ordering service of all papers upon the United States pursuant to 31 U.S.C. § 3730(c)(3), and ordering that should the plaintiffs or defendants propose that this action be dismissed, settled, or otherwise resolved,

---

2      In their opposition to the motion to dismiss, plaintiffs contend that they were all terminated for low labor hours, but the second amended complaint does not contain facts regarding Hawkins's termination.

the Court would solicit the written consent of the United States before ruling or granting its approval pursuant to § 3730(b)(1).[3]  Order [Dkt. # 15] at 1–2.

Plaintiffs filed an amended complaint on February 5, 2018, framing their claim specifically as a *qui tam* action under the provisions of the False Claims Act.  *See* Am. Compl. [Dkt. #26]. Plaintiffs notified the government, and it reviewed the proposed amended complaint to determine whether it stated any new allegations necessitating intervention. Not. of Proposed Am. Compl. [Dkt. # 25].  The United States determined no further investigation on its part was necessary, and it again declined to intervene. *Id.* at 1.  Plaintiffs amended their complaint a second time, and again gave notice to the United States.  *See* SAC.  Their second amended complaint omitted the breach of contract claim.  *See id.*  The United States again declined intervention on August 23, 2018. Notice Regarding Proposed Second Am. Compl. [Dkt. # 33].

Plaintiffs' second amended complaint, filed on June 19, 2018, asserts four claims on behalf of the United States under the False Claims Act, and one claim on behalf of themselves under the Trafficking Victims Protection Reauthorization Act.  SAC ¶¶ 6, 19, 26, 32.  On January 4, 2019, defendants moved to dismiss the complaint.  *See* Defs.' Mot.

---

3        Section 3730(b)(1) provides that a private action under the False Claims Act "may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting."  This provision does not apply in this circumstance, because it "pertains only to voluntary dismissals, and does not prevent a court from dismissing an action, without prejudice, without obtaining the consent of the Attorney General."  *United States ex re. Conteh v. IKON Office Solutions, Inc.*, 27 F. Supp. 3d 80, 84 n.3 (D.D.C. 2014), citing *United States ex rel. Baggan v. DME Corp.*, No. 96–1983, 1997 WL 600569, at *3 n. 6 (D.D.C. Sept. 22, 1997); *see United States ex rel. Mergent Servs. v. Flaherty*, 540 F.3d 89, 91 (2d Cir. 2008); *Minotti v. Lensink*, 895 F.2d 100, 103–04 (2d Cir. 1990).

**STANDARD OF REVIEW**

In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

## I.    Rule 12(b)(1) Standard

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002). Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint."

*Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## II.    Rule 12(b)(6) Standard

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 678–79, citing *Twombly*, 550 U.S. at 555–56.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678, citing *Twombly*, 550 U.S. at 556. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*, quoting *Twombly*, 550 U.S. at 556. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*, citing *Twombly*, 550 U.S. at 555.

When considering a motion to dismiss under Rule 12(b)(6), the Court is bound to construe a complaint liberally in the plaintiff's favor, and it should grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994), citing *Schuler*, 617 F.2d at 608. Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *See id.*; *see also Browning*, 292 F.3d at 242. In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

## III. Rule 9(b) Standard

To withstand a motion to dismiss for failure to state a fraud claim, including a claim under the False Claims Act, the plaintiff must meet the pleading standard set out in Federal Rule of Civil Procedure 9(b), which provides that "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also Universal Health Servs., Inc. v. United States ex rel. Escobar* ("*Escobar*"), 136 S.Ct. 1989, 2004 n.6, (2016) ("False Claims Act plaintiffs must also plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b)."); *United States ex rel. Totten v. Bombardier Corp.* ("*Totten I*"), 286 F.3d 542, 551–52 (D.C. Cir. 2002) ("[B]ecause the False Claims Act is self-evidently an anti-fraud statute, complaints brought under it must comply with Rule 9(b)."). This heightened pleading standard is designed to "discourage[ ] the initiation of suits brought solely for their nuisance value, and safeguard[ ] potential defendants from frivolous accusations of moral turpitude," as well as

"guarantee all defendants sufficient information to allow for preparation of a response." *United States ex rel. Heath v. AT & T, Inc.* ("*Heath*"), 791 F.3d 112, 123 (D.C. Cir. 2015) (first alteration in original), quoting *United States ex rel. Williams v. Martin–Baker Aircraft Co., Ltd.* ("*Williams*"), 389 F.3d 1251, 1256 (D.C. Cir. 2004).

The plaintiff must plead with sufficient particularity "the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *Williams*, 389 F.3d at 1256, quoting *Kowal*, 16 F.3d at 1278; *see also United States ex rel. Shea v. Cellco P'ship* ("*Shea*"), 863 F.3d 923, 936 (D.C. Cir. 2017). In other words, the plaintiff must provide the "who," "what," "when," and "where" with respect to the circumstances of the fraud, so that the defendant is put on "fair notice of the fraud of which it is accused." *See Heath*, 791 F.3d at 124.

## ANALYSIS

Defendants contend first that the second amended complaint fails to state a claim under the False Claims Act, because the it lacks plausible allegations of falsity, materiality, and scienter. Defs.' Mem. at 13–26. Second, they argue that plaintiffs have failed to plead the claims with particularity. *Id.* at 8–13. Third, in connection with the allegation of fraud related to the qualifications of ManTech's employees, defendants argue that the "public disclosure bar," found in 31 U.S.C. § 3730(e)(4), applies and requires the dismissal of the claims. *Id.* at 26–33. With respect to the Trafficking Victims Protection Reauthorization Act claim, defendants argue that plaintiffs have failed to state a claim under the act, *id.* at 33–42, and that the claim is preempted by the Defense Base Act. *Id.* at 42–45.

## I. False Claims Act Violations

### A. Legal Background

The False Claims Act ("FCA"), permits private individuals, called relators, to bring actions on behalf of the United States, against those who have allegedly submitted false claims for payment to the federal government. *Escobar*, 136 S.Ct. at 1993. The FCA statute gives rise to several distinct theories of liability. A defendant may be liable under the "presentment clause," if it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Alternatively, a defendant may be liable under the "false statement clause" if it "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," § 3729(a)(1)(B). The "presentment clause," § 3729(a)(1)(A), and "false statement clause," § 3729(a)(1)(B), have always been "complementary," as they were "designed to prevent those who make false records or statements to get claims paid or approved from escaping liability solely on the ground that they did not *themselves* present a claim for payment or approval." *United States ex rel. Totten v. Bombardier Corp.* ("*Totten II*"), 380 F.3d 488, 501 (D.C. Cir. 2004) (emphasis in original). Plaintiffs bring their FCA claims under both of these clauses.

