## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* LARRY HAWKINS, *et al.* | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 15-02105 (ABJ) ) |
| MANTECH INTERNATIONAL CORPORATION, *et al.* | ) ) ) |
| Defendants. | ) ) ) |

### DEFENDANTS' ANSWER TO THE THIRD AMENDED COMPLAINT

Pursuant to Federal Rule of Civil Procedure 12(a)(4)(A), and the Court's July 7, 2023 Minute Order, Defendants ManTech International Corporation and ManTech Telecommunications and Information Systems Corporation (collectively, "Defendants" or "ManTech") hereby submit their Answer to the Third Amended Complaint (ECF No. 85) ("TAC").[1]

The Court recently dismissed four of Plaintiffs' TAC counts: Count II (False Claims Act "FCA" based on SAMS-E data entry), Count III (FCA based on labor qualifications), Count V (FCA based on TVPRA compliance), and Count VI (civil RICO). *See* Memorandum Op. & Order, ECF No. 105. Plaintiffs also previously voluntarily dismissed Count VII (wrongful termination). *See* February 22, 2022 Minute Order; Memorandum Op. & Order, ECF No. 105, at 5, 50. After

---

[1] Along with this Answer, ManTech has moved to dismiss Count IV of the TAC under Federal Rule of Civil Procedure 12(b)(1). ManTech argues the Court lacks subject matter jurisdiction over Count IV because the Trafficking Victims Protection Reauthorization Act's ("TVPRA") civil remedy provision, 18 U.S.C. § 1595(a), invoked as the basis for this Court's jurisdiction, does not apply to overseas conduct. *See* Motion to Dismiss Count IV of the Third Amended Complaint Pursuant to Rule 12(b)(1), ECF No. 108.

the Court's June 20, 2023 Opinion and Order, Plaintiffs, with the consent of ManTech and the United States, voluntarily dismissed their sole remaining FCA claim, Count I (direct labor costs). *See* ECF No. 107. Thus, only Count IV of Plaintiffs' TAC remains. Under Count IV, Plaintiffs continue to pursue abandoned employment, breach of contract, defamation, and tort claims as repackaged TVPRA claims. Plaintiffs were well-compensated ManTech employees who voluntarily accepted positions with ManTech in Kuwait. Accordingly, ManTech denies any liability whatsoever in Plaintiffs' TAC and further denies any allegation not expressly admitted below.

### **INTRODUCTION**[2]

TAC 1.      This Third Amended Complaint is filed by the United States of America on relation of Larry Hawkins, Randall Hayes, Clinton Sawyer, James Locklear and Kent Nelson, and by Plaintiffs Larry Hawkins, Randall Hayes, Clinton Sawyer, James Locklear and Kent Nelson in their own right, pursuant to the Court's Order dated April 18, 2018.

**ANSWER:**      ManTech admits Larry Hawkins, Randall Hayes, Clinton Sawyer, James Locklear, and Kent Nelson ("Plaintiffs") filed this TAC. ManTech further admits that Plaintiffs filed their now dismissed FCA claims on behalf of the United States, and filed their remaining claims, including their sole remaining TVPRA claims (Count IV), on behalf of themselves, individually. ManTech denies the remaining allegations in Paragraph 1.

TAC 2.      The deaths of U.S. military personnel in the Iraq War prompted the development of the United States Army Mine Resistant Ambush Protected vehicles ("MRAPs")

---

[2] ManTech's Answer replicates the TAC's headings and allegations for ease of review. No response is required for the headings, but to the extent these headings could be construed to contain factual allegations that require a response, ManTech denies such allegations. ManTech also replicates the TAC's allegations for ease of review. No changes have been made — any typographical errors contained in the TAC allegations are set forth as they appear in the original.

program. The "V"-shaped, armored MRAPs were developed and designed to protect the lives of U.S. military personnel by withstanding improvised explosive device (IED) attacks and ambushes.

**ANSWER:**    ManTech lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 2, and on that basis, denies those allegations.

TAC 3.        In May 2007, then-defense secretary Robert Gates told top Pentagon officials that "the MRAP should be considered the highest priority Department of Defense acquisition program." Correspondingly, MRAP production rose from 82 vehicles per month in June 2007, to 1,300 vehicles per month by December 2007, with the average cost at about $1 million each.

**ANSWER:**    ManTech lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 3, and on that basis, denies those allegations.

TAC 4.        According to the *New York Times*, 24,000 MRAPs have been deployed to Iraq or Afghanistan at a cost of more than $47 billion. According to an interview of former Defense Secretary Ashton Carter by *USA Today*, data collected from roadside explosions in Afghanistan and Iraq show troops in MRAPs are as much 14 times more likely to survive the blast than those riding in Humvees. In 2011, *TIME* magazine reported that MRAPs saved up to 40,000 lives — 10,000 in Iraq and 30,000 Afghanistan.

**ANSWER:**    The documents and statement referenced in Paragraph 4 speak for themselves, and to the extent that allegations in Paragraph 4 vary therewith, ManTech denies those allegations.

TAC 5.        On May 31, 2012, the U.S. Army Contracting Command, Warren, Michigan awarded Contract No. W56HZV-12-C-0127 (attached hereto and incorporated by reference into this complaint) (hereinafter "the Contract") to ManTech Telecommunications and Information

Systems Corporation (then a wholly owned subsidiary of ManTech International Corporation) (ManTech Telecommunications and Information Systems Corporation and ManTech International Corporation are hereinafter referred to as "ManTech"). The Contract was for logistics sustainment and support for the "MRAP Family of Vehicles." Pursuant to contract modification P00002, the Army expanded the MRAP repair capabilities at the Kuwait Maintenance Sustainment Facility ("KMSF") adjacent to Highway 40 to the south of Kuwait City (sometimes referred to as "the 40 Site").

**ANSWER:**    The Contract and Modifications referenced in Paragraph 5 speak for themselves, and to the extent that allegations in Paragraph 5 vary therewith, ManTech denies those allegations. ManTech denies the remaining allegations in Paragraph 5.

TAC 6.        Relators Randall Hayes, Clinton Sawyer, Larry Hawkins, James Locklear, and Kent Nelson are former ManTech employees who worked as mechanics on MRAPs at the KMSF. On behalf of the United States, they relay original-source knowledge about how ManTech engaged in a pattern of false claims regarding (1) the labor hours expended on the Contract, (2) the accuracy of data entered into the Army's Standard Army Maintenance System-Enhanced data management system ("SAMS-E"), (3) the qualification of its personnel to perform mission-critical repair and maintenance services, and (4) the concealment from the U.S. of the fact that it was engaged in the illegal trafficking of personnel into Kuwait in contravention of international treaties as well as U.S. and Kuwaiti law.

**ANSWER:**    ManTech admits Plaintiffs are former at-will ManTech employees who worked primarily as mechanics on the Contract at the KMSF. All of Plaintiffs' FCA claims have been either voluntarily dismissed or dismissed pursuant to the Court's June 20, 2023 Memorandum

Opinion and Order. *See* ECF No. 105, at 29–50; ECF No. 107. Thus, ManTech is not required to respond to those allegations in Paragraph 6, and denies them on this basis.

TAC 7.    Hayes, Sawyer, Hawkins, Locklear and Nelson also seek damages and restitution under the Trafficking Victims Protection Reauthorization Act ("TVPRA"). ManTech violated the TVPRA by bringing Plaintiffs into Kuwait illegally, confiscating their passports, refusing to apply for the legal authorizations necessary for Plaintiffs to work legally in Kuwait, forcing them to live in constant fear of arrest, subjecting them to horrific work conditions, and refusing to pay them the compensation that would have been due were Plaintiffs afforded the protection of law.

**ANSWER:**    ManTech admits that Plaintiffs attempt to seek damages and restitution under the TVPRA, but denies Plaintiffs are entitled to such recovery. ManTech denies violating the TVPRA and denies the remaining allegations in Paragraph 7.

TAC 8.    As set forth in more detail below, Relators have firsthand, original-source knowledge that ManTech's mode of operation under the Contract was to have workers perform grossly inefficient work and service on U.S. MRAPs, which was carried out by hiring highly unqualified workers and technicians to service these vehicles. As a result, unqualified workers spent countless hours doing tasks that should and could have been done much more efficiently by qualified workers. This also resulted in qualified workers being pulled away from their work to guide unqualified workers through their work, further adding to the inefficiency of ManTech's operations under the Contract. As a result, the billing submitted to the government under the Contract was inflated, manipulated, and otherwise inaccurate, and thus constituted false claims.

**ANSWER:**    All of Plaintiffs' FCA claims have been either voluntarily dismissed or dismissed pursuant to the Court's June 20, 2023 Memorandum Opinion and Order. *See* ECF No.

105, at 29–50; ECF No. 107. Thus, ManTech is not required to respond to those allegations in Paragraph 8, and denies them on this basis.

TAC 9.        Making matters worse, and as a direct corollary with this false reporting of labor hours attendant to the cover-up of its unqualified personnel and their inefficient work, ManTech logged false MRAP data into the Army's mission-critical SAMS-E, discussed in greater detail *infra*, jeopardizing the efforts and lives of U.S. military forces.

**ANSWER:**    All of Plaintiffs' FCA claims have been either voluntarily dismissed or dismissed pursuant to the Court's June 20, 2023 Memorandum Opinion and Order. *See* ECF No. 105, at 29–50; ECF No. 107. Thus, ManTech is not required to respond to those allegations in Paragraph 9, and denies them on this basis.

TAC 10.        Furthermore, ManTech fostered a hostile and unsafe work environment for Relators and other workers, including by forcing workers to go on "visa runs"—thus encouraging and requiring workers to violate immigration and other laws—and to work under conditions where workers were exposed to and health-hazardous fumes and chemicals.

**ANSWER:**    ManTech denies the allegations in Paragraph 10.

TAC 11.        ManTech's inadequate performance and its willful and knowing submission of false and fraudulent time data under the Contract constitute violations of the False Claims Act. Furthermore, by subjecting Relators and other workers to, *inter alia*, "visa runs," fear of violating immigration laws, fear of being fired for failing to comply with "visa runs," and by exposing workers to health-hazardous working conditions, ManTech violated the Trafficking Victims Protection Reauthorization Act.

**ANSWER:**    All of Plaintiffs' FCA claims have been either voluntarily dismissed or dismissed pursuant to the Court's June 20, 2023 Memorandum Opinion and Order. *See* ECF No.

105, at 29–50; ECF No. 107. Thus, ManTech is not required to respond to those allegations in Paragraph 11, and denies them on this basis.

**PARTIES**

TAC 12.      Relator/Plaintiff **Larry Hawkins** ("Hawkins") is citizen of the United States domiciled in Deining, Germany and was employed by ManTech at the KMSF from September 18, 2012 to May 30, 2015 to perform services pursuant to the Contract.

**ANSWER:**    ManTech admits Plaintiff Hawkins was a ManTech at-will employee who worked on the Contract at the KMSF from December 24, 2012 to July 31, 2013. ManTech further admits that Plaintiff Hawkins is a citizen of the United States and resided in Deining, Germany as of January 10, 2022. Whether Plaintiff Hawkins is domiciled in Germany is a legal conclusion to which no response is required. To the extent a response is required, ManTech denies that allegation. ManTech denies the remaining allegations in Paragraph 12.

TAC 13.      Relator/Plaintiff **Randall Hayes** ("Hayes") is a citizen of Alabama and was employed by ManTech at the KMSF from October 2012 to May 2013 to perform services pursuant to the Contract.

**ANSWER:**    ManTech admits Plaintiff Hayes was a ManTech at-will employee who worked on the Contract at the KMSF from November 12, 2012 to May 31, 2013. ManTech further admits that Plaintiff Hayes is a citizen of the United States and resided in Troy, Alabama as of January 12, 2022. ManTech denies the remaining allegations in Paragraph 13.

TAC 14.      Relator/Plaintiff **Clinton Sawyer** ("Sawyer") is a citizen of Georgia and was employed by ManTech at the KMSF from approximately November 25, 2012 until May 2013 to perform services pursuant to the Contract.

**ANSWER:**    ManTech admits Plaintiff Sawyer was a ManTech at-will employee who worked on the Contract at the KMSF from December 31, 2012 to May 31, 2013. ManTech further

admits that Plaintiff Sawyer is a citizen of the United States and had residences in Mangaf, Kuwait and McDonough, Georgia as of January 21, 2022. ManTech denies the remaining allegations in Paragraph 14.

TAC 15.    Relator/Plaintiff **James Locklear** ("Locklear") is a citizen of Texas and was employed by ManTech at the KMSF from November 2012 to May 2013 to perform services pursuant to the Contract.

**ANSWER:**    ManTech admits Plaintiff Locklear was a ManTech at-will employee who worked on the Contract at the KMSF from November 26, 2012 to May 30, 2013. ManTech further admits that Plaintiff Locklear is a citizen of the United States and had residences in Al Bahah Talif, Kuwait and Killeen, Texas as of January 18, 2022. ManTech denies the remaining allegations in Paragraph 15.

TAC 16.    Relator/Plaintiff **Kent Nelson** ("Nelson") is a citizen of Idaho and was employed by ManTech at the KMSF from October 27, 2012 to May 2013 to perform services pursuant to the Contract.

**ANSWER:**    ManTech admits Plaintiff Nelson was a ManTech at-will employee who worked on the Contract at the KMSF from November 12, 2012 to May 30, 2013. ManTech further admits that Plaintiff Nelson is a citizen of the United States and resided in Rigby, Idaho, as of January 14, 2022. ManTech denies the remaining allegations in Paragraph 16.

TAC 17.    Defendant **ManTech International Corporation** ("MT International") is a Delaware corporation with offices in the District of Columbia at 1100 New Jersey Avenue, SE Suite 740, Washington, D.C. 20003 and 600 Maryland Avenue, SW, Washington, D.C. 20024. MT International is a publicly traded company that provides defense-related services to the U.S. Government in the District of Columbia and throughout the world.

8

**ANSWER:**    ManTech admits it is a company that provides defense-related services to the U.S. government, among other things. ManTech also admits ManTech International Corporation is a Delaware corporation. ManTech denies the remaining allegations in Paragraph 17.

TAC 18.    Defendant **ManTech Telecommunications and Information Systems Corporation** ("MT Telecom"), at all times relevant to this complaint was a wholly owned subsidiary of MT International, incorporated in Delaware and based in Virginia, with a registered agent for service of process located in the District of Columbia. at 1015 15th Street, NW, Suite 1000, Washington, D.C. 20005. MT Telecom transacted considerable, ongoing business in the District of Columbia with various U.S. government agencies, in its own name and through MT International. At all relevant times, ManTech was the employer(s) of Relators/Plaintiffs within the meaning of 29 U.S.C. § 203(d) and the Kuwaiti Private Sector Labor Law. On information and belief, ManTech Telecommunications and Information Systems Corporation merged in 2013 with and into ManTech Advanced Systems International, Inc., a Virginia corporation and subsidiary of ManTech International Corporation. Accordingly, all allegations made against MT Telecom are made against ManTech Advanced Systems International, Inc. For ease of review, Defendants are referred to herein as "ManTech."

**ANSWER:**    ManTech admits that ManTech Telecommunications and Information Systems Corporation was a wholly owned subsidiary of ManTech International Corporation, incorporated in Delaware and based in Virginia, and maintained a registered agent for service of process in the District of Columbia. ManTech further admits that it and its referenced subsidiaries are government contractors providing services throughout the nation and in many countries around the world. ManTech also admits that in 2013 ManTech Telecommunications and Information

Systems Corporation merged into ManTech Advanced Systems International, Inc., a Virginia corporation and subsidiary of ManTech International Corporation. ManTech denies the remaining allegations in Paragraph 18.

## JURISDICTION AND VENUE

TAC 19.    The subject matter jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1332, 1367 and 3730(b), and 18 U.S.C. §§ 1595(a) and 1596(a).

**ANSWER:**    The allegations in Paragraph 19 are legal conclusions to which no response is required. To the extent a response is required, ManTech denies the allegations in Paragraph 19. ManTech specifically denies the Court has jurisdiction under 18 U.S.C. § 1595(a) because the TVPRA's civil remedy provision does not apply extraterritorially. *See* Motion to Dismiss Count IV of the Third Amended Complaint Pursuant to Rule 12(b)(1), ECF No. 108.

TAC 20.    Venue lies in this District pursuant to 28 U.S.C. §§ 1391(b)(3) and 3732(a), as ManTech conducts a continuous, robust course of business in the District of Columbia, maintaining offices in the District of Columbia and contracting with various U.S. government agencies based in the District of Columbia.

**ANSWER:**    The allegations in Paragraph 20 are legal conclusions to which no response is required. To the extent a response is required, ManTech denies the allegations in Paragraph 20.

TAC 21.    There is no procedural bar to recovery by the U.S. or Relators under the False Claims Act, 31 U.S.C. §3730(e). Relators have direct, independent, knowledge of the information on which the allegations herein are based, and as alleged above, are an "original source" of the allegations herein, as that term is defined in the pertinent statutory authority. The original complaint was filed under seal to provide the U.S. the opportunity to investigate the allegations contained therein and consider whether to intervene. The U.S. elected not to intervene, and on September 12, 2017, the U.S. District Court unsealed the complaint.

**ANSWER:**   All of Plaintiffs' FCA claims have been either voluntarily dismissed or dismissed pursuant to the Court's June 20, 2023 Memorandum Opinion and Order. *See* ECF No. 105, at 29–50; ECF No. 107. Thus, ManTech is not required to respond to those allegations in Paragraph 21, and denies them on this basis.

<u>**COUNT I**</u>
**Violations of the False Claims Act**
**False Claims with Respect to the Reporting of Labor Hours Pursuant to**
**31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B) Against All Defendants**

TAC 22.   The allegations in Paragraphs 1-142 are incorporated in this count by reference as though fully stated herein.

**ANSWER:**   ManTech incorporates by reference its responses to Paragraphs 1–142 of the TAC and further denies any allegations not expressly admitted.

TAC 23.   The Contract had an original value of $823,446,067.28 for services consisting of maintenance and repair of MRAP vehicles, with a completion date of November 26, 2013. According to a ManTech website, the exercise of successive contract options brought the total value of the Contract to $2.85 billion.

**ANSWER:**   Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 23, and denies them on this basis.

TAC 24.   The Contract included a phase-in period that was to commence at contract award and end not later than 180 days after award. The phase-in period was to be compensated on a "firm fixed-price" basis.  Contract, Page 85 of 388, B.1.2.

**ANSWER:**   Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 24, and denies them on this basis.

TAC 25.      The Contract also included an "Early Operational Readiness" period that was not to exceed 180 days after contract award to commence immediately after the completion of the phase-in period.  This contract performance period was to be compensated on a cost-plus fixed fee level-of-effort basis.  In this period of performance, it was anticipated that the government would issue work directives that would include lists of labor categories to be used by ManTech in tracking labor expended on the Contract, and estimated hours for such labor categories. *Ibid*. B.1.3, Contract Page 85 of 388.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 25, and denies them on this basis.

TAC 26.      As described in 48 CFR 16.207-1, "A firm-fixed-price, level-of-effort term contract requires -- (a) The contractor to provide a specified level of effort, over a stated period of time, on work that can be stated only in general terms; and (b) The Government to pay the contractor a fixed dollar amount."

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 26, and denies them on this basis.

TAC 27.      Under 16.207-2, "The product of the [firm-fixed-price, level-of-effort term] contract is usually a report showing the results achieved through application of the required level of effort. However, payment is based on the effort expended rather than on the results achieved."

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 27, and denies them on this basis.

TAC 28.    The Contract included an "Operational Readiness" period also to begin at the end of the phase-in period (181 days after award) and run until January 13, 2013.  This period of contract performance would also include government-issued work directives, a list of labor categories to be used by ManTech in tracking labor expended on the contract and the government's estimate of the hours that would be expended for the work directives.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 28, and denies them on this basis.

TAC 29.    Following the Operational Readiness period, the Contract would proceed to the Operational Readiness Option Period.  There were to be four option periods (three 12-month options and one 10-month option).  Each of these options were to be compensated on a Cost Plus Fixed Fee Level-of-Effort basis.  Again, this period of contract performance would include work directives from the government regarding labor categories to be used and estimates of hours to be expended.  The Contract, B.1.4, Page 85 of 388.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 29, and denies them on this basis.

TAC 30.    Pursuant to 48 CFR 1352.216-71 (a), "Level of effort (cost-plus-fixed-fee, term contract) . . . In performance of the effort directed in this contract, the contractor shall provide the total of Direct Productive Labor Hours (DPLH) . . . during the term specified in [the contract] . . . DPLH is defined as actual work hours exclusive of vacation, holidays, sick leave, and other absences."  Pursuant to subsection (b), "Only the Direct Productive Labor Hours categories indicated [in the contract] shall be charged directly to the contract."

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 30, and denies them on this basis.

TAC 31.    The Contract gave the U.S. broad discretion to extend the Contract for up to four option periods at established direct labor hour increments.  The Contract, B.1.5, Page 85 of 388.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 31, and denies them on this basis.

TAC 32.    Based on ManTech's representations that it had been in full compliance with the Contract, the U.S. did, in fact, exercise contract options estimated to represent an expenditure of $$ 823,446,067.28 by the government.  The Contract, Modification P00059, Page 3 of 388.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 32, and denies them on this basis.

TAC 33.    Pursuant to Contract Section B.2 (a):

All subsequent awards will be priced in accordance with the following: a. The estimated cost and fixed fee for each applicable Early Operational Readiness, Operational Readiness Base Option, and Operational Readiness Option CLIN shall be calculated from the labor rates found in the tab "Cost Rate by Labor Category" tab, column P, "Composite Cost Per Hour $", multiplied by the number of hours the Government requires for that labor category. The total estimated cost for each CLIN will then be calculated by summing all hours by labor category and the associated estimated labor cost from the "Cost Rate by Labor Category" for each CLIN. The fixed fee shall be calculated from the "Summary of Fee Rate by Performance Period" tab, column B, Fee per Hour as shown in Attachment 12, multiplied by the number of hours required on that CLIN by the Government.

**ANSWER:**   Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 33, and denies them on this basis.

TAC 34.   The Contract, H.11(a), established "The maximum number of labor hours to be ordered during this contract is 34,453,801 labor hours."

**ANSWER:**   Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 34, and denies them on this basis.

TAC 35.   H.11(b) also made clear, "Expenditure of labor hours in excess of the quantity specified in the CLIN(s) ("contract line item") is not allowed except as authorized by the PCO through formal contract action."

**ANSWER:**   Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 35, and denies them on this basis.

TAC 36.   "The Government will estimate the cost of the labor hours per CLIN using actual incurred costs that are averaged by labor category for the most recent month or by using the labor rates provided in Attachment 12 for each of the labor categories, performance locations, and hours specified." *Ibid*.

**ANSWER:**   Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 36, and denies them on this basis.

TAC 37.   Pursuant to Section H.11(b),

If Contractor performance is considered satisfactory by the Contracting Officer, the fixed fee is payable at the expiration of the period(s) of performance as set forth in the

applicable CLIN upon Contractor certification that the quantity of labor hours specified in the contract has been expended in performing the contract work.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 37, and denies them on this basis.

