# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* LARRY HAWKINS, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 15-2105 (ABJ) |
| MANTECH INTERNATIONAL CORPORATION, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION & ORDER

On November 16, 2021, defendants filed a motion to dismiss plaintiffs' Third Amended Complaint ("TAC"). Defs.' Mot. to Dismiss TAC [Dkt. # 88]; TAC [Dkt. # 85]. On March 4, 2022, after the close of discovery, plaintiffs filed a motion for leave to file a fourth amended complaint, seeking leave to amend Counts I and II. Pls.' Mot. for Leave to File a Fourth Am. Compl. [Dkt. # 95]. On June 20, 2023, the Court ruled on both motions. Mem. Op. & Order [Dkt. # 105] ("Mem. Op."). Among other things, the ruling granted defendants' motion to dismiss Count VI, a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), on the grounds that plaintiffs failed to allege a domestic injury so the claim was improperly extraterritorial. And it denied defendants' motion to dismiss Count IV, a claim under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), finding that plaintiffs alleged sufficient facts to survive dismissal under Rule 12(b)(6). *See* Mem. Op.[1] Each side has asked the

---

[1]     An overview of the procedural history of this nearly decade-old case may be found in the opinion. *See* Mem. Op. at 3–6.

1

Court to revisit that ruling, both on the basis of extraterritoriality. *See* Pls.' Fed. R. Civ. P. 60(b) Mot. to Reinstate Count VI of the TAC in Light of *Yegiazaryan v. Smagin* and Defs.' Domestic Malfeasance [Dkt. # 116] ("Pls.' RICO Mot."); Defs.' Mot. to Dismiss Count IV of the TAC Pursuant to Fed. R. Civ. Pro. 12(b)(1) [Dkt. # 108] ("Defs.' TVPRA Mot.").

For the following reasons, the Court will deny both motions. It concludes again that the RICO statute does not reach the allegations in this case, but the TVPRA does.

## I.    Extraterritoriality

It is a "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States'" and is "presume[d to be] 'primarily concerned with domestic conditions.'" *EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 248 (1991), quoting *Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949). Extraterritoriality is a canon of construction, "or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010). Thus, whether a statutory provision has extraterritorial reach is a merits question, not a matter that goes to subject matter jurisdiction. *Id.* at 253–54.

In considering whether a statute rebuts the presumption against extraterritoriality, courts apply a two-step analysis. *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 417 (2023), citing *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 337 (2016). First, courts determine whether "'Congress has affirmatively and unmistakably instructed that' the provision at issue should 'apply to foreign conduct.'" *Id.* at 418, quoting *RJR Nabisco*, 579 U.S. at 335 (internal citation omitted). If the statute gives "a clear, affirmative indication" that it applies extraterritorially, the provision is extraterritorial. *Id.* at 419, quoting *RJR Nabisco*, 579 U.S. at 337. If the statute does not provide

this indication, then courts must go on to the second step of the analysis. *Id.*[2]  The Supreme Court has explained:

> [A]t the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's 'focus.' If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

*RJR Nabisco*, 579 U.S. at 337.  In other words, "to prove that a claim involves a domestic application of a statute, plaintiffs must establish that the *conduct relevant to the statute's focus* occurred in the United States." *Abitron Austria*, 600 U.S. at 418 (emphasis in original) (internal citations and quotation marks omitted).

In *RJR Nabisco*, the Court was asked to address whether the RICO statute, and in particular, the provision creating a private right of action for those harmed by a violation of the statute, applies extraterritorially.  579 U.S. 325 (2016).  RICO establishes criminal offenses under section 1962 and a private civil cause of action under section 1964, *id.* at 331, and the Court held it was necessary to examine the extraterritoriality of each provision separately.  *Id.* at 346.  It ruled that the statute's substantive prohibition in section 1962 rebuts the presumption against extraterritoriality at step one with respect to certain applications of the statute.  *See id.* at 338–40. Even though section 1962 does not itself state that it applies extraterritorially, "Congress's incorporation of . . . extraterritorial predicates into RICO gives a clear, affirmative indication that § 1962 applies to foreign racketeering activity – but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially." *Id.* at 339.

---

2       If a provision is found to be extraterritorial at step one of the analysis, it is not necessary to go on to step two.  *RJR Nabisco*, 579 U.S. at 337.

In contrast, the Court found that section 1964(c), which provides for a private right of action, did not rebut the presumption: "[n]othing in § 1964(c) provides a clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States." *Id*. at 349. Therefore, the majority went on to require that a plaintiff seeking to pursue a civil RICO claim "must allege and prove a *domestic* injury to its business or property." *Id.* at 346 (emphasis in original).

## II.     Plaintiffs' RICO Motion

Plaintiffs ask the Court to reconsider its ruling on their RICO claim. Pls.' RICO Mot. Defendants moved to dismiss that count on the basis that RICO's private right of action does not apply extraterritorially, and the TAC failed to plead a domestic injury to plaintiffs' business or property. *See* Defs.' Mem. in Supp. of Mot. to Dismiss [Dkt. # 88-1] at 34, citing *RJR Nabisco*, 579 U.S. at 346. Upon review of the allegations and various factors relevant to the domestic injury inquiry, the Court concluded that the TAC failed to allege a domestic injury and granted the motion to dismiss the claim. Mem. Op. at 45–49.

