## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————————

UNITED STATES OF AMERICA *ex rel.*
LARRY HAWKINS, *et al.*,

            Plaintiffs,

        v.

MANTECH INTERNATIONAL
CORPORATION, *et al.*,

            Defendants.

—————————————————————————

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 15-2105 (ABJ)

## MEMORANDUM OPINION

Pending before the Court in this nearly decade-old case is a motion for summary judgment filed by defendants ManTech International Corporation and ManTech Telecommunications and Information Systems Corporation (collectively, "ManTech" or "defendants"). Plaintiffs Larry Hawkins, William Hayes, Clinton Sawyer, James Locklear, and Kent Nelson worked as mechanics for ManTech in Kuwait in 2012 and 2013. They filed this lawsuit in 2015 and followed that with a series of amended complaints, asserting claims related to their employment with ManTech based on numerous theories of liability. After the Court dismissed some claims and plaintiffs voluntarily dismissed others, the case has been narrowed to a single count under the Trafficking Victims Protection Reauthorization Act, referred to as the TVPRA.

Following exhaustive discovery, the parties have submitted hundreds of pages of exhibits and summary judgment briefing, which the Court has considered. For the following reasons, the Court will grant defendants' motion for summary judgment.

## FACTUAL BACKGROUND

The following facts are based on defendants' statement of facts [Dkt. # 130-1] ("DSOF"), plaintiffs' counterstatement of facts, Pls.' LCvR 7(h) Counterstatement [Dkt. # 134-1] ("Counterstatement"), and the underlying evidence.[1]  The facts are undisputed unless otherwise indicated.

### The terms of plaintiffs' employment

On May 31, 2012, ManTech won the bid for a contract with the U.S. Army to repair Mine Resistant Ambush Protected ("MRAP") and other military vehicles in the Middle East.  DSOF ¶ 1; *see* Contract No. W56HZV-12-C-0127, Defs.' Ex. 1–2 [Dkt. # 124-2–3] ("the Contract").[2]  On October 26, 2012, the Army modified the Contract to add Kuwait as a location for servicing MRAPs, and on November 20, 2012, it directed ManTech to accommodate this expansion by adding more than 200 personnel to work at the Kuwait Maintenance Sustainment Facility ("KMSF") by the end of the year.  DSOF ¶¶ 5, 7.

---

1    Plaintiffs' Counterstatement is divided into three categories that plaintiffs describe as:

- nine "broadly applicable objections . . . to Defendants' allegedly indisputable facts ('DSOF')" (individually cited herein as "Pls.' Obj.");

- fourteen statements of "undisputable ('PSOF') fact that contradict a wide variety of DSOF" (individually cited herein as "PSOF");

-  plaintiffs' individual "refutation" of each of defendants' 221 individual DSOF (individually cited herein as "PCSOF").

Counterstatement at 1.

2    Defendants' public exhibits appear on the docket at [Dkt. # 124] and [Dkt. # 125], and their sealed exhibits appear at [Dkt. # 130].  Plaintiffs' public exhibits appear at [Dkt. # 134-1], and their sealed exhibits appear at [Dkt. # 135].

ManTech hired plaintiffs and other mechanics to work at the KMSF, sending them offer letters with addenda that set forth the terms of employment. DSOF ¶ 28. The materials stated that employment with ManTech was "at-will." DSOF ¶ 29. They further provided that initial base salaries ranged from $16.00 to $20.50 per hour plus "isolation/hardship" pay and a per diem amount, DSOF ¶¶ 30–31, and that the work schedule called for either 70 or 72 hours per week, with no provision for or mention of overtime pay. DSOF ¶¶ 32–33. Excluding the isolation/hardship pay and per diem, this gave plaintiffs an annual base salary ranging from $58,240 to $76,752.[3]

Among the attachments to the offer letters was an addendum titled "Host Nation Sponsorship & Work Visa – Kuwait (CIVIL ID)" ("Sponsorship Addendum"). DSOF ¶ 35, citing Defs.' Ex. 21–25 (offer letters signed by plaintiffs).[4] The Sponsorship Addendum stated that "a primary requirement for working in Kuwait involve[d] the issuance of a host nation Work Visa with sponsorship." Defs.' Ex. 21–25. It also provided:

> Due to the significant cost for sponsorship, (up to and exceeding $10,000 per person for first year and $5,000 for second year), you agree to commit to a minimum period of employment (deployment) of 24 months or the completion of the contract whichever comes first. . . .
>
> Once the process starts, ManTech is committed to the expenditure of the costs required to complete this process. If you are unable to complete the process regardless of the reason or circumstance, you will be liable for all costs incurred to that point.

---

3       The parties have not directed the Court to evidence about the amounts plaintiffs received in per diem and hardship/isolation pay. Plaintiffs assert that it is a disputed question of fact whether they received the isolation/hardship premium to which they were entitled, but they cite no evidence to support this assertion. *See* PCSOF ¶ 31.

4       *See* Defs.' Ex. 21 at MANTECH-00001126 (Locklear); Defs.' Ex. 22 at MANTECH-00000937 (Nelson); Defs.' Ex. 23 at Hayes.38 (Hayes); Defs.' Ex. 24 at MANTECH-00033108 (Sawyer); Defs.' Ex. 25 at MANTECH-00032863 (Hawkins).

Once the process is completed, should you decide to terminate employment, or are terminated for any reason, voluntary or involuntary, prior to completing 24 months (non-consecutive) of "boots on ground" (BOG) service, **you are responsible for costs incurred and will be required to reimburse the cost to obtain a work visa**. In this event, ManTech will make a determination of financial obligation based on the current circumstances.

Reimbursable costs include all expenses related directly and indirectly to the sponsorship, including travel, lodging, per diem, medical exam(s), background investigation and administration / administrative fees. If terminated, **you may also be responsible for employment and deployment costs as described in the Offer Addendum, as well as costs related to any training or certification process provided to you as part of your employment, including employment related expenses described in the Offer Addendum**.

Sponsorship Addendum (emphasis added); *see also* DSOF ¶ 36.

A "Contract Mandated Training and Training Certification Addendum" ("Training Addendum") was also attached to the offer letters. *See* Defs.' Ex. 21–25. It provided:

As part of your employment you will/may receive government training which will be used during your deployment period to support the contract and the mission. This training and knowledge will become part of your overall job skills and experience and will continue to benefit you personally. This training comes at a cost and therefore, you are expected to complete the training successfully and to apply those learned skills specifically in support of this program.

In the event that you fail to complete an assigned training course or fail to complete an obligated employment period under this contract and defined in this offer, **you will be required to reimburse prorated costs related to the training and certification process**. You further understand and agree that in the event your employment with ManTech is voluntarily terminated or terminated for cause before you complete this commitment period, **you will be required to reimburse training related expenses** as defined above on a prorated basis (1/12th for each month that your employment term is short of the twelve (12) month commitment).

Training Addendum, Defs.' Ex. 21–25 (emphasis added); *see also* DSOF ¶ 39.

Each of the plaintiffs had either previously worked for ManTech, worked at the KMSF for a different contactor, or worked in Kuwait. Hawkins worked at the KMSF for two other companies from 2008 to 2012. DSOF ¶¶ 119, 121, citing Defs.' Ex. 14 [Dkt. # 124-11] ("Hawkins Dep.") at 160–61. Hayes had worked at the KMSF for another contractor in 2012. DSOF ¶ 142, citing Defs.' Ex. 65 and Defs.' Ex. 31 [Dkt. # 130-8] ("Hayes Dep.") at 58. Locklear worked in Kuwait for a different contractor in 2008 and for ManTech in Afghanistan after that. DSOF ¶ 155, citing Defs.' Exs. 71 & 72; DSOF ¶ 157, citing Defs.' Ex. 74. Nelson started working for ManTech earlier in 2012, before taking the position at the KMSF. DSOF ¶¶ 173–74, citing Defs.' Ex. 83. And Sawyer had worked in Kuwait, including at the KMSF, for the eight years from 2004 to 2012 before joining ManTech. DSOF ¶¶ 181–83, citing Defs.' Ex. 13 [Dkt. # 124-10] ("Sawyer Dep.") at 25–26, 74–75, 111, and Defs.' Ex. 88; *see also* Sawyer Dep. at 111.

Each of the plaintiffs signed the offer letter and addenda. *See* Defs.' Ex. 21–25; DSOF ¶¶ 43–47.

### Plaintiffs' immigration status

As part of the expansion to the KMSF, ManTech hired Millbrook International Services LTD in November 2012 to serve as its "Kuwaiti sponsor to assist with obtaining Kuwaiti visas for its employees." DSOF ¶¶ 59, 68; *see* PCSOF ¶ 59 (not disputing that Millbrook provided this service but arguing it was illegal under Kuwaiti law). To sponsor foreign workers, a sponsor must open a labor file with the Kuwait Ministry of Immigration and Ministry of Social Affairs and Labor. DSOF ¶ 54. Millbrook opened a labor file and provided the Ministry with information about the Contract, ManTech's KMSF employees, and the work they would perform. DSOF ¶¶ 54–56, 60, 70, 100.

The process to secure a Kuwaiti work visa, known as a Visa 18, included background checks, fingerprints, and medical examinations. DSOF ¶ 96. "The Kuwaiti government required original passports throughout the Visa 18 process, and in 2012–2013 the Kuwaiti government physically affixed an employee's Visa 18 inside the employee's original passport." DSOF ¶ 102. This process could take several months. DSOF ¶ 83.

In November and December 2012, plaintiffs arrived in Kuwait and entered the country on temporary visas, called Visa 14s. *See* DSOF ¶¶ 125–26, 128 (Hawkins); Hawkins Dep. at 51–53; DSOF ¶¶ 145, 147 (Hayes); DSOF ¶¶ 158, 166 (Locklear); DSOF ¶¶ 174, 178 (Nelson); DSOF ¶¶ 183, 186 (Sawyer).[5] "Millbrook collected Plaintiffs' passports as part of the process to obtain Visa 18s." DSOF ¶ 110, citing Defs.' Ex. 36, Decl. of Mark E. Croll [Dkt. # 124-30] ("Croll Decl.").[6] It was Millbrook's policy to give employees copies of their passports. DSOF ¶ 112; *see, e.g.*, Hayes Dep. at 50 (testifying that he received a Xerox copy of a page of his passport). Defendants assert that Millbrook explained to ManTech employees that it needed their original passports to process the Visa 18 applications. DSOF ¶ 111, citing Croll Decl. at ¶¶ 22–23. But

---

5       "Plaintiffs are not willing to concede" the arrival and start dates stated in defendants' Statement of Facts, but their exact dates are not material to the issues before the Court and the general time frame of November and December 2012 are undisputed. *See* PCSOF ¶¶ 125, 128, 145, 159, 174, 183; Hawkins Dep. at 51–53.