To bring a claim under the presentment clause of the FCA, a relator must allege facts that plausibly show that: (1) the defendant submitted "a claim to the government," (2) "the claim was false," and (3) "the defendant knew that the claim was false." *United States ex rel. Davis v. District of Columbia*, 793 F.3d 120, 124 (D.C. Cir. 2015), citing *United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 218 (D.C. Cir. 2003). The falsehood must also be material to the government's decision to pay in order to be actionable under the FCA. *Escobar*,

136 S.Ct. at 1996; *see also United States v. Sci. Applications Int'l Corp.* ("*SAIC*"), 626 F.3d 1257, 1269 (D.C. Cir. 2010).

Similarly, to state a claim under the false statement clause in section 3729(a)(1)(B), "a plaintiff must allege that (1) the defendant made or used a 'record or statement'; (2) the record or statement was false; (3) the defendant knew it was false; and (4) the record or statement was 'material' to a false or fraudulent claim." *United States ex rel. Keaveney v. SRA Int'l, Inc.*, 219 F. Supp. 3d 129, 153 (D.D.C. 2016), quoting *United States ex rel. Hood v. Satory Global, Inc.*, 946 F. Supp. 2d 69, 85 (D.D.C. 2013). While the elements of the presentment provision and false statement provision are almost the same, the false statement provision "requires evidence that the defendant made a false statement to the government, as opposed to the submission of a false claim for payment." *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 91 (D.D.C. 2014).

Both the presentment clause and the false statement clause of the FCA require proof of falsity, materiality, and scienter. §§ 3729(a)(1)(A)–(a)(1)(B).

### i. Falsity

"In the paradigmatic case, a claim is false because it 'involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.'" *SAIC*, 626 F.3d at 1266, quoting *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001), *abrogated on other grounds by Escobar*, 136 S. Ct. 1989. This scenario has been referred to as a "factually false" claim. *United States ex rel. Barko v. Halliburton Co.* ("*Barko*"), 241 F. Supp. 3d 37, 49–50 (D.D.C. 2017), *aff'd* 709 Fed. App'x 23 (D.C. Cir. 2017), citing *United States v. Kellogg Brown & Roots Servs., Inc.*, 800 F. Supp. 2d 143, 154 (D.D.C. 2011).

Alternatively, an FCA complaint may allege that a claim submitted to the government was "legally false," when the plaintiff "proceed[s] under the so-called 'certification' theory of

liability." *Barko*, 241 F. Supp. 3d at 50; *SAIC*, 626 F.3d at 1266. Under this theory, "the falsity of a claim for payment rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term." *United States ex rel. McBride v. Halliburton Co.* ("*McBride*"), 848 F.3d 1027, 1031 (D.C. Cir. 2017) (internal quotation marks and citations omitted). "False certifications can be either express or implied." *SAIC*, 626 F.3d at 1266. "An express false certification 'occurs when a claimant explicitly represents that he or she has complied with a contractual condition, but in fact has not complied.'" *Barko*, 241 F. Supp. 3d at 49, quoting *Kellogg Brown*, 800 F. Supp. 2d at 154; *see Mikes*, 274 F.3d at 698. "An implied false certification occurs when the claimant makes no affirmative representation but fails to comply with a contractual or regulatory provision where certification was a prerequisite to the government action sought." *Barko*, 241 F. Supp. 3d at 50 (internal citation omitted); *see McBride*, 848 F.3d at 1031. The implied false certification theory can be a basis for liability where two conditions are satisfied: "[F]irst, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 136 S.Ct. at 2001.

### ii. Materiality

The FCA also requires proof that the allegedly false representations were material, defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The materiality inquiry "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation," *Escobar*, 136 S.Ct. at 2002, and the Supreme Court has explained the standard is a "demanding" one:

> The False Claims Act is not "an all-purpose antifraud statute," or a vehicle for punishing garden-variety breaches of contract or regulatory violations. A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.

*Id*. at 2003 (internal citations omitted). The Court added that materiality cannot be found where noncompliance is minor or insubstantial. *Id.*

The Supreme Court has enumerated several factors to be considered when determining whether materiality has been established, but it cautioned that "materiality cannot rest on 'a single fact or occurrence as always determinative.'" *Id.* at 2001, quoting *Matrixx Initiatives Inc. v. Siracusano*, 563 U.S. 27, 39 (2011). First, "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *Id.* at 2003. Second, "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement" supports a materiality finding. *Id.* "Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Id.* Finally, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and it has signaled no change in position, that is strong evidence that the requirements are not material." *Id.* at 2003–04.

Furthermore, the Supreme Court rejected the assertion that materiality is "too fact intensive" for a court to dismiss an FCA claim on a motion to dismiss, in light of the rigorous materiality standard and the heightened pleading standards applicable to FCA claims. *Id.* at 2004 n.6.

### iii. Scienter

With regard to the scienter requirement, the FCA defines "knowing" and "knowingly" to mean that a defendant has "(i) actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." § 3729(b)(1). For implied false certification claims, the plaintiff must show that the defendant must have known both "(1) that it violated a contractual obligation, and (2) that its compliance with that obligation was material to the government's decision to pay." *SAIC*, 626 F.3d at 1271.

The heightened pleading standards in Rule 9(b) apply to all the elements of an FCA claim. *Escobar*, 136 S.Ct. at 2004 n.6. While Rule 9(b) permits scienter to be pled generally, courts require "plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent." *United States v. Comstor Corp.*, 308 F. Supp. 3d 56, 88 (D.D.C. 2018), quoting *United States ex rel. Tessler v. City of New York*, 712 Fed. Appx. 27, 29 (2d Cir. 2017). Like the materiality requirement, the scienter requirement is "addressed through strict enforcement," *SAIC*, 626 F.3d at 1270, and is "rigorous," in order to allay "concerns about fair notice and open-ended liability." *Escobar*, 136 S.Ct. at 2002.

Applying these legal principles, the Court finds that Count I states a claim under the FCA, but Counts II, III, and V do not.

**B. Count I: Defendants' motion to dismiss will be denied because plaintiffs have stated a claim under the FCA, and the claim is pled with particularity.**

In Count I, plaintiffs allege that ManTech intentionally both underreported and overreported direct labor hours, in violation of the Contract, to achieve different goals.[4] SAC ¶ 47. Plaintiffs allege that: (1) ManTech managers would order employees to use inaccurate labor codes to classify time spent on Mine Resistant Ambush Protected vehicles, thereby deflating their direct labor hours to conceal inefficiencies; and (2) ManTech would alter timesheets to reflect higher or lower labor hours and reported those inaccurate hours to the United States. *Id.* ¶ 55.

Defendants moved to dismiss this claim on two grounds: First, they argue that the claim is not pled with particularity as required by Federal Rule of Civil Procedure 9(b). Defs.' Mem. at 8–13. Second, they argue that plaintiffs have not sufficiently stated the elements of a claim under the False Claims Act, and therefore it must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *Id.* at 13–33.