TAC 38.    Section H.11 (f) makes clear:

(1) The Contractor shall notify the Procuring Contracting Officer immediately in writing whenever it has reason to believe that:

 (i)    The level of effort the Contractor expects to incur in the next 60 days will exceed seventy-five (75%) percent of the level of effort established for each funded CLIN; or

 (ii)    The level of effort required to perform the period of performance will be greater than the level of effort established for that period.

As part of the notification, the Contractor shall provide the Contracting Officer a revised estimate of the level of effort required to perform through the completion of the period of performance. As part of the notification, the Contractor also shall submit any proposal for adjustment to the estimated cost and fixed fee that it deems would be equitable if the Government were to increase the level of effort as proposed by the Contractor.

(2) Within thirty days after completion of the work under each CLIN, the Contractor shall submit the following information directly, in writing, to the Contracting Officer, with copies to the COR and the Defense Contract Audit Agency office to which vouchers are submitted:

 (i)    The total number of man-hours of direct labor, including subcontract labor, expended and a breakdown of this total showing the number of man-hours expended in each direct labor classification listed in Attachment 12, including the identification of the key employees utilized;

 (ii)    The Contractor's estimate of the total allowable cost incurred under the CLIN; and

 (iii)    In the case of a cost under run, the amount by which the estimated cost of the CLIN may be reduced to recover excess funds.

(3) In the event that the actual labor performed is expected to exceed the established labor hours on each CLIN, but the actual labor is not expected to exceed the estimated cost of the CLIN, the Contractor, subject to PCO approval, shall be entitled to cost reimbursement for actual hours expended, not to exceed the CLINs estimated cost.

The Contractor shall not be paid fixed fee, however, on the expended labor hours in excess of the labor hours established by the CLIN. This understanding does not supersede or change the ability of the Contractor and Government to agree to change the established hours on the established hours on the CLIN with an equitable adjustment on both cost and fee. This adjustment would be via formal contract modification as directed by the PCO.

(4) If, during the period of performance, the Contractor finds it necessary to accelerate the expenditure of direct labor to such an extent that the total man-hours of effort specified above would be used prior to the expiration of the term, the Contractor shall notify the Contracting Officer in writing setting forth the acceleration required, the probable benefits which would result, and an offer to undertake the acceleration at no increase in the estimated cost or fee together with an offer, setting forth a proposed level of effort, cost breakdown, and proposed fee, for continuation of the work until expiration of the term hereof. The offer shall provide that the work proposed will be subject to the terms and conditions of this contract and any additions or changes required by then current law, regulation, or directives, and that the offer, with a written notice of acceptance by the Contracting Officer, shall constitute a binding contract. The Contractor shall not accelerate any effort until receipt of such written approval by the Contracting Officer.  Any agreement to accelerate will be formalized by contract modification.  The COR may, by written order, direct the Contractor to accelerate the expenditure of direct labor such that the total man-hours of effort specified in paragraph (a) above would be used prior to the expiration of the term. This order shall specify the acceleration required and the resulting revised term. The Contractor shall acknowledge this order within five days of receipt.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 38, and denies them on this basis.

TAC 39.      DoD 7000.14-R Financial Management Regulation Volume 4, Chapter 20, Section 200303, "Identifying Direct Productive Labor Hours" makes clear that "Direct Productive Labor Hours (DPLH) are the hours expended by employees that are directly attributable to production. Management identifies employees whose work constitutes productive labor hours within the production department. These hours are totaled and then estimated idle time and leave/holiday hours are deducted. The result is total departmental productive hours, used as a denominator in the determination of the actual shop rate[.]".

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 39, and denies them on this basis.

TAC 40.        ManTech, as awardee of the Contract, was required to comply with all of the Contract's requirements.  Moreover, by accepting the successive Contract Options, ManTech certified that it was in compliance with all material requirements of the Contract and in compliance with federal and state laws and regulations.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 40, and denies them on this basis.

### The Accurate Reporting to the Army of Direct-Labor Hours Was Material to the United States

TAC 41.        "Labor hour" is referenced 174 times in the Contract.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 41, and denies them on this basis.

TAC 42.        ManTech had an affirmative duty to accurately report its labor hours.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 42, and denies them on this basis.

TAC 43.        The accurate reporting of labor hours was material to the United States.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 43, and denies them on this basis.

**ManTech Made Knowingly False Statements to**
**The U.S. Regarding the Hours Worked by its Employees**

TAC 44.    On information and belief, ManTech reported labor hours during the "phase-in" period.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 44, and denies them on this basis.

TAC 45.    On information and belief, ManTech provided reports to the U.S. regarding the "Early Operational Readiness" and "Operational Readiness" phases of the contract by reporting hours worked servicing MRAPS.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 45, and denies them on this basis.

TAC 46.    With respect to all of its labor hour reporting requirements under the Contract, ManTech submitted claims of direct labor hours worked on the Contract to the government that were knowingly false.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 46, and denies them on this basis.

TAC 47.    Depending on ManTech's needs, ManTech either overreported direct labor hours or underreported direct labor hours by encouraging its employees to mischaracterize direct labor hours as indirect labor hours (and vice versa). On information and belief, ManTech managers altered timesheets that were completed by ManTech employees by either increasing or decreasing direct labor hours with knowledge that they would be reported to the U.S.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 47, and denies them on this basis.

### ManTech Intentionally Underreported Direct Labor Hours To Conceal the Inefficiency of its Unqualified Workforce

TAC 48.    As detailed in paragraphs 122 - 146, in an effort to conceal the inefficiencies of an untrained workforce and to induce the U.S. to exercise the available Contract Options, notwithstanding ManTech's unqualified workforce, ManTech ordered its mechanics and technicians to falsify their direct labor hours to create the false impression of efficiency in performing direct labor mission-critical tasks.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 48, and denies them on this basis.

TAC 49.    ManTech regularly recruited and employed unqualified personnel with no experience and/or knowledge of vehicle maintenance and repair let along MRAP maintenance and repair as was a material provision of the Solicitation and the Contract.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 49, and denies them on this basis.

TAC 50.    Prior to 2012, the contract for maintenance and repair of MRAPs in Kuwait was held by Science Applications International Corp ("SAIC").  As the prime contractor at the KMSF, SAIC subcontracted the actual repair and maintenance services to a variety of subcontractors including Ranger Land Systems, Inc. ("Ranger") and VSE Corporation ("VSE").

**ANSWER:**   Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 50, and denies them on this basis.

TAC 51.   Because of Hawkins's significant prior experience as a mechanic on the MRAPs, first for VSE and then for Ranger, ManTech frequently asked Hawkins to attend meetings with Army contracting officers as a "substitute supervisor." Hawkins began attending these meetings in February 2013.

**ANSWER:**   Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 51, and denies them on this basis.

TAC 52.   The presence of unqualified ManTech employees dramatically slowed efficiency in the repair of MRAP vehicles and distracted the attention of those mechanics and technicians who were qualified to service MRAP vehicles from their tasks. Unqualified ManTech employees frequently stopped work on an MRAP because they did not know how to proceed. The typical remedy for an unqualified employee suspending work was for a qualified technician or mechanic to be found within the KMSF to resolve the impasse experienced by the unskilled employee. That qualified technician or mechanic was required to suspend his own work in order to travel to the workspace of the unqualified technician or mechanic to provide assistance and counsel on how to proceed. Thus, the sufficiently trained and experienced mechanics were forced to mentor the large number of unqualified ManTech employees in order for work on the MRAPs to proceed. This reduced the efficiency of the work on the Contract and caused the unnecessary accumulation of labor hours.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 52, and denies them on this basis.

TAC 53.    At the meetings with Army contracting officers that he attended, Hawkins witnessed ManTech managers deliberately lie to the U.S. government contracting officers about ManTech's efficiency in servicing the MRAP vehicles. Hawkins knew that the information ManTech provided to the Army regarding its efficiency was false because he had prior work experience servicing MRAPs when SAIC was the prime contractor and Hawkins worked for its subcontractor Ranger Land Systems. Hawkins witnessed ManTech claim, falsely, to the Army contracting officers, that ManTech was working far more efficiently than Ranger. As a former Ranger employee, Hawkins knew first-hand that ManTech was operating far less efficiently than Ranger.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 53, and denies them on this basis.

TAC 54.    A significant reason for ManTech working less efficiently than Ranger was that ManTech hired unqualified personnel to work as mechanics or technicians.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 54, and denies them on this basis.

TAC 55.    Hawkins, Sawyer, and Hayes have personal knowledge that ManTech managers were engaged in a systemic scheme to misrepresent labor hours to the U.S. The misrepresentation of time took two forms. First, ManTech managers regularly ordered ManTech

employees to use inaccurate labor codes to classify time spent on MRAPS. Hawkins and Hayes witnessed employees follow these orders and, in fact, deliberately mischaracterize their hours as instructed. Second, where ManTech employees did not mischaracterize their time or where ManTech's need for time manipulation exceeded the mis-categorization of hours, ManTech managers collected the timesheets from ManTech personnel and, on information and belief, reduced or added to the hours reported to the U.S.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 55, and denies them on this basis.

TAC 56.    According to Hawkins, who, at the invitation of ManTech management, attended management meetings beginning in February 2013 because his experience, when employees turned in their time sheets to their ManTech managers, the ManTech managers would alter the record of their labor hours. ManTech managers had predetermined the "appropriate" amount of direct-hour time that should be spent on a vehicle. If the time actually spent servicing a vehicle was above the target time, the ManTech managers would either eliminate hours or reclassify the hours from direct labor to indirect labor. If the time actually spent servicing a vehicle was below the target time, the ManTech managers would either reclassify indirect labor hours as direct labor hours or increase the hours recorded on the timesheet, that were later entered into SAMS-E.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 56, and denies them on this basis.

TAC 57.    At one management meeting that Hawkins attended, a Major from the Army attended.  At that meeting, ManTech reported labor hours to the Army Major that it knew were false in order to demonstrate contract compliance.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 57, and denies them on this basis.

TAC 58.    As a result of the manipulation of the time reported by ManTech to the Army and through oral reports made by ManTech managers in the presence of Hawkins to Army contracting officers at the meetings attended by Hawkins, Hawkins has direct knowledge that ManTech made material false statements to the United States in order to ensure payment under the Contract where some or all of the payments might have been withheld had the government known ManTech's inefficiency in performing the Contract, an inefficiency that was created, in large part, by the lack of qualifications and skills of its new recruits.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 58, and denies them on this basis.

TAC 59.    Hayes was the head of his particular "line" of ManTech employees at the KMSF.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 59, and denies them on this basis.

TAC 60.    Hayes's supervisor, Bud Delano, ordered Hayes to misreport his own time and for Hayes to instruct the men in his line to misreport their labor hours to reduce the number of direct- labor hours reported to the government.  Hayes refused to do so.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 60, and denies them on this basis.

TAC 61.    In the face of Hayes's refusal to order his men to manipulate their reported time, Delano visited the line and instructed the Hayes line to falsify the record of the time spent servicing the MRAPs by using non-direct hour data codes to characterize the direct-hour time spent servicing the MRAPs.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 61, and denies them on this basis.

TAC 62.    After Delano gave this instruction to the men of his line and departed, Hayes addressed the men under his supervision.  Hayes told his men that it was illegal to mis-record the labor hours reported to the government.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 62, and denies them on this basis.

TAC 63.    Bud Delano learned that Hayes had openly contradicted him and had attempted to contravene his instruction to the line.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 63, and denies them on this basis.

TAC 64.    Soon thereafter, Delano replaced Hayes as the head of his line with a man named Marvin Holt who instructed the line consistent with Bud Delano's instruction to miscode labor hours.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 64, and denies them on this basis.

TAC 65.    Hayes was demoted and transferred to another line.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 65, and denies them on this basis.

TAC 66.    On May 30, 2013, Hayes, Sawyer, Nelson, and Locklear were told to report to the office of ManTech supervisor John Gaurnieri ("Gaurnieri"). Hayes and the others who were brought into Gaurnieri's office were fired for cause by ManTech.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 66, and denies them on this basis.

TAC 67.    Gaurnieri told Hayes that he was being fired because Army contracting officers had told ManTech manager Ret. Colonel John Danks, ManTech's liaison with the Army, that Hayes was not meeting minimal expectations for direct hours worked. Hayes immediately

protested to ManTech manager Gaurnieri that any such representation of low direct labor hours was false because his direct labor hours were consistently high.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 67, and denies them on this basis.

TAC 68.    Given that he had consistently reported high direct labor hours yet was being fired because of the Army's claim that he lacked sufficient labor hours, Hayes believes and thus alleges that ManTech managers altered the hours that he had reported.  Specifically, in response to his refusal to miscode his own labor hours, ManTech managers, on information and belief, reduced his hours without his knowledge.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 68, and denies them on this basis.

TAC 69.    Nelson was also told that he was being fired at the request of the U.S. Army because the Army had determined that his recorded direct labor hours were too low.  However, Nelson served as part of the KMSF fire suppression team.  He did not bill time to specific MRAP vehicles. If the data that the Army was basing its analysis on was accurate, the Army would have known that he was recording no direct labor hours not "low" direct labor hours.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 69, and denies them on this basis.

TAC 70.       ManTech's representation that Nelson was being fired because his direct labor hours were "low" leads Nelson to believe and thus allege that ManTech managers submitted false time sheets in Nelson's name to the U.S.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 70, and denies them on this basis.

TAC 71.       Locklear was also told that he was being fired at the request of the U.S. Army because of his low direct labor hours.  However, at all times relevant to this allegation, Locklear worked in the KMSF tool room distributing equipment to men working directly on MRAPs. Locklear was not reporting any direct labor hours.  Thus, the allegation that Locklear's direct labor hours were "low" was false because, in truth, Locklear's direct labor hours were non-existent. These facts lead Locklear to believe and thus allege that ManTech submitted false time sheets in his name.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 71, and denies them on this basis.

TAC 72.       In March 2013, Sawyer attended a leadership meeting led by ManTech manager Scott Campbell ("Campbell").  Campbell instructed the assembled group to falsify their labor hours by mischaracterizing the hours they were working.  Sawyer refused to do so.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 72, and denies them on this basis.

TAC 73.      Sawyer was also fired for cause on May 30, 2013. He was also told that he was being fired because of low direct labor hours.  However, like Hayes, Locklear and Nelson, Sawyer knew that any assertion that he was not billing sufficient direct labor hours was a lie as he was consistently turning in timesheets reflecting his dedicated, non-stop direct hour labor on the MRAPs.  Thus, Sawyer also alleges that ManTech reported falsified time sheets reflecting manipulated man hours to the U.S.

    **ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 73, and denies them on this basis.

TAC 74.      Given the aforementioned facts, Hayes, Locklear, Nelson, and Sawyer believe and thus allege that ManTech deliberately and effectively prevented the relevant U.S. Army personnel responsible for the Contract from knowing that ManTech's time reporting with respect to the Contract was materially false and inaccurate and, as a result, U.S. Army personnel took important actions with respect to the Contract that were based on materially false facts.

    **ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 74, and denies them on this basis.

TAC 75.      The recordation of labor hours is directly related to SAMS-E data reporting. As is discussed in detail below, each day, ManTech mechanics and technicians were required to fill-out time sheets to record their time using codes to describe the various tasks undertaken.  These time sheets were collected by ManTech managers at the end of each day.  The coded hours were then entered as data into the SAMS-E system.  Thus, if time is misrecorded on a time sheet or it

time is mischaracterized on a time sheet, that time would also be misrecorded or mischaracterized in the SAMS-E system.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 75, and denies them on this basis.

TAC 76.    Upon his summary termination and forced return to the United States, Sawyer began investigating the grounds for his dismissal.  He knew that the representation that he had low direct labor hours was a lie, and he set out to prove it.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 76, and denies them on this basis.

TAC 77.    Sawyer knew that the time reflected from his timesheets would be entered as data into the Army's SAMS-E data system.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 77, and denies them on this basis.

TAC 78.    Sawyer believes and therefore alleges that ManTech manipulated his labor hours both by overreporting labor hours and underreporting labor hours to the government. This misreporting was material in that ManTech submitted claims for payment to the government that were not accurate which resulted in the U.S. paying ManTech based upon that false information.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 78, and denies them on this basis.

TAC 79.    ManTech made certifications to the U.S. by requesting and receiving payments that were premised on labor hours it was regularly reporting to U.S.  By knowingly reporting false and inaccurate labor hours, ManTech knew it was not in compliance with material and legal requirements of the Contract; thus, such requests for payment constituted false claims for payment.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 79, and denies them on this basis.

TAC 80.    Statutory damages to the U.S. include, but are not limited to, three times the full value of all such false and/or fraudulent claims.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 80, and denies them on this basis.

TAC 81.    Each false and/or fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 81, and denies them on this basis.

TAC 82.    Defendants are jointly and severally liable for all damages under this Count.

**ANSWER:**    Plaintiffs previously voluntarily dismissed Count I. *See* ECF No. 107. Thus, ManTech is not required to respond to the allegations in Paragraph 82, and denies them on this basis.

## <u>COUNT II</u>
**Violations of the False Claims Act False Claims with Respect to the Input of Data into SAMS-E Pursuant to 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B) Against All Defendants**

TAC 83.    The allegations in Paragraphs 1-142 are incorporated in this count by reference as though fully stated herein.

**<u>ANSWER:</u>**    ManTech incorporates by reference its responses to Paragraphs 1–142 of the TAC and further denies any allegations not expressly admitted.

TAC 84.    ManTech violated the False Claims Act by intentionally and/or recklessly submitting inaccurate data in the SAMS-E. Those false statements were material to ManTech being paid by the United States.

**<u>ANSWER:</u>**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 84, and denies them on this basis.

### <u>Accurate SAMS-E Data Entry Was Material to the United States</u>

TAC 85.    The Contract emphasized, pursuant to regulation, the importance the Army placed on accurate data. Section 9, Page 8 of 388 incorporated by reference KSCR1-18:

> KSCR1-18 – CONTRACTOR MANPOWER REPORTING (OCT 2011)
> In accordance with AFARS 5137.9601, the requirement to report contractor manpower shall be included in all contracts, task/delivery orders and modifications, with place of performance in Kuwait.
>
> CONTRACTOR MANPOWER REPORTING (OCT 2011)
> Contractor Manpower Reporting: The Office of the Assistant Secretary of the Army (Manpower & Reserve Affairs) operates and maintains a secure Army data collection site where the contractor shall report ALL contractor manpower (including subcontractor manpower) required for performance of this contract. The contractor is required to completely fill in all the information in the format using the following web address https://cmra.army.mil/login.aspx
> The required information includes:
> (1) Contracting Office, Contracting Officer, Administrative Contracting Officer;
> (2) Contract Number;

(3) Beginning and ending dates covered by reporting period;
(4) Contractor name, address, phone number, email address, identify of contractor employee entering data;
(5) Estimated direct labor hours (including sub-contractors);
(6) Estimated direct labor dollars (including sub-contractors);
(7) Total payments (including sub-contractors);
(8) Predominant Federal Service Code (FSC) reflecting services provided by contractor (and separate predominant FSC for each sub-contractor, if different);
(9) Estimated data collections cost;
(10) Organizational title associated with the Unit Identification Code (UIC) for the Army Requiring Activity (the Army Requiring Activity is responsible for providing the contractor with its UIC for the purposes of reporting this information);
(11) Locations where contractor and subcontractor perform the work (specified by zip code in the United States or nearest city, country when in an overseas location, using standardized nomenclature provided on website);
(12) Presence of deployment or contingency contract language; and
(13) Number of contractor and sub-contractor employees deployed in theater during this reporting period (by country).

**ANSWER:**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 85, and denies them on this basis.

TAC 86.    At approximately the time that the U.S. entered into the Contract with ManTech, the Army was rolling out a new comprehensive system for tracking the life cycle of critical hardware: SAMS-E.

**ANSWER:**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 86, and denies them on this basis.

TAC 87.    The SAMSE-E system is designed for use by Army mechanics. It is not designed for use by private contractors. However, tracking the life cycle of mission-critical MRAPs was so important, so material, to the U.S. that the Army established a SAMS-E data terminal for use at the KMSF.

**ANSWER:**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 87, and denies them on this basis.

TAC 88.    A U.S. Army publication describes how materially important SAMS-E is to the Department of Defense ("DoD") and the government.  SAMS-E is material because it is the key maintenance component of the Army's Logistics Information Technology systems:

> [SAMS-E] provides Warfighters around the world with automated management of equipment maintenance on everything from M-16 rifles to aircraft.  Soldiers use SAMS-E to track asset and equipment life, order parts, interface with related logistics systems and much more. SAMS-E users can compile equipment readiness reports to provide operational command and control support to Army and Joint leadership. The system also enables effective Force and Fleet sustainment operations at the national level through consolidated equipment maintenance data. (Gay, William, "SEC's Standard Army Maintenance System-Enhanced ensures operational readiness worldwide, July 21, 2011).

**ANSWER:**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 88, and denies them on this basis.

TAC 89.    The wide variety of information collected by SAMS-E provides additional evidence of SAMS-E's materiality to the government. SAMS-E Master File, RN 750-1s/ACRS 700A/0-6 states, "The SAMS-E system . . . generate[s] hard copy reports . . . of record numbers: Maintenance Requests, Preventive maintenance schedules, Equipment inspection and maintenance worksheets, Historical records or logbooks, Equipment maintenance records, Shop property accounts, Oil Analysis Records, and Equipment operation permits that are kept at the unit level CFA." SAMS- E generates reports of record numbers including maintenance requests, preventive maintenance schedules, equipment inspection and maintenance worksheets, historical records or logbooks, equipment maintenance records, shop property accounts, oil analysis records, and equipment operation permits, among other things.

**ANSWER:**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 89, and denies them on this basis.

TAC 90.        The accurate collection of SAMS-E data is material to the U.S. military because the U.S. military is a data-driven decision-making processes.  SAMS-E provides DoD with automated management of equipment maintenance on a wide range of military equipment.  SAMS-E provides DoD with the ability to track asset and equipment life, order parts, and interface with related military logistics systems.  SAMS-E is materially important to the government because it allows DoD to compile equipment readiness reports to provide operational command and control support to military decision-making.  SAMS-E is materially important to the government because it enables DoD to maintain force and fleet sustainment operations through consolidated equipment maintenance data.  It has been described as "the most important automated system to field maintenance managers."  Army Pamphlet 750-3 UNCLASSIFIED, Maintenance of Supplies and Equipment Soldiers' Guide for Field Maintenance Operations (Sept. 18, 2013), § 3-2 (b), "The Army Maintenance Management System." *See* Department of the Army, Pamphlet 750–1, Maintenance of Supplies and Equipment, Commanders' Maintenance Handbook Headquarters Department of the Army Washington, DC (Dec. 4, 2013), pp. 4, 11, 17, 18, 24, 26-29, 34, 37-41, and 43.

**ANSWER:**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 90, and denies them on this basis.

TAC 91.        SAMS-E is materially important to the government as a maintenance management tool that assists front line managers with work scheduling and dispatching of

government equipment. Source input is manually input by users and data is transferred from other Logistics Information System (LIS) via Secure File Transfer Protocol ("SFTP"). *Ibid.*

  **ANSWER:** The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 91, and denies them on this basis.

  TAC 92. SAMS-E is a materially important for the timeliness, accuracy and reporting of maintenance data to DoD decision-makers.