Plaintiffs' instant motion is based on *Yegiazaryan v. Smagin*, 599 U.S. 533 (2023), a case that was handed down by the Supreme Court two days after the Court's ruling in this case. *See* Pls.' RICO Mot.[3] They argue that contrary to *Yegiazaryan*, the Court "improperly relied exclusively on facts related to Plaintiffs' experience in Kuwait" in ruling that their RICO claim was extraterritorial. Pls.' RICO Mot. at 1. They point to "jurisdictional facts" and attach 110 pages of exhibits in support of their motion. *See* Pls.' RICO Mot.; Exs. to Pls.' RICO Mot. [Dkt. ## 116-2–116-25]. But all of what they describe is based on an incorrect understanding that the

---

3       This motion is fully briefed. *See* Defs.' Opp. to Pls.' RICO Mot. [Dkt. # 121] ("Defs.' RICO Opp."); Pls.' Reply to Defs.' RICO Opp. [Dkt. # 122] ("Pls.' RICO Reply").

RICO claim was dismissed for lack of subject matter jurisdiction.  Pls.' RICO Mot. at 1–2; Exs. to Pls.' RICO Mot.; *see* Mem. Op. at 49 (dismissing the claim because the TAC "failed to allege" a domestic injury).  And a review of the Court's prior ruling in light of *Yegiazaryan* does not reveal a need for reconsideration.

### A.      The Rule Applicable to Plaintiffs' Motion

Plaintiffs filed their motion pursuant to Federal Rule 60(b).  *See* Pls.' RICO Mot. (referencing the rule in the title of the motion).  Rule 60(b) authorizes courts to "relieve a party . . . from a *final* judgment, order, or proceeding" for the reasons enumerated in the rule.  Fed.R.Civ.P. 60(b) (emphasis added); *see Dellums v. Powell*, 566 F.2d 231, 234 (D.C. Cir. 1977) ("Rule 60(b) applies only to modifications of final judgments.").

Federal Rule of Civil Procedure 54(b) provides that "any order or other decision . . . that adjudicates fewer than all the claims . . . does not end the action as to any of the claims . . . and may be revised at any time before the entry of a judgment . . . ."  Fed.R.Civ.P. 54(b).  Thus, this rule "by its terms allow[s] the trial court to modify its earlier [interlocutory] order."  *Dellums*, 566 F.2d at 234; *see also Cobell v. Norton*, 355 F. Supp. 2d 531, 539 (D.D.C. 2005) ("Rule 54(b) governs reconsideration of orders that do not constitute final judgments in a case.").  Because the Court's ruling was not a final judgment and did not dispense with all of the claims in this matter, the Court will consider plaintiffs' motion under Rule 54(b).

District courts have discretion to hear Rule 54(b) motions for reconsideration "as justice requires."  *Lin v. Dist. of Columbia*, No. 20-7111, 2022 WL 4007900, at *5 (D.C. Cir. Sept. 2, 2022), quoting *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011).  To determine whether justice requires reconsideration, a court may assess, among other things, "whether a controlling or significant change in the law or facts has occurred since the submission of the issue to the Court."  *Youssef v. Holder*, 62 F. Supp. 3d 96, 98 (D.D.C. 2014)

(citation omitted); *see also United States v. Sullivan*, Crim. Action No. 21-78 (EGS), 2022 WL 3027007, at *2 (D.D.C. Aug. 1, 2022). The party moving for reconsideration "carries the burden of proving that some harm would accompany a denial of the motion." *In Def. of Animals v. Nat'l Insts. of Health*, 543 F. Supp. 2d 70, 76 (D.D.C. 2008). "[A] Rule 54(b) motion cannot be used to reargue facts and theories upon which a court has already ruled or to present theories or arguments that could have been advanced earlier." *Shvartser v. Lekser*, 330 F. Supp. 3d 356, 360 (D.D.C. 2018) (quotation marks and alterations omitted); *United States v. Booker*, 613 F. Supp. 2d 32, 34 (D.D.C. 2009) ("Arguments that could have been, but were not, raised previously and arguments that the court has already rejected are not appropriately raised in a motion for reconsideration.").

At the outset, the Court notes that plaintiffs' Rule 54 submission suffers from two critical deficiencies. First, extraterritoriality is an issue that goes to the merits and not subject matter jurisdiction. *Morrison*, 561 U.S. at 253–54. Therefore, whether the "domestic injury" requirement has been satisfied turns on the sufficiency of the facts alleged in the complaint, *see Yegiazaryan*, 599 U.S. at 543, not facts outside it. Thus, to the extent plaintiffs' motion relies on "jurisdictional facts" or exhibits not referred to or incorporated in the TAC, they are not appliable to the inquiry, and the Court will not consider them.[4]

Furthermore, while plaintiffs argue now that they suffered a domestic injury, this is an argument they could have made previously but did not. *See* Pls.' Opp. to Mot. to Dismiss TAC

---

4       *Compare Hohri v. United States,* 782 F.2d 227, 241 (D.C.Cir.1986) (a court "is not limited to the allegations of the complaint" when considering its jurisdiction), *vacated on other grounds,* 482 U.S. 64 (1987), *with Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face").

[Dkt. # 91] at 21.[5]  Instead, they took the position that *RJR Nabisco* was "inapposite," advancing

an argument that the Supreme Court had expressly rejected, albeit over a vigorous dissent.  *See*

*id.*[6]  Given this, justice does not necessarily require the Court to consider an argument that

plaintiffs previously decided to forego before.  *Lin*, 2022 WL 4007900, at *5; *Capitol Sprinkler*,

630 F.3d at 221; *Shvartser*, 330 F. Supp. 3d at 360.

In any event, *Yegiazaryan* does not change the Court's conclusion.

### B.    *Yegiazaryan* requires courts to apply a context-based analysis to determine if a plaintiff has alleged or proven a "domestic injury."

It was not necessary for the Supreme Court to address what would constitute "domestic

injury" in *RJR Nabisco*, because the plaintiffs in that case had stipulated that they were not seeking

redress for domestic injuries.  579 U.S. at 354.  The Court reached the issue in *Yegiazaryan v.*

*Smagin*, 599 U.S. 533 (2023), a civil RICO action filed by Smagin, a Russian national who lives

in Russia, against Yegiazaryan, a Russian national who lives in California.  599 U.S. at 536–37.