6       Plaintiffs object to the declaration of Millbrook's managing director Mark Croll, cited by defendants. *See, e.g.*, Pls.' Obj. 2; DSOF ¶¶ 68, 110. They argue that the declaration contains inadmissible hearsay because Croll is unavailable "to testify and undergo cross-examination either at trial or in a pre-trial deposition." Pls.' Obj. 2. But they do not explain why Croll is unavailable to testify, and they do not assert that ManTech failed to identify him as having discoverable information or that plaintiffs tried to depose him.

Hayes testified that "[t]hey never did explain that. . . . [N]obody there really understood why they kept our passport." Hayes Dep. at 51.

Plaintiffs began working at the KMSF upon their arrival in Kuwait even though they had not yet received work visas for their jobs with ManTech.[7] *See* DSOF ¶¶ 128, 151, 166, 178, 186. Working in Kuwait on a tourist visa is something some plaintiffs had done for previous employers or knew was a practice in Kuwait at the time. Hawkins's passport shows that he worked for another U.S. contractor in Kuwait on a Visa 14 for eleven months before receiving a Visa 18, DSOF ¶¶ 121–124, citing Hawkins Dep. at 160, 169–72, and he testified that "[y]ou always come in on a [Visa] 14, which is a tourist visa." DSOF ¶ 139, citing Hawkins Dep. at 97. Locklear stated that Visa 18s are not required on "day one" when an employee begins working in Kuwait. Defs.' Ex. 11 [Dkt. # 130-5] ("Locklear Dep.") at 73; DSOF ¶ 169. He also testified that at the time of his deposition in 2022, he was working in Kuwait for another U.S. government contractor on a Visa 14. DSOF ¶ 170; Locklear Dep. at 17–19. Sawyer testified that he worked for multiple U.S. contractors in Kuwait on Visa 14s before and after working for ManTech. DSOF ¶¶ 181–82, 192, citing Sawyer Dep. at 25, 42–44, 74.

While their work visa applications for ManTech were pending, plaintiffs and other employees had to periodically renew their temporary visas. Millbrook would return the passports, *see* DSOF ¶¶ 133, 151, 178, 185–86, 166, and the employees would take flights out of Kuwait to a nearby country and promptly return to receive a new visa stamp upon reentry. *See* DSOF ¶¶ 83–

---

7    Hawkins worked at the KMSF for Ranger Land Systems from 2011–2012 and had a Kuwaiti work visa issued on April 4, 2012 for that job. DSOF ¶¶ 121, 124. Hayes still appeared on the labor file related to his former employer in Kuwait. DSOF ¶ 147.

84.  These trips, called "visa runs" or "turn and burns," were often made in one day.  *See* DSOF

¶ 84; PCSOF ¶ 194, citing Pls.' Ex. BB, Sawyer's Ans. to Interrog. 7.

The U.S. Army was aware that ManTech employees were working in Kuwait under

temporary visas and making visa runs to renew them, and it paid for the visa run flights.  DSOF

¶ 88, citing Defs.' Ex. 115.  Kuwaiti officials who viewed plaintiffs' passports at airports upon

their return from visa runs and as part of the work visa application process would have also seen

that ManTech employees were working under temporary visas since those visas appeared in their

passports.  *See, e.g.*, PCSOF ¶ 153 (stating that plaintiff Hayes was scolded by immigration

authorities for returning from a visa run within seventy-two hours but that his passport was

stamped with a tourist visa and he was allowed to re-enter Kuwait); DSOF ¶ 188 (Kuwaiti officials

issued Sawyer a Visa 18 in May of 2013).

None of the plaintiffs were arrested or deported during the time they worked for ManTech,

and ManTech never threatened to have them arrested or deported.  DSOF ¶¶ 134, 136 (Hawkins);

*id.* ¶¶ 153–54 (Hayes); *id.* ¶¶ 171–72 (Locklear); *id.* ¶¶ 179–80 (Nelson); *id.* ¶¶ 193–94 (Sawyer).

But they became aware over the course of their employment that their immigration status was

problematic.  Nelson and Sawyer were told by other employees that it was illegal to work in Kuwait

on a tourist visa.  *See* PCSOF ¶ 179, citing Pls.' Ex. BB, Nelson Ans. to Interrog. 11; PCSOF

¶ 193, Pls.' Ex. BB, citing Sawyer's Ans. to Interrog. 7.  Further, Hayes and Sawyer learned that

ManTech manager Marvin Holt had been arrested at a checkpoint for not having a passport or

documentation of his legal status in his possession:  "Mr. Holt, at the insistence of SAIC, was

required to provide a mandatory briefing to the other contractors at the KMSF, including to

ManTech's employees, about the risk of not possessing one's passport and adequate legal

documents verifying one's citizenship and legal status in Kuwait."  PCSOF ¶ 154, quoting Pls.'

Ex. II, Hayes Ans. to Interrog. 21; PCSOF ¶ 193, quoting Pls.' Ex. CC, Sawyer Ans. to Interrog. 22.[8]

Plaintiffs were also reprimanded by airport officials when returning from visa runs. Hayes reports that he was berated for coming back before he had been outside of the country for at least seventy-two hours, and that he was told this was grounds for arrest. PCSOF ¶¶ 153–54, citing Pls.' Ex. II, Hayes's Ans. to Interrog. 14. Every time he made a visa run "the police officers that were at the airport . . . would literally get in your face and scream and cuss at you and tell you that, number 1, what you did was wrong and you're supposed to wait 72 hours to come back and that you don't have your paperwork right." PCSOF ¶ 153, quoting Hayes Dep. at 53–54. Locklear was also told upon returning from a visa run that he had not been out of the country for the required amount of time and could be subject to arrest. PCSOF ¶ 171, quoting Locklear Dep. at 115. Sawyer complained to his supervisor that visa runs were illegal and that taking his passport and other credentials put him in danger of being arrested by Kuwaiti authorities. PCSOF ¶ 194. "On March 30, 2013, ManTech instructed Sawyer, still without a Visa 18, to execute a 'visa run.'" *Id.*, quoting Pls.' Ex. BB, Sawyer's Ans. to Interrog. 7. Sawyer again "told his ManTech managers that he and his fellow employees were at risk of arrest for doing a 'visa run.' ManTech again ignored this warning and ordered . . . Sawyer and the others in the group to proceed with the one-day 'turn and burn' (visa run) as scheduled or be fired." *Id.*

---

8    Plaintiffs assert that "Hawkins felt threatened by arrest and was on notice that if he did not execute visa runs for ManTech, he would be summarily fired," but they only cite his 208-page deposition transcript as a whole for this factual assertion, without identifying specific testimony that supports it. *See* PCSOF ¶ 136, citing Hawkins Dep.

## Other aspects of plaintiffs' employment

Outside of work, plaintiffs either lived in their own apartments or in apartments provided by ManTech.  DSOF ¶ 199.  They could come and go from their apartments as they pleased and had access to smartphones, computers, the internet, and television.  DSOF ¶¶ 200–01.  Hawkins had his own car and spent his days off doing laundry and grocery shopping.  DSOF ¶¶ 202–03.  Sawyer spent his days off walking to the beach.  DSOF ¶ 204.  Hayes had maids clean his apartment and told a friend that he exercised at a gym and "made some older Kuwaiti friends that are really nice."  DSOF ¶¶ 205–06.

Plaintiffs were also permitted the leave country for personal reasons, and Millbrook returned plaintiffs' passports to them when they took leave.  Nelson received his passport when he took leave from February 4 to February 19, 2013, after a family member in the United States was hospitalized.  DSOF ¶¶ 176, 211, citing Defs.' Ex. 12 [Dkt. # 124-9] ("Nelson Dep.") at 67; PCSOF ¶ 176.  Locklear received his passport when he went on leave for six weeks from January 13 to February 22, 2013, DSOF ¶¶ 160–61, for the birth of a son who remained in intensive care for forty-five days.  PCSOF ¶ 160.  After Locklear returned to Kuwait, he "requested to transfer to a mechanic position in Texas because of family issues that were challenging to handle from Kuwait."  DSOF ¶ 162.  ManTech offered him a position in Texas on March 15, 2023, but he ultimately declined the offer because the pay was lower.  *See* DSOF ¶¶ 164–65, citing Defs.' Ex. 79.

Plaintiffs identify other circumstances, though, that troubled them about ManTech.  First of all, the employees worked twelve hours a day, six days a week.  DSOF ¶ 196.  Hawkins, Sawyer, and Hayes had worked similar schedules at previous jobs in Kuwait, and Locklear was working on the same schedule for a different employer in Kuwait at the time of his January 2022 deposition.

10

DSOF ¶¶ 197–98, citing Hawkins Dep. at 57–58, Sawyer Dep. at 49–50, Hayes Dep. at 78, Locklear Dep. at 28. Plaintiffs maintain that ManTech should have paid them overtime. *See* Pls.' Obj. 9.[9]

Plaintiffs also complain that the air quality at the KMSF was poor and that they lacked personal protective equipment ("PPE"). *See* PSOF ¶ 9. Hayes testified that he had frequent nose bleeds, PCSOF ¶ 199, citing Hayes Dep. at 64–66, and Locklear testified that "ventilators weren't a part of [personal protective equipment]. . . . You would go home at night, take a shower, blow your nose, have black soot coming out of your nose. It made it hard to breathe." *Id.*, citing Locklear Dep. at 92. ManTech employees, including plaintiffs, could request PPE such as respirators from Science Applications International Corporation ("SAIC"), the contractor operating the KMSF safety department responsible for the safety and environmental conditions there.[10] DSOF ¶¶ 13–14, 23.

Some of the plaintiffs found that the culture at ManTech fell short when compared to previous employers. Hayes testified that the "atmosphere [at ManTech] was a little different [than the atmosphere at Ranger Land Systems]." PCSOF ¶ 35 (edits in original), quoting Hayes Dep. at 116.

---

9    Although the TAC asserts that "Plaintiffs Were Damaged by ManTech's TVPRA Violations by Being Victims of Wage Theft" by not paying them overtime in violation of Kuwaiti law, *see* TAC ¶¶ 269–282, plaintiffs' expert report does not opine on wage laws in Kuwait and their brief and Counterstatement do not present a factual dispute on this issue.

10    SAIC was the Joint Logistics Integrator at the KMSF before and during ManTech's performance of the Contract. DSOF ¶ 13. In 2011, before ManTech arrived at the KMSF, the U.S. government required SAIC to conduct air quality testing because of poor air quality. DSOF ¶¶ 19–20. The parties have not directed the Court to evidence about the result of those tests or whether tests were undertaken during or after plaintiffs' employment.