To comply with Rule 9(b), a plaintiff must generally set forth "the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud," *Kowal*, 16 F.3d at 1278 (quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981), and "identify individuals allegedly in the fraud." *Untied States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004). In other words, plaintiffs must provide the "who," "what," "when," and "where" with respect to the circumstances of the fraud, so that the defendant is put on "fair notice of the fraud of which it is accused." *See Heath*, 791 F.3d at 124. While Rule 9(b) requires that the plaintiffs "state with

---

4    Plaintiffs allege that both overreporting and underreporting occurred because ManTech wanted both to appear to be efficient in order to obtain successive contract awards and to inflate the amount of effort expended in certain categories to ensure full contract payment.  SAC ¶ 47.

particularity the circumstances constituting fraud," *id.* at 123, they are not required "to plead representative samples of claims actually submitted to the government [because that] would require relators, before discovery, to prove more than the law requires to be established at trial." *Id.* at 126.

Defendants submit that the complaint falls short because plaintiffs have not identified who perpetrated the fraud and how the false certifications were linked to payments made by the U.S. government. Defs.' Mem. at 9. They also point out that there are no allegations in the complaint regarding the allegedly false invoices ManTech submitted. *Id.* at 10.

The Court finds that plaintiffs have pled the circumstances of the fraud with sufficient particularity to withstand the motion. First, they have sufficiently alleged that contract payments were premised, at least in part, on the direct labor hours expended. The Contract here was a level-of-effort cost-plus-fixed-fee contract. *See* Contract at 5. Federal regulations require that in this type of contract, "[t]he contractor . . . provide a specified level of effort, over a stated period of time, on work that can be stated only in general terms; and . . . [t]he Government . . . pay the contractor a fixed dollar amount." SAC ¶ 26, citing 48 C.F.R. § 16.207-1.[5] Furthermore, "[t]he product of the [firm-fixed-price, level-of-effort term] contract is usually a report showing the results achieved through application of the required level of effort. However, payment is based on the effort expended rather than on the results achieved." *Id.* ¶ 27, citing 48 C.F.R. § 16.207-2. In

---

5     Section 1.104 of the Federal Acquisition Regulation ("FAR") provides that the FAR applies to all acquisitions as defined in part 2 of the FAR, except where expressly excluded. Part 2 defines "acquisition" as "the acquiring by contract with appropriated funds of supplies or services (including construction) by and for the use of the Federal Government through purchase or lease, whether the supplies or services are already in existence or must be created, developed, demonstrated, and evaluated." Thus, the FAR applies to this Contract.

this type of contract, "[t]he required level of effort is identified and agreed upon in advance." § 16-207-3.

According to the Solicitation,[6] the maximum number of direct labor hours to be ordered during the Contract was 32,108,513. Solicitation § H.13 at 51. In the event that less than 100% of the established level of effort is actually expended by the completion date of the contract, the government will have the option of either requiring the contractor to continue performance until it reaches 100% at no increase in the fee of the Contract or effecting a reduction in the fixed fee by the percentage by which the total hours is less than the established level of effort. *Id.* § H.13 at 51. Thus, if the direct labor hours reported were lower than projected, the government would be entitled to a pro-rated reimbursement of the fixed-fee specified in the contract. *Id.* And, if labor hours were overreported, as is alleged here, it is plausible that ManTech was overpaid since the government may have been entitled to reimbursement.

In addition, section B.2(a) of the Contract provided that "subsequent awards" would be priced in part based on the company's actual experience.

> The estimated cost and fixed fee for each applicable Early Operational Readiness, Operational Readiness Base Option, and Operational Readiness Option CLIN [("Contract Line Item")] shall be calculated from the labor rates found in the tab "Cost Rate by Labor Category" tab, column P, "Composite Cost Per Hour $", multiplied by the number of hours the Government requires for that labor category. The total estimated cost for each CLIN will then be calculated by summing all hours by labor category and the associated estimated labor cost from the "Cost Rate by Labor Category" for each CLIN. The fixed fee shall be calculated from the "Summary of Fee Rate by Performance Period" tab, column B, Fee per

---

6    While plaintiffs do not attach the Solicitation to the second amended complaint, defendants pointed the Court to a copy of the Solicitation, *see* Defs.' Mem. at 4 n.2, and the Court may consider it on a motion to dismiss without converting the motion to one for summary judgment since it has been incorporated into the second amended complaint. *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009) (collecting cases).

> Hour as shown in Attachment 12, multiplied by the number of hours required on that CLIN by the Government.

Contract at 85. In other words, the fixed fee for each period depended on the number of labor hours to be expended during that period multiplied by the cost, and to calculate cost, the government would use "actual incurred costs that are averaged by labor category for the most recent month or by using the labor rates provided in Attachment 12 for each of the labor categories, performance locations, and hours specified." SAC ¶ 36, citing Section H.11(a) of the Contract. Thus, the number of labor hours reported could affect the fees charged in subsequent periods, and it is plausible that inflating the amount of labor hours led to costs that were higher than they should have been.

Furthermore, ManTech was required to certify the number of labor hours expended. Pursuant to section H.11(b) of the Contract: "If Contractor performance is considered satisfactory by the Contracting Officer, the fixed fee is payable at the expiration of the period(s) of performance as set forth in the applicable CLIN upon Contractor certification that the quantity of labor hours specified in the contract has been expended in performing the contract work." SAC ¶ 37. Section H.11(f) also required the contractor to provide the total number of man-hours of direct labor, including the number of hours in each labor category, and required the contractor to notify the government when it had reason to believe that the level of effort needed to finish the period of the Contract would be greater than estimated. *Id.* ¶ 38.

Read together, the Solicitation and Contract provisions give rise to the plausible inference that payment for the Contract was premised, at least in part, on the number of direct labor hours reported to the government. [7]

Second, plaintiffs have sufficiently alleged that ManTech did in fact falsely report or falsely categorize its employees' labor hours in submissions to the government. Plaintiff Hayes alleges that his supervisor, Bud Delano, ordered him and other employees to misreport their labor hours. SAC ¶ 61. When Hayes refused, *id.* ¶¶ 61–63, he was demoted, and his replacement instructed his subordinates to misreport their time. *Id.* ¶¶ 64–65. Plaintiff Sawyer describes a similar experience; he attended a meeting in March 2013 where he was instructed by his manager, Scott Campbell, to falsify labor hours and mischaracterize the hours he expended. *Id.* ¶ 72.