  **ANSWER:** The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 92, and denies them on this basis.

  TAC 93. SAMS-E is a materially important maintenance management tool that assists front line managers with work scheduling and dispatching of government equipment.

  **ANSWER:** The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 93, and denies them on this basis.

  TAC 94. Accurate SAMS-E reporting is a critical instrument for Army and DoD commanders to assess overall readiness of U.S. military forces. Maintaining accurate SAMS-E reporting is mission-critical for U.S. military forces engaged in combat, as failure to maintain accurate reporting can jeopardize the efforts and lives of U.S. troops on the front lines.

  **ANSWER:** The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 94, and denies them on this basis.

TAC 95.    The materiality of this SAMS-E data to the Contract is demonstrated by the rote fact that, contrary to most other contract jobs, the Army provided, at its own expense, SAMS-E terminals for use by ManTech so that ManTech could directly input data into SAMS-E on a real-time basis. If the SAMS-E data had not been of independent importance to the Army, ManTech would have only been required to provide timesheets for the purpose of compensation. On information and belief, the reason why the Army took this unusual step because the Army needed accurate, field-input data in order make assessments on a real-time basis regarding the readiness, reliability, and availability of MRAPs. Such information was needed to make battlefield decisions in a manner to enhance effectiveness and minimize casualties from IEDs.

**ANSWER:**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 95, and denies them on this basis.

TAC 96.    The time sheets used to report labor hours for contract performance were also used to collect the data that was inputted into SAMS-E. Specifically, the time sheets included codes for characterizing increments of time. The coded time data was collected from these time sheets and entered into SAMS-E.

**ANSWER:**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 96, and denies them on this basis.

TAC 97.    A menu of SAMS-E manhour codes was included in the timesheets used by ManTech's employees. A non-exclusive list of such codes included:

| SAMS ID CODES |
| --- |
| 01 DIRECT LABOR |
| 03 SUPERVISION |
| 04 MAINTENANCE ADMINISTRATION |

| |
|---|
| 05 MAINTENANCE ON INSTALLATION TECHNICAL TRAINING |
| 06 QUALITY INSPECTION |
| 08 MAINTENANCE MEETINGS |
| 09 PLANT/ EQUIPMENT OPERATION |
| 10 CLEANING AND POLICING |
| 11 VEHICLE OPERATIONS |
| 12 STOCK CHASING |
| 17 EQUIPMENT |
| 20 LAG- AWAITING ASSISTANCE |
| 21 LAG- AWAITING EQUIPMENT, TOOLS OR FACILITY SPACE |
| 22 LAG- AWAITING TRANSPORTATION |
| 23 LAG-WEATHER |
| 24 LAG- AWAITING PARTS |
| 25 LAG-BREAK |
| 35 TDY- OTHER |
| 36 PERSONNEL PROCESSING |
| 40 COMPENSATORY TIME OFF FOR OVERTIME |
| 42 LEAVE- OFFICIAL |
| 43 SICK LEAVE- CIVILIAN |
| 44 MEDICAL ABSENCE |
| 45 PERSONAL AFFAIRS |
| 47 LWOP |
| 48 JOB RELATED INJURY |
| 0 LABOR- CLOSED WORK ORDER |

**ANSWER:**   The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 97, and denies them on this basis.

### ManTech Made Knowingly False Entries into SAMS-E

TAC 98.       As described above, ManTech manipulated and falsified the time it reported to the U.S. for servicing MRAPs under the Contract.

**ANSWER:**   The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 98, and denies them on this basis.

TAC 99.    When, at the instruction of ManTech managers, employees used inaccurate codes to describe time serving MRAP vehicles, those inaccurate time codes were then entered into the SAMS-E data system.

**ANSWER:**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 99, and denies them on this basis.

TAC 100.    The false coding of time resulted in false data being entered into SAMS-E. For example, if the amount of time spent on a particular MRAP was in danger of exceeding that anticipated direct man hour time, ManTech management instructed its employees to use non-direct labor codes (such as "12 Stock Chasing" or "17-Equipment") instead of the Direct Labor Hour code of 01. Conversely, if the amount of direct labor hours for a particular task order was lagging, ManTech managers would instruct their employees to enter inflated direct labor hours on their timesheets.

**ANSWER:**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 100, and denies them on this basis.

TAC 101.    When ManTech managers collected time sheets and then, depending on the need, increased or decreased the time as reported to the U.S., the misrecorded time was then entered into SAMS-E. This misreported time constituted corrupt, inaccurate data in SAMS-E.

**ANSWER:**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 101, and denies them on this basis.

TAC 102.     By polluting SAMS-E with corrupted data, ManTech denied the government all of the benefits that the government sought from ManTech when it provided ManTech the multimillion-dollar SAMS-E reporting system in the first instance. Thus, not only were the costs incurred by the U.S. in configuring a SAMS-E system wasted, the entry of corrupted data into SAMS-E made the Army worse off than if the Army had chosen not to provide ManTech with the SAMS-E terminal in the first instance. Specifically, had the Army not provided a SAMS-E terminal to ManTech, the subsequent SAMS-E data analytics would have been known to have lacked key maintenance and repair datapoints. However, not knowing that the data entered into the KMSF SAMS-E terminal was corrupt, the Army could not know that its underlying data were unreliable.

**ANSWER:**     The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 102, and denies them on this basis.

TAC 103.     Based on the aforementioned facts, including their personal observations, Hawkins, Sawyer, Hayes, Nelson, and Locklear allege that ManTech intentionally entered falsified the time data into the Army's SAMS-E system.

**ANSWER:**     The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 103, and denies them on this basis.

TAC 104.     The damage to the U.S. extends far beyond the direct financial injury inflicted by the fraud and the servicing of U.S. equipment by a contractor that employed unqualified mechanics and technicians.

**ANSWER:**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 104, and denies them on this basis.

TAC 105.    The U.S. military depends on accurate data to determine readiness for military action. Readiness includes the availability of weaponry and equipment in the field. Readiness is gauged by recorded maintenance turn-around times, the reliability of the equipment that has been deployed, and whether equipment currently being used by our forces is sufficiently reliable to merit additional purchase (or whether the U.S. would be better served purchasing different, more reliable equipment).

**ANSWER:**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 105, and denies them on this basis.

TAC 106.    False data in this data-driven system pollutes readiness calculations, reliability assessments, and procurement decisions, and does further damage to the U.S. military.

**ANSWER:**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 106, and denies them on this basis.

TAC 107.    ManTech made implicit certifications to the U.S. by requesting and receiving payments that were premised on compliance with material requirements of the Contract and applicable Kuwaiti, U.S., and state laws and regulations. By knowingly entering false data, ManTech knew it was not in compliance with such material and legal requirement; thus, such requests for payment constituted false claims for payment.

**ANSWER:**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 107, and denies them on this basis.

TAC 108.    Statutory damages to the U.S. include, but are not limited to, three times the full value of all such false and/or fraudulent claims.

**ANSWER:**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 108, and denies them on this basis.

TAC 109.    Each false and/or fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

**ANSWER:**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 109, and denies them on this basis.

TAC 110.    Each false data entry into SAMS-E constitutes a separate false claim to the U.S.

**ANSWER:**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 110, and denies them on this basis.

TAC 111.    Defendants are jointly and severally liable for all damages under this Count.

**ANSWER:**    The Court dismissed Count II with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 111, and denies them on this basis.

**COUNT III**

**Violations of the False Claims Act False Claims with Respect to the Qualifications of ManTech's Personnel Pursuant to 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B) Against All Defendants**

TAC 112.    The allegations in Paragraphs 1-142 are incorporated in this count by reference as though fully stated herein.

**ANSWER:**    ManTech incorporates by reference its responses to Paragraphs 1–142 of the TAC and further denies any allegations not expressly admitted.

TAC 113.    ManTech violated the False Claims Act by intentionally and/or recklessly submitting inaccurate information and certifications to the U.S. regarding the qualifications of the personnel that it had assigned to work on the critically important MRAP vehicles.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 113, and denies them on this basis.

**The Qualifications of the ManTech Mechanics Working on the MRAPs were Material to the United States**

TAC 114.    The MRAPs were a top priority for the Department of Defense and the Army as this high-cost vehicle had the design and construction necessary to withstand IED blasts and, thus, save the lives of thousands of U.S. service men and women.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 114, and denies them on this basis.

TAC 115.    The Contract required ManTech to staff the KMSF with mechanics and technicians who were adequately trained to efficiently and effectively provide MRAP repair and maintenance services. Solicitation W56HZV-11-R-0181, page 107 of 125.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 115, and denies them on this basis.

TAC 116.    ManTech was required to certify that its mechanics were qualified to work on the MRAP vehicles by either submitting (1) a certification of training from MRAP-U, or (2) a waiver to MRAP-U training (the MRAP-U certification-training credentials requirement may be waived for those personnel that have had previous experience with MRAP Vehicle Systems). Solicitation W56HZV-11-R-0181, page 107 of 125.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 116, and denies them on this basis.

TAC 117.    Given the cost of each MRAP, the mechanical stresses that an MRAP are designed to withstand (the explosion of an IED), and the lives at stake through the availability of MRAPs to U.S. service personnel, the qualification of the mechanics working on these vehicles was material to the U.S. and the Contract.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 117, and denies them on this basis.

### ManTech Made Knowingly False Statements to The U.S. Regarding the Qualifications of its Mechanics

TAC 118.    Relators Hawkins, Hayes, Sawyer, and Locklear have original-source knowledge that ManTech made false claims to the U.S. about the qualifications of its mechanics – qualifications that were material to the Contract for the servicing of these $1 million vehicles –

and that ManTech made these false statements knowingly even though ManTech knew its false statements would result in the input of unreliable and corrupted data into SAMS-E.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 118, and denies them on this basis.

TAC 119.    ManTech initially absorbed the existing mechanics and technicians who had been employed by its predecessor SAIC and its subcontractors. Thereinafter, ManTech embarked on a recruiting program that was designed to get "boots on the ground" at a low-cost – irrespective of its material contract obligations to the U.S. to have only qualified mechanics service the MRAPs.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 119, and denies them on this basis.

TAC 120.    In order to save money, ManTech passed overqualified mechanics as new hires in favor of bring a low-skill, low-cost workforce to the KMSF that was unqualified to service the MRAPs in accordance with the requirements of the Contract.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 120, and denies them on this basis.

TAC 121.    The experience of Sawyer exemplified the intentional willingness to ignore lack of qualification in order to fill job quotas. After ManTech took control of the KMSF, ManTech asked Sawyer to relocate to Afghanistan to serve as a certified welding inspector. Sawyer

repeatedly informed ManTech that he did not know how to weld and was not qualified to inspect others' welding.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 121, and denies them on this basis.

TAC 122.    Given the combat stresses to which MRAPs are subjected (e.g., IED blasts, exposure to chemical agents, etc.), the quality of welding is materially important to the servicing and maintenance of these vehicles.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 122, and denies them on this basis.

TAC 123.    ManTech ignored Sawyer and demanded that he serve as a welding inspector in Afghanistan. ManTech threatened to fire him if he did not take the job as welding inspector. Still, he refused.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 123, and denies them on this basis.

TAC 124.    After ManTech took over from SAIC and had absorbed the first wave of employees from SAIC's subcontractors, ManTech brought unqualified employees to Kuwait to work on the MRAP contract. Sawyer has personal knowledge of ManTech hires who had been recruited from the Military Youth Corps, one of whom, Michael Green, was previously a beautician and another who had been hired from a job at a fast-food restaurant.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 124, and denies them on this basis.

TAC 125.    ManTech seemed not to care that these men – and so many of the others who came to Kuwait after the existing KMSF mechanics had been hired by ManTech – had no pertinent skills.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 125, and denies them on this basis.

TAC 126.    In September 2012, Hawkins learned that ManTech would be taking over the MRAP contract at the KMSF. He was invited to reapply for his job as a ManTech employee.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 126, and denies them on this basis.

TAC 127.    As part of the process of applying for a job as a mechanic with ManTech, Hawkins was required to take an online test to prove his competence as a mechanic. There existed no ID- verification or other security to ensure that the person taking the mechanic's test was the same person who was applying for the job.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 127, and denies them on this basis.

TAC 128.    On information and belief, ManTech hired persons who had engaged third parties to take and pass the mechanic competency test. In conversations Hawkins, Hayes, Sawyer,

and Locklear had with new hires, new hires at times admitted that someone else had provided the answers on their mechanic competency test. This practice was so widespread and the safeguards against third parties providing answers to this test were so non-existent, that ManTech knew or acted with reckless disregard as to the qualifications of new hires.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 128, and denies them on this basis.

TAC 129.    As a consequence of the lack of experience of the personnel hired by ManTech, the MRAP vehicles were frequently returned to the maintenance facility due to their negligent servicing. The additional time and resources taken by the return of these vehicles to the KMSF caused economic loss to the United States.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 129, and denies them on this basis.

TAC 130.    It was Hawkins's job to work with and train the new hires. In so doing, he learned that many of those hired by ManTech had no prior work experience as mechanics. The most recent job for many of them was working at fast-food restaurants.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 130, and denies them on this basis.

TAC 131.    One of the new hires that Hawkins met was hired as a line-supervisor. However, this new hire did not have any experience as a mechanic. His lack of experience caused productivity on the line to come almost to a complete halt.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 131, and denies them on this basis.

TAC 132.    Locklear has knowledge that ManTech was deliberately hiring new employees who lacked fundamental knowledge about the job they were hired to do. Locklear had a broad view on this problem working in the tool room dispensing equipment to ManTech employees at the KMSF. As an example, a new hire was sent to see Locklear to obtain a half-inch impact wrench. An impact wrench is a socket wrench, high torque power tool that is routinely used in, inter alia, automotive repair, heavy equipment maintenance, and product assembly. Any worker qualified to service MRAPs would and should have an understanding of how an impact wrench operates and is maintained. In providing the wrench to him, Locklear instructed the man to put a few drops of oil into it before using it. In response, the "mechanic" asked him where he was to apply the oil. This lack of fundamental knowledge of such a basic piece of equipment indicated to Locklear that this man lacked sufficient experience as a mechanic.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 132, and denies them on this basis.

TAC 133.    There is pervasive other evidence of the lack of qualification of ManTech's labor force.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 133, and denies them on this basis.

TAC 134.    By virtue of the acts and omissions described above, Defendants, by and through their officers, agents, supervisors, and employees, agreed to make use of, and did make use of, or caused to be made use of knowingly false statements to get claims paid or approved by the U.S. Government in violation of 31 U.S.C. § 3729(a)(1)(B).

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 134, and denies them on this basis.

TAC 135.    Because ManTech's mechanics and technicians at KMSF lacked the requisite qualifications, ManTech was not qualified to be a contractor for MRAP service and repair and could not perform with the requisite efficiency that was a necessary and essential predicate for award of successive Contract Options.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 135, and denies them on this basis.

TAC 136.    Because ManTech's mechanics and technicians at KMSF lacked the requisite training, the staff routinely violated the required procedures for MRAP maintenance and repair in order to conceal their deficiencies, conduct that resulted in significant overbilling and excess and unnecessary costs being submitted to, and paid by, the U.S. Government.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 136, and denies them on this basis.

TAC 137.    The U.S. unambiguously stressed the importance of qualified personnel in the Solicitation for the Contract. ManTech went to great lengths to disguise the extent of its

unqualified workforce. Had the U.S. known that ManTech had hired, e.g., untrained, unqualified fast-food workers, beauticians, and youth offenders to come to Kuwait to work on the Army's life-saving armored vehicles, the U.S. would have cancelled the Contract and denied ManTech further payment.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 137, and denies them on this basis.

TAC 138.    Not only was the U.S. damaged by unqualified mechanics and technicians working on mission-critical, expensive, and sophisticated MRAP equipment, but the presence of a cadre of unqualified technicians and mechanics dramatically slowed efficiency in the repair of MRAP vehicles and distracted the attention of those mechanics and technicians who were qualified to service MRAP vehicles from their tasks. Unqualified technicians and mechanics frequently stopped work on an MRAP because they did not know how to proceed. The typical remedy for an unqualified technician or mechanic suspending work was for a qualified technician or mechanic to be found within the KMSF. He was then required to suspend his own work in order to move to the workspace of the unqualified technician or mechanic to provide assistance and counsel on how to proceed. In other words, the large corpus of unqualified technicians and mechanics had to be mentored by the small number of sufficiently qualified technicians and mechanics. This was part and parcel of a system that was purposefully set into motion by ManTech to materially reduce the direct hour efficiency of all the technicians and mechanics working on the Contract, and cause unnecessary billing to the U.S.

**ANSWER:**   The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 138, and denies them on this basis.

TAC 139.   ManTech made explicit and implicit certifications to the U.S. by requesting and receiving payments that were premised on compliance with material requirements of the Contract that required ManTech to ensure that only adequately qualified mechanics serviced the mission critical, life-saving, and expensive MRAPs. By knowingly allowing unqualified personnel to service the MRAPS, ManTech knew it was not in compliance with such material and legal requirement; thus, such requests for payment constituted false claims for payment.

**ANSWER:**   The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 139, and denies them on this basis.

TAC 140.   Statutory damages to the U.S. include, but are not limited to, three times the full value of all such false and/or fraudulent claims.

**ANSWER:**   The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 140, and denies them on this basis.

TAC 141.   Each false and/or fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

**ANSWER:**   The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 141, and denies them on this basis.

TAC 142.   Defendants are jointly and severally liable for all damages under this Count.

**ANSWER:**    The Court dismissed Count III with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 142, and denies them on this basis.

**COUNT IV**
**Violations of the Trafficking Victims Protection Reauthorization Act**
**U.S.C. §§ 1581, *et seq.***

TAC 143.    The allegations in Paragraphs 1-21 and 144-324 are incorporated in this count by reference as though fully stated herein.

**ANSWER:**    ManTech incorporates by reference its responses to Paragraphs 1–21 and 144–324 of the TAC and further denies any allegations not expressly admitted.

TAC 144.    Plaintiffs bring this count under the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1581, et seq.

**ANSWER:**    ManTech admits Plaintiffs attempt to bring Count IV under the TVPRA. ManTech denies violating the TVPRA.

TAC 145.    Section 1595 of the TVPRA allows private citizens to bring suit against a perpetrator who has violated the TVPRA.

**ANSWER:**    18 U.S.C. § 1595 referenced in Paragraph 145 speaks for itself, and to the extent that allegations in Paragraph 145 vary therewith, ManTech denies those allegations.

TAC 146.    Section 1589(a)(3) of the TVPRA establishes that whoever knowingly provides or obtains the services of a person by means of the abuse or threatened abuse of law or legal process shall be punished pursuant to the Act.

**ANSWER:**    18 U.S.C. § 1589(a)(3) referenced in Paragraph 146 speaks for itself, and to the extent that allegations in Paragraph 146 vary therewith, ManTech denies those allegations.

TAC 147.    Section 1592 establishes that whoever knowingly conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any

other actual or purported government identification document, of another person -- in the course of

a violation of section 1589 with intent to violate section 1589; or to prevent or restrict or to attempt

to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to

maintain the services of that person, is liable under the TVPRA.

**ANSWER:**    18 U.S.C. § 1592 referenced in Paragraph 147 speaks for itself, and to the

extent that allegations in Paragraph 147 vary therewith, ManTech denies those allegations.

TAC 148.    Section 1593(a) establishes that in in addition to any other civil or criminal

penalties authorized by law, the court shall order restitution for any TVPRA offense.

**ANSWER:**    18 U.S.C. § 1593(a) referenced in Paragraph 148 speaks for itself, and to

the extent that allegations in Paragraph 148 vary therewith, ManTech denies those allegations.

TAC 149.    Under Section 1593(b)(1), the order of restitution under this section shall

direct the defendant to pay the victim the full amount of the victim's losses including any costs

incurred by the victim for medical services relating to physical, psychiatric, or psychological care;

physical and occupational therapy or rehabilitation; necessary transportation, temporary housing,

and child care expenses; lost income; attorneys' fees, as well as other costs incurred; and any other

losses suffered by the victim as a proximate result of the offense.

**ANSWER:**    18 U.S.C. § 1593(b)(1) referenced in Paragraph 149 speaks for itself, and

to the extent that allegations in Paragraph 149 vary therewith, ManTech denies those allegations.

TAC 150.    Under Section 1593(b)(1), the order of restitution shall also include the

greater of the gross income or value to the defendant of the victim's services including the

offender's ill- gotten gains.

**ANSWER:**    18 U.S.C. § 1593(b)(1) referenced in Paragraph 150 speaks for itself, and

to the extent that allegations in Paragraph 150 vary therewith, ManTech denies those allegations.

TAC 151.    Compliance with Kuwait's immigration laws was a material requirement of the Contract.  *See* Count V below. Indeed, in recognition of the fact that such compliance was a "primary" requirement, in a customized "Addendum" to each of ManTech's employment contracts with Plaintiffs, the following is provided:

> Your work area is designated as Kuwait as stated in your offer letter. A primary requirement for working in Kuwait involves issuance of a host nation Work Visa with sponsorship.  To obtain a work visa, you will be required to meet established host nation criteria, including a favorable background investigation (this is in addition to employment background check and security clearance requirements) and a medical examination to determine fitness to work. These requirements may not be waived, are not negotiable and may not be substituted using alternate approvals, *e.g.*, a current active security clearance  does not supersede and cannot be used in place of the required host nation background check, nor is a deployment medical exam acceptable in lieu of the required medical exam.

On information and belief, ManTech's employment contracts with the other employees who worked on the Contract in Kuwait contained similar if not identical provisions.

**ANSWER:**    The documents referenced in Paragraph 151 speak for themselves, and to the extent that allegations in Paragraph 151 vary therewith, ManTech denies those allegations. The Court dismissed Count V in its June 20, 2023 Memorandum Order and Opinion, *see* ECF No. 105, and as such, ManTech is not required to respond to the reference to Count V in the first sentence in Paragraph 151. ManTech admits that employees on the Contract had addenda titled "MRAP-FOV Bridge Contract Offer Addendum – SSILOG, Host Nation Sponsorship & Work Visa-Kuwait (CIVIL ID)" included in their offer letters. ManTech denies the remaining allegations in Paragraph 151.

TAC 152.    Nonetheless, ManTech abused Kuwaiti immigration and labor laws by ordering Plaintiffs and their colleagues to engage in "visa runs" in which they left Kuwait, flew to

and entered Bahrain, and then immediately turned around and flew back to and entered Kuwait in order to be issued renewed tourist visas.

**ANSWER:**    ManTech denies the allegations in Paragraph 152.

TAC 153.    ManTech placed Plaintiffs and their colleagues in fear of arrest for this violation – which was exacerbated by their fear of being fired by ManTech if they failed to obey ManTech's orders, and the harsh economic consequences that would follow as described in the contracts signed by Plaintiffs.

**ANSWER:**    ManTech denies the allegations in Paragraph 153.

TAC 154.    By creating this Hobson's Choice, and forcing Plaintiffs and their colleagues to work in fear, without the protection of any country's laws, ManTech was able to extract their services at an extremely low rate, underbid its competitors for contract work, and make exorbitant profits by obtaining illegal payments from the U.S.