Smagin alleged that Yegiazaryan engaged in criminal activity, mostly in California, to prevent

Smagin from collecting on a California judgment enforcing a foreign arbitration award that he had

secured against Yegiazaryan.  *See id.* at 536–39.  The district court ruled that Smagin had failed to

allege a domestic injury under *RJR Nabisco* and dismissed the case, reasoning, based in part on a

---

5       *Yegiazaryan* did not establish the "domestic injury" requirement for RICO civil actions; it only established the analysis courts must apply when deciding whether the requirement has been satisfied.  *See* 599 U.S. at 541–44.

6       Plaintiffs argued that because section 1962 has extraterritorial effect to the extent alleged predicate offenses are extraterritorial and because the TVPRA is extraterritorial, their RICO section 1964(c) civil claim predicated on violations of the TVPRA was properly extraterritorial. *See* Pls.' Opp. to Mot. to Dismiss at 21; *but see* 579 U.S. at 346, 350 (holding that "[i]t is not enough to say that a private right of action must reach abroad because the underlying law governs conduct in foreign countries" and that civil RICO litigants must allege and prove a "domestic injury").

Seventh Circuit decision,[7] that Smagin resides in Russia and experienced the loss from his inability to collect on the judgment in Russia. *Id.* at 540. The Ninth Circuit reversed, rejecting the residency-based test applied by the district court and the Seventh Circuit. *Id*. It ruled that courts must use a "context-specific" approach when examining whether a plaintiff has a "domestic injury." *Id.* That is, courts must consider not only the residency of the injured party but also where the alleged pattern of racketeering activity occurred and was targeted. *See id.*

Taking up *Yegiazaryan* to resolve the circuit split, the Supreme Court agreed with the approach taken by the Ninth Circuit, and the Second and Third Circuits as well. *Id.* at 540–41. It found a context-specific inquiry to be most consistent with the decision in *RJR Nabisco* in that a contextual approach "better reflects the [domestic injury] requirement's origin in step two of the extraterritoriality framework," under which courts look to a statute's "focus" to assess whether it is being applied domestically. 599 U.S. at 544. *Yegiazaryan* observed that the focus of section 1964(c) "is injuries in 'business or property by reason of a violation of' RICO's substantive provisions." *Id.* at 544.

> So understood, § 1964(c)'s focus is on the injury, not in isolation, but as the product of racketeering activity. Thus, in assessing whether there is a domestic injury, courts should engage in a case-specific analysis that looks to the circumstances surrounding the injury. If those circumstances sufficiently ground the injury in the United States, such that it is clear the injury arose domestically, then the plaintiff has alleged a domestic injury.

*Id*. at 545.

---

7       *See Smagin v. Compagnie Monegasque De Banque*, No. 2:20-cv-11236-RGK-PLA, 2021 WL 2124254, at *3 (C.D. Cal. May 5, 2021), rev'd and remanded sub nom. *Smagin v. Yegiazaryan*, 37 F.4th 562 (9th Cir. 2022), aff'd and remanded, *Yegiazaryan*, 599 U.S. 533 (2023), citing *Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1094 (7th Cir. 2018), abrogated by *Yegiazaryan*, 599 U.S. 533 (2023).

The Court further held that this analysis "turns largely on the particular facts alleged in a complaint." *Id*. at 543. Relevant factors may include "the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity," *id*. at 544 (footnote omitted), but this list is not exhaustive. *Id*. at 545 ("Because of the contextual nature of the inquiry, no set of factors can capture the relevant considerations for all cases.").

Applying this contextual approach to Smagin's claim, the Court recognized that while Smagin's home had some bearing on the analysis, *see id*. at 545 ("it may be true, in some sense, that Smagin has felt his economic injury in Russia"), the narrow focus on his residency "miss[ed] central features of the alleged injury. Zooming out, the circumstances surrounding Smagin's injury make clear it arose in the United States." *Id*. At 545.[8] The Court observed that "much of the alleged racketeering activity that caused the injury occurred in the United States": Yegiazaryan allegedly created U.S. shell companies to hide his U.S. assets, he submitted a forged document to a California District Court, and he intimidated a U.S.-based witness. *Id.* His actions were devised, carried out in, and directed towards L.A. County, California, to impede enforcement of the California judgment against him. *Id.* at 545–46. The effects, then, were largely realized in California, where Smagin obtained the judgment against Yegiazaryan, where Yegiazaryan lived and had assets, where Smagin hoped to collect on the judgment, and where the alleged RICO scheme thwarted Smagin's rights under the judgment. *Id.* at 546. "In sum, Smagin's interests in his California judgment against Yegiazaryan, a California resident, were directly injured by

---

8    Plaintiffs also directed the Court to another Supreme Court case decided after this Court's dismissal order, citing it for the principle that at step two "courts must identify the statute's focus and ask whether the conduct relevant to that focus occurred in United States territory." Pls.' RICO Mot. at 3, quoting *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. at 418. But this quote merely states *RJR Nabisco*'s holding and does not alter the analysis under *Yegiazaryian*. *See id.*

racketeering activity either taken in California or directed from California, with the aim and effect of subverting Smagin's rights to execute on that judgment in California." *Id*. at 546.