> If you asked for something, it seemed like it was a threatening manner that
> they answered you. . . . [I]f you asked something and it was what they
> thought was very serious, you know, their answer was, Well, if you don't
> like it, leave . . . .   Ranger Land never did that, but ManTech always did
> that, **but they would say, ["]But you remember you got to pay back this
> amount of money.["]**  And, you know, it's a threat to the point to where do
> you stay or do you go.

PCSOF ¶ 35 (internal edits in original) (emphasis in original), quoting Hayes Dep. at 116–17.

### The end of the employment relationship

On May 14, 2013, Millbrook obtained a Visa 18 work visa for Sawyer, but it did not complete the process for the other plaintiffs.  DSOF ¶¶ 107–08.   In late May 2013, ManTech terminated Sawyer, along with Hayes, Nelson, and Locklear, at the direction of the U.S. Army, which stated they were "no longer welcome" at the KMSF and directing that they "be removed due to the lack of productivity on the floor."  DSOF ¶¶ 207–08, quoting Defs.' Ex. 99 at MANTECH-00016771–72.   In July 2013, ManTech terminated Hawkins as part of the U.S. government shutting down the KMSF and ending ManTech's work there.  DSOF ¶ 209.  ManTech did not require any plaintiff to reimburse costs related to their employment in Kuwait, DSOF ¶ 210, and it did not report any plaintiff as "absconded" or threaten to report any plaintiff as absconded.  DSOF ¶ 118.[11]

---

11      In response to DSOF ¶ 118, plaintiffs assert that ManTech instructed Millbrook to make threats to report ManTech employees as "absconded."  PCSOF ¶ 118, citing Sawyer Dep. at 65–66.  Defendants object to these statements as inadmissible hearsay, and the Court agrees.  *See* Fed. R. Civ. Pro. 56(c)(2); Defs.' Reply to PCSOF ¶ 118.  Further, the testimony shows that the statement was made to Sawyer *months after* plaintiffs were terminated "because ManTech was trying to clear out all the visas before they closed down."  *See* Sawyer Dep. at 65–66.  So the instructions were not made to keep plaintiffs working at the KMSF; they had already departed.

## PROCEDURAL HISTORY[12]

On December 4, 2015, plaintiffs brought this qui tam action against ManTech pursuant to 31 U.S.C. § 3730(b). *See* Compl. [Dkt. # 1]. The complaint alleged violations of the False Claims Act and the Trafficking Victims Protection Reauthorization Act, as well as breach of contract. Compl. ¶¶ 1–3. The government declined to intervene in the matter after conducting its own investigation into plaintiffs' original claims. *See* Notice of Election to Decline Intervention [Dkt. # 14]. Plaintiffs proceeded with the case pursuant to 31 U.S.C. § 3730(c)(3), *see* Order [Dkt. # 15], and subsequently filed a proposed amended complaint and a second amended complaint. Notice re Pls.' Proposed Am. Compl. [Dkt. #25]; Second Am. Compl. [Dkt. # 30]. After reviewing the amended complaints, the government declined to intervene two more times. *See* Notice re Pls.' Proposed Am. Compl. [Dkt. # 25]; Notice re Pls.' Proposed Second Am. Compl. [Dkt. # 33].

Defendants moved to dismiss the Second Amended Complaint, and on January 28, 2020, the Court granted the motion in part and denied it in part, allowing one claim under the False Claims Act and one claim under the TVPRA to proceed. *See* Defs.' Mot. to Dismiss the Second Am. Compl. [Dkt. # 41]; Order [Dkt. # 48]; Mem. Op. [Dkt. # 49] at 2. Discovery commenced in June of 2020. Scheduling Order [Dkt. # 54].

A year later, in May of 2021, plaintiffs filed a motion for leave to file a Third Amended Complaint ("TAC"), seeking to add, among other things, a claim of wrongful termination and a claim of money laundering under the Racketeer Influenced Corrupt Organizations ("RICO") Act.

---

12      On May 13, 2014, plaintiffs filed suit against ManTech International in the Eastern District of Virginia, alleging breach of their employment contracts, defamation, tortious interference with prospective business advantage, and violation of Fair Labor Standards Act. *Hayes v. ManTech Int'l Corp.*, No. 14-546 (E.D. Va.), Compl. [Dkt. # 1]. They voluntarily dismissed their case on September 11, 2014. *Id.*, Voluntary Dismissal [Dkt. # 17].

*See* Mot. for Leave to File TAC [Dkt. # 79].  Defendants did not oppose the motion, the Court granted leave to file, and the third amended complaint became the operative complaint in the case. *See* Defs.' Resp. to Mot. for Leave [Dkt. # 82]; Minute Order (Sept. 17, 2021); TAC [Dkt. # 85].

On November 16, 2021, defendants filed a motion to dismiss the third amended complaint, and that motion was fully briefed.  Mot. to Dismiss TAC [Dkt. # 88]; Pls.' Opp. to Mot. [Dkt. # 91]; Defs.' Reply Mem. in Support of Mot. [Dkt. # 93].

On March 4, 2022, after the close of fact discovery and while the defense motion to dismiss was ripe and pending, plaintiffs sought leave to file yet another amended complaint.  Pls.' Mot. for Leave to File a Fourth Am. Compl. [Dkt. # 95].  Defendants opposed the amendment.  Defs.' Opp. to Mot. for Leave [Dkt. # 96].

The Court considered both defendants' motion to dismiss the third amended complaint and plaintiffs' motion to file a fourth, and on June 20, 2023, it granted the defendants' motion to dismiss in part and denied plaintiffs' motion to amend.  Mem. Op. & Order [Dkt. # 105].  The Court ruled that the motion to amend was futile and that plaintiffs failed to exercise diligence in seeking to amend.  *Id.* at 12–29.  With respect to the Third Amended Complaint, it dismissed plaintiffs' RICO claim on the grounds that the statute did not provide for extraterritorial jurisdiction over alleged racketeering abroad and plaintiffs failed to allege a domestic injury.  *See id.* at 42–49.  The Court permitted the False Claims Act count and the TVPRA count to move forward.  *See id.* at 35–41.  Plaintiffs subsequently dismissed the False Claims Act count, *see* Stipulation of Dismissal as to Count I of the TAC [Dkt. # 107], so only the TVPRA count remained.

Both parties challenged aspects of the June 2023 ruling.  Defendants moved for the first time to dismiss the TVPRA claim on the basis that the TVPRA does not have extraterritorial

application.  *See* Defs.' Mot. to Dismiss Count IV of the TAC [Dkt. # 108]; Defs.' Mem. in Supp. [Dkt. # 108-1].[13]  Plaintiffs moved to reinstate their RICO claims on the basis that the third amended complaint alleged a domestic injury and therefore, the RICO claims were not improperly extraterritorial.  Pls.' Mot. to Reinstate Count VI of the TAC [Dkt. # 116].[14]  The Court disagreed with each side's application of extraterritoriality principles, and denied both of the motions.  Mem. Op. & Order [Dkt. # 140].

On October 16, 2023, while the parties' extraterritoriality motions were pending, defendants filed the instant motion for summary judgment on the TVPRA count in the Third Amended Complaint, and the parties have briefed that motion as well.  *See* Defs.' Mot. for Summ. J. [Dkt. # 124] ("Defs.' Mot."); Defs.' Mem. in Supp. [Dkt. # 130] ("Defs.' Mem."); Pls.' Opp. to Defs.' Mot. [Dkt. # 134] ("Pls.' Opp."); Defs.' Reply in Supp. of Defs.' Mot. [Dkt. # 137] ("Defs.' Reply").  ManTech's motion for summary judgment included a Statement of Facts, with 221 paragraphs of facts that it asserts are undisputed and entitle it to judgment.  *See* Defs.' Mot. and Defs.' Mem.; DSOF.  Defendants attached 1,624 pages of exhibits in support of their motion and DSOF.  Defs.' Exs. [Dkt. # 124, 125, 130].  In response, plaintiffs filed an opposition and a

---

13    Defendants motion was based on a recent district court decision which held that the TVPRA's civil remedy provision does not apply extraterritorially, *Doe I v. Apple Inc.*, No. 19-cv-3737, 2021 WL 5774224 (D.D.C. Nov. 2, 2021), and two recent Supreme Court decisions on the extraterritoriality of other statutes, *Yegiazaryan v. Smagin*, 599 U.S. 533 (2023), and *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 417 (2023).  *See* Defs.' Mem. in Supp. [Dkt. # 108-1].

14    Plaintiffs based their motion on recent Supreme Court ruling *Yegiazaryan v. Smagin*, 599 U.S. 533 (2023).

15

Counterstatement of Facts, supported by an additional 1,601 pages of exhibits to the Counterstatement. *See* Pls.' Opp. [Dkt. # 134]; Pls.' Counterstatement and Exs. [Dkt. # 134-1].[15]

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment

---

15      In its September 27, 2024 order denying the extraterritoriality motions, the Court noted that the motion for summary judgment was ripe and no further briefing was required. Mem. Op. & Order [Dkt. # 140] at 24–25.

motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

To overcome defendants' motion, plaintiffs must "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted). To this end, Local Civil Rule 7(h)(1) requires a party opposing summary judgment to provide "a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement." Local Civ. R. 7(h)(1). The Court highlighted this requirement in its Scheduling Order, and in accordance with the Local Rules, it ordered that any opposition should "clearly indicate which elements of which counts are subject to genuine factual disputes." Scheduling Order at 4. When opposing the summary judgment motion, plaintiffs were supposed to respond to each individually numbered paragraph in the defendants' statement of facts separately, and for any disputed fact, they were supposed provide "a concise, non-argumentative response and a citation to the evidence supporting that response." *Id.* In other words, while the Court assumed the facts alleged in the succession of complaints to be true when it considered the motions to dismiss and motions for leave to amend in this case, we have reached the stage where plaintiffs have to put the meat on the bones of their claims. They have to point to the *evidence* that gives rise to a triable dispute.

Plaintiffs, who are represented by counsel, ignored the requirements of Rule 56, and they did not attempt to adhere to the Local Rules or Scheduling Order either. The opposition devotes a single paragraph to setting out plaintiffs' position that there are disputed facts requiring a trial, *see* Pls.' Opp. at 3, citing PCSOF, and plaintiffs attempt to utilize the pleading entitled "Counterstatement of Fact" as the vehicle for arguing why the Court should reject defendants'

17

contentions.  As explained in footnote 1 above, the Counterstatement is divided into three categories:  nine "broadly applicable objections to defendants' purported material facts" (each cited as "Pls.' Obj."); fourteen statements of "undisputable . . . fact[s] that contradict a wide variety of DSOF" (each cited as "PSOF"); and individual "refutations" of each of defendants' 221 statements of facts (each cited as "PCSOF").  *See* Counterstatement at 1.  Within each category, many of the paragraphs contain a jumble of extraneous legal arguments and citations, unsupported assertions of fact, and unhelpful, repetitive internal cross-references.  Neither the opposition nor the Counterstatement indicate "which elements of which counts are subject to genuine factual disputes," in accordance with the Scheduling Order and local rule.  *See Gardels v. Cent. Intel. Agency*, 637 F.2d 770, 773–74 (D.C. Cir. 1980) (holding that strict compliance with this local rule is required).  And more importantly, plaintiffs generally fail to identify the evidence in the record that gives rise to a genuine dispute with respect to any particular fact.