Plaintiff Hawkins had significant prior experience as a mechanic on the MRAPs, and his employer frequently asked him to attend meeting with Army contracting officers as a "substitute supervisor." SAC ¶ 51. He began attending these meetings in February 2013, and the complaint alleges that he was present when ManTech managers deliberately lied to government officials regarding the efficiency of the ManTech employees and the amount of labor hours reported. *Id.* ¶¶ 53, 57, 58. Hawkins also alleges that he witnessed managers alter the record of employees' labor hours:

> ManTech managers had predetermined the "appropriate" amount of direct-hour time that should be spent on a vehicle. If the time actually spent servicing a vehicle was above the target time, the ManTech managers would either eliminate hours or reclassify the hours from direct-labor to indirect labor. If the time actually spent servicing a vehicle was below the target

---

7     ManTech states that hours were both underreported and overreported. The hours were allegedly underreported to cover up inefficiencies, and thus the government awarded ManTech successive contract option. At summary judgment, plaintiffs will have to establish particular instances of either overreporting or underreporting and demonstrate what impact that had on the government's payments.

time, the ManTech managers would either reclassify indirect labor hours as direct labor hours or increase the hours recorded on the timesheet.

*Id.* ¶ 56.

Plaintiff Sawyer was able to obtain a document reflecting the number of his labor hours reported to the United States, and it reported that on some days he worked more hours than he actually did: it was reported that he worked 34 hours on December 22, 2011; 25 hours on July 30, 2011; 22.5 hours on August 24, 2011, and 24.5 hours on September 29, 2011.[8] SAC ¶ 79.

Plaintiffs allege that defendants were contractually required to certify to the government the correct amount of direct labor hours that their employees expended, and that the Contract based the government's payment in part on the number of labor hours expended. SAC ¶ 82. While specific invoices are not identified, the Court finds that plaintiffs have pled sufficient facts to give rise to the inference that requests for payment or invoices based on false direct labor hours were submitted to the government. Thus, the complaint sufficiently alleges the "how" and "what" of the claim.

Furthermore, plaintiffs have also sufficiently set forth when the fraud took place. They allege that the fraud occurred during the "phase in" period (180 days after contract award which was May 31, 2012); the "early operational readiness" period (after the phase in period but not to exceed 180 after contract award); the "operational readiness" period (after phase-in until January 13, 2013); and the four successive option periods (after operational readiness for three 12-month periods and one 10-month period). SAC ¶¶ 24, 25, 28, 29. Plaintiffs also alleged that managers instructed misreporting of hours in the spring of 2013. *See id.* ¶¶ 56, 72.

---

8       Sawyer has alleged that he began working at ManTech in November 2012, SAC ¶ 14, but the time he cites to is from 2011. It is unclear to the Court whether this is a typo or whether his misreported hours indeed occurred in 2011.

While plaintiffs do not identify specific individuals who submitted the number of labor hours to the government, that is not required to survive a motion to dismiss because the alleged fraud occurred at the corporate level – it was defendant ManTech that was required to certify to the government the number of direct labor hours expended. *See Heath*, 791 F.3d at 125 (finding that the relator did "identify a specific actor – AT&T. . . . The complaint makes clear, in other words, that corporate levers were pulled; identifying precisely who pulled them is not an exorable requirement of Rule(9)(b) in all cases."). And, plaintiffs have identified specific managers who instructed employees at ManTech to misrepresent their hours. SAC ¶¶ 60, 72.

Finally, plaintiffs allege that the fraud took place in Kuwait.

Because plaintiffs have identified the who, what, when, where, and how of the fraud, plaintiffs have pled this FCA claim with sufficient particularity to satisfy Rule 9(b), and the Court will not dismiss Count I on this basis.

Plaintiffs have also sufficiently pled each element of an FCA violation. First, plaintiffs have alleged that defendants made false statements to the government. Plaintiffs proceed on both a factual false theory and false certification theory. They allege that defendants submitted the incorrect number of hours to the U.S. Government. SAC ¶ 47 ("Depending on ManTech's needs, ManTech either overreported direct labor hours or underreported direct labor hours by encouraging its employees to mischaracterize direct labor hours as indirect labor hours (and vice versa)."). And they allege that by accepting the Government's exercise of the Contract options, defendants falsely certified that it was in compliance with the contractual requirements. *Id.* ¶ 40 ("Moreover, by accepting the successive Contract Options, ManTech certified that it was in compliance with all material requirements of the Contract and in compliance with federal and state laws and regulations."). Under either theory, plaintiffs have alleged the falsity needed to state a claim under

the FCA. Plaintiffs' second amended complaint details a scheme in which ManTech would encourage its employees to incorrectly classify their hours or to increase or decrease their hours. SAC ¶¶ 57–81. Those allegations, coupled with the allegation that "ManTech made certifications to the U.S. by requesting and receiving payments that were premised on labor hours," *id.* ¶ 82, support the inference that the hours reported by ManTech to the U.S. Government were false.

Second, plaintiffs have sufficiently pled materiality. They point to the provisions in the Contract that required defendants to submit labor hours; the provisions that detail how the actual number of labor hours expended bore upon the fixed cost of the Contract; and how the number of direct labor hours would affect the value of Contract options and/or any entitlement to reimbursement. SAC ¶¶ 26–32. These contractual requirements support the inference that the number of labor hours reported were material to the government's payments to ManTech.

Finally, plaintiffs have alleged the requisite scienter to sustain their claim. They allege that ManTech managers would order employees to misreport and miscategorize their time. SAC ¶¶ 55, 60, 72. They also allege that ManTech management falsely reported labor hours at meetings with Army officials. *Id.* ¶¶ 53, 57. These allegations support the inference that ManTech managers knew that the labor hours were false. This is enough to show, at least, that "the company acted recklessly" based on "the actions of employees or [the company's] systems and structure." *SAIC*, 626 F.3d at 1276.

In sum, assuming the truth of the allegations in the complaint and resolving all inferences in favor of the plaintiffs, as the Court must do at this stage, the Court finds that plaintiffs have sufficiently pled a violation of the FCA in Count I, and defendants' motion to dismiss will be denied as to this Count.

## C. Count II: Plaintiffs fail to state a claim under the False Claims Act regarding inputting incorrect data into the SAMS-E system.

In Count II, plaintiffs allege that defendants violated the FCA by intentionally and/or recklessly submitting inaccurate data into the "SAMS-E" system, which was a "comprehensive system for tracking the life cycle of critical hardware." SAC ¶¶ 87, 89. Plaintiffs allege that defendants were required to submit employees' labor hours and the time codes associated with those hours into the SAMS-E system. *Id.* ¶¶ 99–100. They assert that defendants entered hours that were either false in amount or category, as described in Count I, into the SAMS-E system. *Id.* ¶¶ 102–05.

Plaintiffs explain, at length, why the SAMS-E system is important to the U.S. Military:

- "Soldiers use SAMS-E to track asset and equipment life, order parts, interface with related logistics systems and much more. . . . The system also enables effective Force and Fleet sustainment operations at the national level through consolidated equipment maintenance data." *Id.* ¶ 91.