**ANSWER:**    ManTech denies the allegations in Paragraph 154.

### ManTech Obtained Plaintiffs' Continued Services
### Through the Abuse of Kuwait's Laws

TAC 155.    ManTech's employment contracts recited that employees would be working in Kuwait legally and that the conditions of employment would be lawful.  This representation was false.

**ANSWER:**    The documents referenced in Paragraph 155 speak for themselves, and to the extent that allegations in Paragraph 155 vary therewith, ManTech denies those allegations. ManTech denies Plaintiffs had "employment contracts" with ManTech and denies the remaining allegations in Paragraph 155.

TAC 156.    Once Plaintiffs were in Kuwait, their contracts forced them to remain on the job for at least two years – even after they discovered that they were in-country illegally and that

the conditions of their employment were unlawful – on pain of payment of substantial financial penalties for resigning sooner.

    **ANSWER:**    ManTech denies the allegations in Paragraph 156.

    TAC 157.    Specifically, Plaintiffs were required to sign employment contracts that committed them to work for ManTech for twenty-four (24) months. A significant financial penalty was imposed for early termination. "MRAP-FOV Contract Offer Addendum – SSILOG, Host Nation Sponsorship & Work Visa- Kuwait (CIVIL ID)" made it clear that ManTech would control the immigration requirements for its employees to work at the KMSF, incurring substantial costs for this process. Plaintiffs' employment contracts stated:

> Due to the significant cost for sponsorship, (up to and exceeding $10,000 per person for first year and $5,000 for second year), you agree to commit to a minimum period of employment (deployment) of 24 months or the completion of the contract whichever comes first. Once the process is completed, *should you decide to terminate employment, or are terminated for any reason*, voluntary or involuntary, prior to completing 24 months (non-consecutive) of "boots on ground" (BOG) service, *you are responsible for costs incurred and will be required to reimburse the cost to obtain a work visa*. In this event, ManTech will make a determination of financial obligation based on the current circumstances. *Reimbursable costs include all expenses related directly and indirectly to the sponsorship, including travel, lodging, per diem, medical exam(s), background investigation and administration/ administrative fees. If terminated, you may also be responsible for employment and deployment costs* as described in the Offer Addendum, as well as costs related to any training or certification process provided to you as part of your employment, including employment related expenses described in the Offer Addendum.

*See* Employment Contract Excerpts at Ex. 02 (Emphasis added).

    **ANSWER:**    The documents referenced in Paragraph 157 speak for themselves, and to the extent that allegations in Paragraph 157 vary therewith, ManTech denies those allegations. The offer letters Plaintiffs quote in Paragraph 157 make clear that Plaintiffs' employment with

ManTech was "at will," and that Plaintiffs, or ManTech, could terminate that employment at any time and for any reason. ManTech denies the remaining allegations in Paragraph 157.

TAC 158.     The ManTech MRAP-FOV Contract Offer Addendum – SSILOG, Host Nation Sponsorship & Work Visa- Kuwait (CIVIL ID) made clear that if, prior to completing two years of employment in Kuwait, a ManTech employee either quit or was terminated, he would be contractually obligated to pay ManTech $15,000.00 as reimbursement for the costs incurred for sponsorship of that employee in Kuwait.

**ANSWER:**     ManTech admits that Plaintiffs' ManTech offer letters included addenda titled "MRAP-FOV Bridge Contract Offer Addendum – SSILOG, Host Nation Sponsorship & Work Visa- Kuwait (CIVIL ID)." ManTech denies the remaining allegations in Paragraph 158.

TAC 159.     In addition, as stated in the "MRAP-FOV Contract Offer Addendum Contract Mandated Training and Training Certification" portion of that employee's contract with ManTech:

> In the event that you fail to complete an assigned training course or fail to complete an obligated employment period under this contract and defined in this offer, *you will be required to reimburse prorated costs related to the training and certification process*. You further understand and agree that in the event your employment with ManTech is voluntarily terminated or terminated for cause before you complete this commitment period, *you will be required to reimburse training related expenses as defined above on a prorated basis* (1/12th for each month that your employment term is short of the twelve (12) month commitment).

*Ibid* (emphasis added).

**ANSWER:**     The document referenced in Paragraph 159 speaks for itself, and to the extent that allegations in Paragraph 159 vary therewith, ManTech denies those allegations.

TAC 160.     The Kuwait Private Sector Labor Law ("KPSLL") mandates that "the replacement of the expatriate labor force by the national labor force – whenever it can be possible

– . . . is one of the main objectives of the State that should finally be achieved." Explanatory Memorandum Law No. (6) of 2010 Concerning Private Sector Labour Law Explanatory Memorandum, pp. 45-6. Expatriates, such as Plaintiffs, cannot work in Kuwait unless they subject themselves to Kuwait's laws. ManTech deliberately and intentionally violated this main objective of the State of Kuwait.

     **ANSWER:**    The Kuwait Private Sector Labor Law referenced in Paragraph 160 speaks for itself, and to the extent that allegations in Paragraph 160 vary therewith, ManTech denies those allegations. Plaintiffs' allegation in Paragraph 160 that "Expatriates, such as Plaintiffs, cannot work in Kuwait unless they subject themselves to Kuwait's laws," calls for a legal conclusion to which no response is required. To the extent a response is required, ManTech denies that allegation. ManTech denies the remaining allegations in Paragraph 160.

     TAC 161.    Article 10 of the KPSLL states: "The employer is banned to employ foreign labor force unless they are duly authorized by the Competent Authority to work for him." ManTech should have been banned from employing Plaintiffs because, during all times pertinent to this complaint, Plaintiffs were not duly authorized by any competent authority to work for ManTech because their presence in Kuwait was illegal. Further, ManTech engaged in a pattern of behavior designed to hide from Kuwaiti authorities that its work force of expatriates had not been authorized to work in the country. Article 10 further states, "If the worker abandons coming to his work and worked for another employer, the employer shall be obliged to return the employer back to his home country, upon registering an absconding notice against the worker by his main sponsor."

**ANSWER:**    The Kuwait Private Sector Labor Law referenced in Paragraph 161 speaks for itself, and to the extent that allegations in Paragraph 161 vary therewith, ManTech denies those allegations. ManTech denies the remaining allegations in Paragraph 161.

TAC 162.    Only companies that are majority owned by Kuwait nationals may provide employment in Kuwait.

**ANSWER:**    The allegations in Paragraph 162 are legal conclusions to which no response is required. To the extent a response is required, ManTech denies the allegations in Paragraph 162.

TAC 163.    It is illegal for foreign national companies, such as ManTech, to employ foreign national workers in Kuwait.

**ANSWER:**    The allegations in Paragraph 163 are legal conclusion to which no response is required. To the extent a response is required, ManTech denies the allegations in Paragraph 163.

TAC 164.    In order for foreign nationals to work legally in Kuwait, they must be employed by a Kuwaiti-national owned company and they must obtain a Resident Visa – a resident visa that ensures that, as a resident of Kuwait, they are subject to Kuwait's laws.

**ANSWER:**    The allegations in Paragraph 164 are legal conclusions to which no response is required. To the extent a response is required, ManTech denies the allegations in Paragraph 164.

TAC 165.    The issuance of a Resident Visa (frequently and hereinafter referred to as a "Visa 18") is a pre-condition to working legally in Kuwait. In order to qualify for a Visa 18, the Kuwait- national owned company must apply for authorization from the Ministry of Labor and Social Affairs ("MOSAL") for permission to employ such foreign national workers. This application includes submitting information about the prospective employee's qualifications to be a resident alien working in Kuwait such as a criminal records background check, a medical examination, and the provision of important information including fingerprints. This application

process is required to be performed before the foreign national enters Kuwait. If MOSAL approves a Kuwaiti company's application to employ a foreign worker, the necessary Visa 18, Work Authorization, and Civil Identification number are issued to the Kuwait company and the foreign national is then authorized to travel to Kuwait to work as an employee of the Kuwaiti-owned company.

**ANSWER:**   The allegations in Paragraph 165 are legal conclusions to which no response is required. To the extent a response is required, ManTech denies the allegations in Paragraph 165.

TAC 166.   It is illegal for a foreign national to enter Kuwait for the purpose of employment in Kuwait without having first obtained permission from the Kuwaiti government to live and work in Kuwait.

**ANSWER:**   The allegations in Paragraph 166 are legal conclusions to which no response is required. To the extent a response is required, ManTech denies the allegations in Paragraph 166.

TAC 167.   ManTech knew it was illegal for its workforce to be in Kuwait without proper immigration and employment authorization. Early in ManTech's deployment to Kuwait, ManTech's Division Vice President for Ground Systems Operations Division, the division that includes the MRAP contract, lamented that she had 46 employees illegally in present in Kuwait, a fact that the "Government will notice . . . soon."

**ANSWER:**   The document referenced in Paragraph 167 speaks for itself, and to the extent that allegations in Paragraph 167 vary therewith, ManTech denies those allegations. ManTech denies the remaining allegations in Paragraph 167.

TAC 168.   ManTech knew that it was illegal for members of its work force to remain in Kuwait after the expiration of a temporary entry visa such as a "tourist" or a "commercial" visa

(issued to professionals for the purpose of transacting business, but not for the purpose of being employed in Kuwait).

**ANSWER:**    ManTech denies the allegations in Paragraph 168.

TAC 169.    In order for its employees to have current tourist visas, ManTech forced its employees to engage in "visa runs" (otherwise known as "turn and burns") wherein its U.S. citizen workers were forced to fly out of Kuwait to a third country, usually Bahrain, turn around and fly back into Kuwait so that a fresh entry stamp could be made in that employee's passport.

**ANSWER:**    ManTech admits that employees engaged in a routine process which typically involved employees flying out of Kuwait and then returning to Kuwait to receive new visas. Upon return to Kuwait, Kuwaiti immigration officials can review the individual's passport and determine whether to permit the individual to enter the country. ManTech further admits that some people referred to this process as "visa runs" or "turn and burns." The U.S. government knew visa runs were a standard practice for U.S. contractors working in Kuwait during this period. ManTech provided the U.S. government with employee rosters (called PERSTATs) which notified the U.S. government when ManTech employees were on visa runs. ManTech also appropriately invoiced the U.S. government for visa runs (ManTech's "Other Direct Costs" in its invoice submissions included "visa run" costs), and the U.S. government reimbursed ManTech for costs associated with visa runs. ManTech denies the remaining allegations in Paragraph 169.

TAC 170.    ManTech was also aware that it was illegal for a person leaving Kuwait to reenter without waiting forty-eight hours prior to attempting reentry.

**ANSWER:**    ManTech denies the allegations in Paragraph 170.

TAC 171.    ManTech was explicitly warned that it was illegal for members of its workforce to work in Kuwait on tourist visas.  Specifically, on December 2, 2012, ManTech

Program Manager Muge Cody ("Cody") received an email from Keith D. Hunter, a ManTech MRAP Shop Manager who informed Cody "Last evening I received a phone call from a guy at the ministry saying we were not in compliance with Kuwait government rules because working in Kuwait on tourist visa's (sic) is illegal . . . this guy threatened me with jail time . . . The bottom line is this contract means allot (sic) to me and other (sic) who are employed here and problems like this is not good for the long-term effort." Cody summarily dismissed Mr. Hunter's concerns in an email she copied to ManTech Business Unit President Kevin Cody (the husband of Muge Cody), ManTech Assistant Executive Director for MRAP FOV Program Scott Campbell, and ManTech Senior Maintenance Supervisor Brian Earhart.

**ANSWER:**    The documents referenced in Paragraph 171 speak for themselves, and to the extent that allegations in Paragraph 171 vary therewith, ManTech denies those allegations. ManTech denies the remaining allegations in Paragraph 171.

TAC 172.    On December 4, 2012, Muge and Kevin Cody received an email from Neeto Sahni the owner of Neeto International Logistics & Gen. Trading Co., wherein Mr. Sahni warned them "a large number of ManTech employees that are working at the [K]MSF building in Mina Abdullah on a Visa 14 which is a tourist visa. As per Ministry of Labor this is not allowed, and any person found to be working without a valid Visa 18 or document stating that Visa 18 has been processed will face consequences as per Labor Law."

**ANSWER:**    The document referenced in Paragraph 172 speaks for itself, and to the extent that allegations in Paragraph 172 vary therewith, ManTech denies those allegations.

TAC 173.    ManTech also knew that it was putting its employees in jeopardy of arrest and deportation when it demanded that the turn around and reenter Kuwait immediately after arriving in Bahrain. Notwithstanding warnings that ManTech received about having their

employees immediately reenter Kuwait from Bahrain, ManTech continued to demand such turn around because ManTech would not pay for the cost of an overnight hotel in Bahrain.

**ANSWER:**    ManTech denies the allegations in Paragraph 173.

TAC 174.    ManTech was ruthless in its policy of forcing its employees to engage in turn and burns.  On January 6, 2013, six ManTech employees (Chester Rodriguez, Randy Bennett, Gregory Fuller, Julian Poe, Edward Broeder, and Timothy Jennings) refused to participate in a turn and burn to Bahrain and back.  Upon learning that these employees' "failure to obey the directions given to them by their Theater Lead," these employees were immediately terminated (with the consent of ManTech senior management), flown immediately back to the United States, and charged for the unused ticket to Bahrain that was purchased in their name.

**ANSWER:**    ManTech admits that around January 6, 2013, six ManTech employees — Chester Rodriguez, Randy Bennett, Gregory Fuller, Julian Poe, Edward Broeder, and Timothy Jennings — were terminated for going through Immigration and Passport Control in Kuwait to get their stamps for exiting the country, going to the departure gate, but failing to board their scheduled flight or otherwise leave the country. ManTech admits these individuals then returned to Immigration and Passport Control and misrepresented to Kuwaiti immigration officials that they had just arrived in country to obtain their entry stamp. ManTech admits it terminated these employees for their misconduct and that the U.S. government was aware of this incident. ManTech further admits these six individuals were flown back to the United States. ManTech denies the remaining allegations in Paragraph 174.

TAC 175.    On November 26, 2012, ManTech writing in the name of Kevin Craft, United States Army Joint Program Office (FWD), Mine Resistance Ambush Protected Vehicles, Kuwait (hereinafter "JPO") on ManTech letterhead, wrote to the Assistant Undersecretary, Labor Affairs

of MOSAL.  The correspondence is captioned: "Confirmation of Millbrook as Subcontractor to ManTech Telecommunications and Information Systems Corporation under Subcontract #GSSV020104.  In this letter, ManTech, through JPO, claims "Millbrook is required to provide approximately 250 American Nationals to support subject prime contract thru (sic) December 2013." This claim to MOSAL was false.  Millbrook did not supply any American nationals.  The American Nationals were already supplied by ManTech and were never employees of Millbrook.

**ANSWER:**    The document referenced in Paragraph 175 speaks for itself, and to the extent that allegations in Paragraph 175 vary therewith, ManTech denies those allegations. ManTech denies the remaining allegations in Paragraph 175.

TAC 176.    On December 3, 2012, Contracting Officer Loretta Bursey, Department of the Army, U.S. Contracting Command – Warren wrote to Kristy Leavitt, Contracts Senior Manager for ManTech.  Referencing Contract W56HZV-12-C-0127 and ManTech's pledge to schedule its employees ten hours a day, seven days a week, Contracting Officer Bursey asked, "[C]an you please detail how ManTech is complying with the Kuwait Labor Law?  Based on the 2010 law, and with limited exceptions, the Kuwait Labor Law requires an individual to work an eight-hour day, six days a week."  This question set off a flurry of activity in ManTech's senior management.

**ANSWER:**    The document referenced in Paragraph 176 speaks for itself, and to the extent that allegations in Paragraph 176 vary therewith, ManTech denies those allegations. ManTech denies the remaining allegations in Paragraph 176.

TAC 177.    On December 10, 2012, Richard Fisne, Vice President, Contracts, ManTech answered the question posed of Ms. Leavitt by Bursey.  The letter made a variety of claims, all of them false.  Specifically, the letter claimed that ManTech "has engaged Kuwait legal counsel from

Salman Duaij Al-Sabah Law Office to ensure our compliance with Labor Laws in the Country of Kuwait." There is no evidence that ManTech ever retained this law firm. Mr. Finse also stated that, based on the legal advice received, Kuwait's labor law "applies solely to Kuwaiti companies and employees working in Kuwait." This claim, while facially true, was substantively false because it failed to disclose that, through ManTech's contractual relationship with Millbrook, all of ManTech's workers would – in the eyes of the Kuwaiti government (based on the misrepresentations by Millbrook) – be considered Millbrook's employees who would, indeed, be covered by Kuwait's labor laws. Mr. Fisne then stated, "Our legal counsel and labor law sponsor have also advised and confirmed that it is standard practice to have extended hours and/or extended work schedules based on specific requirements. 'Employment is commonly conditioned on the foreign laborers accepting the terms of the employment contract for their additional days of employment without providing overtime payments.'" This statement, applied to the question asked, is also false. It is false because it suggests a nuanced interpretation of Kuwait's Private Sector Labor Law. However, there could be no nuanced interpretation of Kuwait's labor laws to the question asked because none of ManTech's employees working at the KMSF were legally present in Kuwait, none had been granted residency visas, and none were permitted to work at all. The only application of Kuwait's laws, on December 10, 2012 was to have ManTech's entire KMSF workforce arrested and deported.

**ANSWER:**    The documents referenced in Paragraph 177 speak for themselves, and to the extent that allegations in Paragraph 177 vary therewith, ManTech denies those allegations. ManTech denies the remaining allegations in Paragraph 177.

TAC 178.    On December 12, 2012, Mr. Sahni followed up with another email warning to Muge and Kevin Cody stating, "ManTech has put their employees at risk for working illegally on

tourist Visa. Is ManTech ready to continue risking its employees working without visa 18 on tourist visa and risk them on random checking by Ministry for illegal workers?" Cody forwarded the email to ManTech Procurement Manager Kathryn Romance, ManTech Procurement Manager Joy O'Brien, Scott Campbell, and Kevin Cody with the instruction "Don't share this with personnel."

**ANSWER:**    The documents referenced in Paragraph 178 speak for themselves, and to the extent that allegations in Paragraph 178 vary therewith, ManTech denies those allegations.

TAC 179.    To conceal that its employees were working illegally in Kuwait, ManTech entered into an agreement with Millbrook International Services, LTD (dba in Kuwait as "Millbrook Kuwait"; hereinafter referred to as "Millbrook"), a company that was, at least on papers submitted to the Kuwait Government, owned by a Kuwaiti national.

**ANSWER:**    ManTech admits it hired Millbrook International Services, LTD ("Millbrook") to perform Kuwaiti sponsorship services, including, among other things, obtaining Kuwaiti visas for its employees, providing employee housing, and transporting employees to and from the KMSF. The U.S. government required ManTech to obtain a local Kuwaiti sponsor as part of the Contract and knew Millbrook served as ManTech's Kuwaiti sponsor on the Contract. ManTech denies the remaining allegations in Paragraph 179.

TAC 180.    Under the terms of this agreement (innocuously called a "sponsorship"), Millbrook agreed to deliberately misrepresent to the United States and Kuwait governments that the U.S. citizens (and other foreign nationals) who were working at the KMSF were Millbrook's own employees.

**ANSWER:**    ManTech denies the allegations in Paragraph 180.

TAC 181.    In furtherance of this scheme to misrepresent its employees as employees of a Kuwaiti-national owned company, on December 20, 2012, ManTech Subcontract Manager

Kathy Romance sent a letter to the United States through the U.S. Army Host Nations Affairs in Kuwait ("HNA") that stated,

> This is to confirm that Millbrook Kuwait, a company registered to conduct business in Kuwait, has been subcontracted by ManTech Telecommunications and Information Systems Corporation to provide labor (AN), in support of referenced prime contract (W56HZV-12-0127), under subcontract CSSV020104 . . . Millbrook is required to provide approximately 250 American Nationals to support subject prime contract thru (sic) 31 December 2013 and with potential option periods thru (sic) 30 June 2013. Millbrook Kuwait is considered by ManTech as a responsible subcontractor, pursuant to both United States Acquisition Regulations (FAR) and supplements thereto, including Kuwaiti laws.

**ANSWER:**    The document referenced in Paragraph 181 speaks for itself, and to the extent that allegations in Paragraph 181 vary therewith, ManTech denies those allegations. ManTech denies the remaining allegations in Paragraph 181.

TAC 182.    ManTech sent another letter to HNA, on January 3, 2013, that stated, "This is to confirm that Millbrook Kuwait commits to bringing the first months proof of payroll to the Host Nations office upon opening the labor file." This statement was false because, as ManTech knew, the mechanics working for it on Contract W56HZV-12-0127 had not been paid by Millbrook, were not being paid by Millbrook, and would not be paid by Millbrook.

**ANSWER:**    The document referenced in Paragraph 182 speaks for itself, and to the extent that allegations in Paragraph 182 vary therewith, ManTech denies those allegations. ManTech denies the remaining allegations in Paragraph 182.

TAC 183.    In reliance of the truth of the claims made by ManTech (claims that were false), JPO wrote a memo to HNA, also on January 3, 2013, stating "This is to confirm that Millbrook Kuwait commits to bringing the first months (sic) proof of payroll to the Host Nations office upon opening a labor file." ManTech was aware that one part of the United States military

was passing along ManTech's false statement, as if true, to another part of the United States military and did nothing to correct the retransmission of its original false statement.

**ANSWER:**    ManTech lacks sufficient knowledge or information to form a belief as to the truth of whether and to what extent the Joint Program Office ("JPO") relied on any ManTech statement, and on that basis, denies that allegation in Paragraph 183. The document referenced in Paragraph 183 speaks for itself, and to the extent that allegations in Paragraph 183 vary therewith, ManTech denies those allegations. ManTech denies the remaining allegations in Paragraph 183.

TAC 184.    In reliance of the truth of the claims made by ManTech and repeated as true by JPO, HNA wrote to the Kuwait Ministry of Social Affairs on January 8, 2013, to certify that Millbrook Kuwait would be providing 250 personnel for Contract W56HZV-12-C-0127. With the full faith, credibility, and explicit certification of the United States with respect to *bona fides* of Millbrook supplying 250 of its own personnel to work on Contract W56HZV-12-C-0127, the Kuwaiti government had no reason to further investigate the veracity of representations made by Millbrook to MOSAL regarding "its" employees.

**ANSWER:**    ManTech lacks sufficient knowledge or information to form a belief as to the truth of whether and to what extent the U.S. Army's Host Nation Affairs ("HNA") relied on any ManTech statement, and on that basis, denies that allegation in Paragraph 184. The document referenced in Paragraph 184 speaks for itself, and to the extent that allegations in Paragraph 184 vary therewith, ManTech denies those allegations. ManTech denies the remaining allegations in Paragraph 184.

TAC 185.    On or about January 22, 2013, in reliance of the U.S. Government's certifications and confirmations to the Kuwait Government regarding the *bona fides* of ManTech's representation that it would obtain the labor for the KMSF from Kuwait-national owned Millbrook,

the Kuwait Ministry of Social Affairs and Labors opened a labor file to begin processing resident visa, Visa 18, applications submitted by Millbrook on behalf of "its" employees.