C.   *Yegiazaryan* **does not require plaintiffs' RICO claim to be reinstated.**

*Yegiazaryan* does not require a different outcome in this case. First of all, the Court did not apply the "rigid, residency-based test" that the Supreme Court rejected. *See Yegiazaryan*, 599 U.S. at 540–41 (agreeing with the test applied by the Second, Third, and Ninth Circuits); Mem. Op. at 46–48 (describing the analyses applied by the Second and Third Circuits and considering factors examined by those circuit courts). Rather, it considered numerous factors – including the nationality and location of the parties; the "location" of the intangible injured property, that being plaintiffs' unpaid wages; where the alleged injury "arose"; where the relevant agreements giving rise to the injury were executed; and which laws governed those agreements. *See* Mem. Op. at 47–49. The Court concluded that the Third Amended Complaint does not allege a domestic injury. *See id.*

More importantly, the context-based analysis the Court is now required to undertake also points to the conclusion that the complaint does not allege a domestic injury. Plaintiffs are mechanics who formerly worked at a maintenance facility in Kuwait, repairing U.S. military vehicles under a contract defendant ManTech had with the U.S. government. TAC ¶¶ 5–6. The operative complaint alleges that ManTech violated the TVPRA "by bringing Plaintiffs into Kuwait illegally, confiscating their passports, refusing to apply for the legal authorizations necessary for Plaintiffs to work legally in Kuwait, forcing them to live in constant fear of arrest" by Kuwaiti officials, "subjecting them to horrific work conditions, and refusing to pay them the compensation that would have been due were Plaintiffs afforded the protection of law." TAC ¶ 7; *see also* TAC ¶ 272 ("Had Plaintiffs . . . worked legally in Kuwait, as required under the Kuwait Private Sector Labor Law and consistent with the requirements of Kuwait's immigration laws and the necessity

of a Visa 18, they would have been entitled to the overtime wages and other benefits mandated by the laws of Kuwait."). In other words, unlike the situation in *Yegiazaryan*, the alleged conduct giving rise to the claim was undertaken almost exclusively abroad.

The situation is also reversed when one considers the nature of the alleged injury, as *Yegiazaryan* requires. 599 U.S. at 544. The injury here includes the physical and emotional harm caused by the conditions the plaintiffs were forced to endure, as well as the alleged deprivation of wages. The TAC details the fear plaintiffs experienced from being required to work in Kuwait without proper immigration papers, TAC ¶¶ 153, 215, 244, 247; "horrific" working conditions and the resulting impact on their health, TAC ¶¶ 247–265 (alleging that the air in the facility "was putrid and thick with suffocating smoke and fumes from a variety of sources" and that they were exposed to highly toxic chemicals little or no ventilation or respirators); and the "overtime wages and other benefits mandated by the laws of Kuwait" that they were denied. TAC ¶ 272; *see* TAC ¶¶ 269–71, 275–78.

All of this was felt in Kuwait. While plaintiffs argue now that the injury occurred in the United States, because their families and dependents at home received diminished financial support, this is analogous to Yegiazaryan's claim that Smagin experienced the injury in Russia and not the United States because that was where the money was supposed to end up eventually. Pls.' RICO Mot. at 2–3. So even if those allegations were in the complaint, they would not alter the fact that the bulk of plaintiffs' injury occurred in Kuwait.

Turning to the racketeering activity that directly caused plaintiffs' injuries as *Yegiazaryan* requires, 599 U.S. at 544, plaintiffs here allege the defendant engaged in a scheme to conceal the fact that plaintiffs were working illegally in Kuwait. Plaintiffs allege in order to carry that out, that ManTech confiscated their passports, TAC ¶¶ 206, 213, 230, 237, 240; used fear and financial

pressure to force them to stay in their jobs, *see* TAC ¶¶ 152, 156–59, 169, 174 (imposing a $15,000 penalty, plus fees and repayment of training costs, for employees who terminated their two-year contracts early and firing employees who refused to make "visa runs" to nearby countries to renew their tourists visas); and starting in late 2012, used subcontractor Millbrook Kuwait to "fake Millbrook salary payments" to plaintiffs.  TAC ¶¶ 175, 187, 313.

Recognizing that these allegations would not support a finding of a domestic injury under *Yegiazaryan*, plaintiffs now assert that ManTech U.S.-based personnel masterminded the alleged scheme, asserting that they "planned, set into motion, ratified, and committed violations of the TVPRA and set in motion a prohibited money laundering scheme to further its TVPRA violations." Pls.' RICO Mot. at 3.  Again, this is not in the complaint; the TAC describes the actions of certain managers, but it does not allege that they were located in the United States.  But even if plaintiffs had alleged that U.S.-based employees devised the scheme, this does not tip the balance since the plan was carried out abroad and directed at Kuwait.  *See* 599 U.S. at 545–46 (finding that even though "other components of the scheme occurred abroad," it was primarily carried out "through acts and communications initiated in and directed towards Los Angeles County, California").  Kuwait is where ManTech or Millbank personnel took plaintiffs' passports.  *See, e.g.*,TAC ¶¶ 206, 213, 230, 237, 240.  It is where plaintiffs were made to engage in activities to hide ManTech's violations of Kuwaiti immigration laws.  *See* TAC ¶¶ 152, 169, 174.  And the scheme was specifically directed toward Kuwait since its alleged purpose was to conceal ManTech's violations of Kuwaiti law from Kuwaiti officials and deprive plaintiffs of their rights under Kuwaiti law.  *See* TAC ¶ 272.

The alleged "effects" of the injuries overlap considerably with the alleged injuries from the racketeering scheme.  *See* 599 U.S. at 545–46.  Plaintiffs allegedly received less pay than they

were owed, *see* TAC ¶¶ 275–277 (calculating the unpaid wages owed), and they experienced ill-health effects from working at the facility.  TAC ¶ 266 (alleging headaches, respiratory distress, sinus congestion, mucus expectoration, burning eyes and throat, and nosebleeds); TAC ¶ 267 (alleging some plaintiffs continue to have "chronic respiratory and sinus illness" and that they all "may experience other more serious ailments").