Nevertheless, the Court will exercise its discretion to consider the motion, *see id.* at 773, relying on the facts in the Counterstatement that are supported by cites to evidence and ignoring irrelevant arguments and unsupported assertions.  *See also* Scheduling Order at 4 ("The Court will not consider any fact (a) not supported by a reference to evidence; (b) supported by a citation to a pleading rather than to evidence; (c) that states a legal conclusion; or (d) that is asserted in a brief and not in the movant's statement of material facts.").

## ANALYSIS

Count IV, plaintiffs' TVPRA claim, is predicated on three legal theories:  that ManTech forced plaintiffs to work (1) by abusing the laws and legal processes of Kuwait, (2) by using a scheme to put them in fear of serious harm if they quit their jobs in violation of the TVPRA, and

(3) by confiscating their passports while engaging in these unlawful actions. *See* TAC ¶ 146, citing

18 U.S.C. § 1589(a)(3);[16] TAC ¶ 147, citing 18 U.S.C. § 1592; TAC ¶ 153.

Section 1595 of the statute authorizes victims of a TVPRA violation to file a civil action

for damages, 18 U.S.C. § 1595, and plaintiffs brought this case under that provision. TAC ¶ 145.

Discovery has closed, and defendants have moved for summary judgment in their favor. *See* Defs.'

Mot.

Section 1589 of the TVPRA makes it a crime to "knowingly" obtain the labor or services

of a person "by means of the abuse or threatened abuse of law or legal process," 18 U.S.C.

§ 1589(a)(3), or by other unlawful means, including "any scheme, plan, or pattern intended to

cause the person to believe that, if that person did not perform such labor or services, that person

or another person would suffer serious harm or physical restraint." *Id.* § 1589(a)(4).

The statute defines "abuse or threatened abuse of law or legal process" as

> use or threatened use of a law or legal process, whether administrative, civil,
> or criminal, in any manner or for any purpose for which the law was not
> designed, in order to exert pressure on another person to cause that person
> to take some action or refrain from taking some action.

*Id.* § 1589(c)(1). It defines "serious harm" as

---

16      While Count IV of the TAC does not explicitly refer to section 1589(a)(4), the Court ruled
that plaintiffs stated a claim under this provision because the TAC alleged that ManTech engaged
in a scheme to cause plaintiffs to fear serious harm if they quit or were fired. *See* Mem. Op. &
Order [Dkt. # 105] at 39; TAC ¶ 268 (alleging that plaintiffs reasonably believed that they had no
choice but to continue working due to "ManTech's confiscation of their passports, ManTech's
refusal to obtain legal authorization . . . necessary for them to live without constant fear of arrest,
the power that ManTech had to report them to Kuwaiti authorities as having 'absconded' if they
did not report to work, and ManTech's threat of severe financial penalties were Plaintiffs to leave
their employment prior to the expiration of the twenty-four months required of their contract");
*see also id.* ¶¶ 153, 156–57, 215, 264, 279.

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

*Id.* § 1589(c)(2).

## I.    The Section 1589(a)(3) "Abuse of Law" Claim

To establish an "abuse of law" claim under section (a)(3), plaintiffs must show that ManTech:  (1) "knowingly," (2) used an "administrative, civil, or criminal" law or legal process, (3) "in any manner or for any purpose" for which it was not designed, (4) "to exert pressure" on plaintiffs, (5) to obtain their labor.  18 U.S.C. § 1589(a)(3), (c)(1).

Plaintiffs allege that the actionable abuse of law in this case was defendants' alleged abuse of the visa process in Kuwait.  TAC ¶¶ 152–246.  Defendants maintain that the Court should enter judgment in their favor on this aspect of Count IV because plaintiffs have not demonstrated that any misuse of the visa process was intended to coerce them to perform work against their will.  Defs.' Mem. at 12–24.

It is undisputed that ManTech brought plaintiffs to Kuwait on temporary visas, that its contractor "Millbrook collected [their] passports as part of the process to obtain" work visas for them, *see* DSOF ¶¶ 110, 112; PCSOF ¶¶ 110, 112, and that plaintiffs were required to carry out visa runs to renew the temporary visas while waiting for the work visas, or Visa 18s, to be approved.  *See* DSOF ¶¶ 83, 84; *see also* DSOF ¶¶ 128, 147, 166, 178, 186; PCSOF ¶¶ 83–84, 128, 153, 166, 178, 186.  The record also contains evidence that the Kuwaiti government required that plaintiffs' original passports be presented as part of the process of obtaining Visa 18s.  DSOF ¶ 102.  Visa runs by U.S. government contractors were common at the time, and the U.S. Army covered the cost of the ManTech employees' trips.  *See* DSOF ¶ 88; Defs.' Ex. 115.

Plaintiffs do not dispute these facts. PCSOF ¶¶ 83–84, 101–102. Rather, they have submitted a report from Zafar Iqbal and Khalid Ahmed, who are proffered as experts on Kuwaiti law. Pls.' Obj. 4. Plaintiffs state these legal experts will testify at trial that it is illegal for someone with a tourist or commercial visa to work in Kuwait and that only "Kuwaiti-registered companies" may "sponsor foreign nationals for resident visas (Visa 18s) and work permits" and companies like Millbrook cannot "sponsor" foreign company employees, like plaintiffs, for these purposes. PCSOF ¶¶ 49–50; Pls.' Ex. A, Pls.' Expert Witness Rep.; Pls.' Ex. C, Iqbal Dep. at 100–04; Pls.' Ex. Z, Ahmed Dep. at 43; *see also* Pls.' Obj. 4.[17]

Plaintiffs note that they object to the evidence provided in the declaration from the Millbrook manager that visa runs and sponsorships were "customary" in Kuwait on the grounds that the declaration is "hearsay." Pls.' Obj. 5.[18] And they take issue with defendants' reliance on evidence showing that the U.S. Army was aware of ManTech's visa practices and that it compensated its contractor for the visa run flights, asserting that these are not "undisputed material

---

[17]    Plaintiffs also assert that visa runs were illegal but their experts do not opine on visa runs, *see* Pls.' Expert Witness Rep., and they provide no support for this assertion. *See, e.g.*, PCSOF ¶¶ 83–84, 87 (stating only that plaintiffs' experts "will testify at trial . . . that 'Millbrook assisted Plaintiffs in periodically renewing their Visa 14s' is euphemistic for . . . ManTech's demand that they engage in an illegal visa run by flying to Bahrain and back to Kuwait").

[18]    Defendants' reliance on a declaration comports with Rule 56, which expressly permits a party asserting that a fact cannot be disputed may support that assertion with affidavits or declarations. *See* Fed. R. Civ. P. 56(c)(1)(A). The rule further specifies that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Croll states that he is basing the information on his personal knowledge and information, *see* Croll Decl. ¶ 1, and his declaration does not include statements made to him by others offered to prove the truth of any matter asserted in them.

fact[s] upon which ManTech may rely" because "[t]he U.S. Army does not serve as legal counsel to ManTech."  PCSOF ¶ 88.

But none of this adds up to a genuine dispute of fact for the jury that would defeat the motion for summary judgment.

First, what was lawful or illegal at the time under Kuwaiti law is a legal issue for the Court to determine, not a factual question to be resolved by a jury.  *See* Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law."); *see also Chin-Teh Hsu v. New Mighty U.S. Tr.*, No. 10-1743, 2020 WL 588322, at *3 (D.D.C. Feb. 6, 2020) ("Under [Rule 44.1], a court's determination of foreign law must be treated as a ruling on a question of law.") (internal quotations and citation omitted).  Plaintiffs have not filed a cross-motion for summary judgment on this issue, nor did they brief the issue in their twelve-page opposition to the defendants' motion for summary judgment; they simply posit that it is a disputed question of fact.

Further, when summary judgment can be decided based on the elements of the TVPRA, a court need not interpret the law that has allegedly been abused.  *See Alvarado v. Universidad Carlos Albizu*, No. 10-22072, 2010 WL 3385345, at *3 n.1 (S.D. Fla. Aug. 25, 2010) (declining to construe U.S. regulation and determine whether the defendant "abused" U.S. law, because the defendant did not intend to use regulation as a "tool of coercion").

Here, whether ManTech's actions complied with Kuwaiti law is not the relevant question because the TVRPA's "abuse of law" provision "requires more than evidence that a defendant violated other laws . . . or encouraged others to do the same." *Muchira v. Al-Rawaf*, 850 F.3d 605, 622–23 (4th Cir. 2017), citing 18 U.S.C. § 1589(a).  It "requires proof that the defendant

'knowingly' abused the law or legal process as a means to *coerce* the victim to provide labor or services against [their] will." *Id.*, citing 18 U.S.C. § 1589(a) (emphasis in original). In other words, plaintiffs must provide evidence of ManTech's intent to abuse the visa and immigration process as means to force them to continue working for the company.

Plaintiffs have not identified the evidence that would establish this element of their claim. They submit that they "surrendered their passports . . . upon the thinly veiled threat of summary termination," but they cite no evidence for this factual assertion. *See* PCSOF ¶¶ 110–11. Sawyer did testify that a ManTech manager ordered him to make a visa run or be fired. PCSOF ¶ 194, citing Pls.' Ex. BB, Sawyer's Ans. to Interrog. 7. But if an employee was told, "if you don't do this, you will lose your job," and he felt pressured to comply in order to keep the job he wanted, that is not evidence he was instructed to do something as a means to force him to stay against his will.

Fear of termination alone does not amount to a TVPRA violation; the whole point of the TVPRA is to prohibit practices that trap the employees in an abusive situation. *See Roman v. Tyco Simplex Grinnell*, 732 F. App'x 813, 817 (11th Cir. 2018) (affirming dismissal of TVPRA claim and noting that "[a]lthough [plaintiff] argues that the threat of termination qualified as a serious harm under the TVPRA, he does not explain how the potential financial harm he might have suffered would be any more serious than the financial harm any employee encounters when faced with termination"); *Salem v. Mich. State Univ.*, No. 19-220, 2021 WL 1381149, at *6 (W.D. Mich. Apr. 13, 2021) ("[T]here is a difference between harm that arises as a natural consequence of the employee's decision to cease work and harm that would not arise as a natural consequence but is intentionally inflicted or threatened by the employer if the victim refuses to continue working.").