- "SAMS-E . . . generates . . . reports of record numbers [including] maintenance requests, preventive maintenance schedules, equipment inspection and maintenance worksheets, historical records or logbooks, equipment maintenance records, shop property accounts, oil analysis records, and equipment operation permits, among other things." *Id.* ¶ 92.

- "SAMS-E is materially important to the government because it allows DoD to compile equipment readiness reports to provide operational command and control support to military decision-making." *Id.* ¶ 93.

- "Accurate SAMS-E reporting is a critical instrument for Army and DoD commanders to assess overall readiness of U.S. military forces. Maintaining accurate SAMS-E reporting is mission-critical for U.S. military forces engaged in combat, as failure to maintain accurate reporting can jeopardize the efforts and lives of U.S. troops on the front lines." *Id.* ¶ 97.

Plaintiffs allege that the U.S. government experienced financial injury when defendants "pollut[ed] SAMS-E with corrupted data," thereby wasting the money that the U.S. had spent in providing ManTech with the SAMS-E reporting system.  SAC ¶ 105.  They allege that:

> ManTech made implicit certifications to the U.S. by requesting and receiving payments that were premised on compliance with material requirements of the Contract and applicable Kuwaiti, U.S., and state laws and regulations. By knowingly entering false data, ManTech knew it was not in compliance with such material and legal requirement; thus, such requests for payment constituted false claims for payment.

*Id.* ¶ 110.

What is missing from plaintiffs' allegations about the SAMS-E system, however, is how the system itself is relevant to the contractor's claims for payment or payments made by the United States to ManTech.  Both the presentment and false statement clauses of the FCA require that the alleged false representation be material to the government's decision to pay.  But the complaint contains no allegation that the SAMS-E system was the method by which ManTech certified its number of direct labor hours as it was required to do under Contract.  Indeed, plaintiffs emphasize that the purpose of the SAMS-E system was not to measure compliance with the Contract and to remit payments, but to supply data so that the military could accurately measure the readiness of U.S. forces and equipment.  Thus, there is no allegation that supports an inference that payment was induced by the false data entered into SAMS-E.

Because the complaint does not tie the SAMS-E system to the Contract or the requirements for payment, so there is no basis to find the alleged false data entries were material, and defendants' motion to dismiss Count II will be granted.  *See Kellogg Brown & Root*, 800 F. Supp. 2d at 155; *see also Escobar*, 136 S.Ct. at 2003.

### D. Count III: Plaintiffs fail to state a claim under the False Claims Act regarding representations made about the qualifications of ManTech employees.

Plaintiffs allege that ManTech falsely certified the qualifications of its mechanics who did not have the requisite engineering experience to the United States "to get claims paid or approved by the U.S. government in violation of 31 U.S.C. § 3729(a)(1)(B)." SAC ¶ 137.

Plaintiffs assert that the "Contract required ManTech to staff the KMSF with mechanics and technicians who were adequately trained to efficiently and effectively provide MRAP repair and maintenance services." SAC ¶ 118, citing Solicitation at 107 (stating that ManTech was required to either submit a certification of training from MRAP-University ("MRAP-U") or a waiver to MRAP-U training). But according to the complaint, some of those who had been hired had been fast food employees, beauticians, and youth offenders, who did not have the requisite engineering experience. *Id.* ¶¶ 127, 133–34. These unqualified workers, plaintiffs contend, would work inefficiently, which would result in "significant overbilling and excess and unnecessary costs being submitted to, and paid by, the U.S. Government." *Id.* ¶ 139. They allege that had the United States known that ManTech had hired unqualified personnel, "the U.S. would have cancelled the Contract and denied ManTech further payment." *Id.* ¶ 140. Furthermore, plaintiffs allege that ManTech would hire individuals who had "engaged third-parties to take and pass the mechanic competency test." *Id.* ¶ 131.

With respect to this count, defendants argue first that plaintiffs cannot predicate a *qui tam* claim on material that was already publicly disclosed, and second, that plaintiffs have failed to

state a claim under the FCA.  Because the Court finds that plaintiffs failed to state a claim under

the FCA, it need not analyze whether the public disclosure bar applies.[9]

Plaintiffs are proceeding on an implied false certification theory, under which "the falsity

of a claim for payment 'rests on a false representation of compliance with an applicable federal

statute, federal regulation, or contractual term.'"  *McBride*, 848 F.3d at 1031, quoting *SAIC*, 626

F.3d at 1266.  The implied certification theory can be a basis for liability "where two conditions

are satisfied: first, the claim does not merely request payment, but also makes specific

---

9       The FCA states:

> The court shall dismiss an action or claim under this section, unless opposed
> by the Government, if substantially the same allegations or transactions as
> alleged in the action or claim were publicly disclosed—
>
>> (i) in a Federal criminal, civil, or administrative hearing in which the
>> Government or its agent is a party;
>>
>> (ii) in a congressional, Government Accountability Office, or other
>> Federal report, hearing, audit, or investigation; or
>>
>> (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing
> the action is an original source of the information.

31 U.S.C.A. § 3730(e)(4)(A).

This provision was amended in 2010.  The pre-2010 version was expressly jurisdictional,
while the provision today states only that a court must dismiss a case falling under the public
disclosure bar.  "Thus, when the amended version of § 3730(e)(4)(A) applies, public disclosure
does not deprive the Court of subject matter jurisdiction, but merely deprives the plaintiff of his
claim." *United States ex rel. Shea v. Verizon Commc'ns, Inc.*, 160 F. Supp. 3d 16, 24 (D.D.C.
2015), *aff'd sub nom. United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923 (D.C. Cir. 2017);
*see United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466, 470–71 (D.C. Cir. 2016)
(discussing whether the court had subject matter jurisdiction under the public bar provision for a
claim that was filed in 2008).  Here, the post-2010 public disclosure bar provision applies, and
thus, it is not a matter of subject matter jurisdiction.

representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 136 S.Ct. at 2001.

*Escobar* involved the Medicaid program, which required facilities to have certain clinicians on staff and delineated the licensing requirements for those positions. Universal Health Services Inc. submitted claims for Medicaid reimbursement to the government using payment codes that corresponded to specific counseling services. *Id.* at 1998. The reimbursement claims also contained the National Provider Identification ("NPI") numbers of staff members who provided those services; NPI numbers can only be obtained if the staff members have certain qualifications and licenses. *Id.* The relators in *Escobar qui tam* case alleged that the staff members did not have the qualifications and licenses that they impliedly represented they had by submitting NPI numbers with the reimbursement claims. *Id.* at 2000. The Court held that the relators stated a claim under the FCA when they alleged that Universal Health misled the government into believing that the staff had certain qualifications, and thereby misrepresented its compliance with the mental health facility requirements, which, they alleged, were so central to the contract that Medicaid would not have paid the claims had it known of the violations. *Id.* at 2004.