**ANSWER:**    ManTech admits that on or about January 22, 2013, the Kuwait Ministry of Social Affairs and Labor ("MOSAL") opened Millbrook's labor file. ManTech lacks sufficient knowledge and information regarding what the Kuwaiti government relied on in opening that labor file, and on that basis, denies that allegation in Paragraph 185. ManTech denies the remaining allegations in Paragraph 185.

TAC 186.    ManTech and Millbrook undertook other activities to conceal from both the United States and Kuwait governments that ManTech was abusing Kuwait's immigration laws by bringing Relators and more than 200 others into Kuwait into the country illegally and was abusing Kuwait's Private Sector Labor Laws by lying to MOSAL about the identity of the Relators' employer.

**ANSWER:**    ManTech denies the allegations in Paragraph 186.

TAC 187.    ManTech and Millbrook entered into an illegal agreement to fake Millbrook salary payments to Relators and the others working for ManTech at the KMSF.

**ANSWER:**    ManTech denies the allegations in Paragraph 187.

TAC 188.    In furtherance of the scheme to fake salary payments by Millbrook to "its" employees at the KMSF, ManTech and Millbrook forced Relators and ManTech's other employees at the KMSF to sign blank signature cards that provided Millbrook with authorization to open Kuwait-based depository bank accounts at Burgan Bank in Kuwait.  When ManTech employees objected to signing these blank authorizations, ManTech ordered them to do so.

**ANSWER:**    ManTech admits that Millbrook advised ManTech that Kuwaiti law required every person employed in the country to have a "Salary Bank Account." ManTech further

admits that to comply with that requirement, Millbrook asked individuals to complete Burgan Bank applications. ManTech denies the remaining allegations in Paragraph 188.

TAC 189.    After Millbrook secured these signature authorizations, it set up hundreds of bank accounts at Burgan Bank of Kuwait.

**ANSWER:**    ManTech admits that after securing these Burgan Bank applications, Millbrook opened bank accounts for several ManTech employees to comply with Kuwaiti law which required an individual's sponsor to deposit a minimum salary amount with a local Kuwaiti financial institution. ManTech denies the remaining allegations in Paragraph 189.

TAC 190.    In furtherance of the scheme to fake salary payments by Millbrook to "its" employees at the KMSF, ManTech agreed to wire funds owed to its employees for *per diem* and cost reimbursement to Millbrook.  Using a spreadsheet provided also by ManTech, Millbrook then deposited the funds owed by ManTech to its employees into the Kuwait-based bank accounts Millbrook had opened in these mechanic's' names.

**ANSWER:**    ManTech denies the allegations in Paragraph 190.

TAC 191.    ManTech and Millbrook agreed to use cost reimbursements and *per diem* payments owed to the KMSF mechanics as the source of funds to fake Millbrook's salary payments to these persons in order to conceal this scheme from the United States.

**ANSWER:**    ManTech denies the allegations in Paragraph 191.

TAC 192.    This scheme (wherein ManTech would use its employee's own money, launder that money into Millbrook's bank account in London, UK so that Millbrook could withdraw that money in Kuwait to fake salary payments to deceive the governments of the United States and Kuwait regarding the true identity of the mechanics' employer) was approved by ManTech Senior Vice President for Strategy Michael Brogan specifically to avoid detection by the United States.

On May 1, 2013, he instructed ManTech's Kuwait-based management to follow through with this scheme because it had the benefit of helping ManTech in several ways, including:

> [W]e do not have to "loan" Millbrook money they cycle in and out of the Kuwait bank and return to us at the end of the effort; we do not have to try to invoice the Government the amount we "loan" Millbrook to recognize revenue and then adjust that amount back out at the end of the POP; we retain relative high ground and avoid criticism with respect to complying with Kuwaiti law; and we do not have to modify our subcontract with "interesting" language that could draw unwanted scrutiny from DCMA.

**ANSWER:**    The document referenced in Paragraph 192 speaks for itself, and to the extent that allegations in Paragraph 192 vary therewith, ManTech denies those allegations. ManTech denies the remaining allegations in Paragraph 192.

TAC 193.    This money laundering scheme collapsed when ManTech employees could not access the cost and *per diem* reimbursements that they were expected to withdraw from the Kuwait bank accounts that Millbrook had established in their name.

**ANSWER:**    ManTech denies the allegations in Paragraph 193.

TAC 194.    Upon the collapse of the ManTech/Millbrook scheme for using *per diem* and cost reimbursements as the source of cash to launder money into Kuwait, ManTech made direct payments to Millbrook's UK bank accounts for the purpose of Millbrook withdrawing those funds in Kuwait to fake salary payments into the Burgan Bank accounts set up in the names of the ManTech employees.  On information and belief, ManTech used "interesting" contract language in order to bill the cost of these payments to the United States.

**ANSWER:**    ManTech denies the allegations in Paragraph 194.

TAC 195.    ManTech and Millbrook also collaborated in having fraudulently issued Civil Identification cards issued to the ManTech employees at the KMSF.  Specifically, the Kuwaiti government granted visas for Kuwaiti residency, Visa 18s, to the ManTech employees

working at the KMSF.  The Kuwaiti government issued these resident visas on the false claim that these mechanics worked for a Kuwaiti-national owned company.  In truth, they did not.  In further reliance on ManTech and Millbrook's (false) claim that Relators and the others working at the KMSF were Millbrook's employees, the Kuwaiti government issued identification cards, (Civil ID).

**ANSWER:**    ManTech admits that Millbrook secured residency visas (otherwise known as Visa 18s) and civil identification cards ("Civil IDs") from the Kuwaiti government for some ManTech employees at the KMSF. ManTech denies the remaining allegations in Paragraph 195.

TAC 196.    The receipt of Kuwait-government issued Civil IDs, which had been issued in reliance on ManTech and Millbrook's (false) claims that the KMSF personnel were Millbrook's employees, made it more difficult for the United States and Kuwait to detect that ManTech was illegally trafficking personnel into Kuwait in an abuse of Kuwait's immigration and labor laws.

**ANSWER:**    ManTech denies the allegations in Paragraph 196.

TAC 197.    The deceit that ManTech and Millbrook perpetrated with the Kuwait's MOSAL was successful.  Beginning in April 2013, MOSAL began issuing resident visas (Visa 18s) for the personnel who Millbrook had represented to MOSAL as its own.  In all, approximately 100 of ManTech's employees at the KMSF were issued fraudulent Visa 18s.

**ANSWER:**    ManTech admits that MOSAL began issuing resident visas (also known as Visa 18s) to ManTech KMSF employees beginning in April 2013. ManTech admits that several employees received Visa 18s. ManTech denies the remaining allegations in Paragraph 197.

TAC 198.    None of the KMSF ever received any of the benefits and protections of Kuwait's labor laws.  Nearly simultaneous with delivering the Visa 18s to ManTech's employees, Millbrook demanded that those to whom it provided Visa 18s to sign a letter written in Arabic

(with no English language translation).  By this letter, (a translation of which was received by ManTech's management when it was discovered that Millbrook had demanded that its employees sign the letter), the Visa 18 recipients were required to pledge that she or he had been employed by Millbrook Kuwait Company and Fawzan United Trading Company (identified as the "Employer"). The letter also required the ManTech employee to certify that she or he had "received from the Employer any and all rights, amounts, dues, salaries, and travel expenses, annual and official leaves, as well as other forms of leave which are applicable by law or payments in lieu of leave, compensation that are due under the employment contract or Kuwaiti law and other rights which may be due to me in relation to my employment with the Employer."  Then, the mechanics were required to affirm the statement, "I do hereby expressly declare that I do not have any claims for any rights, amounts, dues, salaries, annual and official leaves, as well as other forms of leave which are applicable by law or payments in lieu of leave, compensations due as per the employment contract or the Kuwaiti law and other rights which may be due to me by the Employer."  Finally, the letter required the mechanics to affirm the statement "I hereby expressly, unconditionally, irrevocably release the Employer from any rights, claims or legal proceedings of whatever nature or form, regardless of whether known or unknown to me, and I hereby expressly waive my right, at any time hereafter, to initiate any legal proceeding against the Employer for any matter, kind or nature whatsoever."

**ANSWER:**    The letter referenced in Paragraph 198 speaks for itself, and to the extent that allegations in Paragraph 198 vary therewith, ManTech denies those allegations. ManTech denies the remaining allegations in Paragraph 198.

TAC 199.    The initial reaction of the ManTech management at the KMSF was to order ManTech's employees not to sign this letter.  Wrote Senior Maintenance Supervisor Brian Earhart

to Kathryn Romance, Scott Campbell, and Gaurnieri, "I am not allowing our employees to sign this until Corp. gives it's blessing.  When I spoke to Lee in regards to this he tells me that they will not surrender our passports unless it is signed this is ILLEGAL!!!!"  Kathryn Romance agreed with Earhart's assessment, replying and copying Cody and Scott Campbell, "Good Morning – I would not encourage the employee's (sic) to sign this.  Its intent lends itself to releasing Millbrook of any responsibility, liability, or accountability."

**ANSWER:**    The documents referenced in Paragraph 199 speak for themselves, and to the extent that allegations in Paragraph 199 vary therewith, ManTech denies those allegations. ManTech denies the remaining allegations in Paragraph 199.

TAC 200.    However, after the question of the propriety of the letter was passed up the chain of command to ManTech Senior Vice President for Strategy Michael Brogan.  After Brogan had a telephone call with Mark Croll, the head of Millbrook, Brogan passed the order down the chain of command that each and every ManTech employee who received a Visa 18 from Millbrook had to sign this Arabic language letter.  These executed letters were collected by Millbrook and later presented to MOSAL as evidence that Millbrook had fully complied with Kuwait's laws. Nothing in these letters was true.  Millbrook, with ManTech, had flagrantly abused Kuwait's laws.

**ANSWER:**    ManTech admits that Michael Brogan, ManTech Vice President for Strategy, emailed Scott Campbell regarding a Labour Clearance Letter. Those documents speak for themselves, and to the extent the allegations in Paragraph 200 vary therewith, ManTech denies those allegations. ManTech lacks sufficient knowledge and information to form a belief as to what Millbrook did with any signed Labour Clearance Letters, and on that basis, denies that allegation in Paragraph 200. ManTech denies the remaining allegations in Paragraph 200.

TAC 201.    ManTech told Plaintiffs that it would be responsible, as their employer, for obtaining all of the immigration approvals and work permits needed for them to work in Kuwait. Through such statements, Plaintiffs were led to believe that ManTech would act in accordance with the law in obtaining the necessary immigration approvals and necessary authorizations for Plaintiffs to work in Kuwait.

**ANSWER:**    ManTech denies the allegations in Paragraph 201.

TAC 202.    Plaintiffs can confirm this systematic, coordinated, ritualized scheme employed by ManTech to abuse Kuwait's immigration laws.

**ANSWER:**    ManTech denies the allegations in Paragraph 202.

TAC 203.    Prior to working for ManTech, Hawkins worked for VSE Corporation ("VSE") and Ranger Land Systems at the KMSF.

**ANSWER:**    ManTech admits the allegations in Paragraph 203.

TAC 204.    Both of these companies applied for and obtained Visa 18s for Hawkins to meet the legal requirements for Hawkins to work for them in Kuwait.

**ANSWER:**    ManTech denies that Plaintiff Hawkins had a Visa 18 when he began working with Ranger Land Systems in May 2011. ManTech admits that Plaintiff Hawkins ultimately received a Visa 18 from Ranger Land Systems' Kuwaiti sponsor eleven months after he began working in Kuwait. ManTech lacks sufficient knowledge or information to form a belief as to the truth of the allegations regarding whether VSE Corporation's Kuwaiti sponsor obtained a Visa 18 for Plaintiffs Hawkins, and on that basis, denies those allegations.

TAC 205.    On or about September 18, 2012, Hawkins became an employee of ManTech. Unlike VSE and Ranger, ManTech did not complete any paperwork necessary for Hawkins to receive a Visa 18 from the Kuwaiti Government.

**ANSWER:**    ManTech denies the allegations in Paragraph 205.

TAC 206.    At ManTech's instruction, Hawkins left Kuwait to participate in ManTech's new- employee training in the U.S.  When Hawkins's new-employee training ended, Hawkins returned to Kuwait to continue his work on the MRAPs at the KMSF.  Upon his arrival at the Kuwait International Airport, ManTech transported him to Camp Ali Al-Salem, the transit point for Americans arriving in Kuwait.  After a day at Camp Ali Al-Salem, ManTech transported him back to the Kuwait International Airport to have his passport stamped with a tourist visa.  After it was stamped with a tourist visa, ManTech confiscated Hawkins' passport.

**ANSWER:**    ManTech admits the Kuwaiti government stamped Plaintiff Hawkins' passport with a Visa 14 in Kuwait on December 23, 2012. ManTech further admits that Plaintiff Hawkins' passport was collected so Millbrook could obtain his Visa 18 from the Kuwaiti government in accordance with Kuwaiti practice. ManTech also admits that Plaintiff Hawkins attended employee training in the United States. ManTech denies the remaining allegations in Paragraph 206.

TAC 207.    During his entire experience working for ManTech at the KMSF, Hawkins repeatedly reminded ManTech management that he needed to have a Visa 18 in order to work legally in Kuwait. The managers he spoke with about it repeated the same line, "we're working on it," so frequently that Hawkins began to think that ManTech had not even started the Visa 18 application process.

**ANSWER:**    ManTech denies the allegations in Paragraph 207.

TAC 208.    Despite Hawkins telling ManTech's management directly that he needed a Visa 18 to work legally in Kuwait, ManTech's management ignored him, and repeatedly ordered Hawkins to execute "visa runs."

**ANSWER:**    ManTech denies the allegations in Paragraph 208.

TAC 209.    On one such ManTech-ordered "visa run," Hawkins left Kuwait for Bahrain on December 23, 2012.  Though Hawkins exited Bahraini immigration control upon his arrival, he was not permitted to reenter Bahraini immigration control when he turned around to board a plane back to Kuwait. He was barred from passing through Bahraini immigration because of a "hold" that had been placed on his passport barring him from reentering Kuwait.  Hawkins did not know why a "hold" was placed on his passport barring him from reentry into Kuwait.  Hawkins called ManTech managers in Kuwait to report his detention and request their assistance but they refused. Hawkins requested that ManTech make inquiries with Kuwaiti authorities about why a hold was placed on his reentry.  ManTech refused to provide any meaningful assistance.

**ANSWER:**    ManTech admits that around March 2013 Plaintiff Hawkins advised ManTech that he was prohibited from leaving Bahrain due to what he later described as a civil case in Germany that had nothing to do with his ManTech employment. ManTech denies the remaining allegations in Paragraph 209.

TAC 210.    Having traveled to Bahrain with essentially only the clothes on his back (Hawkins had anticipated completing his "visa run" in the course of a single day), he was trapped for approximately three weeks, with no assistance from ManTech.  In fact, in the face of the legal peril caused by ManTech's forced visa run, ManTech's Earhart counselled to simply abandon hope of reentering Kuwait and return home, stating "the chances of your getting back in country are slim to none[.]"

**ANSWER:**    ManTech admits that Plaintiff Hawkins remained in Bahrain for approximately ten days while he worked to resolve the personal issues, unrelated to his ManTech employment. The document referenced in Paragraph 210 speaks for itself, and to the extent that

allegations in Paragraph 210 vary therewith, ManTech denies those allegations. ManTech denies the remaining allegations in Paragraph 210.

TAC 211.    Given what he has learned about ManTech's immigration practices since this event, Hawkins believes and thus alleges that ManTech provided no assistance to him and made no inquiries with Kuwaiti immigration authorities because to do so risked such Kuwaiti authorities discovering that ManTech was systemically trafficking its full-time mechanic and technician workforce into Kuwait on tourist visas.

**ANSWER:**    ManTech denies the allegations in Paragraph 211.

TAC 212.    Upon returning to Kuwait, Hawkins learned that, to explain Hawkins's detention to other ManTech employees, ManTech propagated false information about him. Such information included false statements that Hawkins had been arrested for committing a crime, that his inability to reenter was the consequence of a contentious divorce proceeding, and that he was behind on child-support payments.

**ANSWER:**    ManTech denies the allegations in Paragraph 212.

TAC 213.    At ManTech's direction, Hawkins executed another "visa run" on March 27, 2013, whereby he met Millbrook agents at the Kuwait International Airport in the early morning hours in order to obtain his passport, passed through Kuwait exit immigration control, flew to Bahrain, passed through Bahraini entry immigration control, passed through Bahraini exit immigration control, flew back to Kuwait where his passport was stamped with another six-month tourist visa, met the Millbrook personnel as he exited the airport to surrender his passport, and returned to his living quarters.

**ANSWER:**    ManTech admits that its Kuwaiti sponsor, Millbrook, was responsible for, among other things, obtaining Visa 18s which required physical possession of employees'

passports in accordance with Kuwaiti practice. ManTech admits Plaintiff Hawkins entered Kuwait on March 27, 2013 and told ManTech he resolved the legal case preventing his return to Kuwait. ManTech lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in Paragraph 213, and on that basis, denies the remaining allegations in Paragraph 213.

TAC 214.    ManTech managers were so callous toward the safety and well being of the ManTech employees that, after Hawkins returned from his detention in Bahrain but just before he was required by ManTech to execute yet another visa run, ManTech administrator Laura Meehan sent an email to ManTech manager Earhart that stated, "Larry Hawkins is on this (visa) run. . . shall we wish him luck?" Earhart's response: "HAHA yeah tell him to pack an extra bag just in case."

**ANSWER:**    The document referenced in Paragraph 214 speaks for itself, and to the extent that allegations in Paragraph 214 vary therewith, ManTech denies those allegations. ManTech denies the remaining allegations in Paragraph 214.

TAC 215.    The same pattern was repeated on May 5, 2013. Each time this happened Hawkins's dual fears were exacerbated: He was afraid of being arrested for violating Kuwait's labor laws, and deported and barred from ever returning to Kuwait, and he was equally afraid of being fired and suffering the dire economic consequence of ending his employment with ManTech prior to the expiration of the required twenty-four months in Kuwait. Such termination would cause financial to Hawkins and his family from the loss of income, the applicable contractual penalty, and the difficulty he could face in obtaining employment after being fired.

**ANSWER:**    ManTech denies the allegations in Paragraph 215.

TAC 216.    Because he lacked a Visa 18 and was not in possession of his own passport, Hawkins lived in fear of arrest. Hawkins was aware that foreign nationals were subject to arrest and mistreatment by Kuwaiti authorities for violating its immigration laws. Hawkins was particularly fearful that the Kuwait law enforcement authorities would spot-check the ManTech worksite for immigration compliance. The ManTech workforce constantly talked about and lived in fear of mass arrest.

**ANSWER:**    ManTech denies the allegations in Paragraph 216.

TAC 217.    Prior to working for ManTech, Hayes worked for subcontractors VSE and Ranger when SAIC was the prime contractor on MRAP maintenance and repair.

**ANSWER:**    ManTech admits Plaintiff Hayes worked for VSE and Ranger Land Systems before working for ManTech on the Contract. ManTech denies the remaining allegations in Paragraph 217.

TAC 218.    VSE and Ranger obtained a Visa 18 for Hayes to ensure that he could work there legally.

**ANSWER:**    ManTech denies the allegations in Paragraph 218.

TAC 219.    When SAIC was replaced by ManTech as the prime contractor, Ranger was terminated, and Ranger, in turn, terminated Hayes's Visa 18.

**ANSWER:**    ManTech denies ManTech replaced SAIC as the "prime contractor." SAIC was the Joint Logistics Integrator ("JLI") at the KMSF before and during ManTech's performance on the Contract. The JLI was responsible for managing the KMSF, including by providing safety technicians to monitor mechanics' safety and enforce safety equipment requirements. ManTech denies the remaining allegations in Paragraph 219.

TAC 220.    Acting on ManTech's invitation to SAIC's subcontract employees to reapply for their jobs, Hayes did so and was successful.  At ManTech's instruction, Hayes returned to the United States for training.

**ANSWER:**    ManTech admits it invited individuals who had worked at the KMSF to apply for positions with ManTech. ManTech further admits it hired Plaintiff Hayes under the Contract and that he attended training in the United States. ManTech denies the remaining allegations in Paragraph 220.

TAC 221.    When Hayes's training ended, he returned to Kuwait at ManTech's instruction to continue to work on MRAPs at the KMSF.

**ANSWER:**    ManTech admits that Plaintiff Hayes traveled to Kuwait to work for ManTech at the KMSF under the Contract after his training ended. ManTech denies the remaining allegations in Paragraph 221.

TAC 222.    To Hayes's knowledge, ManTech never obtained a Visa 18 for Hayes. Instead, ManTech instructed him to engage in repeated "visa runs" to Bahrain to have his tourist visa repeatedly renewed.

**ANSWER:**    ManTech admits that Plaintiff Hayes did not receive a Visa 18 while working for ManTech on the Contract due, in part, to his prior employer's Kuwaiti sponsor failing to remove him from its labor file with the Kuwaiti government. To continue the Visa 18 process, ManTech told Plaintiff Hayes he needed to contact his prior employer's Kuwaiti sponsor and ask it to remove him from its labor file. ManTech denies the remaining allegations in Paragraph 222.

TAC 223.    Hayes, in the company of approximately five to eight other ManTech employees, embarked, as ordered by ManTech manager Bud Delano, on a "visa run" on or about February 5, 2013.

**ANSWER:**    ManTech admits that Plaintiff Hayes embarked on a "visa run" on or about February 7, 2013. ManTech denies the remaining allegation in Paragraph 223.

TAC 224.    In the spring of 2013, Hayes informed his ManTech managers that his tourist visa had expired.  ManTech took no action, even though he was now in the country illegally. When he voiced his concern that he could be arrested and deported, ManTech instructed him that if he was concerned that he would be arrested he should confine himself to his apartment when he was not working.

**ANSWER:**    ManTech denies the allegations in Paragraph 224.

TAC 225.    Just prior to May 16, 2013, ManTech again ordered Hayes to embark on another "visa run," following the same procedure as before.

**ANSWER:**    ManTech admits that Plaintiff Hayes embarked on a "visa run" on or around May 16, 2013. ManTech denies the remaining allegations in Paragraph 225.

TAC 226.    Prior to working for ManTech, Sawyer was employed by VSE which was a subcontractor to ManTech's predecessor SAIC on the MRAP contract.

**ANSWER:**    ManTech admits that prior to working for ManTech, VSE employed Plaintiff Sawyer. ManTech denies the remaining allegations in Paragraph 226.

TAC 227.    While employed by VSE, Sawyer had a Visa 18 that VSE had obtained for him through its Kuwaiti sponsor.

**ANSWER:**    ManTech denies Plaintiff Sawyer received a Visa 18 before he began working for VSE in Kuwait. ManTech admits that VSE's Kuwaiti sponsor later obtained a Visa 18 for Plaintiff Sawyer months after he began working for VSE in Kuwait. ManTech further admits Plaintiff Sawyer worked for VSE in Kuwait on a Visa 14 until he received his Visa 18.

TAC 228.    When ManTech took over the contract, ManTech invited employees of SAIC's subcontractors to reapply for their prior jobs.  Sawyer did so.