Plaintiffs now argue that the effects of scheme extend to the United States where their families received diminished financial support.  They submit that they feared termination "because of the impact felt in the U.S.," and they add that ManTech paid plaintiffs "from the U.S. by way of checks sent to the mechanics in the U.S."  Pls.' RICO Mot. at 3–4.  This contradicts plaintiffs' allegations that ManTech paid plaintiffs through its agent in Kuwait, Millbrook, using Kuwait-based bank accounts set up in the names of ManTech employees.  *See* TAC ¶¶ 188–189, 313.  And for the reasons set out above concerning the locus of the "injury," these secondary "effects" do not change the calculus.

Under the context-based analysis as elaborated in *Yegiazaryan*, the Court holds that plaintiffs' alleged injury and the circumstances surrounding it do not sufficiently ground the injury in the United States, so the injury did not arise domestically, which means that under *RJR Nabisco*, plaintiffs have not stated a cognizable civil RICO claim.  The Court will, therefore, deny plaintiffs' motion for reconsideration.

## III.   Defendants' TVPRA Motion

In June 2023, the Court turned down defendant's request that it dismiss Count IV of the TAC brought under the Trafficking Victims Protection Reauthorization Act.  Mem. Op. at 1, 35–39.  The count alleges that defendants violated two provisions of the statute:  section 1589(a)(3), which prohibits forced labor, and section 1592, which makes it a crime to confiscate or possess a victim's passport in the course of violating certain sections of the TVPRA, including section 1589.

*See* TAC ¶¶ 146–47; 18 U.S.C. §§ 1589(a)(3), 1592(a).  Plaintiffs brought the claim pursuant to section 1595 of the TVPRA, which gives victims of violations of the Act a civil remedy.  *See* TAC ¶ 145; 18 U.S.C. § 1595.

Defendants now move to dismiss the claim again, this time for lack of subject matter jurisdiction, arguing that Count IV asserts an improper extraterritorial application of the civil remedy.  *See* Defs.' TVPRA Mot.; Mem. in Supp. of Defs.' TVPRA Mot. [Dkt. # 108-1] ("Defs.' TVPRA Mem.").[9]

## A.    The Rule Applicable to Defendants' Motion

Because, as the Court explained above, extraterritoriality is not an issue of subject matter jurisdiction, *Morrison*, 561 U.S. at 253–54, and defendants already filed an answer to the TAC, *see* Defs.' Answer to TAC [Dkt. # 109], the Court will deem defendants' Rule 12(b)(1) motion to be a Rule 12(c) motion for judgment on the pleadings.  Rule 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  A Rule 12(b) motion filed after a defendant files a responsive pleading is untimely, but Rule 12(c) motions may "be treated as a motion for judgment on the pleadings based on a failure to state a claim on which relief may be granted."  *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999) (ruling that the district court did not err when it construed untimely 12(b)(6) motion filed after a responsive pleading as a 12(c) motion); *see also Nat'l Ass'n of Pharm. Mfrs. v. Ayerst Labs.*, 850 F.2d 904, 909 n.2 (2d Cir.1988) ("a defense of failure to state a claim may be raised in a Rule 12(c) motion for judgment on the pleadings, and when this occurs the court simply treats the motion as if it were a motion to dismiss").

---

9    This motion is also fully briefed.  *See* Pls.' Opp. to Defs.' TVPRA Mem.  [Dkt. # 115] ("Pls.' TVPRA Opp."); Exs. to Pls.' TVPRA Opp. [Dkt. # 115-1]; Reply Mem. in Supp. of Defs.' TVPRA Mot. [Dkt. # 123].

A Rule 12(c) motion is "functionally equivalent to a Rule 12(b)(6) motion." *Rollins v. Wackenhut Servs., Inc.,* 703 F.3d 122, 130 (D.C. Cir. 2012) ("Other circuits have held that *Iqbal* and *Twombly* apply to Rule 12(c) motions, and we do likewise.") (internal citations omitted). Accordingly, the Court's analysis of the defense motion, like its analysis of plaintiffs' motion above, concerns what plaintiffs have alleged in the TAC, not the "jurisdictional facts" they argue now, *see* Pls.' TVPRA Opp. at 11–12, or exhibits they attach their opposition. *See* Exs. to Pls.' TVPRA Opp.; *Iqbal*, 556 U.S. at 678; *Bell Atlantic Corp v. Twombly,* 550 U.S. 544, 570 (2007).

## B.    The Trafficking Victims Protection Reauthorization Act

The Trafficking Victims Protection Reauthorization Act "imposes liability for offenses related to human trafficking." *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 638 (2021). The Act appears in chapter 77 of Title 18 of the United States Code and is titled "Peonage, Slavery, and Trafficking in Persons." 18 U.S.C. § 77. Enacted in 2000, the statute initially imposed only criminal liability. *Nestlé USA, Inc.*, 593 U.S. at 638.[10] It established a number of criminal offenses, *see* 18 U.S.C. §§ 1581–92, some of which apply extraterritorially by their own terms. *See, e.g., id.* § 1585 (making it a crime "on any foreign shore [to] seize[] any person with intent to make that person a slave"); *id.* § 1586 ("Whoever . . . voluntarily serves on board of any vessel employed or made use of in the transportation of slaves from any foreign country or place to another, shall be fined under this title or imprisoned not more than two years, or both.").

In 2003, Congress amended the statute to provide a civil remedy.

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should

---

10    Portions of the statute, codified at 22 U.S.C. Chapter 78, authorize funds and programs to support victims of human trafficking and international efforts to curtail it. *See* 22 U.S.C. §§ 7101–15.

> have known has engaged in an act in violation of this chapter) in an
> appropriate district court of the United States and may recover damages
> and reasonable attorneys fees.