Further, even if Millbrooks' sponsorship was not compliant with Kuwait's immigration procedures, there is no evidence that ManTech intended to use the country's administrative visa process for any purpose other than to obtain the required work visas for the plaintiffs.  18 U.S.C. § 1589(c)(1); *see Martinez-Rodriguez v. Giles*, 31 F.4th 1139, 1150 (9th Cir. 2022) (examining whether defendants used a visa program in a different manner or for a different purpose than it was designed and thus violated the "abuse of law" provision).  Here, the undisputed facts show that ManTech hired Millbrook to sponsor the plaintiffs for work visas; that Millbrook collected the employees' passports in order to present them to the Kuwaiti government as part of the visa application process; that the passports were returned to the plaintiffs when they needed them for travel; that visa runs were a common practice in Kuwait at the time; that U.S. government officials knew that U.S. contractor employees made visa runs; and that the U.S. Army paid for the costs associated with the visa runs.  The record also indicates that the Kuwaiti officials who processed the ManTech employees' visa applications would have seen that ManTech employees were working on temporary visas.  And it is undisputed that plaintiff Sawyer ultimately received a work

visa through Millbrook's efforts, and that his original passport was returned to him after the work

visa was issued.  DSOF ¶¶ 189, 191.[19]

The Court acknowledges that plaintiffs have identified a number of troubling aspects about

their employment.  The record shows that ManTech put its employees at risk of significant legal

consequences, including arrest, by requiring them to make repeated visa runs and by leaving the

---

[19]    Plaintiffs quote testimony from a ManTech executive in a different case in a different
jurisdiction against ManTech to posit a motive for defendants' actions.  Pls.' Opp. at 2–3, quoting
*Cody v. ManTech Int'l Corp.*, No. 16-cv-00132 (E.D.Va.) at Pls.' Ex. F [Dkt. # 134-1] (arguing
that ManTech "intentionally underbid" the Contract, requiring it to cut mechanic compensation
and safety equipment costs).  But the excerpt quoted by plaintiffs does not give rise to a genuine
dispute with respect to this element of the abuse of law claim.

> But the overall thing was to try to find that floor to compensation to hire the
> qualified people.  The government referenced it quite a number of times in
> the – in the discussions they had, and this was L47 RFP, which basically –
> it's actually right below here. But they're asking for you – for each
> competitor to do a marketplace analysis of what the costs are.  They're
> basically saying, We don't want to see low prices.  We want to see a
> marketplace evaluation, what that is.  We also want to see a total
> compensation plan for the people.  And then it also says that we would be
> able to attract, hire, and retain for the life of the contract.  So when ManTech
> keeps trying to drop their bid, what they're doing is the costs that we will
> submit will not allow us to hire and retain for the life of the bid, not qualified
> personnel.  And this – again, on a DX-rated program, lives are at stake.  I
> mean, the minute we fix a vehicle, they take it out, and they use it.  And we
> have to have people that are qualified to do that, and to keep that qualified
> workforce, which was, I think, the reason the phase-in plan and everything
> else the government was evaluating was – they really wanted to make sure
> that we could support the contract.  Whoever won the contract, whoever
> was awarded the contract would have what it took to keep the people there
> on the ground to fix those vehicles in the time they needed to be fixed.

Pls.' Ex. F at 574–75.  While this shows that ManTech was motivated to maintain a qualified work
force on site, it does not show that the alleged visa application improprieties were an attempt to
abuse the law in order to force these employees to stay.  ManTech and Millbrook were in fact
working to get employees the work visas at the time, employees who asked to go home were able
to go home, and they even offered one of them a job in the United States instead, which he declined.

workers without their original passports for extended periods of time. *See* PCSOF ¶¶ 153–54, 171–72, 179–80, 193. However, there is no evidence tying these practices to an intent on the company's part to force the employees to remain at the company against their will. Some of them had carried out visa runs and worked on temporary visas for previous employers. *See* DSOF ¶¶ 123, 170, 190. Indeed, these risks, which some plaintiffs testified that they feared,[20] are the type of circumstances that some courts have said would make employees want to *leave* their jobs, not force them to stay.

In *Headley v. Church of Scientology International*, 687 F.3d 1173 (9th Cir. 2012), the Ninth Circuit held that the plaintiffs' complaints about the discipline, lifestyle, and familial constraints imposed by their employer did "not suggest that the defendants obtained the [plaintiffs'] labor 'by means of' those features," but were circumstances that caused them to leave their positions instead. *Id.* at 1180. Applying that reasoning, the fact of the visa runs alone is not enough to establish the necessary element that if ManTech circumvented or abused Kuwaiti law, it did so to compel the plaintiffs to stay. Moreover, the record reflects that the employees who needed to return to the United States were permitted to retrieve their passports and travel home, DSOF ¶¶ 160–61, 176, 211; PCSOF ¶¶ 160, 176; they were not trapped in Kuwait.

There is no genuine dispute that through Millbrook, ManTech was utilizing the Kuwaiti visa process – whether in strict accordance with all of the relevant provisions of Kuwaiti law or not – for the purpose of obtaining work visas, and plaintiffs have pointed to no evidence that would

---

20    *See* PCSOF ¶¶ 153–54, 171, 179, 193 (Nelson testified that he feared being arrested); PCSOF ¶ 153, citing Pls.' Ex. II, Hayes's Ans. to Interrog. 14 (stating that Hayes lived in fear Kuwaiti authorities would raid the KMSF).

enable a reasonable jury to conclude that ManTech was instead using the process for a purpose for which it was not designed, with the intent "to exert pressure" on plaintiffs to obtain their labor. 18 U.S.C. § 1589(a)(3), (c)(1). Therefore, the Court will grant summary judgment in favor of defendants on the "abuse of law" aspect of Count IV.

## II.    The Section 1589(a)(4) "Serious Harm" Claim

To establish a "serious harm" claim under section (a)(4), plaintiffs must show that ManTech (1) "knowingly" (2) used a "scheme, plan, or pattern" to threaten plaintiffs with (3) "serious harm," *see* 18 U.S.C. § 1589(a)(4), which means a harm that is "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." *Id.* § 1589(c)(2).

Although the D.C. Circuit has not addressed a section 1589(a)(4) claim, other circuit courts have held that the threat of harm is "considered from the vantage point of a reasonable person in the place of the victim." *Muchira*, 850 F.3d at 618, *quoting United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011). There must be sufficient evidence for a jury to reasonably conclude that defendants "knowingly or intentionally engaged in actions or made threats that were sufficiently serious to compel a reasonable person in [plaintiffs'] position to remain in [defendant's] employ against [their] will and in order to avoid such threats of harm, when [they] otherwise would have left." *Muchira*, 850 F.3d at 620.

Courts also consider "the particular vulnerabilities of a person in [plaintiffs'] position" and whether plaintiffs' behavior was "objectively reasonable under the circumstances." *United States v. Rivera*, 799 F.3d 180, 186–87 (2d Cir. 2015). "[K]nown objective conditions that make the victim especially vulnerable to pressure (such as youth or immigration status) bear on whether the

27

employee's labor was obtained by forbidden means." *United States v. Bradley*, 390 F.3d 145, 153 (1st Cir. 2004) (quotation marks and alteration omitted) (explaining that "to rely upon some hidden emotional flaw or weakness unknown to the employer would raise various problems" such as "scienter"). "The correct standard is a hybrid," requiring the victim's "acquiescence be objectively reasonable under the circumstances." *Rivera*, 799 F.3d at 186–87.

Plaintiffs' claim of serious harm is based on the addenda to their employment agreements, which they assert "threatened ruinous financial penalties for leaving Kuwait prior to two years of service (even if fired)." Pls.' Opp. at 3; PCSOF ¶¶ 35, 38–41. "[T]he Host Nation Sponsorship Addendum and the Training Addendum imposed a penalty for a mechanic exercising what is represented, in the body of the employment contract, as a right to terminate employment at will." PCSOF ¶ 41. According to plaintiffs, these terms, coupled with the collection of their passports, "created an environment of anxiety whereby Plaintiffs lived in fear of arrest and summary termination (with attendant penalty)" to "keep this now undercompensated and overworked workforce in place." Pls.' Opp. at 3.

ManTech disputes plaintiffs' characterization of the written agreements that governed plaintiffs' employment. It notes that the offer letters state that employment would be an "at-will" arrangement; either the employer or the employee could terminate the relationship at any time. Defs.' Mem. at 25–28; DSOF ¶ 29. While that may be true, the Sponsorship Addendum contained an explicit two-year time commitment. So that argument by the defendants rings hollow. ManTech also disputes plaintiffs' claim that leaving before the two-year point would necessarily trigger a penalty of a pre-determined amount; it points out that the Sponsorship Addendum stated

that the reimbursable sponsorship costs "*could* reach and exceed" the estimate, with the amount to be paid based on actual costs.  Defs.' Mem. at 25 (emphasis added), citing DSOF ¶¶ 37–38.[21]

### A.    The Contract Addenda

The Sponsorship Addendum to the ManTech employment agreement explained that to work in Kuwait, an employee must receive a "host nation Work Visa with sponsorship," which required the employee to meet the host nation's criteria, "including a favorable background investigation (this is in addition to employment background check and security clearance requirements) and a medical examination to determine fitness to work."  Sponsorship Addendum, Defs.' Exs. 21–25.  It went on to state:

> Due to the significant cost for sponsorship, (up to and exceeding $10,000 per person for first year and $5,000 for second year), you agree to commit to a minimum period of employment (deployment) of 24 months or the completion of the contract whichever comes first. . . .

> Once the process starts, ManTech is committed to the expenditure of the costs required to complete this process.  If you are unable to complete the process regardless of the reason or circumstance, you will be liable for all costs incurred to that point.

---

21    ManTech also emphasizes that it never required any of the plaintiffs to repay any costs. *See* Defs.' Mem. at 6, 25; DSOF ¶ 210; PCSOF ¶ 210.  It also argues that under the addendum, employees could only be responsible for costs incurred once the sponsorship process was "completed," and because Hawkins, Nelson, Hayes, and Locklear were terminated before the process was completed and Sawyer was terminated shortly after he received his visa, none of them could reasonably fear a provision that did not apply to them.  *See* Defs.' Mem. at 27–28.  But it is the *threat* of financial penalty – the prospect of owing up to $15,000 – that is the basis of plaintiffs' claim that they were all afraid to leave.

> Once the process is completed, should you decide to terminate employment, or are terminated for any reason, voluntary or involuntary, prior to completing 24 months (non-consecutive) of "boots on ground" (BOG) service, you are responsible for costs incurred and will be required to reimburse the cost to obtain a work visa.  In this event, ManTech will make a determination of financial obligation based on the current circumstances.