Here, plaintiffs do not point to any "specific representations about the goods or services" that were submitted to the government in ManTech's requests for payment. *Id.* at 2001. Plaintiffs generally allege that employees were not qualified because they had certain backgrounds, and that their deficiencies in experience resulted in "significant overbilling and excess and unnecessary costs." SAC ¶ 139. But, unlike in *Escobar,* where the claims containing fraudulently obtained NPI numbers implicitly misrepresented the clinician's qualifications, here, plaintiffs do not point

to any representations about employee qualifications – implicit or explicit – contained in ManTech's claims for payment. *Escobar*, 136 S.Ct. at 1997.

Nor have plaintiffs alleged facts that would demonstrate defendants' alleged noncompliance was material to the government's decision to pay. As stated above, the FCA's "materiality requirement is demanding." *Id*. at 1994. Materiality "cannot be found where noncompliance is minor or insubstantial" and "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *Id.* at 2003.

Here, the facts alleged do not indicate that the provision of the Solicitation requiring MRAP-U certified mechanics – or a waiver of MRAP-U training – is a condition of payment under the Contract as opposed to a contractual obligation. "The False Claims Act is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Escobar*, 136 S.Ct. at 2003, quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008). Plaintiffs provide no support for their allegation that the U.S. government would have cancelled the Contract or any payments had they known about the qualifications of the personnel ManTech hired – particularly since a waiver would have sufficed under the contract – and plaintiffs did not identify any instances in which the government declined payment when it learned about the background of employees. Also, plaintiffs do not allege that any of the MRAP vehicles were improperly repaired or maintained as a result of the unqualified workers. *See United States ex rel. Hutchins v. DynCorp Int'l, Inc.*, 342 F. Supp. 3d 32, 57 (D.D.C. 2018) (finding relators did not state a claim under the FCA when they alleged that the contractor hired unqualified employees because they did not explain how the contractor's "internal hiring decisions were material to the decisions of the Army" and no performance issues were alleged).

Count III also fails because it is not pled with sufficient particularity. Plaintiffs do not specify a time frame for this particular fraud (although in their opposition, they generally allege that it was for the duration of the contract), and plaintiffs do not provide sufficient detail about how the fraud was perpetrated, such as whether ManTech submitted false waivers of MRAP-U Training requirements or whether employees simply did not go through the necessary training. Plaintiffs allege that sometimes ManTech would hire individuals who had "engaged third-parties to take and pass the mechanic competency test," SAC ¶ 131, but plaintiffs do not allege when this occurred, or through what means the false claim was submitted to the government. Furthermore, plaintiffs do not come forward with any factual allegations supporting their conclusory assertion that ManTech was aware that employees had not taken the test themselves.

For these reasons, plaintiffs have failed to state an FCA claim under the implied false certification theory in Count III, and the claim will be dismissed without prejudice.

### E. Count V: Plaintiffs fail to state a claim under the False Claims Act regarding defendants' alleged failure to comply with the Trafficking Victims Protection Reauthorization Act.

Plaintiffs allege that defendants violated the FCA when they committed violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), and then requested and accepted payments under the Contract, thereby falsely implying certification of its compliance with TVPRA obligations. SAC ¶¶ 284, 287.

The second amended complaint cites 22 U.S.C. § 7104(g), which provides that any contract entered into by the federal government and a private entity must include the condition that the government is authorized to terminate the Contract if the subcontractor uses forced labor in the performance of the contract. SAC ¶ 265. In the Solicitation for the Contract at issue here, section C-3 stated that contractors were not allowed to confiscate passports, and if they had to do so for

administrative purposes, they would only be able to hold them for the "shortest period of time reasonable." *Id.* ¶ 271, citing 48 C.F.R. 5152.222-5900 (incorporated into the Contract on page 55). The Solicitation also provides that "[t]he United States Government has adopted a zero-tolerance policy regarding trafficking in persons." *Id.* ¶ 272, citing FAR 52.222-50(6). Furthermore, the Federal Acquisition Regulations ("FAR"), which are incorporated into the Solicitation, prohibit the use of forced labor, and provide that a violation of this provision of the FAR may result in removal from the contract. *Id.* ¶¶ 273, 275. The Contract added more specificity: it stated that failure to comply with the Trafficking in Persons policy could result in, among other things: suspension of contract payments, subcontractor termination, loss of fee for the performance period in which the contractor was non-compliant, and termination of the contract. *Id.* ¶ 277. The Contract also provided that the contractor had an affirmative duty to advise the government if it learned of any violations of trafficking laws. *Id.* ¶ 271.

With that as the background, plaintiffs premise Count V on the "implied false certification" theory underlying Count IV: that "when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment," and an undisclosed violation of a material statutory, can be "a misrepresentation that renders the claim 'false or fraudulent' under § 3729(a)." *Escobar*, 136 S.Ct. at 1995, quoting § 3729(a)(1)(A). As noted above, the implied false certification theory can be a basis for liability where two conditions are satisfied: when the claim makes specific representations about the goods or services provided; and the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements renders those representations to be misleading. *Id.* at 2001.

The Contract at issue here conditions payment upon compliance with the TVPRA, but as the Supreme Court noted, this is "relevant[] but not automatically dispositive" of materiality. *Id.*

at 2003. Defendants argue that their obligations under the TVPRA were not material because they did not "go to the very essence of the bargain" between the government and ManTech. Defs.' Mem. at 23–24. But, taking the allegations in the complaint in the light most favorable to plaintiffs, the Court finds that plaintiffs have sufficiently pled materiality. Both the federal regulations and the Contract emphasize that noncompliance with the TVPRA is not "minor or insubstantial." *Escobar*, 136 S.Ct. at 2003. The statute and the Contract impose an affirmative duty to report any known violations, and both specifically identify withholdings of payments as a sanction. Contract at 297. These allegations support the inference that TVPRA violations were material to the government's payments.

But, as in Count III, where plaintiffs' claim fall short is that it does not point to "specific representations" made to the United States that were rendered misleading by the alleged TVPRA violations. *Escobar*, 136 S.Ct. at 2001. There is no allegation in the second amended complaint that defendants made any representations in their invoices or requests for payments that would be inconsistent with, or made misleading by, any alleged violations of the TVPRA.

Plaintiffs concede that they were not privy to invoices or certification statements made by ManTech to the government. Pls.' Opp. at 38. But they maintain that certification was required under the law and the Contract; that they have sufficiently alleged violations of the TVPRA; that ManTech received payments from the U.S. government; and had the government known of the alleged trafficking violations, it could have terminated the Contract or withheld payment. *Id.* Plaintiffs argue that those facts give rise to a plausible inference that ManTech made false claims to the United States in its requests for payments. But the heightened pleading standard required at this stage and Supreme Court precedent require more. Because plaintiffs allege only that ManTech

submitted requests for payment that did not disclose its violations of the TVPRA, this Count will be dismissed without prejudice for failure to state a claim under the FCA.