**ANSWER:**    ManTech admits that it invited individuals who had worked at the KMSF to apply for positions with ManTech. ManTech admits Plaintiff Sawyer accordingly applied to ManTech. ManTech denies the remaining allegations in Paragraph 228.

TAC 229.    ManTech did not prepare the paperwork that Sawyer remembered that VSE had prepared for Sawyer for obtaining a Visa 18.

**ANSWER:**    ManTech denies the allegations in Paragraph 229.

TAC 230.    Sawyer surrendered his passport to ManTech because ManTech told him it needed his passport to apply for a Visa 18 in his name.

**ANSWER:**    ManTech admits that Millbrook collected Plaintiff Sawyer's passport to obtain his Visa 18 from the Kuwaiti government. ManTech denies the remaining allegations in Paragraph 230.

TAC 231.    Though Sawyer could cancel his VSE Visa 18 on his own, he could not obtain a new Visa 18 in the name of ManTech on his own.  He required the involvement and cooperation of his new employer, ManTech.  At the start of his employment with ManTech and at each opportunity that arose to discuss his immigration status, Sawyer repeatedly told ManTech that it had to apply for and obtain a Visa 18 in his name.

**ANSWER:**    ManTech admits that Plaintiff Sawyer needed to work with VSE and its Kuwaiti sponsor to cancel any previous Visa 18 VSE's Kuwaiti sponsor obtained for Plaintiff Sawyer during his VSE employment. ManTech denies the remaining allegations in Paragraph 231.

TAC 232.    Sawyer asked ManTech when he would get his Visa 18.  ManTech was non-committal.  ManTech told him that obtaining visas for him and his fellow employees was not a

priority for the company.  This was evident to Sawyer because ManTech seemed to have no process in place and no personnel in place to obtain Visa 18s.

**ANSWER:**    ManTech denies the allegations in Paragraph 232.

TAC 233.    On March 30, 2013, ManTech instructed Sawyer, still without a Visa 18, to execute a "visa run."

**ANSWER:**    ManTech denies the allegations in Paragraph 233.

TAC 234.    Sawyer told his ManTech managers that he and his fellow employees were at risk of arrest for doing a "visa run."  ManTech ignored this warning and ordered Sawyer and the others in the group to proceed with the one-day "turn and burn" as scheduled or be fired.

**ANSWER:**    ManTech denies the allegations in Paragraph 234.

TAC 235.    Sawyer and the others were subject to arrest for not remaining outside of Kuwait for a minimum 72-hours prior to reentry, as required under Kuwaiti law.  However, they were under orders from ManTech to return immediately so that they could get back to work at the KMSF immediately and were forced to risk arrest in order to report for work at the time demanded by ManTech.

**ANSWER:**    ManTech denies the allegations in Paragraph 235.

TAC 236.    From November 22, 2012 to May 30, 2013, Sawyer worked in Kuwait without a Visa 18.

**ANSWER:**    ManTech denies the allegations in Paragraph 236.

TAC 237.    To Locklear's knowledge, ManTech never obtained a Visa 18 for him despite confiscating and holding his passport.

**ANSWER:**    ManTech admits that Plaintiff Locklear did not receive a Visa 18 during his ManTech employment on the Contract. ManTech denies the remaining allegations in Paragraph 237.

TAC 238.    Instead of obtaining a Visa 18 for him, ManTech repeatedly ordered Locklear to engage in "visa runs."

**ANSWER:**    ManTech denies the allegations in Paragraph 238.

TAC 239.    Nelson left for Kuwait on November 9, 2012, after completion of U.S. training. ManTech did not provide him with any information about the requirements for working legally in Kuwait. ManTech did not, for example, tell Nelson that it was illegal to work in Kuwait when in- country only on a tourist visa.

**ANSWER:**    ManTech admits that Plaintiff Nelson arrived in Kuwait on November 11, 2012, to begin working for ManTech at the KMSF on the Contract. ManTech denies the remaining allegations in Paragraph 239.

TAC 240.    Upon Nelson's arrival in Kuwait, ManTech confiscated his passport.

**ANSWER:**    ManTech denies the allegations in Paragraph 240.

TAC 241.    To Locklear's knowledge ManTech had not obtained a Visa 18 for Nelson, a prerequisite for Nelson to work legally there.

**ANSWER:**    ManTech admits that Plaintiff Nelson did not receive a Visa 18 while working for ManTech on the Contract. ManTech denies the remaining allegations in Paragraph 241.

TAC 242.    The flight that transported Nelson to Kuwait carried approximately twenty other new ManTech employees. To his knowledge, none of them knew that it would be illegal for them to work in Kuwait without a Visa 18.

**ANSWER:**    ManTech lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 242, and on that basis, denies those allegations. ManTech denies that it is illegal to work in Kuwait without a Visa 18.

TAC 243.    Once he was in Kuwait, Nelson met Americans who were employed by ITT and General Dynamics.  Nelson learned from these Americans that expatriates, such as he, could work in Kuwait only if they had a Visa 18.  His friends at those companies had all obtained Visa 18s before going to Kuwait.

**ANSWER:**    ManTech lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 243, and on that basis, denies those allegations.

TAC 244.    Nelson lived in fear that he would be arrested and deported.  Particularly unnerving was the fact that, because he had no passport, he lacked the ability to immediately prove his U.S. citizenship in a time of crisis.  Thus, in that event, he not only lacked the legal authority to be in Kuwait, he also lacked the ability to take shelter, as a U.S. citizen, on a U.S. military facility.

**ANSWER:**    ManTech lacks sufficient knowledge or information to form a belief as to what Plaintiff Nelson feared, and on that basis, denies those allegations. ManTech denies the remaining allegations in Paragraph 244.

TAC 245.    On or about April 28, 2013, ManTech management ordered Nelson and a group of other ManTech employees whose temporary visas were about to expire to execute a "visa run."

**ANSWER:**    ManTech admits that Plaintiff Nelson, along with other ManTech employees, embarked on a "visa run" on or about April 28, 2013. ManTech denies the remaining allegations in Paragraph 245.

TAC 246.    Millbrook held additional power over Plaintiffs and their coworkers.  If any employee of ManTech who had been issued a Millbrook "sponsored" Visa 18 failed to report to work, Millbrook could report to the Kuwaiti authorities that such employee had "absconded" from the workplace, a criminal violation in Kuwait.  Upon the filing of such charges, Kuwaiti authorities would issue an arrest warrant for that person.  As Kuwait is a member of the Gulf Cooperation Council ("GCC"), arrest warrants issued by Kuwait would be enforced by immigration and law enforcement personnel in the United Arab Emirates, Bahrain, Saudi Arabia, Oman, and Qatar. Once an absconding charge was issued by authorities in Kuwait, Plaintiffs or other ManTech's employees who held Millbrook-sponsored Visa 18s and who departed from Kuwait without ManTech's authorization (or who do not return from an approved leave) would be deemed criminals in these other GCC countries, denied entry, and/or be subject to arrest.  Plaintiffs knew that leaving ManTech, leaving the KMSF without the approval of ManTech, or failing to return to the KMSF from a "visa run" or any other reason could result in legal complications including arrest.

**ANSWER:**    ManTech denies the allegations in Paragraph 246.

## Plaintiffs Were Damaged by Violations of the TVPRA

*Plaintiffs were Denied the Protection of U.S. Law and*
*Were Exposed to Illegal Levels of Toxic Poison*

TAC 247.    ManTech used intimidation and coercion to keep its employees in constant fear of being terminated and deported.  The work conditions were horrific.  The air was putrid and thick with suffocating smoke and fumes from a variety of sources.

**ANSWER:**    ManTech denies the allegations in Paragraph 247.

TAC 248.    The Army's MRAPs are coated with Chemical Agent Resistant Coating ("CARC paint").  CARC paint is a coating system routinely used on military vehicles to make metal

surfaces highly resistant to corrosion and penetration of chemical agents encountered in chemical weapons attacks.

**ANSWER:**    ManTech admits that some Army MRAPs are coated with Chemical Agent Resistant Coating ("CARC paint"). ManTech lacks sufficient knowledge and information to form a belief as to the truth of whether all Army MRAPs are coated with CARC paint, and on that basis, denies that allegation in Paragraph 248.

TAC 249.    CARC paint contains isocyanate (HDI). The CDC identifies the following about HDI:

> Isocyanates are a family of highly reactive, low molecular weight chemicals. They are widely used in the manufacture of flexible and rigid foams, fibers, coatings such as paints and varnishes, and elastomers, and are increasingly used in the automobile industry, autobody repair, and building insulation materials. Spray-on polyurethane products containing isocyanates have been developed for a wide range of retail, commercial, and industrial uses to protect cement, wood, fiberglass, steel and aluminum, including protective coatings for truck beds, trailers, boats, foundations, and decks.

> Isocyanates are powerful irritants to the mucous membranes of the eyes and gastrointestinal and respiratory tracts. Direct skin contact can also cause marked inflammation. Isocyanates can also sensitize workers, making them subject to severe asthma attacks if they are exposed again. There is evidence that both respiratory and dermal exposures can lead to sensitization. Death from severe asthma in some sensitized subjects has been reported. Workers potentially exposed to isocyanates who experience persistent or recurring eye irritation, nasal congestion, dry or sore throat, cold-like symptoms, cough, shortness of breath, wheezing, or chest tightness should see a physician knowledgeable in work-related health problems.

> Preventing exposure to isocyanates is a critical step in eliminating the health hazard. Engineering controls such as closed systems and ventilation should be the principal method for minimizing isocyanate exposure in the workplace. Other controls, such as worker isolation and use of personal protective equipment such as respirators and personal protective clothing to prevent dermal exposures may also be necessary. Early recognition of sensitization and prompt and strict elimination of exposures is essential to reduce the risk of long-term or permanent respiratory problems for workers who have

become sensitized.

**ANSWER:**    The documents referenced in Paragraph 249, including footnote 4 of the TAC, speak for themselves, and to the extent that allegations in Paragraph 249 vary therewith, ManTech denies those allegations.

TAC 250.    Isocyanate/HDI is highly irritating to skin and the respiratory system. Heavy exposure to it can lead to itching and reddening skin, burning sensations in the nose and throat, and watering of the eyes. With extreme exposure, HDI can cause a cough, shortness of breath, pain during respiration, increased sputum production, and tightening of the chest.

**ANSWER:**    ManTech lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 250, and on that basis, denies those allegations.

TAC 251.    Additionally, inhaling high concentrations of solvents contained in CARC can cause coughing, shortness of breath, watery eyes, and respiratory problems, including asthma.

**ANSWER:**    ManTech lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 251, and on that basis, denies those allegations.

TAC 252.    During the drying process, CARC can also release toluene diisocynate ("TDI"). Burning, grinding or welding CARC paint also releases TDI.

**ANSWER:**    ManTech lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 252, and on that basis, denies those allegations.

TAC 253.    Exposure to HDI and TDI can result in a multitude of adverse health effects. The adverse health effects of TDI exposure include acute airway irritation and sensitization ("isocyanate asthma").  Exposure to TDI can also cause kidney damage.

**ANSWER:**    ManTech lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 253, and on that basis, denies those allegations.

TAC 254.    Occupational asthma related to isocyanate exposure can develop in individuals with no prior history of asthma and can sometimes be followed by more generalized hyperreactivity to other irritants.

**ANSWER:**    ManTech lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 254, and on that basis, denies those allegations.

TAC 255.    Occupational safety best practices thus dictate that CARC-coated materials should never be cut or welded, and CARC-coated materials should not be grinded or sanded without high- efficiency air purifying respirators in use.

**ANSWER:**    ManTech lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 255, and on that basis, denies those allegations.

TAC 256.    Given the serious health hazards associated with working with CARC paint, it was and is incumbent upon ManTech to provide workers with suitable and safe work conditions in which workers can avoid the risk of being exposed to or inhaling CARC fumes, particles, or other by-products.

**ANSWER:**    ManTech admits that it attempted to provide its workers with safe work conditions. ManTech further admits that it did not control the environmental conditions at the KMSF, as it was one of several contractors servicing MRAP vehicles and was not the JLI at the KMSF. The JLI was responsible for safety and environmental conditions at the KMSF during ManTech's performance on the Contract. ManTech denies the remaining allegations in Paragraph 256.

TAC 257.    As an Army contractor, ManTech was obligated to follow Department of Defense and Army legal mandates with respect to servicing CARC coated vehicles.

**ANSWER:**    To the extent the allegations in Paragraph 257 constitute legal conclusions, no response is required. To the extent a response is required, ManTech denies the allegations in Paragraph 257.

TAC 258.    U.S. Army Technical Bulletin 43-0242, WD CARC Spot Painting, Department of the Army, 3 Dec 2007, asserts bluntly at 7-1: "Welding is Out.  Never weld or use a cutting torch on CARC – or WD CARC-painted material.  Welding or cutting painted surfaces releases toxic gases, vapors and metal fumes."

**ANSWER:**    The document referenced in Paragraph 258 speaks for itself, and to the extent that allegations in Paragraph 258 vary therewith, ManTech denies those allegations.

TAC 259.    The air at the KMSF was polluted with the smoke of burning CARC paint caused by arc-welding of MRAP vehicles, grinding of CARC paint and metal by sanders, the release of fossil fuels from engine exhaust, fumes released from petroleum products, and other toxins released by the employees' abrasive work on the MRAP vehicles.

**ANSWER:**    ManTech denies the allegations in Paragraph 259.

TAC 260.    When ManTech employed Plaintiffs at the KMSF, the air became dramatically worse.  The KMSF stopped running ventilation fans designed to remove toxic smoke and fumes caused by the welding and grinding of MRAP surfaces. ManTech told Plaintiffs that the ventilators were stopped because they were making too much noise and endangered Plaintiffs' hearing. ManTech's suggestion that it could not maintain adequate ventilation and run ventilator fans without jeopardizing workers' hearing was disingenuous.

**ANSWER:**    ManTech denies the allegations in Paragraph 260.

TAC 261.    ManTech ignored Plaintiffs and other ManTech employees' frequent and repeated complaints about the thick, caustic, smoke that gathered within the facility.  Each day, an

ever- increasing black cloud of toxic smoke filled with caustic chemicals gathered within the KMSF because the ventilators had been turned off. Locklear and his fellow employees were forced to go out into the searing heat during breaks simply to get fresh air.

**ANSWER:**    ManTech denies the allegations in Paragraph 261.

TAC 262.    In response to the complaints about the poor air quality and in rejecting requests to restart the ventilator fans, ManTech instructed its employees to keep the bays doors of the warehouse open. However, this was not a realistic solution as the outside temperature in Kuwait was frequently 120 degrees Fahrenheit.

**ANSWER:**    ManTech admits the doors to the KMSF were periodically opened. ManTech denies the remaining allegations in Paragraph 262.

TAC 263.    Another significant difference in the health and safety conditions at the KMSF between when SAIC directly administered the MRAP contract and when ManTech held the contract was the availability of respirators. Despite many requests from Plaintiffs and other employees at the KMSF, ManTech refused to provide respirators and even refused to provide fresh, clean filters for use with the respirators.

**ANSWER:**    ManTech lacks sufficient knowledge or information to form a belief as to the truth of the allegations pre-dating ManTech's performance under the Contract, and on that basis, denies those allegations in Paragraph 263. ManTech denies the remaining allegations in Paragraph 263.

TAC 264.    When Plaintiffs and other ManTech employees complained about the lack of respirators to filter the smoke-filled air, ManTech threatened to fire them. In fear of suffering the dire economic consequence of ending his employment with ManTech prior to the expiration of the required twenty-four months in Kuwait, the financial loss that would be realized by Plaintiffs

and their families from the loss of income (and the applicable penalty), and the difficulty they might face in obtaining employment after being terminated by ManTech, Plaintiffs were coerced into silence regarding their working conditions.

**ANSWER:**    ManTech denies the allegations in Paragraph 264.

TAC 265.    In sum, the smoke-filled work areas at the ManTech facility had little or no ventilation, and as a result, the working conditions for Plaintiffs and the other mechanics were horrific.  Smoke and particulate matter were discharged from multiple sources, including arc-welding of CARC paint-coated MRAP vehicle bodies, exhaust from running vehicle engines, dust from the grinding down of CARC paint and metallic parts, and other sources of toxicity.  Toward the end of each workday, smoke filled the work area so densely that Plaintiffs could not see from one side of the facility to the other.

**ANSWER:**    ManTech denies the allegations in Paragraph 265.

TAC 266.    Plaintiffs and other ManTech employees experienced immediate and long-term ill- health effects from their exposure to toxic pollution at the KMSF that continue to this day. All Plaintiffs experienced headaches, respiratory distress, sinus congestion, mucus expectoration, and burning in their eyes and throat during the time that they worked at the KMSF.  Some Plaintiffs experienced chronic, daily nosebleeds as a consequence of working in the KMSF during ManTech's control of the facility.

**ANSWER:**    ManTech lacks sufficient knowledge or information to form a belief as to the truth of the allegation in Paragraph 266 regarding "other ManTech employees" not identified, and on that basis, denies that allegation. ManTech denies the remaining allegations in Paragraph 266.

TAC 267.    Plaintiffs and other former ManTech employees continue to experience chronic respiratory and sinus illness since working at the KMSF when ManTech controlled the facility. Furthermore, Plaintiffs and other workers may experience other more serious ailments that are associated with long-term exposure to CARC and CARC solvents.

**ANSWER:**    ManTech lacks sufficient knowledge or information to form a belief as to the truth of the allegation in Paragraph 267 regarding "other ManTech employees" not identified, and on that basis, denies that allegation. ManTech denies the remaining allegations in Paragraph 267.

TAC 268.    Plaintiffs did not want to work under the inhumane and arduous conditions to which they were subjected by ManTech, but reasonably believed that they had no choice, due to ManTech's control over their lives, as manifested, inter alia, by ManTech's confiscation of their passports, ManTech's refusal to obtain legal authorization (Visa 18, employment authorization, and Ministry of Labor identifications) necessary for them to live without constant fear of arrest, the power that ManTech had to report them to Kuwaiti authorities as having "absconded" if they did not report to work, and ManTech's threat of severe financial penalties were Plaintiffs to leave their employment prior to the expiration of the twenty-four months required of their contract.

**ANSWER:**    ManTech denies the allegations in Paragraph 268.

*Plaintiffs Were Damaged by ManTech's TVPRA Violations by*
*Being Victims of Wage Theft*

TAC 269.    KPSLL Article 64 of the State of Kuwait Labor Law states: "it is forbidden to allow workers to work for more than 48 hours per week or 8 hours a day, except in such events as are specified in this Law." Moreover, "[w]orking hours during the holy month of Ramadan shall be equal to 36 hours per week." *Id.*

**ANSWER:**    The Kuwait Private Sector Labor Law referenced in Paragraph 269 speaks for itself, and to the extent that allegations in Paragraph 269 vary therewith, ManTech denies those allegations.

TAC 270.        KPSLL Article 66 provides when a laborer is required to work in excess of forty- eight (48) hours per week, the laborer has the "right to obtain a wage against the overtime hours in a rate which is more than his ordinary rate in a similar period by 25%." The KPSLL makes clear that, "[t]he additional working hours shall not be more than two hours per day and in a maximum number of one hundred eighty (180) hours per year. Also, the additional work periods shall not exceed three days a week and ninety days per year." Id.

**ANSWER:**    The Kuwait Private Sector Labor Law referenced in Paragraph 270 speaks for itself, and to the extent that allegations in Paragraph 270 vary therewith, ManTech denies those allegations.

TAC 271.        Per KPSLL Article 68, "The official holidays granted to a laborer with full pay are: a) Hijiri New Year Day - One day; b) Ascension (lsra & Miraj) Day -One day; c) Eid Al Fitr (Lesser Bairam) -Three days; d) Waqfat Arafat Day - One day; e) Eid Al Adha Greater Bairam - Three days; f) Prophet Birthday - One day; g) National Day (25th February) - One day; h) Liberation Day (26th February) - One day; i) New Gregorian Year - One day." Further, Article 68 states, "If the work circumstances require keeping any laborer in work on any of the official holidays, he shall be paid a double wage together with an alternative compensation day." Plaintiffs were further damaged by ManTech by being the victims of wage theft.

**ANSWER:**    The Kuwait Private Sector Labor Law referenced in Paragraph 271 speaks for itself, and to the extent that allegations in Paragraph 271 vary therewith, ManTech denies those allegations.

TAC 272.    Had Plaintiffs Sawyer, Hayes, Locklear, Nelson, and Hawkins worked legally in Kuwait, as required under the Kuwait Private Sector Labor Law and consistent with the requirements of Kuwait's immigration laws and the necessity of a Visa 18, they would have been entitled to the overtime wages and other benefits mandated by the laws of Kuwait.

**ANSWER:**    To the extent Plaintiffs assert legal conclusions regarding the Kuwait Private Sector Labor Law referenced in Paragraph 272, no response is required. To the extent a response is required, ManTech denies the allegations in Paragraph 272.

TAC 273.    During the time they were employed by ManTech, Plaintiffs' average day consisted of waking up 4:00 a.m. to be picked up by a ManTech bus from the ManTech-provided apartment at 5:00 a.m. The ManTech work facility was approximately an hour drive away. After signing in at the KMSF, Plaintiffs started work at 7:00 a.m. Plaintiffs were provided a fifteen-minute break at 9:15 a.m. Plaintiffs were provided a one-hour break from 11:30-12:30 – a time that Plaintiffs and most employees would try to venture outside of the KMSF facility in order to obtain fresh air. Frequently, however, the outside desert conditions were too severe to venture outside, and Plaintiffs were forced to take their lunch break within the toxic fume/smoke-filled FMSF facility. Nonetheless, at times the interior pollution was so painful and suffocating that Plaintiffs ventured into the blistering heat just to breathe somewhat normally. Plaintiffs were provided another fifteen-minute break at 3:00 p.m. Their workday ended at 6:00 p.m. After checking out and boarding the ManTech bus back to their ManTech-provided apartment, Plaintiffs were in their own living quarters at 7:30 p.m. They had virtually no personal freedom except to work, shower, relieve themselves, and go to bed to be ready to rise again at 4:00 a.m. Plaintiffs were provided one day off per week.

**ANSWER:**    ManTech admits employees at times worked 12 hours per day, 6 days per week at the KMSF during the Contract as directed by the U.S. government. ManTech also admits that those working hours were disclosed to employees in their offer letters before accepting their ManTech employment. ManTech further admits that employees had breaks and did not have to clock in or out when taking breaks during the Contract. Finally, ManTech admits that it provided employees with bus transportation between their apartments and the KMSF, but some employees chose to drive themselves. ManTech denies the remaining allegations in Paragraph 273.

TAC 274.    Plaintiffs worked 72 hours a week in Kuwait-- 24 hours beyond the Kuwaiti maximum of 48 hours per week (and 32 hours beyond the maximum established by the United States Fair Labor Standards Act, which did not cover them in Kuwait).

**ANSWER:**    To the extent Plaintiffs assert legal conclusions regarding the Kuwait Private Sector Labor Law and United States Fair Labor Standards Act ("FLSA") referenced in Paragraph 274, no response is required. To the extent a response is required, ManTech denies those allegations in Paragraph 274. ManTech admits that employees at times worked 12 hours per day, 6 days per week at the KMSF during the Contract as directed by the U.S. government.