18 U.S.C. § 1595(a); Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No.

108–193, § 4, 117 Stat. 2878.  In that same amendment, Congress expanded the extraterritorial

reach of the statute to include offenses involving sex trafficking committed by anyone "within the

special maritime and territorial jurisdiction of the United States."  18 U.S.C. § 1591; 117 Stat. at

2879; *see* 18 U.S.C. § 7(9) (defining "special maritime and territorial jurisdiction of the United

States" to include locations such as U.S. military and diplomatic installations abroad).

In 2006, Congress again explicitly expanded the extraterritoriality of the statute.  It added

section 3271 to authorize the prosecution of U.S. government employees and contractors who

violate the TVPRA abroad.

> Whoever, while employed by or accompanying the Federal Government
> outside the United States, engages in conduct outside the United States
> that would constitute an offense under chapter 77 or 117 of this title if the
> conduct had been engaged in within the United States or within the special
> maritime and territorial jurisdiction of the United States shall be punished
> as provided for that offense.

18 U.S.C. § 3271(a); Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. No.

109–164, § 103, 119 Stat. 3562 (2006).[11]

And in 2008, it further expanded the extraterritoriality of specific offenses that were not

extraterritorial on their own terms.

> In addition to any domestic or extra-territorial jurisdiction otherwise
> provided by law, the courts of the United States have extra-territorial

---

11      Chapter 117 prohibits transportation for illegal sexual activity and related crimes.
18 U.S.C. §§ 2421–29.  The term "employed by the Federal Government outside the United States"
includes anyone employed "as a Federal contractor . . . or as an employee of a Federal contractor"
who is "present or residing outside of the United States in connection with such employment" and
is "not a national of or ordinarily resident in the host nation." 18 U.S.C. § 3272(1).

jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section 1581, 1583, 1584, 1589, 1590, or 1591 if –

> (1) an alleged offender is a national of the United States or an alien lawfully admitted for permanent residence (as those terms are defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101)); or

> (2) an alleged offender is present in the United States, irrespective of the nationality of the alleged offender.

18 U.S.C. § 1596(a); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110–457, § 223, 122 Stat. 5071.

### C.   Section 1595 expressly and directly incorporates the TVPRA's offenses and has extraterritorial application with respect to offenses that apply extraterritorially.

Defendants move to dismiss plaintiffs' TVPRA claim on the basis that it is improperly extraterritorial. Based on *RJR Nabisco*, they argue at step one of the extraterritorially analysis that nothing in section 1595 – the civil provision of the statute – "shows a clear, affirmative congressional intent to allow private plaintiffs to bring TVPRA claims for overseas conduct and injuries," and at step two, that the claim does not allege a domestic application of the provision. Defs.' TVPRA Mem. at 1–2. Plaintiffs reply that section 1589 – the forced labor provision that underlies Count IV – applies extraterritorially pursuant to section 1596, *see* Pls.' TVPRA Opp. at 20–21, citing *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1164–65 (9th Cir. 2022) (discussing Congress's 2008 amendment of the TVPRA), and that what they are seeking is domestic enforcement of the TVPRA. Pls.' TVPRA Opp. at 11–12.[12]

---

12    Plaintiffs ask the Court to begin its analysis at step two, which courts have the discretion to do, *see WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413 (2018), but the Court bases its decision on the first step of the analysis.

Section 1595(a) of the TVPRA states simply that an "individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator."  18 U.S.C. § 1595(a). There is no mention of extraterritoriality on the face of the provision, and defendants contend that "Congress's silence is controlling."  Defs.' TVPRA Mem. at 8.  But "an express statement of extraterritoriality is not essential."  *RJR Nabisco*, 579 U.S. at 340.  The presumption can be overcome "by a clear indication of extraterritorial effect," and a provision's context is relevant to determining whether such an indication exists.  *Id.*, citing *Morrison* 561 U.S. at 265; *see also Roe*, 917 F.3d at 242, citing *RJR Nabisco*, 579 U.S. at 340 ("*RJR Nabisco* teaches that, even absent an express statement of extraterritoriality, a statute may apply to foreign conduct insofar as it clearly and directly incorporates a predicate statutory provision that applies extraterritorially.").

Congress gave some offenses of the TVPRA extraterritorial application when it enacted the statute in 2000.  *See* 18 U.S.C. §§ 1585, 1586.  When it provided a civil remedy to victims of violations of the statute three years later, it did so without limitation, making the civil reach of the statute coextensive with its criminal reach:  "[a]n individual who is a victim of a violation of *this chapter* may bring a civil action against the perpetrator."  18 U.S.C. § 1595(a) (emphasis added). Indeed, it did so in legislation that expanded the number of extraterritorial provisions of the statute, so one can only draw the conclusion that it was well aware it was adding a broadly worded civil provision to a statute that applied to conduct abroad.  Thus, the Court finds that section 1595 expressly and by its own terms incorporates offenses that themselves have extraterritorial application, *see, e.g.*, 18 U.S.C. §§ 1585–86, and that there is a clear indication that the civil remedy was meant to apply extraterritorially as to those offenses.

Defendants rely upon *RJR Nabisco* to assert that the two-step extraterritoriality analysis must be applied separately to the TVPRA's substantive and civil remedy provisions.  *See* Defs.'