*Id.*

The Training Addendum provided that if an employee "fail[ed] to complete an assigned training course or fail[ed] to complete an obligated employment period" under the contract, the employee "will be required to reimburse prorated costs related to the training and certification process," and if an employee "is voluntarily terminated or terminated for cause before you complete this commitment period, you will be required to reimburse training related expenses as defined above on a prorated basis."  Training Addendum, Defs.' Exs. 21–25.

### B.    Plaintiffs fail to present a genuine dispute that the repayment provisions in the contract posed improper financial penalties.

When considering a challenge to similar provisions under the TVPRA, courts must "distinguish[] between contract provisions that merely impose a hardship on an employee, on the one hand, versus those that may constitute 'compulsion' under the [statute]."  *Dale Carmen v. Health Carousel, LLC*, No. 20-CV-313, 2021 WL 2476882, at *7 (S.D. Ohio June 17, 2021); *see Gordon v. City of Oakland*, No. 08-CV-1543, 2008 WL 2948663, at *4 (N.D. Cal. July 24, 2008) ("[T]here is nothing inherently unlawful when an employer requires its employees to pay the cost of training because the training itself is a condition to employment.").  And "there are all sorts of financial pressures that can arise in the employment setting," such as the loss of income when an

employee leaves a job, but "not all of them serve to establish a TVPA violation."[22] *Carmen*, 2021 WL 2476882, at *6 (explaining that while the threat of losing a paycheck may be sufficiently serious to compel someone to stay in a job, an employer does not violate the TPVA by simply not paying employees who have quit).

The analysis does not turn on "a numerical floor for what financial penalty can give rise to serious harm," but "on the effect that these financial penalties may have on a worker deciding whether or not to leave his or her job." *Vidal v. Advanced Care Staffing, LLC*, No. 22-cv-05535, 2023 WL 2783251, at *14 (E.D.N.Y. Apr. 4, 2023), citing *Baldia v. RN Express Staffing Registry LLC*, No. 19-cv-11268, 2022 WL 477836, at *7 (S.D.N.Y. Oct. 3, 2022) ("When assessing serious harm under the TVPA, it is not the amount of liquidated damages, *per se*, that controls the analysis. Rather, what matters is whether the specified liquidated damages in a given case rise to the level of serious harm considering all of the surrounding circumstances . . . ."). "The relevant analysis is whether a reasonable person in [plaintiff's] position would have found all of [the employer's] threatened financial penalties serious enough to compel him or her into remaining on the job, even in the face of unsafe or intolerable working conditions." *Vidal*, 2023 WL 2783251, at *14.

Applying these principles, courts have found some provisions like the one in the ManTech contract to threaten serious harm while others did not.  For example, in *Paguirigan v. Prompt Nursing Employment Agency, LLC*, the court ruled that the employment contracts between a class of Filipino nurses and the defendant employment agency, which contained a liquidated damages

_____

22      The "TVPA" refers to the Trafficking Victims Protection Act, which is the precursor to the TVPRA and was reauthorized and amended when Congress enacted the TVPRA in 2003.  *See* Pub. L. No. 108-193, 117 Stat. 2875 (2003).

clause of $25,000 for terminating their employment contract early, threatened serious harm under the TVPRA. *See* No. 17-cv-1302, 2019 WL 4647648, at *2, *8 (E.D.N.Y. Sept. 24, 2019), *aff'd in part, appeal dismissed in part,* 827 F. App'x 116 (2d Cir. 2020) (summary order). The named plaintiff and other nurses quit before the end of their contract terms because the defendant was not paying them the prevailing wage for the job as set by the Department of Labor and as required under the employment contract, and the defendant sued them to enforce the liquated damages provision, as well as $250,000 in tortious interference damages. *Id.* at *2, *16, *18. The evidence showed that the employer sustained less than $4,500 in actual damages, which the plaintiff demonstrated was ascertainable at the time of the contract. *Id.* at *11. Given this, the court found the provision did not bear "a reasonable proportion to the probable loss" and was therefore an unenforceable penalty under New York law. *Id.* It also found the evidence showed that the employer intended for the provision to compel the nurses to work because they were required to sign a confession of judgment in the amount of the liquidated damages, *id.* at *3, and that the document "outright state[d] that its purposes [was] to 'secure Employee's performance of the Employment Term.'" *Id.* at *3, *8. The fact that it would have taken the named plaintiff, who earned less than $700 a week after taxes, almost nine months to pay off the liquidated damages assuming she had no other expenses, also supported the court's finding of intent. *See id.* at *8. The court concluded that the undisputed facts showed the defendant "acted with knowledge and intent that the liquidated damages provision would effectively coerce nurses into continuing to work." *Id.* at *19.

In contrast, the court in *Panwar v. Access Therapies, Inc.*, granted summary judgment in favor of the employer in a case involving liquidated damages provisions ranging from $15,000 to $20,000. *See* 2015 WL 1396599, at *8–9 (S.D. Ind. Mar. 25, 2015). The defendants in that case

provided healthcare placement services and sponsored employees for H-1B visas.  *Id.* at *1.  They hired the plaintiffs to work in the United States as physical therapists, and the plaintiffs who accepted job offers signed employment agreements that included liquidated damages provisions and promissory notes corresponding to the liquidated damages amount.  *Id.* at *2.  If an employee quit before completing the contract term, he was required to pay the amount of the promissory note to cover the employer's expenses and lost revenues.  *Id.*  The plaintiffs claimed, among other things, that the provisions threatened "serious harm" under the TVPRA, but the court found this claim unsupported by either the evidence or the law.  *Id.* at *3–5.  The undisputed evidence showed that the plaintiffs had voluntarily entered into the employment contracts, the contracts' terms "were plainly written," the liquidated damages provisions were conspicuous and emphasized by the promissory notes, and the plaintiffs understood the agreements and their obligations under them, including the consequences of early termination.  *Id.* at *3.  Further, the court held that the provisions complied with both state and federal law.  *Id.* at *4.[23]  Given this, the court granted summary judgment in favor of the defendants on TVPRA claim.

Here, plaintiffs do not dispute that they signed the employment contracts and the addenda, in which the terms were plainly set out.  They submit that their "signatures were procured through

_____

[23]    The court observed that under federal law, an H-1B employer "is permitted to receive bona fide liquidated damages from the H-1B nonimmigrant who ceases employment with the employer prior to the agreed date."  *Panwar*, 2015 WL 1396599, at *4, quoting 20 C.F.R. 655.731(c)(10)(i)(B).  And under the applicable state law, where the stipulated amount "is not greatly disproportionate to the loss likely to occur, the provision will be accepted as a liquidated damages clause and not as a penalty."  *Id.*, quoting *Gershin v. Demming,* 685 N.E.2d 1125, 1128 (Ind. Ct. App. 1997).  The plaintiffs had shown no evidence that the stipulated sums were grossly disproportionate to the losses the defendants were likely to incur if an employee terminated his contract early, while the defendants had submitted evidence that the sums were proportionate to the loss likely to occur.  *Id.*

misrepresentation and fraud," PCSOF ¶¶ 43–47, citing Pls.' Obj. 9 and PSOF ¶ 4, but they fail to connect this conclusory statement with the elements of the TVPRA claim; the claimed "material misrepresentations" concern overtime pay, *see* Pls.' Obj. 9, and worker safety requirements. *See* PSOF ¶ 4. Plaintiffs do not assert and point to no evidence that suggests that they were unaware of or misunderstood the terms of the Sponsorship and Training addenda.

Rather, plaintiffs maintain that the "sum certain" in the Sponsorship Addendum is a penalty because it was "not a good faith estimate of actual damages." PCSOF ¶ 38. ManTech responds that the provision in question does not constitute an improper penalty. Defs.' Mem. at 26–27, citing *Estavilla v. Goodman Grp., LLC*, No. CV 21-68, 2022 WL 539192, at *13 (D. Mont. Feb. 23, 2022) ("To constitute [serious] 'financial harm' within the meaning of the TVPA . . . the threatened harm must be in some way improper or illicit."), citing *Carmen,* 2021 WL 2476882, at *6 ("[N]o one would suggest – or at least no one should suggest – that an employer violates the TVPA simply by refusing to continue paying employees who have quit. Rather, to constitute 'financial harm' under the TVPA, the threatened harm must be in some way improper or illicit.").

Under Virginia law, which governs the parties' employment contracts,[24] a liquidated damages clause is a provision in which the parties to a contract

> agree in advance about the amount to be paid as compensation for loss or injury which may result from a breach of the contract when the actual damages contemplated at the time of the agreement are uncertain and difficult to determine with exactness and when the amount fixed is not out of all proportion to the probable loss.

---

24    *See* Defs.' Ex. 29 at MANTECH 00033070; *see also* Pls.' Obj. 9 (citing Virginia law as the U.S. law applicable to the employment agreement).

*Boots, Inc. v. Prempal Singh*, 649 S.E.2d 695, 697 (2007), quoting *O'Brian v. Langley School*, 507 S.E.2d 363, 365 (1998) (internal quotation marks and alterations omitted).

Plaintiffs assert that the $15,000 referenced in the Sponsorship Agreement – up to $10,000 for the first year and up to $5,000 for the second year – was not a good faith estimate of the cost of obtaining work visas for the employees because when the parties signed the contracts, ManTech had not yet calculated the cost of obtaining work visas in Kuwait or contracted with Millbrook to oversee the visa process. *See* PCSOF ¶¶ 38, 41. That is not disputed, but those facts serve to demonstrate that actual damages were uncertain and difficult to determine with exactness at the time of contracting. *Boots, Inc.*, 649 S.E.2d. at 697. This circumstance would, under Virginia law, justify a contractual provision containing an agreed estimate. But here, as ManTech points out, while the addendum predicted that that the sponsorship costs could be "up to and exceeding $10,000 per person for first year and $5,000 for second year," it provided that the amount due would be calculated based on actual costs incurred in completing the process. Sponsorship Addendum, Defs.' Exs. 21–25.

With respect to the Training Addendum, plaintiffs only argue that its repayment requirement "was all part of the atmosphere of intimidation and coercion by ManTech." *See, e.g.*, PCSOF ¶ 39. Like the Sponsorship Addendum, however, it did not require repayment of their "training related expenses" based on a predetermined, fixed amount, but on a "prorated basis." Training Addendum, Defs.' Exs. 21–25.

After exhaustive discovery, plaintiffs present no evidence that the estimate in the Sponsorship Addendum or the terms of the Training Addendum required them to pay amounts that were "out of all proportion to the probable loss," *Boots, Inc.*, 649 S.E.2d. at 697, nor do they dispute that ManTech never tried to enforce the addendum against any plaintiff, including Sawyer

35

who "completed the [visa] process." DSOF ¶ 109. Given these undisputed facts, neither the Sponsorship Addendum nor the Training Addendum were improper under the applicable state law, and therefore, they were not coercive. *See Estavilla*, 2022 WL 539192, at *13.