## II. Count IV: Plaintiffs state a claim under the Trafficking Victims Protection Reauthorization Act.

Plaintiffs allege that when defendants confiscated their passports, did not obtain proper work visas for them, forced them to go on "visa runs" to neighboring countries, and threatened to impose exorbitant fees if they terminated their employment contracts early, defendants obtained their labor by force in violation of the Trafficking Victims Protection Reauthorization Act.[10]

The TVPRA states:

> (a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—
>
> > (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> >
> > (2) by means of serious harm or threats of serious harm to that person or another person;
> >
> > (3) by means of the abuse or threatened abuse of law or legal process; or
> >
> > (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,
>
> shall be punished as provided under subsection (d).

---

10      The TVPRA is a criminal statute, but an individual who is a victim of trafficking "may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engage in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees." 18 U.S.C. § 1595(a).

18 U.S.C. 1589(a).[11]

Plaintiffs allege that defendants violated the statute through "threats of serious harm" and "abuse or threatened abuse of law or legal process." Pls.' Opp. at 33–34. "Serious harm" is defined to include "any harm, whether physical or nonphysical, including psychological . . . harm, that is sufficiently serious, under all of the surrounding circumstances, to compel a reasonable person of the same background . . . to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). The TVPRA defines "abuse or threatened abuse of law or legal process" as "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." § 1589(c)(1).

---

11    Plaintiffs also claim a violation of § 1592, which states:

(a) Whoever knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person—

(1) in the course of a violation of section . . . 1589 . . .;

(2) with intent to violate section . . . 1589 . . .; or

(3) to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons, as defined in section 103 of the Trafficking Victims Protection Act of 2000

shall be fined under this title or imprisoned for not more than 5 years, or both.

Thus, a violation of § 1592 is predicated on a violation of § 1589. *See Lagayan v. Odeh*, 199 F. Supp. 3d 21, 29 (D.D.C. 2016).

The legislative history of the provision reflects that the TVPRA was meant "to address the increasingly subtle methods of traffickers who place their victims in modern-day slavery, such as where traffickers . . . restrain their victims without physical violence or injury." H.R. Rep. No. 106–939, at 101 (2000) ("Conf. Rep."). In adopting a broad definition of "serious harm," Congress stated that "prosecutors will not have to demonstrate physical harm or threats of force against victims' to prove liability under § 1589." *Id.*; *see also Lagayan v. Odeh*, 199 F. Supp. 3d 21, 28 (D.D.C. 2016) ("No allegation of actual physical harm or an explicit threat of such harm is required to make out such a claim.").

The D.C. Circuit has not interpreted the term "serious harm," but applying these principles, other courts have held that severe financial harm could suffice. *See, e.g.*, *United States v. Dann*, 652 F.3d 1160, 1170–71 (9th Cir. 2011) (employer's threat that a foreign worker would owe $8,000 if she quit constituted threat of "serious harm" under the TVPA); *Paguirigan v. Prompt Nursing Employment Agency LLC*, 286 F. Supp. 3d 430, 437–38 (E.D.N.Y. 2017) (where the contract provided for a $25,000 termination fee, court found that the fee constituted "serious harm" and therefore, plaintiff stated a claim under the TVPA); *see also Javier v. Beck*, No. 13CV2926, 2014 WL 3058456, at *6 (S.D.N.Y. July 3, 2014) (threatened enforcement of $15,000 confession of judgment constitutes threat of serious harm); *Nunag–Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1146 (C.D. Cal. 2011) (threatened payment of $10,000 constitutes threat of serious harm).

"The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim[s] to believe that such harm would befall" them if they left employment. *Muchira v. Al–Rawaf*, 850 F.3d 605, 618 (4th Cir. 2017), quoting *Dann*, 652 F.3d at 1170. In considering whether the employer intends the victims to believe they

cannot leave, the Court must "consider the particular vulnerabilities of a person in the victim's position," though the victim's acquiescence must be *objectively reasonable* under the circumstances. *Id.*, citing *United States v. Rivera*, 799 F.3d 180, 186–89 (2d. Cir. 2015). "No matter how unpleasant the work, or the conditions under which services are provided, the critical inquiry for the purposes of the TVPA is whether a person provides those services free from a defendant's physical or psychological coercion that as a practical matter eliminates the ability to exercise free will or choice." *Muchira v. Al-Rawaf*, No. 1:14-CV-770 AJT/JFA, 2015 WL 1787144, at *6 (E.D. Va. Apr. 15, 2015), *aff'd*, 850 F.3d 605 (4th Cir. 2017), *as amended* (Mar. 3, 2017).

Here, plaintiffs allege that defendants confiscated their passports, SAC ¶¶ 181, 209, 216, 219, and that they were required to sign an employment contract that committed them to ManTech for twenty-four months and carried significant financial penalties for early termination:

> Due to significant cost for sponsorship (up to and exceeding $10,000 per person for the first year and $5,000 for the second year), [the employee] agrees to commit to a minimum period of employment (deployment) of 24 months or the completion of the contract whichever comes first. Once the process is completed, *should [the employee] decide to terminate employment, or are terminated for any reason*, voluntary or involuntary, prior to completing 24 months (non-consecutive) of "boots on the ground" (BOG) service, *[the employee] [is] responsible for costs incurred and will be required to reimburse the cost to obtain a work visa*. In this event, ManTech will make a determination of financial obligation based on current circumstances. *Reimbursable costs include all expenses related directly and indirectly to the sponsorship, including travel, lodging, per diem, medical exam(s), background investigation and administration/ administrative fees. If terminated, you may also be responsible for employment and deployment costs* as described in the Offer Addendum, as well as costs related to any training or certification process provided to you as part of your employment, including employment related expenses described in the Offer Addendum.

*Id.* ¶ 160 (emphasis in original), citing Ex. 2, Employment Contract Excerpts. The employment contract also provided that "[i]n the event that [the employee] fails to complete an assigned training course or fail to complete an obligated employment period under this contract and defined in this offer, [*the employee] will be required to reimburse prorated costs related to the training and certification process*." *Id.* ¶ 162 (emphasis in original), citing Ex. 2, Employment Contract Excerpts. Thus, plaintiffs allege that if they left their employment, they would face significant financial penalties. *Id.* ¶ 161.

Plaintiffs also allege that at no time "during the relevant period of this complaint did ManTech obtain visa 18s or work authorizations in Plaintiffs' names." SAC ¶ 171. Plaintiffs could not obtain the proper work visa without ManTech's active participation in the process, and this meant they were required to live in Kuwait illegally. *Id.* ¶ 172. Furthermore, plaintiffs maintained that ManTech "abused Kuwaiti immigration laws" by demanding that plaintiffs go on "visa runs" in Bahrain, "for the purpose of obtaining fresh 'tourist' visa stamps in their passports." *Id.* ¶¶ 155, 174–75 (describing the visa runs). Plaintiffs were aware that they were working in Kuwait illegally, and they assert that they reasonably believed and feared that they could be arrested by Kuwaiti officials for immigration violations. *Id.* ¶¶ 168, 195. They also asserted that they feared that if they did not go on visa runs or work overtime, ManTech would either terminate them (which could carry harsh economic consequences) or report them to Kuwaiti officials. *Id.* ¶¶ 156, 225.