TAC 275.    By forcing Plaintiffs to work without the protection of any country's laws, ManTech engaged in flagrant wage theft.  By way of example, Hayes worked 23 weeks in Kuwait at a rate of $19.67 per hour, and 7 weeks at $19.98 per hour.  Under the Kuwait Private Sector Labor Law, ManTech owes him approximately $2,714.46 (24 hours x 23 weeks x 19.67 per hour x .25 (additional overtime rate)); plus $839.16 (24 x 7 x 19.98 x .25, or $209.79) for an estimated total overtime compensation of $3,553.62.  Under U.S. law, ManTech owed Hayes approximately $7,338.56 (calculated as 32 hours x 23 weeks x 19.67 per hour x .50 (additional overtime rate));

plus $2,237.76 (32 hours x 7 weeks x 19.98 x .50) for an estimated total compensation of working overtime of $9,576.02.

    **ANSWER:**   ManTech denies that the FLSA applies to Plaintiffs' employment because Plaintiffs provided services during the workweek in a foreign country, *see* 29 U.S.C. § 213(f), and denies the allegations in Paragraph 275.

    TAC 276.    By way of example, Locklear worked 26 weeks in Kuwait. He was also required to work a 72-hour work week. Using his pay of $19.56 as the rate to calculate his missing overtime wages, Locklear was entitled to additional pay at the Kuwaiti rate of 24 hours x $19.56 x .25 x 26 weeks, or $3,051.36. At a rate compensable under U.S. law, Locklear was entitled to 32 hours x $19.56 x .50 x 26 weeks or $3,976.02.

    **ANSWER:**   ManTech denies that the FLSA applies to Plaintiffs' employment because Plaintiffs provided services during the workweek in a foreign country, *see* 29 U.S.C. § 213(f), and denies the allegations in Paragraph 276.

    TAC 277.    By way of example, during his 1st week in Kuwait, Nelson worked 80 hours. Accordingly, for the overtime worked that week, under the Kuwait Private Sector Labor Law, Nelson was owed $144.00 ($16.00 x .25 x 36 hours) (under the Fair Labor Standards Act, he would have been paid $320.00 ($16.00 x .50 x 40 hours)). During his 2nd week of work in Kuwait, Nelson worked 60 hours. Under Kuwaiti law he was owed $112.00 ($16.00 x .25. x 28 hours) (under the Fair Labor Standards Act, he would have been owed $256.00 ($16.00 x .50 x 32 hours)). During the 3rd-12th weeks of his work in Kuwait, Nelson was required to work 72 hours each week. Under Kuwaiti law, he was owed $1,120.00 ($16.00 x .25 x 28 hours x 10 weeks) (under U.S. law, $2,560.00 ($16.00 x .50 x 32 hours x 10 weeks)). In addition, in weeks 16 through 20 Nelson was forced to work 72 hours each week. Under Kuwaiti law, he was owed $448.00 ($16.00

x .25 x 28 hours x 4 weeks) (under U.S. law, $1,024.00 ($16.00 x .50 x 32 hours x 4 weeks)). In

week 21, Mr. Nelson's pay was raised to $16.26 per hour. Yet he was still required to work 72

hours for weeks 21 through week 28. Thus, under Kuwaiti law he is owed $796.74 (16.26 x .25 x

28 hours x 7 weeks) (under U.S. law he is owed $1,821.12 ($16.26 x .5 x 32 hours x 7 weeks)). In

week 29, Nelson was required to work 64 hours. Under Kuwaiti law he was owed $112.00 ($16.26

x .25 x 20 hours) (under U.S. law $195.12 ($16.26 x .50 x 24 hours)).

**ANSWER:**    ManTech denies that the FLSA applies to Plaintiffs' employment because

Plaintiffs provided services during the workweek in a foreign country, *see* 29 U.S.C. § 213(f), and

denies the allegations in Paragraph 277.

TAC 278.    Through ManTech's abuse, Plaintiffs lacked the protection of any country's

laws. They were entitled to the protections of some nation's wage and hour laws yet having left

the United States, they were not longer covered by the McNamara-O'Hara Service Contract Act

which was generally applicable to the Contract. The Contract, pp. 53, 339, 345, 388. Yet, having

brought Plaintiffs into Kuwait illegally and without the recognition and rights afforded to them as

residents of Kuwait, Plaintiffs were denied any rights under the Kuwait Private Sector Labor Law.

Thus, Plaintiffs were denied the compensation and benefits of U.S. law and Kuwait law, both.

**ANSWER:**    ManTech admits that the McNamara-O'Hara Service Contract Act ("SCA")

does not apply to Plaintiffs' employment on the Contract with ManTech. ManTech denies the

remaining allegations in Paragraph 278.

TAC 279.    Plaintiffs could not advocate for their rights to fair wages because they lived

in fear of arrest for lack of U.S. passports, proper immigration papers, and a proper work

authorization. Plaintiffs were acutely aware of the fate of Americans who, when arrested by

Kuwaiti police for immigration violations, were forced into shared, overcrowded jail cells; with

inadequate food; poor sanitation; and physical, verbal, and psychological abuse.  Moreover, Plaintiffs knew that, if arrested, they would be subject to summary deportation, and a consequent lifetime ban on reentering Kuwait or any other Gulf-Cooperation Council country.  Plaintiffs also feared the consequences of being fired by ManTech, including the financial penalty for termination prior to completing 24-months of service.

**ANSWER:**    ManTech denies the allegations in Paragraph 279.

TAC 280.    Pursuant to 18 U.S.C. §1593(a), the Court shall enter an order of restitution for each and all of the TVPRA offenses described above.

**ANSWER:**    ManTech denies the allegations in Paragraph 280.

TAC 281.    Pursuant to 18 U.S.C. §1593(b)(1), such an order of restitution shall direct the Defendant to pay the victim the full amount of the victim's losses including any costs incurred by the victim for medical services relating to physical, psychiatric, or psychological care; physical and occupational therapy or rehabilitation; necessary transportation, temporary housing, and child care expenses; lost income; attorneys' fees, as well as other costs incurred; and any other losses suffered by the victim as a proximate result of the offense.

**ANSWER:**    ManTech denies the allegations in Paragraph 281.

TAC 282.    Under 18 U.S.C. §1593(b)(1), the order of restitution shall also include the greater of the gross income or value to the Defendant of the victim's services including the offender's ill- gotten gains.

**ANSWER:**    ManTech denies the allegations in Paragraph 282.

<u>**COUNT V**</u>
**Violations of the False Claims Act with Respect to Compliance with The Trafficking Victims Protection Reauthorization Act Pursuant to 31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B) or Implied False Claim**

TAC 283.    The allegations in Paragraphs 1-21 and 143-324 are incorporated in this count by reference as though fully stated herein.

**<u>ANSWER:</u>**    ManTech incorporates by reference its responses to Paragraphs 1–21 and 143–324 of the TAC and further denies any allegations not expressly admitted.

**<u>Compliance with TVPRA was a Material Condition for Payment Under the Contract</u>**

TAC 284.    Public Law 108-193, the "Trafficking Victims Protection Reauthorization Act of 2003" (Dec. 19, 2003), gave the Government the authority to terminate grants, contracts, or cooperative agreements for Trafficking-In-Persons-related violations. It established:

> The President shall ensure that any grant, contract, or cooperative agreement provided or entered into by a Federal department or agency under which funds are to be provided to a private entity, in whole or in part, shall include a condition that authorizes the department or agency to terminate the grant, contract, or cooperative agreement, without penalty, if the grantee or any subgrantee, or the contractor or any subcontractor (i) engages in severe forms of trafficking in persons or has procured a commercial sex act during the period of time that the grant, contract, or cooperative agreement is in effect, or (ii) uses forced labor in the performance of the grant, contract, or cooperative agreement. 22 U.S.C. §7104g [2009].

**<u>ANSWER:</u>**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 284, and denies them on this basis.

TAC 285.    In 2006, the U.S. Civilian Agency Acquisition Council and the U.S. Defense Acquisition Council agreed on an interim rule implementing the above stated requirement, adding Federal Acquisition Regulation Subpart 22.17, "Combating Trafficking in Persons." The regulation stated that the "subpart applies to all acquisitions," and paragraph 22.1705, "contract clause" states: (a) Insert the clause at 52.222-50, Combating Trafficking in Persons, in all

solicitations and contracts. (b) Use the basic clause with its Alternate I when the contract will be performed outside the United States (as defined at 25.003) and the contracting officer has been notified of specific U.S. directives or notices regarding combating trafficking in persons (such as general orders or military listings of "off-limits" local establishments) that apply to contractor employees at the contract place of performance.

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 285, and denies them on this basis.

TAC 286.    The DoD Inspector General mandate for this evaluation was contained in Public Law 110-457, "William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008," December 23, 2008. Subtitle D, section 232, which required the Inspector General, for fiscal years 2010 through 2012, to: "…investigate a sample of … contracts, or subcontracts at any tier, under which there is a heightened risk that a contractor may engage, knowingly or unknowingly, in acts related to trafficking in persons, such as: (A) confiscation of an employee's passport; (B) restriction on an employee's mobility; (C) abrupt or evasive repatriation of an employee; (D) deception of an employee regarding the work destination; or (E) acts otherwise described in section 106(g) of the Trafficking Victims Protection Act of 2000 (22 U.S.C. 7104)."

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 286, and denies them on this basis.

TAC 287.    Section 232 of Public Law 110-457 required a report to Congress no later than January 15 of each year: (A) summarizing the findings of the investigations conducted in the previous year, including any findings regarding trafficking in persons or any improvements needed

to prevent trafficking in persons; and (B) in the case of any contractor or subcontractor with regard to which the Inspector General has found substantial evidence of trafficking in persons, report as to— (i) whether or not the case has been referred for prosecution; and (ii) whether or not the case has been treated in accordance with section 106(g) of the Trafficking Victims Protection Act of 2000 (22 U.S.C. 7104) (relating to termination of certain grants, contracts and cooperative agreements).

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 287, and denies them on this basis.

TAC 288.    In compliance with this Congressional mandate, the Inspector General of the Department of Defense reviewed over 360 Department of Defense contracts for compliance with the "Trafficking Victims Protection Act of 2000," title 22, United States Code, chapter 78 (as amended).

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 288, and denies them on this basis.

TAC 289.    On January 18, 2011, after completing this Congressionally mandated review, the Inspector General of DoD recommended that the Federal Acquisition Regulations and CentCom regional combating trafficking in persons clause be present in all contracts. Specifically, the Inspector General recommended that "[t]he Commander, U.S. Central Command Contracting Command, should:

"a. Ensure that Federal Acquisition Regulation clause 52.222-50, 'Combating Trafficking in Persons,' or Alternate I, is included in all contracts; and

"b. Provide additional guidance to clarify proper usage of the U.S. Central Command Contracting Command clause 952.222-0001, 'Prohibition Against

Human Trafficking, Inhumane Living Conditions, and Withholding of Employee Passports.'"

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 289, and denies them on this basis.

TAC 290.    In the very solicitation for MRAP services, the Army made it clear that it expected ManTech (and all other contract bidders) to adhere to exacting requirements prohibiting the trafficking of humans. Section C-3, "952.222-0001 Prohibition Against Human Trafficking, Inhumane Living Conditions, Jul/2010 (C3) And Withholding of Employee Passports," of the Contract makes clear:

(a)    All contractors (contractors refers to both prime contractors and all subcontractors at all tiers) are reminded of the prohibition contained in Title 18, United States Code, Section 1592, against knowingly destroying, concealing, removing, confiscating, or possessing any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person, to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the persons liberty to move or travel, in order to maintain the labor or services of that person.

(b)    Contractors are also required to comply with the following provisions:

(1) Contractors shall only hold employee passports and other identification documents discussed above for the shortest period of time reasonable for administrative processing purposes.

\*\*\*

(5) Contractors shall incorporate checks of life support areas to ensure compliance with the requirements of this Trafficking in Persons Prohibition into their Quality Control program, which will be reviewed within the Governments Quality Assurance process.

(6) Contractors shall comply with International and Host Nation laws regarding transit/exit/entry procedures, and the requirements for visas and work permits.

(c)    Contractors have an affirmative duty to advise the Contracting Officer if they learn of their employees violating the human trafficking and inhumane living

conditions provisions contained herein. Contractors are advised that contracting officers and/or their representatives will conduct random checks to ensure contractors and subcontractors at all tiers are adhering to the law on human trafficking, humane living conditions and withholding of passports.

(d)    The contractor agrees to incorporate the substance of this clause, including this paragraph, in all subcontracts under his contract.

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 290, and denies them on this basis.

TAC 291.    Solicitation W56HZV-11-R-0181, page 54 of 125, provided conspicuous notice that any and all bidders would be required to follow FAR 52.222-50, "Combating Trafficking in Persons," which made clear, "The United States Government has adopted a zero tolerance policy regarding trafficking in persons." Id. at § (b) (emphasis added).

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 291, and denies them on this basis.

TAC 292.    The Federal Acquisition Regulations themselves gave additional notice that "Contractors and contractor employees shall not — (1) Engage in severe forms of trafficking in persons during the period of performance of the contract; . . . or (3) Use forced labor in the performance of the contract." Id. In addition:

The Contractor shall — (1) Notify its employees of — (i) The United States Government's zero tolerance policy described in paragraph (b) of this clause; and (ii) The actions that will be taken against employees for violations of this policy. Such actions may include, but are not limited to, **removal from the contract**, reduction in benefits, or termination of employment; and (2) Take appropriate action, up to and including termination, against employees or subcontractors that violate the policy in paragraph (b) of this clause.

*Id.* at § (c) (emphasis added).

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 292, and denies them on this basis.

TAC 293.    Solicitation reference FAR 52.222-50 (d)(1), "Notification," required that "[t]he Contractor shall inform the Contracting Officer immediately of — Any information it receives from any source (including host country law enforcement) that alleges a Contractor employee, subcontractor, or subcontractor employee has engaged in conduct that violates this policy" A contractor's failure to inform the United States of trafficking activity may result in suspension or debarment. Id. at (e).

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 293, and denies them on this basis.

TAC 294.    The Contract signed by ManTech contained a variety of federal regulations that were incorporated by reference at Section 9, Page 8 of 388 including requirements that ManTech observe host country, international, and host-country law and the anticipated prohibition on human trafficking.

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 294, and denies them on this basis.

TAC 295.    With respect to the observance of law, the Contract made clear that ManTech would be bound by Regulation 252.225-7040, specifically:

**252.225-7040 Contractor Personnel Supporting U.S. Armed Forces Deployed Outside the United States**. Under subclause (d) (1), "Compliance with laws and regulations," ManTech was required to "comply with, and shall ensure that its personnel supporting U.S. Armed Forces deployed outside the United States… are

familiar with and comply with, all applicable - (i) United States, host country, and third country national laws; (ii) Provisions of the law of war, as well as any other applicable treaties and international agreements; (iii) United States regulations, directives, instructions, policies, and procedures; and (iv) Orders, directives, and instructions issued by the Combatant Commander, including those relating to health… [or]safety[.]"

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion

and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations

in Paragraph 295, and denies them on this basis.

TAC 296.    Reflecting the importance and materiality of the conduct prohibited by FAR

52.222-50, the Contract contained even greater protections than those presaged by the Solicitation:

**KSCR1-2 – Prohibition Against Human Trafficking, Inhumane Living Conditions, And Withholding Of Employee Passports (Oct 2011)**. On October 15, 2011, U.S. Central Command ("CentCom"), CentCom Contracting Command (CJTSCC), issued "Unique Requirements for Theater Business Clearance in the Kuwait Area of Operation." KSCR1-2 states:

"KSCR1-2 – Prohibition Against Human Trafficking, Inhumane Living Conditions, And Withholding of Employee Passports (Oct 2011)" [s]hall be included in all services or construction contracts which require performance in Kuwait. This mandated requirement augments FAR Clause 52.222-50 "Combating Trafficking in Persons" Alternate I. By Reference, include FAR 52.222-50 and the following: PROHIBITION AGAINST HUMAN TRAFFICKING, INHUMANE LIVING CONDITIONS, AND WITHHOLDING OF EMPLOYEE PASSPORTS (OCT 2011) Trafficking in
Persons (TIP): Contractor employees and subcontractor employees performing under this contract shall comply with all DOD and ASG-KUs Trafficking in Persons policies. Contractor employees are subject to prescriptions and remedies at FAR Clause 52.222-50 and the terms and conditions stated herein.

***ASG-KU has adopted a more stringent policy than federal requirements regarding trafficking in persons.*** All Contractor employees and subcontractor employees shall be subject to FAR Clause 52.222-50, Combating Trafficking in Persons. Contractor shall adhere to and abide by all Kuwait Labor Laws during the performance of this contract. (emphasis added).

Registered Employee Listing: On a monthly basis, the Contractor shall provide the ACO with a listing of employee names registered with the Ministry of Social Affairs and Labor (MOSAL). Failure to provide the ACO with a list of employees registered with the MOSAL will result in the denial of installation badging privileges for Contractor employees. Furthermore, a copy of each individual's employment contract shall be available to the USG by the conclusion of the

Transition Period. At a minimum, the employment contract shall be in English and the language of the employee. The Contractor shall disclose and make known to its employees the terms and conditions of employment.

For the duration of the contract, the Contractor shall ensure all wages earned (hourly, weekly, monthly, yearly), to include benefits and allowances, or any type of debt bondage arrangement in effect between the Contractor and employee, are included in each employee's contract. Contractor shall specify the compensation rate to be earned for hours in excess a normal workweek within the employment contract.

\*\*\*

**Notification**: Contractor shall inform the PCO immediately of any information received from any source (including host country law enforcement) that alleges a Contractor employee, subcontractor, or subcontractor employee has engaged in conduct that violates [Trafficking in Persons] policies, and any actions taken against Contractor or subcontractor employees pursuant to FAR Clause entitled "Combating Trafficking in Persons".

**Remedies**: In addition to other remedies available to the USG, the Contractors failure to comply with TIP policy may render the Contractor subject to the following at no cost to the USG:
(1)    Required removal of a Contractor employee or employees from the performance of the contract.
(2)    Required subcontractor termination.
(3)    Suspension of contract payments.
(4)    Loss of fee, consistent with the fee plan, for the performance period in which the USG determined Contractor non-compliance.
(5)    Termination of the contract for default or cause, in accordance with the termination clause of this contract.
(6)    Suspension or debarment.

**Subcontracts**: Contractor shall flow-down to its subcontracts the terms and conditions of this paragraph IAW Host Nation laws, regulatory guidance, DOD, and FAR clauses referenced herein.

**<u>ANSWER:</u>**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 296, and denies them on this basis.

TAC 297.    In March 2014, the Army took the opportunity to remind ManTech of its obligations under the TVPRA by adding Section C-3 to the contract. Section C-3, citing FAR 5152.222-5900. stated, in pertinent part:

**PROHIBITION AGAINST HUMAN TRAFFICKING, INHUMANE LIVING CONDITIONS AND WITHHOLDING OF EMPLOYEE PASSPORTS**

(a)    All contractors ("contractors" refers to both prime contractors and all subcontractors at all tiers) are reminded of the prohibition contained in Title 18, United States Code, Section 1592, against knowingly destroying, concealing, removing, confiscating, or possessing any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person, to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the persons liberty to move or travel, in order to maintain the labor or services of that person.

(b)    Contractors are also required to comply with the following provisions:

(1)    Contractors shall only hold employee passports and other identification documents discussed above for the shortest period of time reasonable for administrative processing purposes.

\*\*\*

(5)    Contractors shall incorporate checks of life support areas to ensure compliance with the requirements of this Trafficking in Persons Prohibition into their Quality Control program, which will be reviewed within the Governments Quality Assurance process.

(6)    Contractors shall comply with International and Host Nation laws regarding transit/exit/entry procedures and the requirements for visas and work permits

(c)    Contractors have an affirmative duty to advise the Contracting Officer if they learn of their employees violating the human trafficking and inhumane living conditions provisions contained herein. Contractors are advised that Contracting Officers and/or their representatives will conduct random checks to ensure contractors and subcontractors at all tiers are adhering to the law on human trafficking, humane living conditions and withholding of passports.

(d)    The contractor agrees to incorporate the substance of this clause, including his paragraph, in all subcontracts under his contract.

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 297, and denies them on this basis.

TAC 298.    Indeed, in recognition of the fact that such compliance was a "primary" requirement, in a customized "Addendum" to each of ManTech's employment contracts with Plaintiffs, the following is provided:

> Your work area is designated as Kuwait as stated in your offer letter. A primary requirement for working in Kuwait involves issuance of a host nation Work Visa with sponsorship. To obtain a work visa, you will be required to meet established host nation criteria, including a favorable background investigation (this is in addition to employment background check and security clearance requirements) and a medical examination to detem1ine fitness to work. These requirements may not be waived, are not negotiable and may not be substituted using alternate approvals, e.g., a current active security clearance does not supersede and cannot be used in place of the required host nation background check, nor is a deployment medical exam acceptable in lieu of the required medical exam.

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 298, and denies them on this basis.

TAC 299.    On information and belief, ManTech's employment contracts with the other employees who worked on the Contract in Kuwait contained similar if not identical provisions.

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 299, and denies them on this basis.

TAC 300.    Not only was ManTech aware of it's the United States government's zero tolerance toward trafficking but it passed such notice and warnings on to its subcontractors. Specifically, in the Purchase Order that ManTech created for Millbrook's services, infra, ManTech was explicit in making clear Millbrook's obligations. Attachment B to the Millbrook Purchase Order makes clear that Millbrook will be bound by FAR 52.222-50, "Combating Trafficking in Persons." ManTech made plain that FAR 52.222-50 applied to "[a]ll orders" that would be placed by ManTech.

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 300, and denies them on this basis.

**Willful Violations of International Treaty Obligations, U.S. Law, and Army Regulations with Respect to Adherence to Violations of the Trafficking Victims Protection Reauthorization Act Were Material as a Matter of Fact and Material as a Matter of Law**

TAC 301.    Through repeated policy pronouncements, numerous refinements of contracting regulations, and substantial efforts by the Department of Defense to root out human trafficking and forced labor as a collateral detriment of the foreign deployment of U.S. military forces overseas, the Department of Defense has made manifest the materiality of adherence to the TVPRA.

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 301, and denies them on this basis.

TAC 302.    Irrespective of whether any particular Army contracting officer might think about the materiality of TVPRA adherence, the policy pronouncement of a "zero tolerance" for activities that violate the TVPRA makes such violations material as a matter of law.

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 302, and denies them on this basis.

TAC 303.    ManTech was under an affirmative obligation to disclose to the U.S. facts that would, if known, disqualify ManTech from contracting with the U.S. ManTech's failure to disclose its knowledge of human trafficking activity by its employees and its lack of adherence to prescribed safety standards constitute false claims regarding qualification for payment and, thus, false claims for payment.

112

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 303, and denies them on this basis.

TAC 304.    By accepting payment and additional options periods under the contract, ManTech falsely implied certification of compliance with the TVPRA requirements.

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 304, and denies them on this basis.