TVPRA Mem. at 7.  But that decision involved the provision creating a private right of action for violations of the RICO statute, and it can only be understood and applied here if one understands the unique structure of the RICO statute, and how it differs from the TVPRA.  A defining aspect of the RICO statute, 18 U.S.C. § 1961 *et seq.*, is that there can be no violation of the statute without the commission of one of a series of itemized separate offenses not found in the statute.  Indeed, one is not enough; there must be a *pattern* of such offenses.  And only some of the so-called RICO "predicate offenses" are extraterritorial.   Therefore, in the Supreme Court's view, the extraterritoriality of the RICO criminal provisions was purely derivative, and it depended entirely on whether the predicate offenses underlying the alleged RICO offenses in any particular case were extraterritorial themselves.  *See* 579 U.S. at 339.   It then concluded (notwithstanding the absence of limiting language) that it could not read that transferred or derivative extraterritoriality into the RICO civil provision.  *See id.* at 346–50.

The TVPRA, by contrast, prohibits conduct at home and abroad *itself*, and not by reference to other statutes.  Its express objective, unlike RICO, was to reach certain types of conduct and the resulting harm both at home and abroad.  *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106–386 § 102, 114 Stat. 1464, 1466–69 (congressional finding that "[a]t least 700,000 persons annually" are trafficked "within or across international borders," and trafficking in persons is a "growing transnational crime").  Congress included provisions with extraterritorial reach in the statute from the start.  When it amended the statute in 2003, it found that "[t]rafficking in persons continue[d] to victimize countless men, women, and children in the United States and abroad," Trafficking Victims Protection and Reauthorization Act of 2003, Pub. L. No. 108–193, § 2(1), 117 Stat 2875, and it added the civil remedy, which provided that *anything* that constituted a crime under the statute could also serve as the basis for a civil claim.  So there is

no basis to conclude that when other extraterritorial provisions were added to the statute, that somehow they could not support a civil action as well.

Defendants rely on a recent case in this district to argue the contrary. *See* Defs.' TVPRA Mem. at 1, citing *Doe I v. Apple Inc.*, No. 19-cv-3737, 2021 WL 5774224 (D.D.C. Nov. 2, 2021), *aff'd sub nom. Doe 1 v. Apple Inc.*, 96 F.4th 403 (D.C. Cir. 2024) (affirming without reaching the extraterritoriality issue). That case involved civil claims filed pursuant to 18 U.S.C. § 1595 alleging that several U.S. manufacturers of electronics products violated two provisions of the TVPRA because the electronics they produced use cobalt mined in the Democratic Republic of the Congo using child labor. 2021 WL 5774224, at *1, *14.

The court considered the text of the TVPRA's civil remedy and held it does not rebut the presumption against extraterritoriality, *id.* at *14, rejecting the plaintiffs' argument that section 1596 provides a clear indication that the civil remedy has extraterritorial effect. *Id.* at *15–*16.[13] The court observed that it "seems likely that when in § 1596(a) Congress granted extraterritorial jurisdiction over 'any offense (or any attempt or conspiracy to commit an offence) under section 1581, 1583, 1584, 1589, 1590, or 1591,' its omission of § 1595 was not mistaken, but was an intentional decision not to extend extraterritorially the reach of the statute's civil component." *Id.* at *16 (emphasis omitted). The court added that section 1596's use of terms associated with criminal matters – "offense" and "prosecution" – to indicate section 1596 "was focused on criminal, not civil, applications." *Id.* at *15.

The Court is not persuaded by this analysis. First, it fails to take into account the order in which the various provisions were enacted. When the statute was first passed in 2000, it included

---

13      In *Doe*, the court granted the defendants' motion to dismiss on a number of other grounds, but it went on to discuss the extraterritoriality issue anyway.

some extraterritorial offenses.  It was after that, in 2003, that Congress announced that a victim could bring a civil action for violation, and it added more extraterritorial provisions.  And it was only after that, in 2008, that Congress expressed is intention in section 1596(a) that other offenses should also have extraterritorial reach.  So it would be inappropriate to predicate a narrowing construction of the civil provision on a later, unrelated amendment to the statute.

Second, the *Doe* opinion finds meaning in the fact that the civil remedy provision, section 1585, was not listed in 2008 when Congress identified additional provisions that could be applied abroad.  *See* 2021 WL 5774224 at *16; 18 U.S.C. § 1596(a) ("In addition to any domestic or extra-territorial jurisdiction otherwise provided by law, the courts of the United States have extra-territorial jurisdiction over any offense . . . under section 1581, 1583, 1584, 1589, 1590, or 1591 . . . .").  But that would not have made sense.  Section 1956(a) listed "offenses" over which courts would have extraterritorial jurisdiction, and section 1595 is not an "offense" – it is a free-standing provision that creates a civil remedy for an "offense," that is, any "violation of this chapter."  18 U.S.C. § 1595(a).

The Court finds the Fourth Circuit decision in *Roe v. Howard*, 917 F.3d 229 (2019), to be more in line with the text of the TVPRA.  The defendants in that case were a married couple who worked for the U.S. State Department.  *Id.* at 233.  The plaintiff worked for them as a housekeeper when they were stationed at the U.S. embassy in Yemen, and she sued the wife for her role in sexual abuse that she suffered at the hands of the husband.  *Id.*[14]  A jury found the defendant liable of four violations of the TVPRA, all of which occurred in Yemen, and the defendant challenged the verdict on the basis that the civil provision under which the plaintiff had sued does not apply extraterritorially.  *Id.* at 238.

---

14      The husband was deceased by the time the lawsuit was filed.  917 F.3d at 234.

The Fourth Circuit ruled that while section 1595 does not expressly state it has extraterritorial application, its text "directly incorporates a set of predicate offenses 'that plainly apply to at least some foreign conduct.'"  *Id.* at 242, quoting *RJR Nabisco*, 579 U.S. at 338.

> [Section] 1595 permits "a victim of a violation of this chapter [chapter 77 of Title 18]" to bring "a civil action against the perpetrator."  *See* 18 U.S.C. § 1595.  Many of the predicate offenses proscribed by chapter 77 apply extraterritorially, either expressly or by way of other provisions delineating their extraterritorial application.  *See, e.g.*, 18 U.S.C. § 1585 (prohibiting, inter alia, seizure of persons "on any foreign shore" with "intent to make that person a slave").