One plaintiff testified that ManTech supervisors would remind them about the repayment provisions to keep them in line. "[I]f you asked something and it was what they thought was very serious[,] . . . their answer was, Well, if you don't like it, leave . . . . But you remember you got to pay back this amount of money." Hayes Dep. at 116–17. But courts "must distinguish between improper threats or coercion and permissible warnings of adverse but legitimate consequences." *Walia v. Veritas Healthcare Sols., L.L.C.*, No. 13 Civ. 6935, 2015 WL 4743542, at *4 (S.D.N.Y. Aug. 11, 2015), quoting *Headley*, 687 F.3d at 1180; *see also Bradley*, 390 F.3d at 151, *judgment vacated on other grounds*, 545 U.S. 1101 (2005) (courts must "draw a line between improper threats or coercion and permissible warnings of adverse but legitimate consequences"). Since there is no evidence that the addenda were improper or illicit, these statements, which were vague and general, are warnings of adverse but legitimate consequences.

### C. Plaintiffs fail to present evidence about the surrounding circumstances of their employment that could cause a reasonable fact-finder could find they were coerced to work.

Even if a reasonable juror could conclude that a mechanic faced with the repayment terms in the addenda here would reasonably feel that he was being forced to remain at the company against his will, that would not be the end of the analysis. Section 1589(c)(2) requires that the threatened harm must be sufficiently serious "under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to

continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

Again, these circumstances include the particular known, objective vulnerabilities of these plaintiffs. *Rivera*, 799 F.3d at 186–87; *Bradley*, 390 F.3d at 153. Courts also consider

> circumstances such as squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world), threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation), and exploitation of the victim's lack of education and familiarity with the English language, all of which are used to prevent vulnerable victims from leaving and to keep them bound to their captors.

*Tegete v. Maryknoll Sisters of Saint Dominic, Inc.*, No. 20-CV-5023, 2023 WL 2504744, at *10 (S.D.N.Y. Mar. 14, 2023), quoting *Muchira*, 850 F.3d at 618–19. There is no evidence that these factors were at work here.

### 1. Plaintiffs' vulnerabilities

Plaintiffs were not vulnerable, inexperienced workers whose lack of education or ability to speak the language made them susceptible to coercion. *See Dann*, 652 F.3d at 1163, 1170–71 (finding a TVPRA violation because, among other reasons, the employer brought an employee who did not speak English to the United States and never paid her); *Lagayan v. Odeh*, 199 F. Supp. 3d 21, 25 (D.D.C. 2016) (plaintiff, who stated a TVPRA claim, did not speak English and was prohibited from speaking with others who spoke her language). Plaintiffs here were experienced mechanics who each had previously worked for ManTech or another employer in Kuwait or elsewhere in the Middle East,[25] and they voluntarily accepted ManTech's offer to work

---

25      *See* DSOF ¶¶ 119, 121 (Hawkins); DSOF ¶ 142 (Hayes); DSOF ¶ 155 (Locklear); DSOF ¶¶ 173–74 (Nelson); DSOF ¶¶ 181–83 (Sawyer).

at the KMSF.  *See Muchira*, 850 F.3d at 620 (finding that the plaintiff, who was not young, inexperienced, or brought to the United States illegally, was not especially vulnerable).

### 2.    Plaintiffs' living conditions

Nor did plaintiffs live in squalid conditions or suffer "extreme isolation."  They had their own apartments or apartments provided by ManTech, and they could come and go as they pleased. DSOF ¶¶ 199–200.  Hayes had maid service, DSOF ¶ 206, and as Locklear wrote in a December 2012 email:  "I have a very nice Apt I go out on the balcony and look at the ocean."  DSOF ¶ 199, quoting Defs.' Ex. 97 at MANTECH-00004–07.  As for isolation, two plaintiffs were given leave to return to the United States to attend to family matters.  *See* DSOF ¶¶ 160–65, 176, 211; PCSOF ¶¶ 160, 176.  Hawkins had his own car, DSOF ¶ 202, and all plaintiffs had access to smartphones, computers, and the internet, and regularly communicated with family and friends.  DSOF ¶¶ 201, 205, 212, 216.[26]  These are not employees who were subjected to squalid living conditions or isolated from family or other members of their community.  *See F.C. v. Jacobs Sols. Inc.*, No. 23-CV-02660, 2025 WL 1766069, at *19 (D. Colo. June 26, 2025) (plaintiffs who alleged, among other things, "inhumane living conditions, such as being 'packed into a room with eleven other people, with insufficient air conditioning and infestations of bedbugs,'" stated a TVPRA claim); *Wang v. Gold Mantis Constr. Decoration (CNMI), LLC*, 705 F. Supp. 3d 1190, 1207 (D. N. Mar. I. 2021) (in a case resulting in a default judgment, the court found TVPRA violations, among other

---

26    Plaintiffs received isolation pay, *see* DSOF ¶¶ 30–31; MRAP-FOV Contract Offer Addendum Compensation, Defs.' Ex. 21–25, but they were not subjected to "extreme isolation." Plaintiffs do not dispute that they received isolation/hardship pay, only that they "will . . . demonstrat[e] to a jury that such hardship pay is determined by the country of post, not environmental contamination" and that "[i]t remains a disputed question of fact whether Plaintiffs received the isolation/hardship premium to which they were entitled."  *See* PCSOF ¶¶ 30–31.

reasons, because plaintiffs were "crammed into filthy, overcrowded dormitories, sometimes with

no showers and air conditioning, sometimes with up to 12 bunk beds, and sometimes where rats

crawled over them") (internal citations omitted); *Lagayan*, 199 F. Supp. 3d at 25 (plaintiff was not

permitted to speak to anyone outside the family).

### 3.     Plaintiffs' working conditions

Plaintiffs provide evidence about the working conditions at the KMSF, which defendants

argue is only relevant to damages. Defs.' Mem. at 29–30. But a worker's employment conditions

"may provide support for a jury's conclusion that a defendant's threats plausibly compelled the

victim to serve." *Shukla v. Sharma*, No. 07-cv-2972, 2012 WL 481796, at *2 (E.D.N.Y. Feb. 14,

2012) (internal quotation marks and edits omitted); *see Vidal*, 2023 WL 2783251, at *14 ("The

relevant analysis is whether a reasonable person in [plaintiff's] position would have found all of

[the employer's] threatened financial penalties serious enough to compel him or her into remaining

on the job, even in the face of unsafe or intolerable working conditions."); *see also United States

v. Kozminski*, 487 U.S. 931, 952 (1988) ("in determining whether the physical or legal coercion or

threats thereof could plausibly have compelled the victim to serve," the factfinder is entitled to

consider "evidence of other means of coercion or of poor working conditions"); *United States v.

Veerapol*, 312 F.3d 1128, 1130–31 (9th Cir. 2002) (considering working conditions, including

"excessive working hours," in analyzing involuntary servitude claim).

Plaintiffs complain about their work schedules and pay, asserting that they were entitled to

overtime pay under Kuwaiti and "U.S./Virginia law" and questioning whether they received the

"isolation/hardship premium to which they were entitled." *See* PCSOF ¶¶ 30–32; Pls.' Obj. 9. But

ManTech's offer letters clearly set forth the terms of employment, including the work schedule,

pay, and the fact that ManTech did not pay overtime. *See* DSOF ¶¶ 30–33; Defs. Ex. 21–25; *see*

*also* Hawkins Dep. at 198 (testifying that ManTech told employees "from the beginning they don't pay overtime").[27]

They also assert that the "workplace environment . . . placed Plaintiffs in danger," PCSOF ¶ 199, presenting evidence that the air quality at the KMSF was poor and that they did not receive PPE from ManTech. *See, e.g.*, PSOF ¶ 9; PCSOF ¶¶ 14, 19; PCSOF ¶ 199, citing Defs.' Ex. 9, April Lowery Dep. [Dkt. # 124-7] at 31–38; Hayes Dep. at 64–66 (testifying that he had nose bleeds); Lockler Dep. at 92 (same). But plaintiffs do not dispute that the KMFS's air quality was poor well before they started working there, DSOF ¶¶ 19–20, or that SAIC was responsible for environmental and safety conditions and equipment there. DSOF ¶¶ 13–18, 22. Rather, they argue that SAIC's role as Joint Logistics Integrator "does not relieve ManTech of its legal obligations to its own employees" or "its obligations under the MRAP Repair Contract and associated directives" to protect its own employees. *See* PCSOF ¶ 13; *see also* Pls.' Obj. 1 (arguing that "repeated reference to other companies doing business at the KMSF is not relevant").

But it is undisputed that ManTech's job postings for plaintiffs' positions advised that the KMSF had "Poor Ventilation," *see* DSOF ¶ 27, and that some plaintiffs knew firsthand about the KMSF environmental conditions before they accepted their job offers; Hawkins and Hayes had previously worked at the KMSF servicing MRAPs. *See* DSOF ¶¶ 21, 119, 121, 142.

---

27    Plaintiffs continue to assert that ManTech violated the Fair Labor Standards Act, *see* Pls.' Opp. at 8 n.12, but assert no claim under that statute. In any event, the statute does not apply outside the United States. *See* 29 U.S.C. § 213(f); *Cleary v. U.S. Lines, Inc.*, 555 F. Supp. 1251, 1258 (D.N.J. 1983), *aff'd*, 728 F.2d 607 (3d Cir. 1984) ("Section 213(f) of the FLSA restricts application of the Act to this country.").

While there appears to be evidence that the employees were subjected to poor air quality and that ManTech was aware of that circumstance, plaintiffs have not pointed to circumstances onerous enough to establish that plaintiffs were forced to remain on the premises against their will under a threat of serious financial harm. *See Wang*, 705 F. Supp. 3d at 1207 (plaintiff construction workers "suffered physical injuries given the hazardous work conditions" and "were told not to go to the hospital and were left to tend to their own medical injuries").

### 4.   Plaintiffs' ability to leave

Evidence that an employee has the opportunity to leave a position also weighs heavily against a finding of coercion. *See Headley*, 687 F.3d at 1180–81; *Tegete*, 2023 WL 2504744, at *14 ("Because Plaintiff's own testimony and other undisputed facts demonstrate her awareness that she had a choice between continued service and freedom, she was not working involuntarily.") (internal quotation marks and edits omitted).