According to plaintiffs, because they were residing illegally in the country, and feared that they would be reported or fired, they could not complain about the working conditions they experienced. SAC ¶¶ 156, 168, 249. They also asserted that they were forced to work in an environment filled with chemicals and toxic fumes that was devoid of the proper safety precautions

required by law. *Id.* ¶¶ 226–34, 241–44, 246. And, plaintiffs allege that because they lacked protection of any country's laws, and because they could not advocate for their rights to fair wages because they lived in fear of arrest, they were required to work very difficult schedules without any overtime pay. *Id.* ¶¶ 253–63.

Defendants argue that plaintiffs fail to state a claim under the TVPRA because plaintiffs were not "personally threatened with deportation or any other adverse legal consequences by ManTech in order to induce them to take, or refrain from taking, some action." Defs.' Mem. at 35. But as plaintiffs point out, the TVPRA does not require explicit threats. It is enough that the employer intended the victims to believe that serious harm would befall them if they left. *Muchira*, 850 F.3d at 618.

Defendants also point out that plaintiffs were not particularly vulnerable victims because some relators had worked in military facilities in Kuwait before they worked for ManTech. Defs.' Mem. at 41. It is true that in determining whether a defendant's intent has been established, the Court must consider "the particular vulnerabilities of a person in the victim's position." *Muchira,* 850 F.3d at 618. But while those facts may be taken into consideration at a later point in the proceedings, they are not enough to render the allegations insufficient on their face when one reads the complaint in the light most favorable to the plaintiffs.

In light of the facts in the complaint, and drawing all inferences in favor of the plaintiffs, the Court finds that plaintiffs have stated a plausible claim under the TVPRA. They allege that they feared that if they had left their employment, they would have faced serious harm in the form of high financial penalties or arrest by local authorities. Plaintiffs allege that defendants maintained possession of their passports, required the "visa runs," and did not complete the steps to enable them to remain in Kuwait legally. Plaintiffs were told that if they complained, they

would be fired or reported to authorities. In light of the broad scope of § 1589, the Court finds that these facts are enough to state a claim under this provision.

Defendants contend that to the extent that plaintiffs seek damages under the TVPRA for the harm they suffered due to the work conditions, the Court lacks subject matter jurisdiction over the claim because it is preempted by the Defense Base Act. Defs.' Mem. at 42–45.

The Defense Base Act, 42 U.S.C. § 1651 *et seq.* (2012), was enacted in 1941 to provide relief to employees of government contractors who experienced death or injury while accompanying military forces overseas.[12] The Base Act builds upon and incorporates provisions of the Longshore Act, which was enacted to provide workers' compensation coverage to maritime employees. *See* 42 U.S.C. § 1651(a); 33 U.S.C. § 902(3). As with the Base Act, Congress passed the Longshore Act "to strike a balance between the concerns of [the employees] on the one hand, and their employers on the other." *Morrison–Knudsen Constr. Co. v. Dir., Office of Workers' Comp. Programs*, 461 U.S. 624, 636 (1983). "Employers relinquished their defenses to tort actions in exchange for limited and predictable liability," and employees accepted "limited recovery because they receive prompt relief without the expense, uncertainty, and delay that tort actions entail." *Id.*

Both the Longshore Act and the Base Act contain exclusivity provisions stating that employer liability under the statutes "shall be exclusive and in place of all other liability." 33 U.S.C. § 905(a) (Longshore Act); 42 U.S.C. § 1651(c) (Base Act). Contrary to defendants' contention, Defense Base Act preemption is not a jurisdictional issue. *Sickle v. Torres Advanced*

---

12    The Defense Base Act does not define injury, but the Longshore Act defines injury as "accidental injury or death arising out of and in the course of employment, and such occupational disease or infection as arises naturally out of such employment or as naturally or unavoidably results from such accidental injury." 33 U.S.C. § 902(2).

*Enter. Sols., LLC*, 884 F.3d 338, 345 (D.C. Cir. 2018).  "Rather, preemption forecloses a plaintiff from stating a legally cognizable claim for recovery. . . .  Preemption under the Base Act . . . speaks to the legal viability of a plaintiff's claim, not the power of the court to act."  *Id.*

The Defense Base Act provides that its workers' compensation benefit scheme "shall be exclusive and in place of all other liability of" employers and contractors to "employees (and their dependents) coming within the purview of this chapter, under the work[ers'] compensation law of any State, Territory, or other jurisdiction."  42 U.S.C. § 1651(c).  "Express preemption under that provision thus is limited to claim 'under the work[ers'] compensation law of any State, Territory, or other jurisdiction.'"  *Sickle*, 884 F.3d at 347, quoting § 1651(c).  Here, plaintiffs' claim arises under the TVPRA, not under any workers' compensation scheme.

But, the Defense Base Act also incorporates the exclusivity provision of the Longshore Act, which makes exclusive "an employer's liability as prescribed in Section 904 of the Longshore Act."  *Id.*, quoting 33 U.S.C. § 905(a).  Section 904 makes employers liable for compensation payable related to medical treatment, disability, and death.  § 904, citing § 907, § 908, and § 909.  In their second amended complaint, plaintiffs have alleged that they experienced injury due to their workplace environment and seek restitution under the TVPRA relating to physical, psychiatric, or psychological medical care plaintiffs sought for those injuries.  SAC ¶¶ 226–63.  It is unclear to the Court how chemical exposure damages flow from the trafficking violation.  And, in their opposition to the motion to dismiss, plaintiffs also argue that any injuries from the working conditions have not yet manifested since the "damage inflicted from chronic exposure to potentially . . . deadly . . . fumes might not manifest for years."  *See* Pls.' Opp. at 37.  So, at this point, it is not clear that plaintiffs intend to, or would be entitled to, recover for any injuries sustained in the workplace.  But, in addition to the chemical exposure damages, plaintiffs also seek

restitution in the form of lost wages arising out of the alleged trafficking violation, because they were allegedly forced to work overtime with no additional pay. And that kind of harm is not preempted by the DBA.

Thus, the TVPRA claim may move forward, and as plaintiffs' claim is more fully developed, the issue of DBA preemption may be revisited. At this point, plaintiffs' claim will not be dismissed based on DBA preemption, but at the summary judgment stage, plaintiffs must clarify the nature of their claimed damages. Therefore, defendants' motion to dismiss claim IV will be denied without prejudice.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted as to Counts II, III, and V and denied as to Counts I and IV.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: January 28, 2020