TAC 305.    Ignoring the U.S. Government's "zero-tolerance" policies with respect to prohibitions on Human Trafficking and its express obligations under the Contract, ManTech trafficked Plaintiffs and their colleagues illegally into Kuwait, abused Kuwait's immigration and labor laws and, by doing so, inflicted serious harm on Plaintiffs and their colleagues.

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 305, and denies them on this basis.

TAC 306.    Through its trafficking activity, ManTech placed Plaintiffs and their colleagues in fear of arrest, imprisonment, and expulsion; forced Plaintiffs and their colleagues to work in deplorable, dangerous conditions; and refused to pay them in accordance with the laws of the U.S. and Kuwait.

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 306, and denies them on this basis.

**ManTech Made Materially False Claims to the United States and Generated Volumes of
False Records to Conceal its Abuse of Kuwait's Immigration Laws, Abuse of Kuwait's
Private Sector Labor Laws, Its False Claims to the Government of Kuwait, and its Abuse
of Its Workforce**

TAC 307.    ManTech made explicit false statements, generated false records to hide
from the United States that it was engaged in conduct that violated the TVPRA.

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion
and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations
in Paragraph 307, and denies them on this basis.

TAC 308.    On November 26, 2012, generated a false record in furtherance of its
scheme to abuse Kuwait's immigration and labor laws. Specifically, on that date ManTech sent
correspondence, that it had drafted and on ManTech letterhead, in the name of Kevin Craft,
Contract Representative, JPO. This letter was written directly to the Assistant Undersecretary,
Labor Affairs, MOSAL. In this letter, ManTech causes Mr. Craft to falsely state, "under
subcontract #GSSV02014 issued by ManTech to Millbrook on 21 November 2011, Millbrook is
required to provide approximately 250 American Nationals to support subject prime contract thru
(sic) 31 December 2013." This statement was false. It was never anticipated that Millbrook would
supply any American Nationals. All the American Nationals working for ManTech in Kuwait were
already under direct contract with ManTech. The purpose of this letter was to mislead the Kuwaiti
government and make the Kuwaiti government believe that the mechanics working at the KMSF
were the employees of a Kuwaiti company. This letter also falsely claimed that ManTech's
contractual relationship dated to 2011 when, in fact, on November 26, 2012, ManTech was still in
negotiations with Millbrook for a "sponsorship" contract (one that, in any case, was illegal as it
falsified the ultimate employer of those working at the KMSF). ManTech back-dated the

proclaimed relationship because its employees had been present, illegally present, in Kuwait for more than a year.

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 308, and denies them on this basis.

TAC 309.    The December 10, 2012 Letter from ManTech to the Department of the Army, U.S. Contracting Command (Warren) was a false claim and a false record. Contracting Command had asked a specific question regarding whether ManTech was complying with Kuwait's labor law. ManTech responded with false statements of fact and false statements of law. These false statements were made to conceal the fact that ManTech was abusing Kuwait's immigration and labor laws.

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 309, and denies them on this basis.

TAC 310.    On December 20, 2012, ManTech generated a false record, to wit a letter written on ManTech letterhead and executed by ManTech Subcontracts Manager Kathryn H. Romance, that made the following false statement to the United States through HNA:

> This is to confirm that Millbrook Kuwait, a company registered to conduct business in Kuwait, has been subcontracted by ManTech Telecommunications and Information Systems Corporation to provide labor (AN), in support of referenced prime contract (W56HZV-12-0127), under subcontract CSSV020104 . . . Millbrook is required to provide approximately 250 American Nationals to support subject prime contract thru (sic) 31 December 2013 and with potential option periods thru (sic) 30 June 2013. Millbrook Kuwait is considered by ManTech as a responsible subcontractor, pursuant to both United States Acquisition Regulations (FAR) and supplements thereto, including Kuwaiti laws.

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 310, and denies them on this basis.

TAC 311.    This statement was false because ManTech employed Relators and the other mechanics working on Contract W56HZV-12-0127 worked for ManTech directly. This statement was false because neither Relators nor the other mechanics working on Contract W56HZV-12-0127 were employed by Millbrook. This statement was false because ManTech had already been provided notice that Millbrook was not a company in good standing under the laws of Kuwait.

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 311, and denies them on this basis.

TAC 312.    On January 3, 2013, ManTech generated and sent to the United States another false record that contained another false claim made to conceal conduct that violated the TVPRA. Specifically, ManTech Subcontracts Manager Ms. Romance sent another letter to HNA, again on ManTech letterhead, that stated, "This is to confirm that Millbrook Kuwait commits to bringing the first months (sic) proof of payroll to the Host Nations office upon opening the labor file."

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 312, and denies them on this basis.

TAC 313.    At the time this false record and false claim were made, ManTech knew that the mechanics in question were under direct contract with ManTech, not Millbrook, and were to be paid by ManTech, not Millbrook, for the services provided at the KMSF. ManTech knew that

no bona fide payroll would be created for these employees because the employees did not work for Millbrook. In fact, at the time this statement was made, ManTech was in negotiations with Millbrook to use ManTech provided funds to falsify Millbrook "salary" payments into Kuwait-based bank accounts (that would be set up in the names of ManTech's employees). Wrote Mark Croll, The Manager Director of Millbrook, in a November 24, 2012 email to Cody, Kathryn Romance, and Joy O'Brien:

> I have agreed with Muge that we would be happy to receive the money to our account in Kuwait and then disburse it to the individual accounts as directed by ManTech. There will be no charge from Millbrook to do this and 100 % of the money received will be distributed each month. We will need to receive the money as cleared funds the week before month end payment date along with a specific spread sheet or instruction of the amount to be credited to each person.

**ANSWER:**   The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 313, and denies them on this basis.

TAC 314.       JPO relied on the claims made by ManTech – claims that were false – when, on January 3, 2013, it lent its credibility and imprimatur to ManTech's statement through its own assurance in this regard. On that date, JPO wrote its own memo to HNA stating "This is to confirm that Millbrook Kuwait commits to bringing the first months (sic) proof of payroll to the Host Nations office upon opening a labor file." ManTech was aware that one part of the United States military was passing along ManTech's false statement, as if true, to another part of the United States military and did nothing to correct the retransmission of its original false claim.

**ANSWER:**   The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 314, and denies them on this basis.

TAC 315.     In reliance of the truth of claims made by both ManTech and JPO, HNA wrote to the Kuwait Ministry of Social Affairs on January 8, 2013, to certify that Millbrook Kuwait would be providing 250 laborers for Contract W56HZV-12-C-0127. ManTech knew that HNA, in reliance on the truth of ManTech's claims, had placed the credibility of the United States at risk in certifying Millbrook as a source of labor for Contract W56HZV-12-C-0127. Yet, ManTech knew that the underlying statement was false. ManTech took no action to prevent the United States from making a materially false statement to the sovereign of another country – a country that is a key strategic ally of the United States.

**ANSWER:**     The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 315, and denies them on this basis.

TAC 316.     The United States has been damaged by the false claims made and false records created by ManTech. Specifically, ManTech's false claims on and false records have defeated important policy objectives of the United States regarding its zero tolerance policy towards companies engaged in violations of the TVPRA. Not only were important policy objectives defeated but ManTech used U.S. taxpayer money to pay a Kuwait-based company to lie to government of Kuwait. The United States was additionally damaged because U.S. taxpayer money was laundered through a bank in the United Kingdom, transferred to Kuwait, deducted by Millbrook for the purpose of engaging in human trafficking. The United States was additionally damaged by the false claims made by ManTech with respect to prohibitions on trafficking because ManTech's knowingly false claims to the United States were transmitted as truths to the State of Kuwait – a transmission of lies that undermines the credibility and standing of the United States with respect to a key ally. The United States was additionally damaged by the false claims by

ManTech because, by repeating as truths ManTech's lies, the United States unwittingly assisted ManTech in the illegal trafficking of people into Kuwait. The United States was additionally damaged because it paid ManTech with taxpayer money when, because of ManTech's human trafficking activities, ManTech was categorically unqualified to receive U.S. taxpayer funds.

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 316, and denies them on this basis.

TAC 317.    Damages include the return of all moneys paid to ManTech under Contract No. W56HZV-12-C-0127, the return of all moneys paid to Millbrook, and civil monetary penalties due on each false record created to conceal ManTech's trafficking activities – activities that, if known, would have disqualified ManTech from obtaining any U.S. taxpayer funds.

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 317, and denies them on this basis.

TAC 318.    Each false and/or fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

**ANSWER:**    The Court dismissed Count V with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 39–42. Thus, ManTech is not required to respond to the allegations in Paragraph 318, and denies them on this basis.

## COUNT VI
### Violations of 18 U.S.C. § 1956
### Laundering of Monetary Instruments

TAC 319.    The allegations in Paragraphs 1-21 and 143- 324 are incorporated in this count by reference as though fully stated herein.

**ANSWER:**    ManTech incorporates by reference its responses to Paragraphs 1–21 and 143–324 of the TAC and further denies any allegations not expressly admitted.

TAC 320.    18 U.S.C. §1956 (2) establishes that whoever transmits or attempts to transmit funds from a place in the United States to a place outside the United States with the intent to promote the carrying on of specified unlawful activity shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both. Pursuant to 18 U.S.C. §1956 (c) (7)(B)(vii) specified unlawful activity includes trafficking in persons.

**ANSWER:**    The Court dismissed Count VI with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 320, and denies them on this basis.

TAC 321.    18 U.S.C. §1962 makes it unlawful for any person who has received any income derived, directly or indirectly, through collection of an unlawful debt in which such person has participated as a principal to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

**ANSWER:**    The Court dismissed Count VI with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 321, and denies them on this basis.

TAC 322.    Pursuant to 18 U.S.C. §1964 (c), any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any

appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

**ANSWER:**    The Court dismissed Count VI with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 322, and denies them on this basis.

TAC 323.    ManTech transmitted funds from the United States to a Millbrook bank account in the United Kingdom for the purpose of abusing Kuwaiti law, to wit, trafficking U.S. citizens into that country illegally and falsifying employment by Millbrook Kuwait in order to circumvent Kuwait's immigration and labor laws and, by doing so, obtain an unlawful debt from the United States.

**ANSWER:**    The Court dismissed Count VI with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 323, and denies them on this basis.

TAC 324.    Pursuant to 18 U.S.C. §1964 (c), Relators Hayes, Locklear, Sawyer, Hawkins, and Nelson seek relief from the United States District Court for ManTech's illegal activity including, but not limited to, treble of damages established by Relators any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

**ANSWER:**    The Court dismissed Count VI with its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 324, and denies them on this basis.

**COUNT VII**
**Wrongful Termination**
**Sawyer, Hayes, Locklear, and Nelson**

TAC 325.    The allegations in Paragraphs 1-142, 326-334 are incorporated in this count by reference as though fully stated herein.

**ANSWER:**    ManTech incorporates by reference its responses to Paragraphs 1–142 and 326–334 of the TAC and further denies any allegations not expressly admitted.

TAC 326.    On May 30, 2013, Bonita Cromartie, Havie Terrie, Jonathan Bowker, Hayes, Sawyer, Nelson, and Locklear were told to report to the office of ManTech supervisor John Gaurnieri ("Gaurnieri"). Hayes and the others who were brought into Gaurnieri's office were fired for cause by ManTech.

**ANSWER:**    Plaintiffs previously voluntarily dismissed, *see* Feb. 22, 2022 Minute Order, and the Court entered dismissal of Count VII in its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 326, and denies them on this basis.

TAC 327.    These seven ManTech employees were terminated for cause at the request of JPO, Kuwait Country Lead John Danks ("Danks") and JPO MRAP Fielding, Training, & Manpower Anthony Orejel ("Orejel"). Specifically, Danks who wrote, on May 24, 2013 sent an email to Orejel stated:

> The 7 people . . . should be removed due to the lack of productivity on the floor. They are in fact non productive and I no longer want them in the facility. I have scrubbed the data a few times to validate the numbers with the team. I am sure that ManTech has not turned in any fraudulent time cards that would change the numbers and it is in the best interest of both parties to remove them from this program.

**ANSWER:**    Plaintiffs previously voluntarily dismissed, *see* Feb. 22, 2022 Minute Order, and the Court entered dismissal of Count VII in its June 20, 2023 Memorandum Opinion and

Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 327, and denies them on this basis.

TAC 328.    Orejel forwarded Danks email to Cody stating, "we have lost confidence in the performance of the following employees: (Sawyer, Nelson, Locklear, Hayes, Havie, Cromartie, and Bowker)."

**ANSWER:**    Plaintiffs previously voluntarily dismissed, *see* Feb. 22, 2022 Minute Order, and the Court entered dismissal of Count VII in its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 328, and denies them on this basis.

TAC 329.    Accordingly, these ManTech employees were terminated for cause and flown out of Kuwait almost immediately.

**ANSWER:**    Plaintiffs previously voluntarily dismissed, *see* Feb. 22, 2022 Minute Order, and the Court entered dismissal of Count VII in its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 329, and denies them on this basis.

TAC 330.    Later, ManTech's Human Resources Senior Manager Lana Zarger and Laura Prock, HR Admin/Generalist, Senior investigated these terminations at the request of Bonita Cromartie. On July 19, 2013, Zarger and Prock completed their investigation and reported her recommendations to Brogan. The report vindicated Ms. Cromartie's claim of wrongful termination were justified and recommended that "Ms. Cromartie's termination code and termination letter be changed to reflect a reduction in force . . . that Ms. Cromartie be paid for any travel expenses, work hours, and pay differentials due a normal employee returning from CONUS. The Investigative Team further recommends that the remaining six (6) employee termination reasons be reviewed to

determine if the low production results are accurate or if the termination codes should be changed to reflect a reduction in force."

**ANSWER:**    Plaintiffs previously voluntarily dismissed, *see* Feb. 22, 2022 Minute Order, and the Court entered dismissal of Count VII in its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 330, and denies them on this basis.

TAC 331.    There is ample evidence regarding the lack fairness inherent in the termination of Sawyer, Hayes, Locklear, and Nelson. On June 14, 2013, Brogan wrote to Bonnie Cook of ManTech:

> I am familiar with these seven cases. We responded to an over- reaction by the new government site lead in Kuwait, Mr. Banks. He claimed that he used Army SAMS-E job data to eliminate these seven employees. Scott Campbell showed Mr. Banks that he used poor data--maintained by the Joint Program Office JLI, SAIC--to generate these loss of confidence letters, but he "already rang the bell."

**ANSWER:**    Plaintiffs previously voluntarily dismissed, *see* Feb. 22, 2022 Minute Order, and the Court entered dismissal of Count VII in its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 331, and denies them on this basis.

TAC 332.    There also exists ample evidence that the SAMS-E production performance information that was being generated through ManTech's data was unreliable. On July 3, 2013, Brogan admitted in writing that there existed a significant disparity in the way the numbers that ManTech provided to SAMS-E measured production performance and how ManTech's "current system" measured production performance. Stated Brogan, "having told people that SAMS-E data was the metric for making the decision creates a risk of litigation."

**ANSWER:**    Plaintiffs previously voluntarily dismissed, *see* Feb. 22, 2022 Minute Order, and the Court entered dismissal of Count VII in its June 20, 2023 Memorandum Opinion and

Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 332, and denies them on this basis.

TAC 333.    As with Cromartie's termination, the termination of Nelson, Sawyer, Hayes, and Locklear at the request of Orejel and Danks was unjustified.

**ANSWER:**    Plaintiffs previously voluntarily dismissed, *see* Feb. 22, 2022 Minute Order, and the Court entered dismissal of Count VII in its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 333, and denies them on this basis.

TAC 334.    Sawyer, Hayes, Locklear, and Nelson seek damages for their wrongful termination including backpay through the end of the drawdown, expenses incurred through their summary ejection from Kuwait, unused vacation time, and any and all other relief that the Court, in law and equity, can confer to do substantial justice.

**ANSWER:**    Plaintiffs previously voluntarily dismissed, *see* Feb. 22, 2022 Minute Order, and the Court entered dismissal of Count VII in its June 20, 2023 Memorandum Opinion and Order, *see* ECF No. 105, at 50. Thus, ManTech is not required to respond to the allegations in Paragraph 334, and denies them on this basis.

## PRAYER FOR RELIEF

With respect to Plaintiffs' "Prayer for Relief," including each subpart thereto, ManTech denies that Plaintiffs are entitled to any relief and avers that judgment should be entered in ManTech's favor.

## DEFENSES

In connection with their Answer, ManTech brings the following defenses to Plaintiffs' remaining Count IV claims in the TAC. Nothing stated herein is intended or shall be construed as an acknowledgment that any particular issue or subject matter is relevant to Plaintiffs' allegations.

Without assuming or admitting that it has the burden of proof and/or burden of persuasion with respect to any of these matters, ManTech asserts the following:

### FIRST DEFENSE

Plaintiffs' Count IV claims are barred, in whole or in part, because Plaintiffs have suffered no damages or have failed to adequately plead that ManTech is the cause of any damages.

### SECOND DEFENSE

Plaintiffs' Count IV claims are barred, in whole or in part, because Count IV fails to state a claim, in whole or in part, under the TVPRA. Among other things, Plaintiffs fail to plead and/or show ManTech abused any law, threatened Plaintiffs with serious harm, or engaged in any scheme, plan, or pattern designed to make any person believe they or another would suffer serious harm. Plaintiffs also fail to plead and/or show that Plaintiffs provided labor to ManTech because of an abuse of law, serious harm, or scheme. Finally, Plaintiffs fail to plead and/or show that ManTech knowingly confiscated their passports or other immigration documents.

### THIRD DEFENSE

Plaintiffs' Count IV claims are barred, in whole or in part, because Plaintiffs fail to show ManTech acted with the requisite scienter under the TVPRA, 18 U.S.C. §§ 1589, 1592.

### FOURTH DEFENSE

Plaintiffs' Count IV claims are barred, in whole or in part, because and to the extent that Plaintiffs expressly and/or implicitly assumed the risk of the allegations described in Count IV.

### FIFTH DEFENSE

Plaintiffs' Count IV claims are barred, in whole or in part, because and to the extent that Plaintiffs cannot demonstrate that their freedom of movement was restrained, that Plaintiffs did not consent to any restraints, and that any restraints imposed were not done for legitimate reasons.

## SIXTH DEFENSE

Plaintiffs' Count IV claims are barred in part because any claim related to injuries or other tortious conduct, whether intentional or negligent, that Plaintiffs claim occurred overseas under the Contract, are exclusively remediable under the Defense Base Act, 42 U.S.C. § 1651, *et seq.*

## SEVENTH DEFENSE

Plaintiffs' Count IV claims are barred, in whole or in part, by the Defense Cooperation Agreement signed by the State of Kuwait and the United States on September 19, 1991. That treaty provides, in part, that U.S. forces in Kuwait, including Department of Defense civilian contractors, are subject to U.S. law rather than Kuwait law. This treaty has been reaffirmed in the years since 1991. *See* Kenneth Katzman, Cong. Rsch. Serv. 7, RS21513, *Kuwait: Government, Security, and U.S. Policy* (last updated May 12, 2021).

## EIGHTH DEFENSE

Plaintiffs' Count IV claims are barred, in whole or in part, because of intervening or superseding causes of the alleged loss or harm to Plaintiffs, including, but not limited to, actions taken by ManTech's sponsor, Millbrook, that impacted Plaintiffs' visa statuses and other employment conditions.

## NINTH DEFENSE

Plaintiffs' Count IV claims are barred, in whole or in part, because of intervening or superseding causes of the alleged loss or harm to Plaintiffs, including, but not limited to, actions taken by the incumbent joint logistics integrator for the KMSF.

## TENTH DEFENSE

Plaintiffs' Count IV claims are barred, in whole or in part, because Plaintiffs have engaged in impermissible forum shopping by repackaging and refiling their abandoned employment claims,

formerly filed in the Eastern District of Virginia, here in the District of Columbia. Plaintiffs are estopped from their attempts to revive their abandoned Virginia litigation.

### ELEVENTH DEFENSE

Plaintiffs' Count IV claims are barred due to derivative sovereign immunity conferred by the United States during ManTech's performance of the Contract, including but not limited to ManTech following the contractually authorized direction of U.S. government officials. In all relevant aspects, the U.S. government authorized ManTech's allegedly tortious actions, and the U.S. government validly conferred those authorizations.

### TWELFTH DEFENSE

Plaintiffs' Count IV claims are barred to the extent the Court lacks subject matter jurisdiction over Count IV because the TVPRA's civil remedy provision, 18 U.S.C. § 1595, does not apply extraterritorially, and Plaintiffs' Count IV claims do not involve a domestic application of the TVPRA.

### THIRTEENTH DEFENSE

Plaintiffs' Count IV claims are barred, in whole or in part, because Plaintiffs' alleged damages are speculative and/or Plaintiffs failed to mitigate any damages they suffered.

### FOURTEENTH DEFENSE

Plaintiffs' Count IV claims are barred, in whole or in part, because the United States knew of, directed, ratified, or otherwise consented to the transactions and occurrences that are the subject of Count IV.

### FIFTEENTH DEFENSE

Plaintiffs' Count IV claims are barred to the extent the Court lacks subject matter jurisdiction over Count IV because resolution of this lawsuit raises nonjusticiable political questions under *Baker v. Carr*, 369 U.S.186 (1962), and its progeny.

## SIXTEENTH DEFENSE

Plaintiffs' Count IV claims are barred, in whole or in part, because ManTech has fully performed all obligations related to Plaintiffs' employment as provided in their offer letters.

## SEVENTEENTH DEFENSE

Plaintiffs' Count IV claims are barred, in whole or in part, to the extent that Plaintiffs unreasonably failed to take advantage of well-disseminated personnel policies designed to address employee concerns provided to them by ManTech.

## EIGHTEENTH DEFENSE

Plaintiffs' Count IV claims are barred, in whole or in part, by the doctrines of laches, unclean hands, and/or waiver.

## RESERVATION OF RIGHTS

ManTech reserves the right to add, amend, and/or supplement this Answer to assert defenses which they deem necessary.

* * *

WHEREFORE, after considering this Answer and Defenses, ManTech respectfully request that this Court:

Order that Plaintiffs are not entitled to damages;

Dismiss this action with prejudice; and

Grant ManTech such other relief the Court deems just and proper.

Dated: August 10, 2023                    Respectfully submitted,

/s/ Roderick L. Thomas
Roderick L. Thomas (D.C. Bar # 433433)
rthomas@wiley.law
P. Nicholas Peterson (D.C. Bar # 982276)
npeterson@wiley.law
Corey J. Hauser (D.C. Bar # 1779088)

chauser@wiley.law
WILEY REIN LLP
2050 M Street NW
Washington, D.C. 20036
Tel: (202) 719-7000
Fax: (202) 719-7049

*Counsel for Defendants ManTech
International Corporation and ManTech
Telecommunications and Information Systems
Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2023, a true copy of the foregoing was served via ECF to:

Joseph A. Hennessey
THE LAW OFFICE OF JOSEPH HENNESSEY, LLC
2 Wisconsin Circle, Suite 700
Chevy Chase, Maryland 20815
jhennessey@jahlegal.com

*Counsel for Plaintiff-Relators*

/s/  Roderick L. Thomas
Roderick L. Thomas (D.C. Bar # 433433)

*Counsel for Defendants ManTech
International Corporation and ManTech
Telecommunications and Information Systems
Corporation*