*Id.* (second edit in original).  This structure and context, the Fourth Circuit held, give "a clear, affirmative indication" that section "1595 provides a civil remedy for the foreign conduct" prohibited by chapter 77 "to the extent that the particular predicate offense supporting a specific claim applies extraterritorially."  *Id.*, citing *RJR Nabisco*, 579 U.S. at 339.[15]  And it held that the substantive offenses at issue in the case – forced labor and forced labor trafficking under TVPRA sections 1589 and 1590 – applied extraterritorially even though they do not directly refer to foreign conduct:  "since 2006, those sections have applied to extraterritorial acts committed by United States employees like [the defendant]."  *Id.* at 244, citing 18 U.S.C. § 3271.

Finally, the Court finds the *Roe v. Howard* context and reasoning to be more analogous to this case than either *RJR Nabisco* or *Doe* – in which the plaintiffs sued only U.S.-based private manufacturers and not their foreign suppliers – because here, defendants are federal government contractors.  As in the *Roe* case, where it was of key importance to the ruling that the illegal acts were perpetrated by U.S. embassy personnel, the instant lawsuit also involves what is essentially

---

15    The court also found that the statute's legislative history and multiple provisions supporting international efforts to address the global problem of human trafficking supported this conclusion.  *See id.* at 242 ("Viewed as a whole, the TVPA represents a far-reaching congressional effort to combat transnational human trafficking on numerous fronts, including by expanding the civil claims and remedies available to its victims.").

an extension of the United States government abroad.   Indeed, Congress explicitly stated its intention in section 3271 that the TVPRA would cover government contractors operating beyond our shores in 18 U.S.C. § 3271(a).

Defendants argue that Congress's repeated use in section 3271 (and section 1596) of the term "offense" and its inclusion of requirements governing prosecutions indicates a focus on criminal matters.   Defs.' TVPRA Mem. at 10–13, citing *Doe I* at *15; *see* 18 U.S.C. §§ 1596(b), 3271(b).   But section 3271 expands the scope of criminal liability under the TVPRA to specific individuals – U.S. government employees and contractors – and it establishes requirements on how that expanded liability is to be enforced.   18 U.S.C. § 3271.   It is thus unremarkable that Congress used terms related to criminal matters in amending a criminal statute.[16]

Finally, defendants argue that section 3271 "does not reach the procedural civil remedy provision" because it regulates "conduct."   *See* Defs.' TVPRA Mem. at 12.   But section 3271 is a procedural provision that extends criminal liability for conduct that is already "an offense under chapter 77" to U.S. government employees and contractors who commit them abroad.   18 U.S.C. § 3271(a).   It does not expand the scope of conduct prohibited by the statute.   The fact that Congress added this provision to Part II of Title 18 ("Criminal Procedure"), and not Part I ("Crimes"), confirms this.   *See* 18 U.S.C. 212A; Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. No. 109–164, § 103, 119 Stat 3562 (2006) ("Part II of title 18, United States Code, is amended by inserting after chapter 212 the following new chapter: . . . .").

---

16     Indeed, the TVPRA's civil provision specifically refers to prosecutions and uses the terms "offense" and "perpetrator," which is often associated with criminal matters.   18 U.S.C. § 1595; *see, e.g., Ojo v. Garland*, 25 F.4th 152, 165–66 (2d Cir. 2022) ("As defined by Black's Law Dictionary, 'crimes against persons' constitute '[a] category of criminal offenses in which the *perpetrator* uses or threatens to use force,' . . . while 'crimes against property' fall within '[a] category of criminal offenses in which the *perpetrator* seeks to derive an unlawful benefit from – or do damage to – another's property without the use or threat of force,' . . . .") (emphasis added).

For all of these reasons, the Court holds that section 1595 applies extraterritorially to the extent that the offenses for which it supplies a private right of action have extraterritorial application.

Given this conclusion, the Court must next determine whether the offenses plaintiffs in this case allege were violated have extraterritorial effect. *See RJR Nabisco*, 579 U.S. at 354; *Roe*, 917 F.3d at 243. Section 1589(a)(3) makes it a crime to "obtain[] the labor or services of a person . . . by means of the abuse or threatened abuse of law or legal process," 18 U.S.C. § 1589(a), and section 1592 makes it a crime to "knowingly . . . confiscate[], or possess[] . . . [a] passport" of a person in the course of violating section 1589 and other TVPRA provisions. 18 U.S.C. § 1592. While neither expressly states that it applies extraterritorially, Congress in 2006 gave all offenses under the TVPRA extraterritorial application when allegedly committed overseas by U.S. contractors, such as defendants.[17] *See* 18 U.S.C. § 3271. Accordingly, sections 1589 and 1592 apply extraterritorially as alleged here.

The TRPVA's civil provision, by its own terms, applies to predicate offenses with extraterritorial reach, and sections 1589 and 1592 reach offenses committed by U.S. contractors abroad pursuant to section 3271. Therefore, the Court will deny defendants' motion to dismiss the TVPRA claim as improperly extraterritorial.

## CONCLUSION

For the reasons set forth above, plaintiffs' motion to reinstate their RICO claim at Count VI of the Third Amended Complaint [Dkt. # 116] is **DENIED**, and defendants' motion to dismiss the TVPRA claim at Count IV [Dkt. # 108] is also **DENIED**. The Court will turn to the motion

---

17      All the named plaintiffs began working for defendant at the facility in Kuwait in 2012. *See* TAC ¶¶ 12–16.

for summary judgment, which is ripe for consideration and for which no further briefing is required.

     **SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE:  September 27, 2024