In *Headley v. Church of Scientology International*, the Ninth Circuit upheld summary judgment in favor of defendants. 687 F.3d 1173 (9th Cir. 2012). The plaintiffs were a married couple who worked for Sea Organization (or Sea Org), "an elite religious order" of the defendant Church of Scientology, which imposed strict discipline and stringent ethical and lifestyle constraints on its members. *Id.* at 1174. The plaintiffs sued the Church under the TVPRA, complaining that they were forced to work against their will by "psychologically coerc[ing] them to provide labor . . . causing them to believe that they could not leave the ministry or that they would face serious harm in doing so." *Id.* at 1178. The evidence showed that the couple indeed experienced strict lifestyle and work conditions, and they lived at the Church headquarters where the level of security made it difficult to leave unnoticed. *Id.* at 1176–77. It also showed that members who did not follow the formal process for withdrawing from Sea Org were tracked by

41

dozens of people in an effort to locate them and to try to persuade them to return. *Id.* at 1175–76. The Court of Appeals affirmed the trial court's entry of summary judgment in favor of the defendants because the plaintiffs had "innumerable opportunities to leave the defendants" over the more than a decade that they worked for Sea Org but did not take them. *Id.* at 1180–81. Further, when plaintiffs finally did leave, they did without following the formal process for withdrawing and without incident, despite the security and persuasion methods which they claimed forced them to stay. *Id.* at 1177.

Here, Locklear was offered an opportunity to leave Kuwait to take a new position with ManTech in the United States, but he declined it, and those events belie any claim that he was forced to work at the KMSF. Locklear requested a transfer to "a mechanic position in Texas because of family issues that were challenging to handle from Kuwait." DSOF ¶ 162. On March 15, 2023, ManTech offered him a position in Texas, but he ultimately declined because the pay was lower. DSOF ¶¶ 164–65. As he explained in an email: "When I talked to James Carmichael about the job and what the pay would be[] I told him I could not go to FT HOOD for the amount they was talking about. Because the amount he told me was different th[a]n the pay Elika Tehrani told me it would be. So I told him I would just stay here in Kuwait and he told me he would fill the job with someone else." *See* Apr. 9, 2013 Email from James Locklear to Deborah Littleford, Defs.' Ex. 79 at MANTECH-00012089. Plaintiffs argue these facts are not material, PCSOF ¶¶ 162, 164, but because Locklear had the opportunity to leave and did not take it, a reasonable fact-finder could not find he was coerced to provide his labor at the KMSF.

>        **5.      Plaintiffs' statements about their jobs and actions after their**
>                 **terminations**

Defendants point to statements by plaintiffs about their jobs and their actions after they were terminated as inconsistent with their claim that they were coerced to work. *See* Defs.' Mem. at 35–36. Hawkins testified that he "personally" did "not hav[e] a problem" as an employee of ManTech. DSOF ¶ 137. Hayes wrote to a friend that people said he was "the happiest" person at the KMSF during his ManTech employment and noted that "[t]he guys running it [ManTech] are trying the[ir] best." DSOF ¶ 212. And Nelson went on leave to Idaho for around two weeks but "wanted to go back" to Kuwait as soon as he could. DSOF ¶ 211.

Plaintiffs take issue with defendants' characterization of their testimony, providing the Court with additional testimony and more fulsome excerpts from the deposition transcripts. With respect to Hawkins, plaintiffs provide a quote from the Hawkins' testimony in which he complains about the air quality at the KMSF. *See* PCSOF ¶ 137, quoting Pls.' Ex. M, Hawkins Dep. at 197–198. But as explained above, Hawkins had worked at the KMSF before and would have known about the work conditions there. *See* DSOF ¶¶ 119, 121. Regarding Nelson's testimony, DSOF ¶¶ 211–15, plaintiffs assert that "Nelson wanted to return to Kuwait because he was worried about getting fired by ManTech." PCSOF ¶ 211, quoting Nelson Dep. at 95–96. But a review of his testimony shows he wanted to return because he wanted to continue getting paid.

> Q. Earlier you testified that during your emergency leave, you wanted to go back to Kuwait as soon as you could. Why did you want to go back to Kuwait? . . .
>
> THE WITNESS: To continue doing the fire suppression work and support our military, also to continue working to get a paycheck.
>
> BY MR. HENNESSEY: Q. Were you worried that if you didn't get back quickly, you might be fired? . . .

THE WITNESS:  Yes.

Nelson Dep. at 95–96.

It is not a violation of the TVPRA if an employee decides to stay with an employer because he wants to earn a paycheck and not be fired; that financial pressure is not imposed *by* the employer.  *See Carmen*, 2021 WL 2476882, at *6 (stating that not all "financial pressures that can arise in the employment setting . . . serve to establish a TVPA violation").  However, the evidence defendants cite showing that Hayes's coworkers described him as "the happiest" person in the KMSF refers to his disposition and not how he felt about his job, and it does not go to the circumstances of his employment.  DSOF ¶ 212; PCSOF ¶ 212.

After plaintiffs were terminated from ManTech, Locklear who had declined a transfer to a position in Texas, emailed a ManTech manager to say that he "enjoyed the time [he] worked with the ManTech Family" and to ask for a job with ManTech in Afghanistan.  DSOF ¶ 216.  Hayes emailed a ManTech manager that he was not mad about his termination but felt "insulted" because he believed he performed better than other ManTech employees, and he sent an email to the U.S. Army to complain about his termination.  DSOF ¶¶ 213–14.  Nelson also emailed a ManTech supervisor to question his termination, writing that he planned "to stay there and work until the end."  DSOF ¶ 215.  Notably, plaintiffs also sued ManTech for wrongful termination, once in the Eastern District of Virginia, as well as in this case.  *See Hayes v. ManTech Int'l Corp.*, No. 14-546 (E.D. Va. May 13, 2014); *see* TAC ¶¶ 325–34.  These statements indicate that plaintiffs wanted to continue their employment and were not being coerced to remain with ManTech against their will.  *See Estavilla*, 2022 WL 539192, at *15 ("[T]he fact that [plaintiff] counterclaimed for wrongful

termination of contract in the Previous Litigation indicates that, if anything, [plaintiff] did not want her employment with Village Health to come to an end.").[28]

Plaintiffs again challenge defendants' characterization of plaintiffs' responses to the termination, quoting Hayes's email to ManTech. *See* PCSOF ¶ 211. But the email does not give rise to a genuine dispute of fact that bears on the TVPRA claim. Hayes stood up for the quality of the employees' performance and for his own work ethic and integrity, *see id.*, but it does not show before he was terminated that he had been pressured to stay. He was saying that they should not have been fired.

Taken together, the evidence in this case does not show the type of surrounding circumstances that employers use "to prevent vulnerable victims from leaving and to keep them bound to their captors" such that a reasonable fact-finder could conclude plaintiffs were forced to work for ManTech under threat of serious harm. *Muchira*, 850 F.3d at 618–19; *cf. Lagayan*, 199 F. Supp. 3d at 25, 29–30 (ruling that an employee who alleged that she was forced to travel to the United States to work for her employers against her will, did not speak English, worked twelve to fourteen hours a day, seven days a week, was not permitted to speak to anyone outside the family, particularly to others who spoke her language, and was never paid by her employer, stated a claim under the TVPA); *United States v. Sabhnani*, 539 F. Supp. 2d 617, 620–23 (E.D.N.Y.

---

28    Plaintiffs voluntarily dismissed their case in Virginia, and they voluntarily dismissed their wrongful termination claims in this case. *See* PCSOF ¶ 207; Minute Order (Feb. 22, 2022). Nevertheless, they continue to press the argument that they are entitled to the "unpaid remainder" of their employment contracts, which as defendants observe, amounts to a complaint that they did not have the opportunity to finish out their contracts that is inconsistent with their claim that they were forced to work against their will. Defs.' Reply at 14, citing Pls.' Obj. 7.

2008) (finding a TVPRA claim in a case in which victims were made to clean another person's house without pay and forced to work with only four hours of sleep each night); *United States v. Calimlim*, 538 F.3d 706, 708–09, 713 (7th Cir. 2008) (affirming forced labor conviction of defendants who, among other things, kept a Filipino woman for nineteen years, requiring her to work sixteen-hour days, seven days a week, rarely permitting her to walk outside, and allowing her to speak with her family on only five occasions over the nineteen years).

### D.    Plaintiffs fail to present evidence of intent.

Finally, plaintiffs present no evidence of a factual dispute about the intent element, the "linchpin of the serious harm analysis." *Dann*, 652 F.3d at 1170. Again, they assert that ManTech "intentionally underbid" the Contract, *see* n.19 *supra*, but the testimony they rely on to support that theory does not show that ManTech required its employees to sign the Sponsorship Addendum with the intent to place them at risk of serious financial harm in order to keep them from leaving. Plaintiffs quote testimony from a ManTech manager in a different case that defendants' submitted costs in bidding for the Contract that would "not allow us to hire and retain for the life of the bid, not qualified personnel." *See* n.19 *supra*, quoting Pls.' Ex. F at 574–75. But they do not connect this theory of underpaying employees in general to save costs with what they have to prove: that the intent behind the Sponsorship Addendum was to compel plaintiffs to continue working when they otherwise would have left. *Muchira*, 850 F.3d at 620.

In sum, viewing all the evidence in the light most favorable to plaintiffs and drawing all reasonable inferences in their favor, no reasonable trier of fact could find that defendants threatened plaintiffs with sufficiently "serious harm" as defined by the TVPRA, or that defendants intended for them to believe that any such serious harm would befall them in order to obtain their

46

labor.  Defendants' motion for summary judgment on the section 1589 forced labor claim will be granted.

### III.    Plaintiffs' Section 1592 Claim

Section 1592 makes it a crime to knowingly destroy, conceal, remove, confiscate, or possess someone's passport in the course of a violation of other sections of the act, including section 1589.  18 U.S.C. § 1592(a)(1).  Thus, to show a violation of section 1592, plaintiffs must show a predicate violation of section 1589.  *See Mallela v. Cogent Infotech Corp.*, No. 19-cv-1658, 2020 WL 2541860, at *6 (W.D. Pa. May 19, 2020) (stating a section 1592 claim is "predicated and dependent on a violation, or intent to violate, the underlying forced-labor statutory provision").

Because the Court has concluded that plaintiffs have failed to present sufficient evidence to overcome defendants' motion for summary judgment with respect to the section 1589 claim, plaintiffs cannot prove a section 1592 claim.  Defendants' motion for summary judgment on the section 1592 claim will be granted.[29]

### CONCLUSION

For the reasons explained above, defendants' motion for summary judgment [Dkt. # 124] will be **GRANTED**.  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  August 29, 2025

---

[29]    The Court need not reach defendants' argument under the Defense Base Act, *see* Defs.' Mem. at 37–40, since plaintiffs have failed to establish a genuine dispute of material fact with respect to their TVPRA claim.